UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 19-22303-CIV-KMW

FLORIDA CARRY, INC., a
Florida not for profit corporation, et al.,

      Plaintiffs,

vs.

CITY OF MIAMI BEACH, et al.,

      Defendants.

_____/

## DEFENDANT CITY OF MIAMI BEACH'S MOTION FOR FINAL SUMMARY JUDGMENT AND ACCOMPANYING MEMORANDUM OF LAW

      Defendant CITY OF MIAMI BEACH ("the City") moves this Court, pursuant to Fed. R. Civ. P. 56, for final summary judgment against Plaintiffs FLORIDA CARRY, INC. ("FC"), et al. Support for the motion is fully set forth in the accompanying memorandum of law.

## MEMORANDUM OF LAW

### I.    INTRODUCTION.

      On June 24, 2018, Plaintiffs, a gun rights group and at least five of its members and another prospective member, held a "demonstration" on Miami Beach's South Pointe Pier ("the Pier"), like they similarly have at municipalities around the state. Defendants' Statement of Facts para. 1-4 ("SOL 1-4"). All but one of them openly carried firearms on the Pier, while a few unbaited fishing rods laid unattended nearby propped against the railing. *Id*. at 15-17. The purpose of these demonstrations is to educate police officers on Plaintiffs' interpretation of Florida's open carry prohibition. *Id*. at 1-4. They contend that a fishing rod anywhere in their vicinity strips approaching police officers of the ability to conduct an investigatory stop when officers observe them openly carrying firearms. Plaintiffs  then file suit against municipalities unlucky enough to fall into their trap. The problem is that Plaintiffs seek to educate police officers to follow an interpretation of

Florida's open carry prohibition that ignores the plain text of the relevant statutes and the binding authority interpreting them.

Contrary to Plaintiffs' view, by establishing an affirmative defense for fishermen, who meet explicit criteria, to the state's general prohibition on openly carrying firearms, state law allows officers to do what makes sense: stop, detain, and even arrest someone violating the state's open carry prohibition, with opportunity for the subject to raise and prove the affirmative defense after everyone is safe from the unknown gunmen, whose propensities are unknown. Fla. Stat. 790.25.

The Florida Supreme Court has explicitly held that officers <u>do not</u> have to consider the existence of this, or any, affirmative defense before stopping, detaining, and/or arresting a subject openly carrying a firearm in public. *Norman v. State*, 215 So. 3d 18, 25 (Fla. 2017). Therefore, as soon as an officer observes a subject openly carrying a firearm in public, probable cause and reasonable suspicion exist to believe that the subject is violating the state's prohibition on openly carrying a firearm. Probable cause to arrest (or reasonable suspicion to detain) defeats all of Plaintiffs' claims against the City in their Amended Complaint ("AC") as a matter of law.

## II.     THE STANDARD FOR SUMMARY JUDGMENT.

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986) (quoting Fed. R. Civ. P. 56(c)). A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Id.* at 248. The opposing party has a duty to present admissible evidence in order to defeat a properly supported motion for summary judgment. *Id.* at 248-49.

## III.    SUMMARY JUDGMENT ON COUNT 13 (STATE LAW FALSE ARREST) MUST BE GRANTED BECAUSE UNDISPUTED EVIDENCE ESTABLISHES ACTUAL PROBABLE CAUSE TO ARREST THEM FOR THE CRIME OF OPENLY CARRYING A FIREARM.

The existence of probable cause to arrest an individual defeats a false arrest claim as a matter of law. *Rankin v. Evans*, 133 F.3d 1425, 1436 (11th Cir. 1998) ("We conclude

that probable cause existed as a matter of law and that the existence of such probable cause defeats both the federal and state claims."). It makes no difference if the probable cause is established for a crime actually charged, so long as probable cause for any crime existed. *Devenpeck v. Alford*, 543 U.S. 146, 153-55 (2004); *Lee v. Ferraro*, 284 F.3d 1188, 1195-96 (11th Cir. 2002). If probable cause to arrest exists, it is axiomatic that stopping, briefly detaining, and investigating an individual based upon the facts that established probable cause is justified as a matter of law. *United States v. Lewis*, 674 F.3d 1298, 1305 (11th Cir. 2012). In determining whether probable cause exists, the possible existence of an affirmative defense is not something that police officers need to consider. *United States v. Spann*, 649 Fed. Appx. 714, 716-717 (11th Cir. 2016) citing *Morris v. Town of Lexington*, 748 F.3d 1316, 1325 (11th Cir. 2014) (finding officers had probable cause to arrest the plaintiff for assault even though the plaintiff later prevailed at his criminal trial by asserting state-law affirmative defenses of self-defense and resisting an unlawful arrest).

Florida is not an open carry state. Openly carrying a firearm in Florida is generally prohibited by law. *See* Fla. Stat. §790.053(1) ("Except as otherwise provided by law …, it is unlawful for any person to openly carry on or about his or her person any firearm."). A separate statute, Fla. Stat. §790.25(3), provides a list of several affirmative defenses to the crime of openly carrying a firearm. *Norman v. State*, 215 So. 3d 18, 25 (Fla. 2017) (the exceptions found in §790.25(3) to §790.053(1)'s general prohibition on openly carrying a firearm are affirmative defenses to the crime, to be plead and proven at trial by a criminal defendant charged with openly carrying a firearm).

