**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Case No.: 19-cv-22303-KMW

FLORIDA CARRY, INC., a
Florida not for profit corporation, *et al.,*

      Plaintiffs,

vs.

CITY OF MIAMI BEACH, *et al.,*

      Defendants.

_____/

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANTS'**
**MOTIONS FOR SUMMARY JUDGMENT**

Defendants, CITY OF MIAMI BEACH, MICHAEL GARCIA ("Officer M. Garcia"),

KENNETH BOLDUC ("Sergeant Bolduc"), GUSTAVO VILLAMIL ("Officer Villamil"),

BRIAN RIVERA ("Officer Rivera"), EDUARDO GARCIA ("Lieutenant E. Garcia"), JESSICA

SALABARRIA ("Sergeant Salabarria"), NAHAMI BICELIS ("Officer Bicelis"), ROBERT

MITCHELL ("Officer Mitchell"), LAVANIEL HICKS ("Officer Hicks"), and ELIZABETH

VIDAL ("Officer El. Vidal") (collectively, the "Defendants"), by and through their undersigned

counsel, by and through their undersigned counsel, and pursuant to Fed. R. Civ. P. 56, hereby file

and serve this Statement of Undisputed Facts in Support of Defendants' Motions for Summary

Judgment, and state as follows:

***UNDISPUTED FACTS***

The following facts are tendered solely for purposes of summary judgment and should not

be deemed admissions for trial or other purposes. Based upon the following facts, supporting

documentation, and legal arguments set forth in their respective Motions for Summary Judgment,

Defendants respectfully submit that they are entitled to judgment in their favor in this case as a matter of law.

1. This lawsuit arises out of an investigatory stop of the individual Plaintiffs that occurred on June 24, 2018 in the City of Miami Beach, Florida. *See* [D.E. 1-2].

2. The individual Plaintiffs were or are members or prospective members of corporate Plaintiff, Florida Carry Inc. ("Florida Carry"), a gun rights advocacy organization that holds itself out as working "tirelessly toward repealing and striking down ill-conceived gun control laws that have been proven to provide safe havens to criminals and be deadly to law abiding citizens." [Ex. A][1]; [Caranna Dep. 100:21-101:1].[2]

3. The social media information proffered by Florida Carry shows that one strategy the activist organization employs are planned, provocative "open carry" events that are intended to draw a response from local law enforcement. [Ex. C, 00:06-00:38]; [Ex. C-1, 2:1-13]; [Ex. GG].[3][4]

4. Since its inception, Florida Carry and its members have held several "fishing events" and other similar demonstrations in various locations throughout the State of Florida, during which the

---

[1] A screenshot of the referenced sections as displayed on the homepage of the Florida Carry website, FloridaCarry.org, is included in Defendants' Appendix as **Exhibit A**.

[2] Deposition Transcript of Sean Caranna, Corporate Representative of Florida Carry, Inc., is included in the Appendix as **Exhibit B**.

[3] Video captured by Plaintiff Taylor via "GoPro" camera on date of the subject incident, which Plaintiff Taylor later posted to the YouTube platform, is referred to herein and in the Appendix as **Exhibit C**, and when cited herein will be followed by the minute and second marks in the video where the relevant cited portions of the video begin and end. Additionally, for the convenience of the Court, a written transcript of the video has also been included in the Appendix and filed via CM/ECF under the same Exhibit tab as the referenced video. For purposes of identification, references to the transcript will be labeled as **Exhibit C-1** herein and in the Appendix, followed by the relevant page and line of the transcript where the cited material can be found. Defendants will conventionally file all evidentiary videos referenced herein upon the Court's approval.

[4] Florida Carry "Open Carry" Event Social Media Announcement for a subsequent demonstration that Plaintiffs held in Miami Beach in October 2018 is attached hereto as **Exhibit GG**.

organization's members congregate in a public location, often to ostensibly fish, while open carrying firearms. [Caranna Dep. 20:14-22; 45:7-14]; [Taylor Dep. 181:8-19].[5]

5. Prior to holding an event, it is Florida Carry's custom and practice to notify local officials that the organization will be holding an open carry event, so that the local police department will be aware of what is occurring in the likely case that police receive calls from concerned citizens regarding a "man-with-a-gun." [Caranna Dep. 44:18-45:22]; [Philpot Dep. 36:18-37-11].[6]

6. Prior to the "open carry" event that Florida Carry planned to hold in the City of Miami Beach on June 24, 2018, Plaintiff Philpot, on behalf of Florida Carry, sent an email containing a Word document attachment regarding the upcoming event via email to the City of Miami Beach's Chief of Police and City Attorney. [Caranna Dep. 49:6-50:10]; [Philpot Dep. 33:11-21].