Plaintiffs only attempt to travel under one of the affirmative defenses found in 790.25(3), found at subsection (h), providing an affirmative defense for "[a] person engaged in fishing, camping, or lawful hunting or going to or returning from a fishing, camping, or lawful hunting expedition; …." AC 18-21. However, that statute does not provide the affirmative defense to everyone. In order to qualify for any of the affirmative defenses, a criminal defendant or suspect must first prove that he is not a person has been adjudged mentally incompetent, that he is not addicted to narcotics or similar drugs, that he is not a habitual or chronic alcoholic, and that he is not a vagrant or other undesirable person. Fla Stat. §790.25(2). The statute requires a person to affirmatively demonstrate the absence of each of these disqualifiers, and that he was actually fishing or traveling to or

from a fishing trip in order to avoid a criminal conviction for openly carrying a firearm in violation of Fla. Stat. §790.053(1). Fla. Stat. §790.25(2). Therefore, in Florida, probable cause to arrest an individual exists immediately upon a law enforcement officer's observation of that individual openly carrying a firearm. Indeed, probable cause to arrest exists even before that point if a third-party reports observing an individual openly carrying a firearm. *Gomez v. Lozano*, 839 F. Supp. 2d 1309, 1315-17 (S.D. Fla. 2012). Immediately upon such an observation by a law enforcement officer (or report by a reliable third-party such as a security guard), justification, therefore, exists, as a matter of law, for the less intrusive step of making an investigatory stop. *GeorgiaCarry.Org, Inc. v. MARTA*, No. 1:09-CV-594-TWT, 2009 U.S. Dist. LEXIS 117989, at *15 (N.D. Ga. Dec. 14, 2009) citing *United States v. Cooper*, 293 Fed. Appx. 117, 199-20 (3d Cir. 2008) ("because licensure is an affirmative defense to a statutory violation for possession of a firearm," "an officer's observance of an individual's possession of a firearm in a public place in Philadelphia is sufficient to create reasonable suspicion to detain that individual for further investigation.").

The right to stop and detain and/or to arrest an individual openly carrying a firearm carries with it the ability of an officer, as a matter of law, to neutralize the threat of harm and to disarm the individual. Indeed, in *Terry v. Ohio*, 392 U.S. 1, 23-24, 88 S. Ct. 1868, 1881 (1968), the United States Supreme Court clearly indicated the need to ensure safety of law enforcement officers confronting armed subjects:

> . . . [I]t would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.
>
> In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

*See also Regalado v. State*, 25 So. 3d 600, 609 (Fla. 4th DCA 2009).

The weight of federal authority holds similarly. In *United States v. Robinson*, 846 F.3d 694, 699 (4th Cir. 2017), the appellate court applied a similar analysis and reached the same result:

> [In *Terry*], the concern -- i.e., the danger -- was thus found in the presence of a weapon during a forced police encounter. Indeed, the Court said as much, noting in approving Officer McFadden's frisk of Terry that "a reasonably prudent man would have been warranted in believing petitioner was <u>armed and thus presented a threat to the officer's safety</u>." *Id*. at 28 (emphasis added).

Applying all these well-established rules to Plaintiffs' claims for assault, battery, and false imprisonment under Florida state law leads inexorably to the conclusion that summary judgment is appropriate in favor of the City. Plaintiffs' claims in Count 8 all arise out of the mistaken premise that the Defendant Officers were not justified by law when four of them approached the six armed defendants with their service revolvers drawn; when they stopped and briefly detained the Plaintiffs; when they briefly disarmed the Plaintiffs; and when they investigated Plaintiffs claims that they were legally justified in openly carrying firearms. Plaintiffs' premise is not supported by the facts or the law.

On June 24, 2018, Plaintiffs, a group of openly armed and unidentified men, converged on the South Pointe Pier, which is surrounded by security-sensitive locations such as the crowded public beach which hosts thousands of men women and children each day on one side, and the high-security Government Cut, which is the sole route of ingress and egress for cruise ships with thousands of people who typically stand at the ship's rails as it leaves and enters the Port of Miami and for U.S. Coast Guard ships carrying out their military missions. SOF 12-14.

The parties have stipulated that there was no prior warning that Plaintiffs were coming. SOF 8, 48, FN 25. And remember that this armed "demonstration" was a mere four months after the deadliest high school shooting in U.S. history took place at South Florida's Marjory Stoneman Douglas High School. SOF 10, FN 6.

The men openly carried their firearms, and their leader, Plaintiff Taylor, stated to an Officer Defendant that Taylor's firearm was "locked and loaded" (SOL 30) and that the

Plaintiffs' firearms were "bigger and powerful than yours."[1]SOL 52.

None of the armed men held a fishing pole when approached by either the civilian park ranger or the four original officers on scene and the falsity of Plaintiffs' contention that they were indeed fishing is belied by the actions and words of another Plaintiff, Gutierrez, who, prior to the arrival of Officers, dropped an un-baited line into the Government Cut channel before leaning his fishing pole on the south-side railing and walking away, telling the group, "I'm not gonna catch anything, I didn't even bring bait." SOF 25.

The previously cited statutes and caselaw establish beyond dispute that the moment that the park ranger, who acts as a civilian security guard in City parks and is a reliable witness, reported men openly carrying firearms on the Pier, probable cause existed for the Officer Defendants to arrest the Plaintiffs for the crime of openly  carrying a firearm. *Norman,* 215 So. 3d at 25; *Gomez*, 839 F. Supp. 2d at 1315-17. Certainly, upon personal observation by the approaching Officer Defendants of Plaintiffs openly carrying firearms, probable cause to arrest the armed Plaintiffs was established beyond question. *GeorgiaCarry.Org, Inc.*, 2009 U.S. Dist. LEXIS 117989, at *15.