7. However, Plaintiff Philpot never spoke with any representative of the City of Miami Beach prior to the event, nor did he make any effort to confirm that anybody in the City of Miami Beach received the communication. [Philpot Dep. 35:22-25; 148:16-24].

8. After the incident giving rise to this lawsuit, it was determined that the Word document correspondence attached to the email that Plaintiff Philpot sent to the City's Chief of Police and City Attorney was unopenable by standard means such that no person of normal computer skill would have been able to open the correspondence to read it. Thus, Plaintiffs provided no advance notice or information to the City of Miami Beach prior to their planned event. The parties have stipulated to this fact.  [Philpot Dep. 148:20-151:23].

9. The inability to open said Word document was demonstrated to Plaintiff Philpot and acknowledged by Philpot during his deposition; however, Philpot could provide no explanation as to why he sent the file in a format that could not be opened. [Philpot Dep. 150:5-151:23].

---

[5] Deposition Transcript of Plaintiff, Michael Taylor, is included in the Appendix as **Exhibit D**.
[6] Deposition Transcript of Plaintiff, Christopher Philpot, is included in the Appendix as **Exhibit E**.

10. On the morning of Sunday, June 24, 2018, the individual Plaintiffs travelled to South Pointe Park Pier in the City of Miami Beach for their Florida Carry sanctioned "open carry" event. [D.E. 1-2, ¶ 8].[7]

11. The South Pointe Park Pier is located at the southernmost point of the City of Miami Beach. The north side of the Pier overlooks South Pointe Beach, one of the City's most crowded beaches,[8] while the south side of the pier is immediately adjacent to the "Government Cut" inlet that leads into the Miami Beach Harbor, one of the country's most heavily traveled waterways.[9] [Ex. F]; [Ex. G].

12. Coast Guard vessels, large cruise ships, cargo ships, and personal watercraft frequently travel in and out of the Government Cut channel. Cruise ships with upwards of 5,000 passengers each and traveling very slowly enter the inlet on Saturday mornings and others leave for voyages at staggered hours on Saturday afternoons. According to the Port of Miami's 2019 Statistics Brochure, 1,220 cruise ships carrying over 5.5 million cruise ship passengers travelled through Government Cut in FY 2018. [Ex. H, at 7].[10]

13. It is also important to note that the South Pointe Park Pier is located approximately 1,500 yards southeast of the U.S. Coast Guard station and approximately 1,700 yards southeast of embark/debarking facility for tourist and cruise ships. [Ex. I].[11]

---

[7] It bears noting that Plaintiffs held this provocative "open carry" event in Miami Beach just four months after a gunman at South Florida's Marjory Stoneman Douglas Highschool killed 17 people and wounded 17 more in the deadliest high school shooting in United States history. *See* https://en.wikipedia.org/wiki/Stoneman_Douglas_High_School_shooting.

[8] Photographs of South Pointe Beach as seen from the South Pointe Park Pier are included in the Appendix as composite **Exhibit F**.

[9] Photographs of cruise ships exiting Government Cut inlet as seen from the South Pointe Park Pier are included in the Appendix as composite **Exhibit G**.

[10] Port of Miami 2019 Statistics Brochure is included in the Appendix as **Exhibit H**.

[11] Aerial image documenting the line-of-sight distance between South Pointe Park Pier and the U.S. Coast Guard Station Miami Beach is attached hereto as **Exhibit I**.

14. The Coast Guard facility is considered a high security military/maritime installation. Both the Coast Guard station and the tourist ship docking facilities would be considered high-value "soft targets" for terrorists and active shooter/mass murderers.[12] [Ex. J, at 11].