The fact that Plaintiffs may falsely allege that they were actually fishing when approached by Officers does not change this analysis at all. Probable cause to arrest exists in Florida as soon as a criminal subject is observed openly carrying a firearm. *Norman,* 215 So. 3d at 25. The defense that Plaintiffs were putatively fishing is an affirmative defense that Plaintiffs would have been obliged to plead and prove at trial if they had been arrested. *Id*. That affirmative defense would have required each Plaintiff to prove that he was indeed fishing or traveling to (or from) a fishing expedition, and that he that he was not a person who had been adjudged mentally incompetent, that he was not addicted to narcotics or similar drugs, that he was not a habitual or chronic alcoholic, and that he was not a vagrant or other undesirable person. Fla. Stat. §790.25(2-3).

---

[1] Mr. Taylor's dangerousness has come further into question during this litigation. When he appeared for an Independent Medical Examination related to his claim that his left shoulder was injured by one of the Defendant Officers, the doctor reported, "Mr. Taylor, upon presenting to the office, refused to follow the office protocol for Covid-19, i.e. he stated that he did not bring a mask despite having been advised that a mask was required, refused to answer the screening questions for Covid-19, stating that he did not believe that Covid-19 was real, refused to have his hands sprayed with a hand antiseptic and refused to provide a photo identification." *See* SOF 52, FN 26.

And while Plaintiffs may incorrectly argue that the presence of unattended fishing poles nearby should have made it obvious that each of the Plaintiffs was indeed fishing, it is entirely undisputed that Defendant Officers had no information whatsoever to inform them whether each Defendant was a person who had not been adjudged mentally incompetent, that he was not addicted to narcotics or similar drugs, that he was not a habitual or chronic alcoholic, and that he was not a vagrant or other undesirable person. *Id*.

Plaintiffs may incorrectly argue that the Officers were required to have some evidence to suggest that one or more of these disqualifiers existed <u>before</u> stopping, disarming, and investigating the Plaintiffs, but that argument ignores the plain text of the statute. Fla. Stat. §790.25(2) does not list the potential disqualifiers as elements of the crime of openly carrying a firearm, it lists them as elements required in order to establish the affirmative defense of fishing, which burden Plaintiffs at all time were required to meet with proof. *Norman*, 215 So. 3d at 25 (Fla. Stat. Stat. §790.25(2-3) (exceptions to §790.053(1)'s general prohibition on openly carrying a firearm are affirmative defenses to the crime, to be plead and proven at trial by a criminal defendant charged with openly carrying a firearm).

The existence of a possible affirmative defense is, therefore, also entirely irrelevant to the analysis as to whether the Defendant Officers possessed the lesser justification to stop, disarm, and briefly detain the Plaintiffs upon report or observation that they were openly carrying firearms. Indeed, Officers could have lawfully arrested Plaintiffs, made them stand trial for the crime of openly carrying firearms, and allowed Plaintiffs to attempt to prove at trial that they could meet their burden of proof to establish that they met the elements of the fishing affirmative defense. *Norman*, 215 So. 3d at 25; *GeorgiaCarry.Org, Inc.*, 2009 U.S. Dist. LEXIS 117989, at *15. Officers' decision to use their discretion to only briefly detain the disarmed Plaintiffs, while Officers assessed the potentially deadly situation that they faced, is therefore entirely unassailable as a matter of law.

In their Amended Complaint, Plaintiffs refer to an unreported district court summary judgment order from the Middle District of Florida, *Freeman et al. v. City of Tampa et al*, Case No. 8:15-CV-2262-T-30EAJ (Dec. 8, 2017)(ECF No. 59)(attached as Exhibit A). In *Freeman*, the District Court found that officers in similar, but distinguishable, circumstances to those faced here, had not established, sufficiently to

obtain summary judgment, justification to stop, disarm, and briefly detain Freeman, who was fishing on a pier while openly carrying a firearm. However, *Freeman* is factually distinguishable, and the District Court was simply wrong on the law with regard to the probable cause / reasonable suspicion analysis.

*Freeman* is factually distinguishable because it involved a single individual who undisputedly was holding a fishing rod and actually fishing when he was approached by officers. The City of Tampa conceded this point. *Id*. at 3. Here, it is undisputed that Defendant Officers were confronted with a group of armed subjects that outnumbered the four original Officers, who stated that that their guns were bigger and more powerful than those used by Officers, and at least one was "locked and loaded." SOF 30. No Plaintiff here was even holding a fishing rod when Officers approached. SOF 19, 25, 29. Moreover, though the pier Freemen was fishing on was similarly adjacent to an area crowded with people enjoying the area, there was no evidence that the pier was also adjacent to a waterway like Government Cut, with the Port of Miami and the U.S. Coast Guard station, where the Coast Guard literally closes the channel and escorts each ship in and out of Government Cut due to the high danger of an attack on the ships while traversing that waterway. SOF 12-16. Finally, City of Tampa did not argue that the date of Freeman's police encounter was temporally close to any mass-shooting event, and the events here were temporally close to a nearby mass shooting, which Officers would be justified in considering. SOF 12.