15. At approximately 9:45 A.M. on Sunday, June 24, 2018, City of Miami Beach Park Ranger Vinas observed a group of several visibly armed men on the South Pointe Park Pier. [Ex. K].[13]

16. Upon observing the group of armed men on the Pier, Park Ranger Vinas approached the men and made contact with Plaintiffs Taylor, Philpot, and Jenkins, who were visibly armed with semiautomatic pistols contained in outside-the-waistband holsters. Plaintiff Devine was also present with a "buck knife" in his possession but was not visibly carrying a firearm. [D.E. 1-2, ¶ 25-26]; [Ex. C, 01:30-02:00]; [Ex. L].[14]

17. Although three unattended fishing poles can be observed leaning against the south-side railing of the Pier, the video recorded by Plaintiff Taylor shows that none of the four men were engaged in the act of fishing when Park Ranger Vinas approached to speak with them, or at any time during their ensuing interaction with Park Ranger Vinas. [Ex. C, 01:30-07:20].

18. Upon contacting Plaintiffs Taylor, Philpot, and Jenkins, Park Ranger Vinas asked the men to put their firearms away, stating that open carry was not permitted. [D.E. 1-2, ¶ 27]; [Ex. C, 01:40-02:00]; [Ex. C-1, 2:15-22].

---

[12] The Expert Report prepared by Defendants' Police Practices Expert Ron Martinelli in connection with this matter is included in the Appendix as **Exhibit J**.

[13] Sworn Declaration of Officer Gustavo Villamil, one of the first responding officers to arrive on scene in response to a dispatch call regarding several armed men on the South Pointe Park Pier, is included in the Appendix as **Exhibit K**.

[14] Plaintiff Devine's Answer to Defendants' Interrogatory Number 12 in this matter is included in the Appendix as **Exhibit L**.

19. Pursuant to Fla. Stat. § 790.053, it is unlawful and constitutes a second-degree misdemeanor for any person to openly carry on or about his person any firearm or electric weapon or device, except in certain limited circumstances provided by law. *See* Fla. Stat. § 790.053 (2020).

20. Nevertheless, the visibly armed Plaintiffs declined to comply with Park Ranger Vinas' request, stating what they were doing was legal. [Ex. C, 01:50-02:10]; [Ex. C-1, 3:1-4; 4:1-25].

21. Although Plaintiff Taylor attempted to hand Park Ranger Vinas a copy of Fla. Stat. § 790.25(3)(h), which provides an affirmative defense for fishermen meeting certain criteria to circumvent Florida's general prohibition on openly carrying firearms, no Plaintiff provided Park Ranger Vinas with any evidence that he was, in fact, actually fishing, and no Plaintiff offered any evidence that he had not been adjudged mentally incompetent, that he was not addicted to narcotics or similar drugs, that he was not a habitual or chronic alcoholic, or that he was not a vagrant or other undesirable person. Fla Stat. § 790.25(2) requires a person to affirmatively demonstrate the absence of each of these disqualifiers in order to avoid a criminal conviction for openly carrying a firearm in violation of Fla. Stat. § 790.053 ("Except as otherwise provided by law …, it is unlawful for any person to openly carry on or about his or her person any firearm.").

22. After several minutes of discussion, Park Ranger Vinas left the area and called City of Miami Beach Police Dispatch to report three visibly armed men walking around on the South Pointe Park Pier. [D.E. 1-2, ¶ 30]; [Ex. K]; [Ex. M, at 2].[15]

23. The CAD Report reflects that a police dispatch call regarding 3 males with visible firearms on the South Pointe Park Pier went out over police radio at approximately 9:55:30 AM. [Ex. M, at 2].

---

[15] Miami Beach Public Safety Call Detail Report ("CAD Report") relating to the subject incident is included in the Appendix as **Exhibit M**.

24. Approximately six and a half minutes after Park Ranger Vinas first contacted Plaintiffs Taylor, Philpot, Jenkins, and Devine, another visibly armed man, now known to be Plaintiff Gutierrez, arrived to join the group on the Pier. [Ex. C, 08:10-08:25]; [Gutierrez Dep. 38:10-39:10].[16]

25. Shortly after his arrival, Plaintiff Gutierrez dropped an un-baited line into the Government Cut channel before leaning his fishing pole on the south-side railing and walking away, quietly telling Plaintiff Taylor, "I'm not gonna catch anything, I didn't even bring bait." [Ex. C, 08:55-09:20].