Even if *Freeman* were not factually distinguishable from this case, the district court judge in that case incorrectly applied the plain language of Fla. Stat. §790.053(1) and §790.25(2-3) and utterly ignored the binding precedent interpreting them.[2] In *Freeman*, the Defendants conceded, and the Court assumed, that Officers could not conduct an investigatory stop there because an individual holding a fishing rod qualifies for the affirmative defense for fishing. *Freeman*, at p. 10 ("Defendants' argument is without merit. Florida law was clear at the time of the incident that Freeman was permitted to open carry his firearm while fishing."). He further faulted the officers in that case for not knowing, off

---

[2] A review of the City of Tampa's motion for summary judgment shows that Tampa conceded Plaintiff's allegation that he was fishing and conceded Plaintiff's interpretation of the law regarding the fishing affirmative defense. Indeed, City of Tampa did not even cite any of the authority cited here or make the arguments advanced by the City here.

the top of their heads, that Fla. Stat. §790.25(2-3) provided an affirmative defense for some fishermen who openly carry a firearm, what the elements of the affirmative defense were, and whether Freeman qualified for it. *Id*. at 10-11. However, Officers are not required to know the details of possible affirmative defenses in order to allow them to stop, disarm, and briefly detain armed subjects openly carrying firearms in public. *GeorgiaCarry.Org, Inc*., 2009 U.S. Dist. LEXIS 117989 at *12-13. The law is clear that officers <u>do not</u> have to even <u>consider</u> the possibility of an affirmative defense when making their probable cause analysis. *Id*. Once they observe an individual openly carrying a firearm in public, officers are justified in <u>arresting</u> the subject and waiting until trial to see if the subject can prove the elements of some affirmative defense (which, as set forth above, requires more than just proving that the subject was fishing). *Id*.; Fla. Stat. §790.25(2-3). They are, therefore, undisputedly entitled to take the less intrusive route of stopping, disarming, and briefly detaining an openly carrying subject before deciding whether to effectuate an arrest. *Id*. The District Court in *Freeman*, which itself did not even analyze all the requirements to qualify for the fishing affirmative defense, incorrectly faulted the officers for not performing that analysis on the fly before disarming and detaining Freeman. Correct application of the law compels the opposite result here. Summary judgment on Count 13 is appropriate.

## IV. PLAINTIFFS' §1983 CLAIM AGAINST THE CITY (COUNT 8) FAILS AS A MATTER OF LAW.

Plaintiffs must plead and offer proof of two independent prongs in order for their section §1983 claim in Count 8 to survive summary judgment: (1) Plaintiff must establish an underlying violation of one or more constitutional rights; and (2) Plaintiff must plead and prove a City-promulgated policy or custom of allowing the violation of that particular constitutional right. *See Bd. of Cnty. Comm'n v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997). Plaintiffs assert generally that the Officer Defendants violated their Fourth Amendment right to be free of unreasonable search and seizures; their First Amendment right of free speech, assembly, and association; and their Second Amendment right to keep and bear arms. *See* AC 283-286. Each of these claims is defeated by the presence of probable cause for the Officer Defendants' to arrest the Plaintiffs for openly carrying a firearm in violation of Fla. Stat. §790.053(1). *Rankin*, 133 F.3d 1425 at 1436

("We conclude that probable cause existed as a matter of law and that the existence of such probable cause defeats both the federal and state claims."). This result is even clearer here, because, unlike the state law claim in Count 13, the <u>Plaintiffs bear the burden</u> of proving the <u>absence</u> of probable cause for their §1983 claim in Count 8. *Id.* Moreover, even if Plaintiffs had offered proof of some underlying constitutional violation, Plaintiffs have offered no evidence of a City-promulgated policy or custom of allowing the violation of that constitutional right. *Gomez v. Lozano*, 759 F. Supp. 2d 1335, 1338 (S.D. Fla. 2011).

### A. Plaintiffs' Have not Proven Any Underlying Constitutional Violation, so Their §1983 Claim Fails.

Probable cause to arrest defeats Plaintiffs' Fourth , First, and Second Amendment claims.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. In interpreting the Fourth Amendment, courts have put police-citizen encounters into three categories:

> First, not every encounter between law enforcement officers and a citizen constitutes a seizure within the meaning of the Fourth Amendment. Some such contact, such as the mere approach and questioning of a willing person in a public place, involves no coercion and detention and hence is outside the domain of the Fourth Amendment. Second, ever since *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), the Court has recognized a limited class of cases where the police-citizen encounter qualifies as a seizure within the Fourth Amendment but may be justified by less than probable cause. *Terry-type* investigative stops satisfy Fourth Amendment strictures if the officer has an objective, reasonable suspicion of unlawful activity. Third, some police-citizen encounters, such as a full-scale arrest, must be supported by probable cause.

*United States v. Thompson*, 712 F.2d 1356, 1359 (11th Cir. 1983); *GeorgiaCarry.Org, Inc.*, 2009 U.S. Dist. LEXIS 117989 at *8-9. Therefore, for a claim of unlawful seizure under the Fourth Amendment, the law in this circuit is clear: the key question is whether, on June 24, 2018, the Defendant Officers had probable cause to arrest, or reasonable suspicion to stop, the Plaintiffs. If Officers had probable cause, an arrest would not have violated the Fourth Amendment. *See Gates v. Khokhar*, 884 F.3d 1290, 1297 (11th Cir. 2018) (probable cause is an "absolute bar"). And courts make equally clear that reasonable suspicion to stop

an individual similarly defeats a Fourth Amendment claim based upon that investigatory stop. *GeorgiaCarry.Org, Inc.*, 2009 U.S. Dist. LEXIS 117989 at *8-9 quoting *Thompson*, 712 F.2d at 1359.