26. Approximately two minutes later, Defendants, Officers M. Garcia, Villamil, Rivera, and Sergeant Bolduc arrived on the Pier in response to a dispatch call advising of multiple visibly armed males, and began their approach towards Plaintiffs Taylor, Jenkins, Philpot, Gutierrez, and Devine. [D.E. 1-2, ¶ 31]; [Ex. C, 10:00-10:50]; [Ex. O].[17]

27. As the officers neared said Plaintiffs and visually confirmed that the then-unknown men later identified as Plaintiffs Taylor, Jenkins, Philpot, and Gutierrez were visibly armed with firearms, the four officers drew their weapons for purposes of officer safety, announced themselves, and instructed the men to put their hands on their heads. [Ex. C, 10:50-12:35]; [Ex. L]; [Ex. K].

28. As they gave commands to the visibly armed Plaintiffs, Defendant Officers M. Garcia, Rivera, and Villamil had their weapons raised, while Sgt. Bolduc had his weapon in the low ready position. [D.E. 1-2, ¶¶ 37-39]; [Ex. C, 11:10-11:15]; [Ex. P].[18]

---

[16] Deposition Transcript of Plaintiff, Carlos Gutierrez, is included in the Appendix as **Exhibit N**.

[17] Offense Incident Report Narrative prepared by Officer Rivera is included in the Appendix as **Exhibit O**.

[18] Offense Incident Report Narrative prepared by Sgt. Bolduc is included in the Appendix as **Exhibit P**.

29. Plaintiffs Taylor, Jenkins, Philpot, and Gutierrez, each of whom were visibly armed, were then handcuffed and disarmed to ensure officer and citizen safety while police investigated. [D.E. 1-2, ¶ 40]; [Ex. O].

30. Specifically, Plaintiff Taylor was handcuffed by Officer Villamil, who then disarmed Taylor by removing his firearm from his holster and rendered it safe, removing the magazine and a chambered round. As Officer Villamil attempted to remove the firearm from Taylor's holster, Taylor can be heard saying "it's locked and loaded." [Ex. C, 11:30-11:55]; [Ex. C-1, 9:8-20]; [Ex. Q, 02:30-02:50]; [Ex. Q-1, 3:17-20].[19]

31. Plaintiffs Gutierrez and Philpot were handcuffed by Officer M. Garcia, who removed their respective firearms from their holsters and rendered them safe. [Ex. Q, 02:30-04:45].

32. Plaintiff Jenkins was handcuffed by Officer Rivera, who then disarmed Jenkins by removing his firearm from his holster and rendered it safe, removing the magazine and a chambered round. [Ex. O].

33. Plaintiff Devine, who was sitting on a bench and not carrying a firearm but did have a "buck folding knife" in his possession, was not handcuffed, but was initially instructed to place his hands on his head. [Ex. L].

---

[19] The first of two videos captured by Officer M. Garcia's Body Worn Camera, depicting the first 42 minutes and 37 seconds after his arrival at South Pointe Park on the date of the subject incident, is referenced herein and included in the Appendix as **Exhibit Q**, and when cited herein will be followed by the minute and second marks in the video where the relevant cited portions of the video begin and end. Additionally, for the convenience of the Court and the Parties, a written transcript of the video has also been included in the Appendix and filed via CM/ECF under the same Exhibit tab as the referenced video. For purposes of identification, references to the transcript will be labeled as **Exhibit Q-1** herein and in the Appendix, followed by the relevant page and line of the transcript where the cited material can be found.

34. Almost immediately after making contact with the five Plaintiffs and gaining their compliance with officer commands, the officers had either holstered their weapons or had pointed them at the ground for safety. [Ex. R].[20]

35. Officers explained to the five Plaintiffs that they were not under arrest but only detained pending an investigation into whether they were openly carrying their weapons in accordance with the law. [Ex. L]; [Ex. C-1, 10:14-17].

36. Shortly after the first four officers arrived on the scene and secured the five Plaintiffs, several more City of Miami Beach police officers began arriving on the Pier to assist with what several believed might be an active shooter situation based on the dispatch call. [D.E. 1-2, ¶ 42]; [Ex. S]; [Ex. T]; [Ex. U]; [Ex. V]; [Ex. W].[21]

37. Defendant Officer Hicks was one of the first backup officers to arrive on the Pier, at which time observed several males that were already detained and began providing scene security. Shortly thereafter, Plaintiff Gutierrez volunteered to Officer Hicks a loaded Smith and Wesson .38 caliber firearm in high right pants pocket and asked Officer Hicks to remove it. Officer Hicks agreed to do so, gently removing the firearm from Gutierrez's front right pocket, and securing it on the bench where all other weapons had been placed. [Ex. W]; [Ex. X, 01:15-02:30].[22]

---

[20] Still screen photographs taken from Plaintiff Taylor's video which confirm this fact are included in the Appendix as **Exhibit R**.