Similarly, probable cause to arrest defeats a claim under the First Amendment as well. Plaintiffs First Amendment claim alleges that "Defendant City allowed its officers acting in reliance upon City policy to interfere with Plaintiffs lawful freedom of association [and assembly] by closing the pier despite no violation of law." AC 274-275.  However, probable cause to arrest Plaintiffs for the crime of openly carrying firearms was established, so the premise for Plaintiffs' claim is incorrect. The Officers could have arrested the Plaintiffs. They had no First Amendment right to remain at the scene of their crime when they had presumptively violated the open carry prohibition (and they offered no evidence of any of the qualifiers for any affirmative defense). Finally, Plaintiffs were not prevented from fishing or protesting, they only had to move a short distance off the pier.

Finally, probable cause to arrest Plaintiffs for openly carrying firearms defeats their claim under the Second Amendment. First (even in the absence of probable cause or reasonable suspicion), it is undisputed that Defendant Officers did not deprive any Plaintiff of the right to keep or bear arms *in toto*, which is the essence of a Second Amendment claim. *Norman*, 215 So. at 31) ("the Supreme Court in *Heller* and *McDonald* struck down laws that, by design and effect, totally prohibited the use of operable firearms in the home"). Second, the Florida Supreme Court specifically held in *Norman* that Florida's prohibition on openly carrying a firearm does not violate the Second Amendment. *Id*. at 41. Therefore, Plaintiffs Second Amendment claim fails as a matter of law.

In the absence of any constitutional violation, Plaintiffs' §1983 claim against the City fails as a matter of law.

**B.  Plaintiffs' Offer no Proof of any Official City Policy or Custom of Violating any of the Rights Allegedly Violated, so Their §1983 Claim Fails for That Reason as Well.**

Assuming *arguendo* that Plaintiffs' had offered proof sufficient to bear their burden to prove that neither probable cause nor reasonable suspicion that they were violating Fla. Stat. §790.053(1) existed (which they have not), their §1983 claim still fails because they also cannot establish the second §1983 prong for municipal liability. In order to impose

§1983 liability on a municipality, like Miami Beach, Plaintiffs must identify a municipal policy or custom that caused their injuries. *Brown*, 520 U.S. at 403. A court can hold the municipality liable only if its custom or policy caused the municipal "employees to violate a citizen's constitutional rights." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998).

First, Plaintiffs have failed to identify any formal written ordinance of the City of Miami Beach prohibiting openly carrying a firearm anywhere in the City. Plaintiffs point to a City sign at the Pier that stated "No Firearms" along with a list of other rules for the Pier. One of the Officer Defendants made clear, however, that they were not relying upon any sign for their authority, declaring, at 5:52 on the video: "open carry is illegal regardless of the sign." SOF 47. Moreover, the declaration of Assistant Police Chief Paul Acosta makes clear that the sign was inadvertently left up when it clearly did not set forth City policy, which was (and is) to obey state law. SOF 62.

Lacking any officially enacted ordinance, Plaintiffs rely on two arguments in an attempt to meet the requirements of Monell's second prong. First, Plaintiffs allege that the City employed a deficient training program "to properly train officers to read and interpret state statutes and caselaw to determine whether conduct was lawful or unlawful" and "regarding Florida law regarding the lawful possession of firearms by law-abiding citizens" AC 270-271. Second, Plaintiffs allege that a single comment to the press, after the incident on June 24, 2018, supporting the actions of the Officers, by the mayor and police chief, created an official City policy by ratifying the actions of the Officers. *Id*. at 104-107. Both theories of liability fail as a matter of law.

Inadequate police training can form the basis for a City custom under §1983, but the inadequacy must arise from the municipality's deliberate indifference to the rights of those with whom the police interact. *See City of Canton v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989). And, to show this deliberate indifference, a plaintiff must show a prior widespread pattern of similar constitutional violations (here, stopping Plaintiffs at gunpoint, detaining and searching them, and investigating), and must show that the City was aware of its program's deficiencies and elected not to do anything about it. *See Skop v. City of Atlanta*, 485 F.3d 1130, 1145 (11th Cir. 2007).

Here, Plaintiff has presented no evidence of any kind of any prior widespread

pattern of improper application of the state's firearms laws by City police officers (or anyone else) existing before June 24, 2018. Indeed, Plaintiffs have not presented any evidence of even a single similar prior incident that might have placed the City on notice of a need to provide different or better training regarding possession of a firearm.[3]

Plaintiffs' second theory of a City custom of tolerating allegedly inaccurate application of the state's firearms statutes is one of ratification based upon a statement in the press made by the City's mayor and police chief <u>after</u> the incident supporting the Officers' actions. AC 104-107, 264, 272.

As an initial matter, it is nonsensical to believe that statements made after an event could have caused the event to happen.

Also, the mayor is not a final policymaker of the City. Pursuant to the City Code, the mayor is one of seven elected legislators whose opinion, by itself, cannot bind the City, ratify anything, or approve of any City official's actions. The Code assigns that job to the city manager. The City has a Commission-City Manager form of government. *See* Charter of the City of Miami Beach ("Charter") §1.01. Under this form of government, the city manager is the chief executive officer of the City and he is responsible only to the city commission as a whole with regard to his decisions. Charter §4.02. Consequently, commissioners, including the mayor, act in a legislative role by introducing, voting upon, and passing resolutions instructing the city manager. Charter §2.03. Similarly, the chief of police reports directly to the city manager and the city manager is the final authority for decisions by the chief of police. *See* Code of the City of Miami Beach ("Code") §2-193; 2-241(b). Therefore, neither the mayor nor the police chief is a final policymaker that can create a city custom or policy by his statement to the press alone.