[21] Offense Incident Report Supplemental Narrative prepared by non-party City of Miami Beach Police Officer Ferbeyre is included in the Appendix as **Exhibit S**; Offense Incident Report Supplemental Narrative prepared by Defendant Officer Mitchell is included in the Appendix as **Exhibit T**; Sworn Declaration of Defendant Officer Bicelis is included in the Appendix as **Exhibit U**; Offense Incident Report Supplemental Narrative prepared by Defendant Sergeant Salabarria is included in the Appendix as **Exhibit V**; Offense Incident Report Supplemental Narrative prepared by Defendant Officer Hicks is included in the Appendix as **Exhibit W**.

[22] The first of three videos captured by Officer Hicks' Body Worn Camera, depicting the first 25 minutes and 45 seconds after his arrival at the South Pointe Park Pier on the date of the subject incident, is referenced herein and included in the Appendix as **Exhibit X**, and when cited herein will be followed by the minute and second marks in the video where the relevant cited portions of the video begin and end.

38. Officer Hicks then returned to Plaintiff Gutierrez and conducted a brief and non-intrusive pat-down to ensure that he was not in possession of any other weapons, before helping Gutierrez to a seat on the shaded bench. [Ex. X, 2:30-3:30].

39. Defendant Officer Mitchell arrived on scene shortly after Officer Hicks, observing the five Plaintiffs had already been detained by the first four officers to respond. Thereafter, Officer Mitchell remained on scene for security and support purposes until the investigation was complete, with his involvement in the incident limited to assisting with completing a property receipt and returning Plaintiff Gutierrez's property to him. [Ex. T].

40. Defendant Sergeant Salabarria also responded to the scene, believing based on the dispatch call that she may have been heading into an "active shooter" situation. Upon her arrival on the Pier, she observed the Plaintiffs to be detained. Sgt. Salabarria further observed that Sgt. Bolduc and his patrol team were conducting a preliminary criminal investigation. Sgt. Salabarria briefly stood by as units conducted their investigation but departed shortly thereafter to return to her patrol district once she established that the scene and incident were under control. She took no law enforcement actions at the scene and had no interaction with any of the Plaintiffs. [Ex. V].

41. Defendant Officer Bicelis was another officer to respond to the Pier after Plaintiffs had been detained. Officer Bicelis remained on the scene as a backup officer and assisted the primary officers in verifying information for the Offense Incident Reports. Officer Bicelis later completed a property receipt for Plaintiff Devine and returned his buck folding knife to him without incident. [Ex. U].

42. Defendant Officer Elizabeth Vidal responded to the scene after all six of the individual Plaintiffs had been detained. She assisted other officers in securing the scene and with escorting

10

Plaintiff Taylor to see EMTs after he complained of shoulder pain. This was the extent of her duties. [Ex. Y][23]; [Ex. Z, 00:25-21:59].[24]

43. Shortly the first four officers to arrive had secured and disarmed Plaintiffs Taylor, Jenkins, Devine, Philpot, and Gutierrez, a sixth visibly armed man, Plaintiff Weiss, arrived at the entrance of the South Pointe Park Pier. [D.E. 1-2, ¶ 45].

44. Officers M. Garcia and Rivera received radio notification from Park Ranger Vinas that there was another male subject armed with a handgun at the entrance of the Pier and responded to the area. As they approached Plaintiff Weiss and observed that he was visibly armed, Officers M. Garcia and Rivera drew their weapons and instructed Weiss to put his hands on his head. Officer M. Garcia then removed Weiss' holstered firearm from his person for officer and citizen safety while officers conducted their investigation. [Ex. Q, 05:40-07:10]; [Ex. Q-1, 6:12-7:22]; [Ex. M, at 1]; [Ex. O].

45. Contrary to what is stated in Plaintiffs' Complaint, Plaintiff Weiss was not handcuffed at any point. *Compare* [D.E. 1-2, ¶ 47] *with* [Ex. Q, 05:40-07:10]; [Ex. BB].[25]

46. Upon disarming Plaintiff Weiss, Officers M. Garcia and Rivera permitted Weiss to collect his belongings and asked him to walk with them to join the other five Plaintiffs on the Pier while they conducted their investigation. [Ex. Q, 6:00-7:00]; [Ex. Q-1, 7:6-8:13]; [Ex. O].