Moreover, research has revealed no caselaw or authority of any kind that stands for the proposition that a single statement to the press, alone, in support of officers' actions, believed by them to be correct at the time, could create City policy on a theory of ratification.

---

[3] This is also not the type of incident that could establish a City custom based only on the single incident that occurred on June 24, 2018 because the constitutional violation, if one occurred at all, was not based upon an egregious violation like in *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 832, 105 S. Ct. 2427, 2440, 85 L. Ed. 2d 791 (1985), but was instead, one that was subject to multiple reasonable interpretations. Research has revealed no caselaw support for the proposition that a single incident like the one intentionally provoked by Plaintiffs on June 24, 2018 could establish a municipal policy or custom.

Finally, to the extent that post-June 24, 2018 evidence can be considered to have caused the Officers to (allegedly) unlawfully conduct their investigatory stop of Plaintiffs on that date, no City custom can be imputed to the mayor and police chief's statements because Plaintiffs visited the City at least two times post-June 24, 2018, and officers allowed them to conduct their demonstration without incident.[4]  SOF 61.

## V.      PLAINTIFFS' §1985 CLAIM (COUNT 9) FAILS AS A MATTER OF LAW.

### A.      Plaintiffs do not set Forth any Facts Asserting Racial or Class-based Discriminatory Animus as Required by §1985.

The Civil Rights Act of 1871, commonly known as the Ku Klux Klan Act, and its subparts were later codified at 42 U.S.C. §§ 1983, 1985, and 1986. *Virginia v. Black*, 538 U.S. 343, 353 (2003). Section 1985 creates no substantive rights but prohibits conspiracies to deprive person of rights created elsewhere; §1985(3), in particular, creates a cause of action against any two persons who conspire to deprive any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws. 42 U.S.C. §1985(3).

The elements of a cause of action under §1985(3) - which is the subdivision of §1985 seemingly at issue here – are: (1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, (3) an act in furtherance of the conspiracy, (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *Childree v. UAP/GA Ag Chem, Inc.*, 92 F.3d 1140, 1146-47 (11th Cir. 1996); *see Lucero v. Operation Rescue*, 954 F.2d 624, 628 (11th Cir.1992)("[T]he second element requires a showing of some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.").

In *Griffin v. Breckenridge*, the Supreme Court limited the reach of §1985(3) to private conspiracies predicated on "racial, or perhaps otherwise class-based, invidiously discriminatory animus." 403 U.S. 88, 102 (1971). This standard has meant that the conspirators in question had to be motivated against a class of persons, not a particular

---

[4] On those dates, Plaintiffs advised the City in advance that they were coming, and the police department worked with them to hold a safe and uneventful demonstration. SOF 61.

political or social issue. *See Trawinski v. United Techs.*, 313 F.3d 1295, 1299 (11th Cir. 2002)("The purpose of §1985 was to stifle the serious class-based deprivation of constitutional rights by private parties, not to serve as a general federal tort law, and, as such, a claim under §1985(3) requires the proof of invidious discriminatory intent as well as the violation of a serious constitutional right protected not just from official, but also from private encroachment."). Simply, §1985(3) protects two types of classes: (1) "those kinds of classes offered special protection under the equal protection clause, and (2) classes that Congress was trying to protect when it enacted the Ku Klux Klan Act." *Farese v. Scherer*, 342 F.3d 1223, 1229 n.7 (11th Cir. 2003).

Therefore, federal courts have dismissed claims under §1985(3) in which either there was no identifiable class or defendants' conduct was aimed at plaintiffs as individuals, not qua members of a traditionally protected class. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993)(holding that whatever the precise meaning of "class" may be, it "unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the §1985(3) defendant disfavors."); *Lucero*, 954 F.2d at 628 (refusing to categorize women seeking abortions as a class under §1985(3) to); *Childree*, 92 F.3d at 1140 (rejecting cause of action because whistleblowers are not a protected class under §1985(3)); *cf. Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1339-40 (11th Cir. 1999)(concluding that women are a "class of persons" within the meaning of §1985(3)); *see also Farber v. City of Paterson*, 440 F.3d 131, 135 (3d Cir. 2006) (concluding that those who share a political affiliation are not a cognizable class for purposes of §1985(3)).

In this vein, federal courts have limited §1985(3) claims to "invidious discrimination" predicated on discrimination against individuals with "immutable characteristics" such as race, gender, or mental disability. *See generally Lake v. Arnold*, 112 F.3d 682, 687 (3d Cir. 1997) (holding disabled persons are protected under §1985(3)); *e.g., Arnold v. Tiffany*, 487 F.2d 216, 217-19 (9th Cir. 1973), *cert. denied*, 415 U.S. 984, 994 (1974)(ruling newspaper dealers are not a protected class under §1985(3)); *e.g., Russo v. Voorhees Twp.*, 403 F. Supp. 2d 352 (D.N.J. 2005)(holding the impoverished are not a protected class under §1985(3)); *e.g., Quinones v. Szorc*, 771 F.2d 289 (7th Cir. 1985)(determining complaint sufficiently pleaded conspiracy's purpose because it alleged

racially-discriminatory animus directed against Latino plaintiff and other non-white citizens); *e.g., D'Amario v. Russo*, 718 F. Supp. 118, 123 (D.R.I. 1989) (finding class of freelance rock photographers failed to state a claim under §1985(3) because class was not "readily recognizable and traditionally protected by the Civil Rights Act.").