47. It should be noted that Plaintiffs point to a City sign at the Pier that stated "No Firearms" along with a list of other rules for the Pier. However, as captured on the dispatch recordings, one of

---

[23] Offense Incident Report Supplemental Narrative prepared by Defendant Officer El. Vidal is included in the Appendix as **Exhibit Y**.
[24] The first of two videos captured by Officer El. Vidal's Body Worn Camera, depicting the first 21 minutes and 59 seconds after her arrival at the South Pointe Park Pier on the date of the subject incident, is referenced herein and included in the Appendix as **Exhibit Z**, and when cited herein will be followed by the minute and second marks in the video where the relevant cited portions of the video begin and end.
[25] Plaintiff Weiss' Answer to Defendants' Interrogatory Number 12 in this matter is included in the Appendix as **Exhibit BB**.

the Defendant Officers made clear on that date that they were not relying upon any sign for their authority, declaring "open carry is illegal regardless of the sign."

As they proceeded onto the Pier, Officer M. Garcia politely explained to Plaintiff Weiss that the police had gotten a call about men with guns and were merely performing an investigation to ensure that Plaintiffs were in compliance with the law. Among the statements that Officer M. Garcia made to Weiss were:

| | |
|---|---|
| Ofc. Garcia: | "---people are calling because they see this." |
| Weiss: | "Yeah, fair enough." |
| Ofc. Garcia: | "And you can't blame people. All right." |
| Wiess: | "Of course not. Not ---" |
| Ofc. Garcia: | "Not the way the world is today." |
| … | |
| Ofc. Garcia: | "So right now we're investigating to make sure who you guys are. All right. If everything checks out and everything pans out, you will be on your way." |

[Ex. Q, 07:00-08:10]; [Ex. Q-1, 8:22-9:8].

48. During their walk, Officer M. Garcia and Plaintiff Weiss also had the following exchange:

| | |
|---|---|
| Garcia: | "All right. So, like I said, people are calling because they see firearms. What do you expect?" |
| Weiss: | "That's fair enough. That's why we let you guys know ahead of time. We e-mailed the City, the City's Attorney, Florida Fish and Wildlife."[26] |
| … | |
| Garcia: | "All right. All right. So as I said, you have an understanding of why we're stopping everybody?" |
| Weiss: | "Yeah, no. It's valid, I understand that." |
| Garcia: | "Alright, we're going to double check everything. If everything pans out you can be on your way." |
| Weiss: | "Of course." |

[Ex. Q, 07:00-08:10]; [Ex. Q-1, 9:19-10:14].

---

[26] As stated above, the Parties stipulated that the emails Plaintiff Philpot attempted to send to the City of Miami Beach's Chief of Police and City Attorney contained an unopenable Word document and that, therefore, Defendants had no advance notice of any kind regarding Plaintiffs' planned event or their intent to openly carry firearms in the City of Miami Beach that day.

49. When Officer M. Garcia and Plaintiff Weiss arrived in the area where the rest of the Plaintiffs were seated, Officer M. Garcia politely asked Plaintiff Weiss to take a seat while officers conducted their investigation. [Ex. Q, 07:50-08:30]; [Ex. Q-1, 10:16-18].

50. Shortly thereafter, officers closed the Pier and cleared all visitors for purposes of citizen safety while officers conducted their investigation. [Ex. Q, 08:45-09:30]; [Ex. Q-1, 12:3-12:10]; [Ex. K].

51. The evidence documents that under the supervision of Lt. E. Garcia, who arrived on scene to supervise and assist after the Plaintiffs had already been detained, Sgt. Bolduc and his officers continuously investigated the status of the formerly armed Plaintiffs and their weapons, including conducting several records checks on persons, criminal records, firearms, and fishing licenses and whether any Plaintiff qualified for any affirmative defense that would permit the men to possess openly carried firearms on their persons while on the public pier. [Ex. P]; [Ex. K].