Here, as a matter of law, Plaintiffs fail to state a valid claim for conspiracy under §1985. Foremost, Plaintiff has not even alleged which subsection of §1985 applies to his situation.[5] Reading the Amended Complaint broadly, it appears that the only portion of §1985 that could apply to plaintiff is §1985(3), which prohibits a conspiracy "for the purpose of depriving either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities  under the laws." 42 U.S.C. §1985(3).

Plaintiffs Amended Complaint, however, plainly fails to allege "invidious discriminatory intent" on the part of the defendants. To the contrary, Plaintiffs make only a conclusory assertion that the City had conspired to deprive them of their civil rights but fails to allege any racial animus or class-based discrimination. *See* AC 287-288.

Pursuant to *Griffin*, where the Supreme Court held that any §1985(3) claim must establish "some racial or perhaps otherwise class-based, invidiously discriminatory animus" behind the conspirators' alleged actions, the Court, here, should grant the City's motion for summary judgment because the Amended Complaint is bereft of alleging racial or class-based, invidiously discriminatory animus. On the contrary, Plaintiff does not even allege that it belongs to either a class offered special protection under the equal protection clause or a class that Congress intended to protect when it enacted §1985(3).

In sum, Plaintiff's failure to show, or even allege, class-based discrimination precludes a cause of action under §1985, so Count 9 fails as a matter of law.

**B.**      **§1985 Claim is Barred by the Intracorporate Conspiracy Doctrine.**

Moreover, even had Plaintiffs alleged the required class-based discriminatory animus, Plaintiffs §1985 conspiracy claim would still fail under the intracorporate conspiracy doctrine.

The intracorporate conspiracy doctrine bars all claims made pursuant to §1985

---

[5] The Plaintiffs' Amended Complaint does not allege any specific subsection of §1985, but rather plainly makes a conclusory allegation that "this action is brought pursuant to Sec. 42 U.S.C.  §1985." AC 287.

among employees of the same entity. *Dickerson v. Alachua County Comm'n*, 200 F.3d 761, 768 (11th Cir. 2000) (rejecting county employee's §1985(3) claim where employee alleged civil conspiracy among solely county employees). "The intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc); s*ee Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594, 603(5th Cir. 1981) (noting that "the multiplicity of actors necessary to conspiracy" is negated when the agents' acts are attributed to the corporation and the corporation and its agents are viewed as a single legal actor).

The intracorporate conspiracy doctrine applies to public entities and government employees. *Denney*, 247 F.3d at 1190 (applying intracorporate conspiracy doctrine to city, city fire chief, and city manager); *see Rehberg v. Paulk*, 611 F.3d 828, 854 (11th Cir. 2010) (barring §1983 conspiracy claim against government actors accused of conspiring together); *see Doherty v. Haverford Twp.*, 513 F. Supp. 2d 399, 408-09 (E.D. Pa. 2007) (holding a municipality and its officials considered a single entity that cannot conspire with itself); *see also Denney v. City of Albany*, 247 F.3d 1172, 1190-91 (11th Cir. 2001) (stating "the only two conspirators identified . . . are both City employees; no outsiders are alleged to be involved" and concluding intracorporate conspiracy doctrine barred plaintiffs' §1985(3) conspiracy claims for deprivation of their equal protection rights); *see also Chambliss v. Foote*, 562 F.2d 1015 (5th Cir.1977), *aff'g*, 421 F. Supp. 12, 15 (E.D. La. 1976) (applying intracorporate conspiracy doctrine to shield public university from §1985(3) conspiracy claim).

Applying this precedent, the intracorporate conspiracy doctrine bars Plaintiffs' §1985 claim because the alleged conspiracy occurred only within a governmental entity, the City of Miami Beach. Like in *Dickerson* and *Chambliss*, the Court should find that Plaintiffs have failed to adequately allege a conspiracy against the City, a municipality that is a single legal entity, and dismiss Count 13 as a matter of law. *Dickerson*, 200 F.3d at 769; *Chambliss*, 421 F. Supp. at 15.

To conclude, the Court, here, should grant the City's motion for summary judgment and dismiss Count 9 as a matter of law because (1) the §1985 claim is bereft of alleging

racial or class-based, invidiously discriminatory animus and (2) the alleged conspiracy claim is barred by the intracorporate conspiracy doctrine.

## VI.   PLAINTIFFS' CLAIM THAT THE CITY VIOLATED §790.33 (COUNT 1) FAILS AS A MATTER OF LAW.

In 1987, the State preempted the field of firearms regulation by enacting §790.33, Florida Statutes, which provided in part that the State is "occupying the whole field of regulation of firearms and ammunition . . . to the exclusion of all existing and future county, city, town, or municipal ordinances or any administrative regulations or rules adopted by local or state government relating thereto. Any such existing ordinances, rules, or regulations are hereby declared null and void." In 2011, the Legislature amended section §790.33, creating the "penalty provisions" against local officials involved in the enactment or enforcement of firearms regulations, including a civil fine, loss of public funds in defense of a claim, and removal from office. *Fla. Carry, Inc. v. City of Tallahassee*, 212 So. 3d 452, 456 (Fla. 1st DCA 2017).

The statute also created standing to sue for "[a] person or an organization whose membership is adversely affected by any ordinance, regulation, measure, directive, rule, enactment, order, or policy promulgated or caused to be enforced in violation of this section…" Fla Stat. §790.33(f). That provision provides for declaratory and injunctive relief, "actual damages," attorney's fees, and costs. *Id*.