52. The video recorded by Plaintiff Taylor documents that Taylor continuously engaged in verbal harassment of the officers while the officers attempted to conduct their investigation, making numerous and incessant antagonistic statements including: "You guys are a bunch of crazy friggin nut bags. Just cause our guns are probably bigger and powerful than yours," and other statements which disrupted and delayed officers in their investigation. In fact, Plaintiff Taylor can be heard verbally berating the officers, while another officer states, "I'm waiting for him to finish so I can run all of them. About six guns." Around the same time, another one of the Plaintiffs encourages Plaintiff Taylor to calm down and "Let [the officers] do their investigation…". [Ex. C, 29:40-29:50]; [Ex. C-1, 25:3-5]; [Ex. Q-1, 14:18-15:15].[27]

---

[27] Though only a brief portion of the video is cited here, Defendants note that Plaintiff Taylor can be heard incessantly berating and attempting to antagonize the responding officers throughout much of his self-

53. Notwithstanding Taylor's behavior, all officers on scene remained polite and respectful to the individual Plaintiffs throughout the entire incident. [Devine Dep. 46:14-18] [28]; *See generally,* [Ex. C]; [Ex. Q]; [Ex. X]; [Ex. CC].

54. The evidence documents that approximately one hour and eighteen minutes after the first four officers to arrive on the Pier made contact with Plaintiffs, the officers unhandcuffed Plaintiffs after completing their investigation and concluding that they would not arrest any Plaintiff. [D.E. 1-2, ¶ 64]; [Ex. BB]; [Ex. CC].

55. Ultimately, all handcuffed Plaintiffs (Taylor, Jenkins, Philpot, and Gutierrez) were unhandcuffed less than one hour and twenty minutes after initial contact with officers. [D.E. 1-2, ¶ 64].

56. Upon removing handcuffs from the four Plaintiffs who had been handcuffed, Lt. E. Garcia addressed all of the individual Plaintiffs and explained that they were free to go, but that the South Pointe Park Pier would remain closed. [Ex. L]; [Ex. K]; [Ex. CC, 52:50-53:15]. [29]

57. Lt. E. Garcia further told Plaintiffs that although the Pier was closed, they could fish elsewhere in the area if they wished to do so. [Ex. L]; [Ex. Q, 54:01-54:11].

---

recorded video of the incident, as well as in the videos captured by the Defendant Officers. Plaintiff Taylor's dangerousness has come further into question during this litigation. When he appeared for an Independent Medical Examination related to his claim that his left shoulder was injured by one of the Defendant Officers, the doctor reported, "Mr. Taylor, upon presenting to the office, refused to follow the office protocol for COVID-19, i.e. he stated that he did not bring a mask despite having been advised that a mask was required, refused to answer the screening questions for COVID-19, stating that he did not believe that COVID-19 was real, refused to have his hands sprayed with a hand antiseptic and refused to provide a photo identification." *See* IME Report for Plaintiff Taylor dated June 5, 2020, p. 3, included in the Appendix as **Exhibit AA**.

[28] Deposition Transcript of Plaintiff, Sean Devine, is included in the Appendix as **Exhibit DD**.

[29] The second of two videos captured by Officer M. Garcia's Body Worn Camera, depicting the second 1 hour and 39 minutes of his presence at South Pointe Park Pier on the date of the subject incident is referenced herein and included in the Appendix as **Exhibit CC**, and when cited herein will be followed by the minute and second marks in the video where the relevant cited portions of the video begin and end.

58. During the same address, Lt. E. Garcia and non-party Officer Ferbeyre explained to Plaintiffs that for purposes of officer safety, they would escort Plaintiffs to their vehicles and return their weapons by placing them in Plaintiffs' trunks or "somewhere away from you"; further informing Plaintiffs that they could retrieve their weapons and "and do whatever you need" once officers departed. [Ex. BB]; [Ex. CC, 52:20-54:01].

59. Thereafter, the individual Plaintiffs and several officers walked from the Pier to a nearby parking lot, at which time officers returned all weapons and miscellaneous property to Plaintiffs with written property release sheets. [Ex. P]; [Ex. K]; [Ex. T]; [Ex. O].

60. After he was released from detention and his weapon returned by police, Plaintiff Weiss ultimately re-holstered his firearm and went back to the jetty adjacent to the South Pointe Park Pier with his fishing equipment. Weiss encountered multiple officers thereafter who did not prohibit him from openly carrying his firearm while fishing and proceeded to fish off the jetty without incident for a short time before departing. [Ex. BB].