The term "actual damages" has been defined by Florida courts interpreting another Florida statute to exclude nominal damages, incidental damages, consequential damages, special damages, speculative losses, or compensation for subjective feelings of disappointment. *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006), review denied, 962 So. 2d 335 (Fla. 2007)(interpreting "actual damages" provision of Florida Deceptive and Unfair Trade Practices Act (FDUTPA); *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. 4th DCA 2008)(same): *Orkin Exterminating Co. v. Petsch*, 872 So. 2d 259, 263 (Fla. 2d DCA 2004) (same).

As to declaratory and injunctive relief, an issue is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief. *Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1216 (11th Cir. 2009); *Spears v. Thigpen*, 846 F.2d 1327, 1328 (11th Cir. 1988) (holding that claims regarding treatment at

facility at which prisoner was no longer incarcerated were moot).

Applying these provisions here mandates dismissal of Plaintiffs' §790.33 claim against the City. Here, Plaintiff's §790.33 claim fails because the City's actions were in full accordance with both Florida and federal law. The Plaintiffs' alleged claim of preemption fails because the record is undisputed that the City did not enact or cause to be enforced any local ordinance, administrative rule, regulation, or policy that conflicted with §790.33. The only possible "rule" that Plaintiffs rely upon is a single sign stating "no firearms" in a list of rules for the Pier. The evidence demonstrates, however, that the sign was inadvertently left up and did not represent a City rule. In fact, the evidence demonstrates that the Office of the City Attorney sent an email to the City of Miami Beach Police Department that the language on parks and Pier signs regarding firearms should state as follows: ordered that signs either not address firearms at all or that the signs be edited to state "No Firearms except as authorized pursuant to §790.33, Florida Statutes." It is undisputed that City staff intended to follow this opinion as City policy. The sign at the Pier today correctly states, "Florida law prohibits the possession of a firearm in this park except as permitted pursuant to Sections §790.06 & §790.25 Fla. Stat." SOF 62. Finally, Plaintiffs have provided no evidence of any kind that anyone was ever charged with violating the alleged rule, or, indeed, that anyone had ever been stopped and detained pursuant to it. SOL 62.

Despite Plaintiff's incorrect contention that "Defendant Officers in this case acted in reliance upon departmental policy and the illegal sign(s) prohibiting the possession of firearms on the pier rather than statutory law," AC 124, the transcript from the body camera footage shows that the Defendant Officers depended on Florida's open-carry law, not the inadvertently posted sign, to stop and detain Plaintiffs upon observing Plaintiffs openly carrying firearms in plain view. *See* SOF ¶ 16-17, 47. An unenforced rule on the books does not violate Fla. Stat. §790.33. *Fla. Carry, Inc. v. City of Tallahassee*, 212 So. 3d 452, 459 (Fla. 1st DCA 2017).

Furthermore, the Defendant Officers acted in accordance with state law when they approached and subsequently detained the Plaintiffs because there was probable cause to arrest them for openly carrying a firearm where the Officers observed the Plaintiffs openly displaying firearms. *See* SOF 16-21. Also, notwithstanding Plaintiffs' naked assertion of

an illegal *Terry* stop, *see* AC 127, the undisputed facts not only establish reasonable suspicion to detain and disarm the Plaintiffs, but also probable cause to arrest them. SOF 22. *See Bethel v. State*, 93 So. 3d 410, 413 (Fla. 4th DCA 2012).

Moreover, few of the Plaintiffs have alleged any "actual damages" as required under §790.33(3)(f) and none have offered any proof of them. Plaintiff Florida Carry, Inc. has sought only nominal damages, which do not qualify as actual damages. *See* FC Interrogatory Responses dated January 9, 2020, #13, attached to Defendants' Appendix. Plaintiffs Taylor and Jenkins claim injuries to their shoulder and Jenkins also to his wrist as a result of being handcuffed, but the BWC footage of the event makes clear that no force at all was used to handcuff either of them. In any case, neither Taylor nor Jenkins has provided any evidence of any medical bills paid by him. None of the other Plaintiffs claim any "actual damages" at all. *See* Individual Plaintiffs' Interrogatory Responses, attached to Appx.

Finally, Plaintiffs' claims for declaratory and injunctive relief in <u>all</u> of their counts against the City are moot, including Counts 1, 8, 9, and 13. Plaintiffs have come back to demonstrate on the Southpointe Pier two more times and were allowed to pretend to fish after letting the City know they were coming. SOL 61. Moreover, the declaration of Paul Acosta makes clear that the sign prohibiting all firearms that was inadvertently posted at the Pier has been removed, and, going forward, City beach, park, and pier signs, in an abundance of caution, will omit language restricting firearms at all. SOL 62.

Therefore, with no preempted ordinance or rule in existence, no claim for "actual damages," and no live controversy that could warrant declaratory or injunctive relief, Plaintiffs' claim under §790.33 (and all claims for injunctive and declaratory relief against the City throughout the Amended Complaint) fails as a matter of law.

CONCLUSION

For the foregoing reasons, the City's Motion should be granted.

Date: February 2, 2021.

Respectfully submitted,

RAUL J. AGUILA, CITY ATTORNEY
CITY OF MIAMI BEACH
1700 CONVENTION CENTER DR.
LEGAL DEPT.-4TH FLOOR
MIAMI BEACH, FLORIDA 33139
TELEPHONE: (305) 673-7470
FACSIMILE: (305) 673-7002

By: */s/Robert F. Rosenwald, Jr.*
ROBERT F. ROSENWALD, JR.
First Assistant City Attorney
robertrosenwald@miamibeachfl.gov
Florida Bar No. 0190039

MARK A. FISHMAN
SENIOR ASSISTANT CITY ATTORNEY
Florida Bar No. 0567000