61. Plaintiffs have returned to the City of Miami Beach to hold "open carry" demonstrations at least twice since the June 2018 incident giving rise to this Complaint, and police have allowed Plaintiffs to conduct their events without incident. [Taylor Dep. 211:21-212:22]; [Philpot Dep. 105:19-112:11]; [Caranna Dep. 22:14-24]. On those dates, Plaintiffs advised the City in advance that they were coming, and the City and its police department worked with them to hold a safe and uneventful demonstration. [Ex. EE].[30]

62. The City of Miami Beach does not have any policy or custom of prohibiting lawfully carrying firearms anywhere in its parks, beaches, and, in particular, the South Pointe Pier. None of the

---

[30] *See* City Manager's Letter to City Commission sent in advance of Plaintiffs' October 2018 demonstration, noting communications between the Miami Beach Police Department and the event organizer in advance of the event.

City signage at these locations contains an outright "No Firearms" prohibition, and the City is currently ensuring that its signage does not mention firearms at all. The City does not intend to erect signage restricting firearms in the future unless such signs become permitted by Florida law. Any sign stating "No firearms" that was present at the South Pointe Pier, South Pointe Park, or on the City's beaches on June 24, 2018 did not accurately reflect City policy and were inadvertently erected after they were ordered removed at least as early as 2014. [Ex. FF, at ¶¶ 1-9].[31]

63. The City does not have a policy or custom of detaining lawfully armed subjects. Openly carrying a firearm is presumptively unlawful and officers are fully trained regarding the City's CALEA accredited policies regarding lawful search, seizure, and use of force. [Ex. FF, at ¶ 9].

64. On or about March 27, 2019, Plaintiffs filed the instant lawsuit against the Defendants, alleging, *inter alia*, unlawful detentions and unlawful searches and seizures of the individual Plaintiffs in connection with the detention and investigation that took place on June 24, 2018.

Dated this 2nd day of February, 2021.

<div style="display:flex;">
<div>

s/Robert L. Switkes
Robert L. Switkes, Esq.
Florida Bar No. 241059
rswitkes@switkeslaw.com
s/Bradley F. Zappala
Bradley F. Zappala, Esq.
Florida Bar No. 111820
bzappala@switkeslaw.com
**SWITKES & ZAPPALA, P.A.**
407 Lincoln Road, Penthouse SE
Miami Beach, Florida 33139
Telephone: (305) 534-4757
Facsimile: (305) 538-5504
*Attorneys for Defendant Officers*

</div>
<div>

RAUL J. AGUILA, CITY ATTORNEY
CITY OF MIAMI BEACH
1700 CONVENTION CENTER DR., 4TH FL
MIAMI BEACH, FLORIDA 33139
TELEPHONE: (305) 673-7470
FACSIMILE: (305) 673-7002
s/Robert F. Rosenwald
Robert F. Rosenwald, Esq.
E-Mail: RobertRosenwald@miamibeachfl.gov
*Attorneys for Defendant, City of Miami Beach*

</div>
</div>

---

[31] Sworn Declaration of Assistant Chief of Police Paul Acosta is included in the Appendix as **Exhibit FF**.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on this $\underline{2^{nd}}$ day of February, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

<u>s/Bradley F. Zappala</u>
Bradley F. Zappala, Esq.

<u>**SERVICE LIST**</u>
*Florida Carry, Inc., et al v. City of Miami Beach, et al.*
**United States District Court, Southern District of Florida**
**Case No.: 19-cv-22303-KMW**

**Eric Friday, Esq.**
Kingry & Friday
1919 Atlantic Blvd.
Jacksonville, Florida 32207
Phone: 904-722-3333
Fax: 954-900-1208
E-Mail: efriday@ericfriday.com
*Attorney for Plaintiffs*

**Noel H. Flasterstein, Esq.**
Law Offices of Noel H. Flasterstein
1700 S. Dixie Hwy, Suite 501
Boca Raton, Florida 33432
Phone: 813-919-7400
*Attorney for Plaintiffs*

**Mark Fishman, Esq.**
1700 Convention Center Drive
4th Floor, Legal Department
Miami Beach, Florida 33139
Phone: 305-673-7470
*Attorney for Defendant, City of Miami Beach*

**Robert F. Rosenwald, Esq.**
1700 Convention Center Drive
4th Floor, Legal Department
Miami Beach, Florida 33139
Phone: 305-673-7470
Fax: 305-673-7002
E-Mail: RobertRosenwald@miamibeachfl.gov
*Attorney for Defendant, City of Miami Beach*