UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-CV-22303-KMW

Florida Carry, Inc., a Florida
not-for-profit corporation, et al.

                              Plaintiffs,

vs.

City of Miami Beach, et al.,

                              Defendants.
-------------------------------------/


VIDEO DEPOSITION

OF

SEAN CARANNA



BY VIDEOCONFERENCE


July 24, 2020

Scheduled for 1:00 p.m.

Commencing at 1:03 p.m. to 4:09 p.m.


     Taken before Sonnia Martinez, Notary
Public in and for the State of Florida at
Large, pursuant to Notice of Taking Deposition
filed in the above cause.
                - - - - - - -

```
                                                      Page 2
 1    APPEARANCES:

 2      ON BEHALF OF THE PLAINTIFFS:

 3           Kingry & Friday
             1919 Atlantic Boulevard
 4           Jacksonville, Florida 32207
             By:  Eric Friday, Esquire
 5
        ON BEHALF OF THE CITY OF MIAMI BEACH:
 6
             City of Miami Beach,
 7           1700 Convention Center Drive
             4th Floor
 8           Miami Beach, Florida 33139
             By: Robert F. Rosenwald, Esquire
 9
       ON BEHALF OF THE OFFICERS:
10
             Switkes & Zappala, P.A.
11           407 Lincoln Road
             Penthouse SE
12           Miami Beach, Florida 33139
             By: Robert Switkes, Esquire
13
14                    - - - - - - -

15                    I N D E X
      Witness: Sean Caranna
16                                     Direct
      By Mr. Switkes                      3
17

18

19

20

21

22

23

24

25
```

1   Thereupon:

2              Sean Caranna,

3   was called as a witness by the Defendants, and

4   after being first duly sworn, was examined and

5   testified under oath as follows:

6                   DIRECT EXAMINATION

7   BY MR. SWITKES:

8       Q.   Could you please state your full

9   name.

10      A.   Sean Caranna.

11      Q.   Do you have a middle name?

12      A.   Conin.

13      Q.   And have you ever had your deposition

14   taken before?

15      A.   I have.

16      Q.   Okay.  So you know that you must give

17   all your answers verbally.  We're a little bit

18   in a different mode with the COVID-19,

19   everybody is doing it from their offices, but

20   the same rules would apply, that is, if you

21   don't give a verbal response the court

22   reporter can't take it down.

23      A.   I understand.

24      Q.   During the course of the deposition

25   if you don't understand any of my questions,

Page 4

1    please ask me to rephrase it and I'll be glad

2    to do so, okay?

3        A.    Sounds good.

4        Q.    Okay.  Are you under the influence of

5    any alcohol, medication or drugs that would

6    prevent you from giving truthful testimony?

7        A.    I am not.

8        Q.    Okay.  And during the course of this

9    deposition if for any reason you need a break

10   just let us know, we'll be more than happy to

11   accommodate you.

12       A.    Will do.

13       Q.    Okay.  Could you give me your date of

14   birth, sir?

15       A.    ████████████

16       Q.    And where were you born?

17       A.    West Monroe, Louisiana.

18       Q.    And your marital status, sir?

19       A.    I am (connection issue.)

20       Q.    Excuse me?

21       A.    I'm married.

22       Q.    And what is your wife's name?

23       A.    Her name is Cynthia.

24       Q.    Excuse me?

25       A.    Cynthia.

1       Q.    Cynthia.  And when were you married?

2       A.    Oh, you're going to get me in trouble

3    now.  2016.

4       Q.    And is this the first marriage --

5       A.    Wait, wait, wait, I'm -- 2006, I cut

6    a decade off there.  See, you're going to get

7    me in trouble.

8       Q.    That was not the intent of the

9    question.

10            2006.  Is this your first marriage?

11      A.    Yes.

12      Q.    Do you have any children over the age

13   of 15?

14      A.    I'm sorry, your audio kind of dropped

15   -- dropped out there.

16      Q.    Do you have any children over the age

17   of 15?

18      A.    No.

19      Q.    And your mother and father are still

20   alive?

21      A.    My -- my mother passed away, my

22   father is.

23      Q.    And what does your father do for a

24   living?

25      A.    He is retired.

```
 1        Q.   And what did he do before he --

 2             MR. FRIDAY:  Bob, I can't hear you.

 3             THE WITNESS:  Yeah, your audio is

 4        very low.

 5             MR. SWITKES:  I've just put it up to

 6        maximum, is that any better?

 7             MR. FRIDAY:  Not really.

 8             MR. SWITKES:  Wow.

 9             Sonnia, do you have any suggestions?

10             THE COURT REPORTER:  No.  Something

11        happened, because you started off fine, so

12        I don't know if something happened.

13             MR. SWITKES:  Let me see.

14             Any better?

15             MR. FRIDAY:  Not really.

16             THE COURT REPORTER:  Sounds muffled.

17             THE WITNESS:  You want to try

18        reconnecting, maybe?

19             MR. SWITKES:  I'll go off and come

20        back on again.

21             THE COURT REPORTER:  Okay.  Let me

22        turn off the -- pause the recording.

23             (Pause in proceedings.)

24   BY MR. SWITKES:

25        Q.   Do you have any sisters or brothers?
```

1      A.    I have a half sister and a half

2  brother.

3      Q.    Okay.  And where do they reside?

4      A.    Honestly, I couldn't tell you.  We

5  were raised separately.

6      Q.    Okay.  Do you know what they do for a

7  living?

8      A.    No idea.

9      Q.    And could I have a brief description

10  of your educational background, starting with

11  high school?  Where did you go to high school?

12      A.    I went to high school in -- well, I

13  finished high school in Houston, Texas.  Then

14  after the Army I went to Embry-Riddle for two

15  and a half years for a degree in aerospace

16  engineering.

17      Q.    And what was the name of the high

18  school that you graduated from?

19      A.    I went to Lamar High School in

20  Houston.

21            Also various community colleges

22  during, before and after the Army.

23      Q.    Okay.  And where did -- what year did

24  you graduate high school?

25      A.    '93.

1      Q.    And you finished, what, an AA from

2   Embry-Riddle?

3      A.    No, I did not complete a degree.

4      Q.    And what years did you go to

5   Embry-Riddle?

6      A.    '97 through '99.

7      Q.    And you mentioned other community

8   colleges, where else did you attend?

9      A.    Houston Community College, Central

10   Texas College and what was Daytona Beach

11   Community College.

12      Q.    And did you receive any degrees from

13   any of those institutions?

14      A.    No.

15      Q.    What were you studying?

16      A.    General basics.  My -- my degree was

17   always aerospace engineering, with the

18   exception of Central Texas College where I was

19   taking criminal justice courses and Houston

20   Community College where I was taking real

21   estate courses.

22      Q.    Okay.  Have you ever personally been

23   a plaintiff or a defendant in a lawsuit of any

24   kind?

25      A.    I have.

1     Q.   And can you give me the parties to

2   those lawsuits?

3     A.   I have current litigation with the

4   sheriff and state attorney in Volusia County.

5     Q.   And so it is Caranna versus --

6     A.   Caranna v. Chitwood.

7     Q.   What is the nature of that lawsuit?

8     A.   It is a second amendment complaint

9   challenging the constitutionality of open

10   carry ban.

11     Q.   And when was that suit filed?

12     A.   One moment.   April 6th.

13     Q.   This year?

14     A.   Yes.

15     Q.   Have you been a party to any other

16   lawsuits?

17     A.   I have a current case, Caranna v.

18   Swearingen against the commissioner of FDLE

19   for illegally charging fees for background

20   checks against licensed -- licensed

21   individuals and law enforcement officers.

22     Q.   And what county is that suit filed?

23     A.   That's in Leon.

24     Q.   Any other lawsuits?

25     A.   Not that I can think of at the

Page 10

1    moment.

2        Q.   Have you ever been arrested, sir?

3        A.   I have.

4        Q.   And when or where?

5        A.   Volusia County, '98/'99, somewhere in

6    there; lost my job and bounced a check.

7        Q.   What was the disposition of that

8    case?

9        A.   Pretrial intervention and nolle pros.

10       Q.   Any other arrests?

11       A.   Driving with a suspended license, I

12   think around the same time period, in Orange

13   County.

14       Q.   And what was the disposition of that

15   matter?

16       A.   That was also -- that was dropped.

17       Q.   Any other arrests?

18       A.   Not that I can think of at the

19   moment.

20       Q.   Okay.  I seem to have found many more

21   arrests than you're indicating.

22       A.   Okay.

23       Q.   Were you arrested back in -- well,

24   8/3/93 was the theft by check, that's the case

25   you're talking about?

1      A.   '93, 8/93.  I was not arrested in

2    '93.  There was -- there was an arrest in

3    Texas in '95, and that was actually my father

4    had bounced a check and I -- on my account

5    when I was twelve and I was arrested for it

6    many years later, but that was finally cleared

7    up and dropped.  I didn't even think about

8    that one.

9      Q.   Okay.

10     A.   But '93, I don't know of any arrest.

11     Q.   Okay.  Records also indicate that

12   March 21st of '98 you had a misdemeanor arrest

13   that was nolle prossed?

14     A.   Yeah, that was probably the one I was

15   speaking about before, was it '98?

16     Q.   Yes, sir.  And then there's two in

17   '99, one of which -- well, you were

18   adjudicated guilty and served one day in jail,

19   5/8/99; do you remember that arrest?

20     A.   That -- maybe that was the suspended

21   license.

22     Q.   Okay.  And then 11/14 of '99,

23   stopping payment with the intent to defraud

24   over $150; do you remember that one?

25     A.   Stopping payment, no.

1    Q.   You don't remember that?

2    A.   No, not on a -- not a stop payment.

3    Q.   That's what the records show.

4         And there was another arrest on

5    3/24/2000, misdemeanor of the first degree; do

6    you remember that?

7    A.   What would that have been?

8    Q.   Indicates you pled nollo and there

9    was an adjudication of guilt.

10   A.   Wait, were these all arrests or --

11   Q.   Yes, sir.

12   A.   -- traffic tickets or something,

13   because I don't know what --

14   Q.   Well, traffic tickets wouldn't result

15   in a misdemeanor, unless it was driving

16   without a drivers license or driving while

17   intoxicated or --

18   A.   No, the worse traffic offense I ever

19   had was a careless driving once in my 20s for

20   spinning the tires on the car, but no, I'd --

21   I'd have -- I'd have to look back, because

22   you've -- you've just read off about five or

23   six items and I have not been put in jail five

24   or six times, so I'm a little confused.

25   Q.   Sometimes when you're arrested they

Page 13

1  give you a notice to appear and that would

2  suffice and you would have to show up in

3  court.  Whether or not you were physically

4  taken into custody doesn't mean you weren't

5  arrested, technically.

6      A.   Okay, fair -- fair enough.  I may

7  have had some notices to appear.  I think one

8  was for a -- for an expired license and, you

9  know, went in and showed them my renewed

10 license and that was that.

11     Q.   One more from 5/31/2000 was a felony

12 of the third degree, you're not aware of that

13 one?

14     A.   That -- that -- that would be the --

15 the bounced check.

16     Q.   Okay.

17     A.   And I paid that off and that was a

18 nolle pros with PTI.

19     Q.   Okay.  Do you hold any Florida

20 licenses of any kind?

21     A.   I have a driver's license and I have

22 a concealed carry license.

23     Q.   And your concealed firearms license

24 is current?

25     A.   Yes.  Oh, I also have hunting and

1    fishing licenses.

2        Q.    They are current?

3        A.    Yes.

4        Q.    Any other licenses?

5        A.    Not issued by Florida, that I can

6    think of.

7        Q.    Do you have licenses similar to that

8    in other states?

9        A.    I have a pilots license, that's

10   issued by the FAA.  I have a ham radio license

11   issued by the FCC.  I have a license to

12   operate a General Mobile Radio Service radio's

13   also issued by the FCC.

14          Let's see, what other licenses might

15   I have.  That's all I can think of at the

16   moment.

17       Q.    Okay.  Give me a brief description of

18   your employment history post high school.

19       A.    I served four years -- just under

20   four years active duty in the United States

21   Army.  After that, I worked for a computer

22   store while I was going to college, had an

23   on-campus job in the electronics lab.

24          I've -- I worked for an IT company.

25       Q.    What was the name of the company?

1      A.    It was -- they're no longer around.

2   E-Commerce Solutions Associates.   Previously

3   -- you know, before that I worked for the -- a

4   local IT provider called Vann Data.   Let's

5   see.

6      Q.    Where was that?

7      A.    Daytona Beach.

8      Q.    Okay.   And when was that, sir?

9      A.    That would have been '98/'99.

10      Q.    And in the military, was from what

11   years to what years?

12      A.    I worked -- I worked for Sears in

13   '97, '97 or '98.

14      Q.    And what was your position with

15   Sears?

16      A.    I was a sales associate.

17      Q.    And you left there for what reason?

18      A.    It was a part-time job while I was

19   going to college.

20      Q.    Okay.

21      A.    Then I went to Vann Data for money

22   and more in my career line working on

23   computers and doing information technology.

24           Then I went to E-Commerce -- well,

25   first -- first I went to BayPort Technologies,

1   but it was an internet startup.

2        Q.   What did you do there?

3        A.   I was their IT administrator, or

4   systems administrator.

5        Q.   And why did you leave there?

6        A.   They had -- they, right before

7   Thanksgiving, or right around Thanksgiving,

8   told me my services were no longer required.

9   They had brought on another IT person that had

10  worked with the TTO previously.  They also

11  held back my last paycheck, which is why I

12  bounced the check, which is why I had a felony

13  come after me.  And the -- then once I got my

14  check that was paid off, and why they

15  continued prosecuting me after I paid I -- I

16  have never understood and I don't think the

17  judge did either, which is why he told them, I

18  don't want to see him in my courtroom anymore

19  and it went to a PTI.

20       Q.   You served in the military from what

21  year to what year?

22       A.   '93 to '97 on active duty.  I was

23  also, in '99 -- I'm sorry, '98, I joined the

24  Florida Army National Guard and served there

25  until September of 2001.

1       Q.    Honorably discharged from Army after

2    four years of service?

3       A.    Both honorable discharges.

4       Q.    Okay.  And that brings us up to your

5    next employer.

6       A.    Let's see, I sold cars for a year at

7    Daytona Dodge.  Then I worked for Raydon

8    Corporation for three years as a -- as a

9    defense contractor doing -- in a couple of

10   roles, but my final role there was a product

11   development test director.

12      Q.    What was the name of the company?

13      A.    Raydon, R-A-Y-D-O-N.

14      Q.    And they are located where?

15      A.    Daytona Beach.

16      Q.    And you left there for what reason?

17      A.    That was -- they are a defense

18   contractor doing gunnery and convoy

19   protection, small arms -- small arms and large

20   arms simulation systems for the military.

21      Q.    And you left there because?

22      A.    Found a better job.  Went to Amicus

23   Corporation.

24      Q.    Spell that for us.

25      A.    I'm sorry?

1    Q.   Can you spell that for us?

2    A.   A-M-I-C-U-S.

3    Q.   And where are they located?

4    A.   Main offices were in Boston, but this

5  was in Daytona Beach at our field office here.

6  There I was a support manager.

7    Q.   And you left there because?

8    A.   We were bought out by another

9  company, Merge Healthcare.  A year after that

10  merger much of my department was told to

11  either move or find new employment.

12       So after that I -- so that was 2006,

13  I believe, 2007 -- hang on.  No, that was --

14  give me one second.  Let me look it up.

15   Q.   Sure.

16   A.   Dates are getting confused.

17   Q.   It gets worse, trust me.

18   A.   Sorry?

19   Q.   It only gets worse, trust me.

20   A.   Okay.  Yeah, I left that job in 2011

21  and started at my current job at 3M.

22   Q.   Where is 3M located?

23   A.   Multinational conglomerate.

24   Q.   And your office is --

25   A.   I work from home.

1     Q.   From home?

2     A.   Yes, sir.

3     Q.   And your position with 3M?

4     A.   I'm a senior integration analyst.

5     Q.   And what does a senior integration

6  analyst do?

7     A.   I connect disparate computer systems

8  for hospitals into our software.

9     Q.   And you've been with them since 2011?

10    A.   Yes.

11    Q.   Do you have any other employment

12  other than 3M?

13    A.   No.

14    Q.   Okay.  Do you personally know the

15  plaintiffs in the lawsuit we're currently here

16  discussing?

17    A.   To an extent I personally know a

18  number of the plaintiffs, not all, and I'm

19  familiar with the case.

20    Q.   Okay.  Who are the individuals that

21  you know personally?

22    A.   I know Michael Taylor, I know Chris

23  Philpot, let's see, give me one moment just to

24  make sure I don't forget anyone.

25    Q.   Steven Jenkins?

Page 20

1      A.   Yes, yes I -- yes, I know Steve

2   Jenkins, thank you.

3      Q.   Sean Devine?

4      A.   Not very well.

5      Q.   Carlos Gutierrez?

6      A.   Not very well.

7      Q.   And Jonah Weiss?

8      A.   To an extent but not very well.  I

9   don't know any of them particularly well, but

10   we've -- we've met at various events and

11   spoken from time to time.

12      Q.   What events have you met those

13   individuals?

14      A.   I have seen them at Gun Rights Policy

15   Conference, when we've gone fishing and when

16   we've gone camping.

17      Q.   And when you say "fishing" and

18   "camping," were these Florida Carry events

19   that you went fishing and camping with them or

20   just fishing and camping?

21      A.   No, usually Florida Carry -- I think

22   -- yeah, they were all Florida Carry events.

23      Q.   And can you tell me which events you

24   went to with those individuals?

25      A.   Let's see, well, there was the --

Page 21

1    when we went to Miami Beach, Daytona Beach,

2    and, forgive me, I think it was Rainbow

3    Springs, one of the springs where we've had

4    our camping events.

5         Q.   Now, you mentioned Daytona Beach, you

6    had an event at Dayton Beach; when,

7    approximately?

8         A.   Actually I believe it was technically

9    Ormond Beach.  That was, oh, a year or two

10   years ago.

11        Q.   And did anything unusual happen at

12   that event?

13        A.   No.

14        Q.   No interaction with any police

15   agencies?

16        A.   No.  We saw some police officers, we

17   waved, we smiled, that was it.

18        Q.   Rainbow Springs, what, if anything,

19   was that event?

20        A.   We -- we have an annual camping event

21   there.  We've been doing that for the past, I

22   believe, three years.

23        Q.   And which of the plaintiffs attended

24   that event?

25             MR. FRIDAY:  Object to form.

Page 22

1          THE WITNESS:  Yeah, I -- I don't know

2      that I can recall that clearly, exactly

3      who was there.  There was a lot of people

4      there.  I believe Philpot and perhaps

5      Michael Taylor, but a lot of these events

6      kinda run together in your mind later.  I

7      couldn't swear to any of their actual

8      attendance at a particular event that

9      stands out.

10  BY MR. SWITKES:

11      Q.   Give me how many events do you attend

12  a year?

13      A.   Lately, probably five or six.

14      Q.   You mentioned Miami Beach as one of

15  the events that you met these plaintiffs, were

16  you physically at Miami Beach?

17      A.   Yes, we drove down a couple of months

18  after the incident that's in the complaint

19  with a large number of our members to assert

20  their right to bear arms while fishing.

21      Q.   And where did you go in Miami Beach

22  to have -- for that event?

23      A.   We went to the same pier where the

24  complaint incident occurred.

25      Q.   Okay.  Did you see any signs when you

1   returned?

2       A.   We saw a number of signs.  I believe

3   someone took some pictures of them.  I don't

4   have those in front of me so I don't recall

5   exactly what they said.

6            I'm sure -- I'm sure we can get you a

7   copy of those pictures.

8       Q.   I'd appreciate it.  If you'd forward

9   that to Mr. Friday he can send those to me.

10  I'd appreciate it.

11           How long have you been associated

12  with Florida Carry, Inc.?

13      A.   Florida Carry was formed in 2011 and

14  I was the founding -- one of the founding

15  co-executive directors.

16      Q.   And who else were founding members?

17      A.   My co-executive director, Rich

18  Nascak.

19           Bryan Border(phonetic), he's no

20  longer on our board, but was our original

21  secretary.

22           Scott Whigham is one of our directors

23  and he's -- he's our also our treasurer; he

24  remains on the board.

25           I can get you the -- I think you

Page 24

1    actually -- I think we've already produced the

2    original corporate filing that names each of

3    the officers.  We've had -- we're an

4    all-volunteer organization, it requires a lot

5    of our time and nobody gets paid for it so,

6    you know, there's -- there's been some

7    turnover on the board over the years, but I

8    wouldn't say significant turnover.

9           We definitely ask a lot of people, so

10   we appreciate what -- what they've volunteered

11   to -- to do for the times that they have.

12      Q.   And what is the mission of Florida

13   Carry, Inc.?

14      A.   We exist to protect the right to bear

15   arms of all Floridians and to educate people

16   on their rights, conduct lobbying and, when

17   necessary, litigation in defense of the right

18   to bear arms.

19      Q.   And in the context of these functions

20   that you do, you've been designated -- you

21   should be impressed, because we have issued a

22   notice of taking the video deposition of the

23   corporate representative of Florida Carry,

24   Inc., and the person with most knowledge.

25           Have you looked through the 34 areas

1    designated by us prior to the time of this

2    deposition?

3        A.    I have -- I have reviewed your list,

4    yes.

5        Q.    And pursuant to the rules of

6    procedure, you have the ability to designate

7    more than one individual.  Are you the

8    individual with the most knowledge to all of

9    the subjects in this particular notice under

10   30(b)(6)?

11       A.    Probably, yes.  If -- if there is --

12   if there is an area where there might be a

13   better person to answer it, I'll designate

14   that at that time.  It depends on your -- it

15   depends on your exact questions.

16       Q.    Okay.  Do you have that list in front

17   of you?

18       A.    Yes.

19       Q.    Okay.

20       A.    Just a sec.  Yep.

21       Q.    Okay.  So on the first question, the

22   date of the inception, I think we've pretty

23   much covered.

24            Two, facts regarding any and all

25   litigations to which Florida Carry, Inc. has

Page 26

1   been a party from the dates of inception.

2          Do you have a list of the litigation

3   that Florida Carry, Inc. has been involved in

4   to date?

5      A.   I believe -- I believe we've produced

6   that, I'm not positive.  But we can certainly

7   get you a list.  There is -- there have been a

8   number of cases that we've been directly

9   involved with over the years.

10     Q.   In fact, there was --

11     A.   It's -- it's, you know, near a decade

12  of history, so.

13     Q.   Okay.  Well, that question was

14  actually asked and objected to by Mr. Friday,

15  if you could forward that list to

16  Mr. Friday --

17     A.   Okay.

18     Q.   -- that would obviate a significant

19  number of questions I would ask on that area.

20          MR. FRIDAY:  Bob.

21          MR. SWITKES:  Yeah.

22          MR. FRIDAY:  That is one of the

23      things the judge ordered me to end up

24      producing and I did produce it.

25          MR. SWITKES:  In a supplemental?

Page 27

1            MR. FRIDAY:  Yes, sir.

2            MR. SWITKES:  Okay.  I don't have

3       that in front of me --

4            MR. FRIDAY:  You want to pause just a

5       minute for me?

6            MR. SWITKES:  No, that's not

7       necessary.  As long as you've done it, and

8       I assume my partner might have it, that's

9       fine.  The familiarity with this witness

10      on that is more what I'm interested in.

11  BY MR. SWITKES:

12      Q.   Do you know when the first case was

13  filed by Florida Carry?

14      A.   I believe the first one was either AB

15  or UN or UNF, let's see.

16           UNF was filed in 2012.  And AB -- I

17  believe AB was 2013.

18           So, yeah, I believe UNF was the

19  first.

20      Q.   Okay.  And UNF is the University of

21  North Florida, correct?

22      A.   Yes.

23      Q.   And then you mentioned AB?

24      A.   Yeah, AB versus City of Daytona

25  Beach.

1    Q.   And what were the allegations in the

2  Daytona case?

3    A.   In AB the police illegally seized

4  firearms from a military veteran and we filed

5  a claim for a return of his firearms and for

6  violation of the preemption that has occurred

7  by their policy.  That case -- we won the

8  case.  I believe this is currently on appeal

9  on the matter of attorney's fees only.

10    Q.   Okay.  And the next case you have on

11  your list?

12    A.   Let's see, I don't have this in

13  chronological order where I'm looking.  One

14  second, let me look up the --

15    Q.   And if you could go through them,

16  even if they're not chronologically in order,

17  that would be fine.  And I've just been handed

18  your supplementary response, which is not

19  sworn to, probably which is why I -- and the

20  -- is it Florida Carry versus Broward County?

21    A.   Yes.

22    Q.   And what was nature of that lawsuit?

23    A.   That was for ordinances in violation

24  of preemption.  We won that case, it's also

25  currently on appeal.

Page 29

1      Q.    Florida Carry versus Gainesville?

2      A.    Again, ordinances in violation of the

3   express veil of preemption.  The city

4   capitulated and we settled that.

5      Q.    And were you a named party in any of

6   -- those first two I went through?

7            MR. FRIDAY:  Object to form.

8            THE WITNESS:  I was not personally a

9       named party.

10   BY MR. SWITKES:

11      Q.    That's what I'm asking.  I know

12   Florida Carry was.

13      A.    No, the -- the only cases I've been

14   involved with personally are Caranna v.

15   Swearingen and Caranna v. Chitwood.

16      Q.    Next one I have is Florida Carry

17   versus Thrasher.

18      A.    There's two -- there's two cases

19   against Thrasher.

20      Q.    Yes, sir.

21      A.    The -- the first is for firearms

22   preemption and the second was for a regulation

23   they passed during the first case regulating

24   ammunition in violation of preemption.

25      Q.    Pretso versus Swearingen?

Page 30

1      A.   That is a class action case against

2  Commissioner Swearingen and FDLE for illegal

3  practices they're conducting in the process of

4  doing background checks for firearms

5  purchases.

6      Q.   Caranna versus Swearingen -- there's

7  two of them, obviously.

8      A.   Yeah, the Caranna versus Swearingen

9  is the -- the illegal fee case.

10      Q.   Illegal fee?

11      A.   Concealed carry licensees and

12  certified active police officers have an

13  exemption from background check fees for

14  firearms purchases, however, the department

15  continues to charge a fee against those people

16  who are exempt, and we've sued to enjoin them

17  from continuing to charge those fees

18  illegally.

19      Q.   Okay.  The next case listed is

20  Florida Carry versus Tallahassee.

21      A.   Tallahassee, that was a -- a local

22  ordinance that they -- that they immediately

23  conceded that they would not enforce.

24      Q.   And Florida Carry versus the

25  University of Florida?

1    A.    UF case was also preemption based and

2    included whether or not people have the -- a

3    right to possess firearms in their homes if

4    that home happens to be owned by the

5    University.

6        Q.    What's your (inaudible).

7        A.    Oh, I think we lost your audio there.

8        Q.    Can you hear me?

9        A.    Oh, there you are, okay.

10       Q.    Okay.  Glatze versus -- Glatze

11   Militum versus North Miami Beach.

12       A.    Oh, that -- that was an illegal

13   zoning ordinance.  Forgive me, I'm not

14   positive on the current state of that one.  I

15   believe it's resolved but I'm not positive.

16       Q.    And Montempo versus Daytona?

17       A.    That's AB.

18       Q.    Are you familiar with facts of this

19   particular lawsuit we're here on today?

20       A.    I am.

21       Q.    What is your familiarity?  What is

22   your understanding of what the case is about?

23       A.    I've -- I've have read the complaint.

24   I've reviewed -- reviewed the video.  I've

25   spoken to our members who were involved.

1      Q.    And when you said you watched the

2   video, what video did you watch?

3      A.    There were videos that were recorded

4   by our own members and there were body cam

5   videos from the police department.

6      Q.    Okay.  Going to Number 9 on the list

7   of corporate knowledge, facts regarding the

8   social media activity of Florida Carry, Inc.

9   in relation to this lawsuit.

10          Are you aware of any social media

11   that was put out by Florida Carry regarding

12   this particular lawsuit?

13      A.    There -- there has been some,

14   especially at the time where we did our

15   follow-up event.  Other than that, as far as

16   official releases, you know, we echoed our

17   press release about the incident on social

18   media.  I could not speak to the -- I can

19   speak only to the official releases by Florida

20   Carry, not necessarily the statements of third

21   parties on our related social media.

22      Q.    Do you have copies of the social

23   media activity about this case that was

24   promulgated by Florida Carry?

25      A.    Yes.

1      Q.   Okay.  We're going to request that

2   and if you could give that to Mr. Friday that

3   would be appreciated.

4           Are you familiar with Number 10 of

5   the items, facts regarding communications sent

6   or received by Florida Carry, Inc. in relation

7   to this lawsuit?

8      A.   I am.

9      Q.   And what are the substance of those

10   communications, sir?

11      A.   The -- the -- the main communication

12   was consistent with our press release and

13   including the press release.

14      Q.   Did you receive any communications of

15   any kind from the plaintiffs in this lawsuit

16   regarding this incident?

17      A.   Have I received any -- have I -- have

18   I spoken to our members about the incident and

19   this case, is that -- is that what you're

20   asking?

21      Q.   Not really but go ahead, answer your

22   question, I like that.

23           THE WITNESS:  Eric, I think that's

24      going to get into --

25           MR. FRIDAY:  Well, I mean, the

Page 34

1      question was have you spoken to them,

2      that's --

3            THE WITNESS:  Yes, I have spoken to

4      them.

5  BY MR. SWITKES:

6      Q.   And what have you inquired of them

7  about this incident?

8            MR. FRIDAY:  And I'm going to object

9      to the extent that those conversations

10     occurred with me present representing both

11     Mr. Caranna, as the representative of

12     Florida Carry, and the other individual

13     plaintiffs, that those conversations

14     probably are going to be within

15     attorney/client privilege unless you want

16     to narrow the question in some way,

17     Mr. Switkes.

18  BY MR. SWITKES:

19     Q.   I'm going to exclude any

20  communications had in the presence of

21  Mr. Friday or counsel.

22           MR. FRIDAY:  So Mr. Caranna, to the

23     extent that I was not -- it was not a

24     phone call involving me and other

25     plaintiffs, individual communication with

1      them outside of my presence, feel free to

2      answer.

3           THE WITNESS:  None -- none directly

4      related to these incidents.

5  BY MR. SWITKES:

6      Q.   Okay.  Question Number 11 -- do you

7  have this in front of you or do I have to read

8  it?

9      A.   I -- I do have it.

10     Q.   Good, that would be helpful.

11          Do you have any information regarding

12  the information requested in Number 11?

13     A.   Yes.  So -- so I'll read this in,

14  information about our membership applications,

15  evaluation of applicants, member composition,

16  member criteria, membership requirements.

17          We're -- we're happy to give you a

18  copy of our member application so you can see

19  that.  However, the composition of our

20  members, Eric, do you want to --

21          MR. FRIDAY:  You can -- you know what

22      the position of Florida Carry is, you can

23      state that.

24          THE WITNESS:  Okay.  Certainly.

25          Our members have a right to

Page 36

1    associational privacy.  We do not discuss

2    demographics or direct information about

3    our members out of respect for their

4    rights.

5  BY MR. SWITKES:

6    Q.   Do you do any background checks on

7  any of your members before they become

8  members?

9    A.   No, we do not.

10    Q.   Are there any criteria that a member

11  has to have before he's admitted or have any

12  disqualifying criteria?

13    A.   If we know someone to be -- to be a,

14  for example, a violent felon or someone who is

15  in -- in some way morally reprehensible, a

16  known racist, for example, anything like that

17  would be disqualifying.

18    Q.   Now, you said "if we know."  How does

19  one evaluate what you know?  Is that just

20  something that you know personally or is that

21  the sum total of the information available to

22  the members or how does one go about

23  determining that?

24    A.   If it -- if it comes to light that

25  someone has a problematic history or

1    disposition, that is usually brought to our

2    attention by other members of Florida Carry or

3    by the person themselves, just like you would

4    have in any association you meet with -- where

5    you meet someone, you know, you -- you find

6    out things about them.

7        Q.   But I guess my question before that

8    was, prior to the time they become a member is

9    there any check that's done, are there felony

10   convictions, are there racists associations,

11   are any of the things you listed as a criteria

12   that would not allow them to be a member of

13   your association?

14       A.   No, we -- we do not employ private

15   investigators or go out of our way for a small

16   membership organization to extensively vet

17   every person who would like to be a member.

18       Q.   Rather than doing something like

19   that, you're in the tech business, in fact

20   your profession is in tech, do you do anything

21   in a way of a computer check, even a cursory

22   examination of those individuals attempting to

23   join your organization or who are members of

24   your organization?

25       A.   I'd say we do no more checks than the

Page 38

1   National Rifle Association, the American

2   Automotive Club or the NAACP does for people

3   who want to join their organizations.

4        Q.   Okay.  But I'm asking you about your

5   organization, not those.

6        A.   I believe I've answered that.

7        Q.   The question was:  You mentioned some

8   disqualifying criteria, being a racist, being

9   a dangerous felon I believe are two that you

10  gave.

11       A.   And if such information were to come

12  to light about someone who had joined Florida

13  Carry it would be dealt with as appropriate,

14  usually by terminating their membership.

15       Q.   And who would go about obtaining that

16  information and then terminating -- making a

17  decision to terminate their membership?

18            MR. FRIDAY:  Object to form.

19            THE WITNESS:  Again, that may come to

20       us in a variety of ways, as I've already

21       pointed out.  It's -- it's actually a

22       pretty rare occurrence for something like

23       that.  The few times we have had to

24       terminate someone's membership is because

25       they became abusive on online chats or --

Page 39

1          and by abusive I mean using foul language,

2          things like that.  Usually if someone uses

3          foul language we'll give them a warning,

4          but if they continue to persist in such --

5          such an unsavory course then, yeah, they

6          will be -- their membership will be

7          terminated.

8    BY MR. SWITKES:

9          Q.   And who makes the decision to

10   terminate someone's membership?

11         A.   That would be made by a director or

12   in consultation with our board of directors.

13         Q.   Okay.  Are there any corporate

14   policies that are either written or

15   promulgated somewhere that indicate what the

16   policies and practices are, and procedures,

17   when you have an event or before the event?

18         A.   We have given instruction to our

19   local leaders on some best practices when

20   they're going to be having any -- any kind of

21   a get-together with our members.

22         Q.   What are those -- are those in a

23   document of some kind?

24         A.   I believe they've been sent via

25   email.

Page 40

1      Q.   And what are, if you know, those

2  practices?

3      A.   General safety rules, making sure

4  people are being responsible with their

5  firearms if they're going to have firearms

6  included, doing things like making sure the

7  people have water if it's going to be a hot

8  day and shade.  So mostly it deals with safety

9  and best ways to have a successful event or

10 get-together.

11     Q.   And is there a document that you can

12 refer me to that has a compilation of these

13 practices?

14     A.   We -- we had one on the website at

15 one point.  I don't know if that's still

16 there, just kind of a general guidance.  But

17 no, there's not a specific, separate document.

18     Q.   Have any civil or criminal fines been

19 assessed against Florida Carry, that you're

20 aware of?

21     A.   No.

22     Q.   Who makes the determination of

23 instituting a lawsuit?

24     A.   That's -- that's done in consultation

25 with our board of directors and our attorneys.

Page 41

1       Q.   Okay.  Now, in regard to this

2    particular lawsuit, you mentioned videos, do

3    you have any quantification to how many videos

4    you've -- you've seen in this regard?

5       A.   I couldn't give you an exact number

6    of them at the moment.

7       Q.   Your approximation.

8       A.   Let's see.  Let's see, that's all one

9    group -- four or five, if I'm -- if I'm

10   remembering correctly on the number of --

11   including the officers' body cams.

12      Q.   You've given all of those to counsel?

13      A.   Yes.

14      Q.   And in terms of communication

15   regarding any statements made on behalf

16   Florida Carry, Inc. regarding this lawsuit, do

17   you have those somewhere in a repository that

18   you can give it to Mr. Friday?

19          MR. FRIDAY:  Object to form.

20          THE WITNESS:  I believe those were

21      already produced.

22   BY MR. SWITKES:

23      Q.   Okay.  What, if any, understanding of

24   what damages you're claiming in this

25   particular lawsuit on behalf of the

1  corporation?

2      A.    There -- there may be some -- some

3  directly compensable quantifiable damages that

4  -- that we can get into later once we've been

5  able to do a full analysis, however, our main

6  -- our main issue with damages is for nominal

7  damages.  There's been damage to the

8  reputation of Florida Carry, there has been

9  damage to the reputation of our members.

10  There is the disruption of our First Amendment

11  protected assembly.  There was closing the

12  pier to make sure that we didn't re-assemble

13  and it was not reopened until after our

14  members left.

15          So as far as quantifiable, that --

16  that might be a little harder, we can get into

17  that at the appropriate phase.  But as far as

18  nominal damages, for what was done to the

19  reputation of our organization and to our

20  members' right of assembly was absolutely an

21  actual, if only nominally, compensable damage.

22      Q.    What damage to the reputation of your

23  organization are you talking about?

24      A.    Well, you know, when people show up

25  and threaten to murder my members by pointing

Page 43

1   guns at them it makes people hesitant to come

2   to our events sometimes.

3          People don't like getting guns

4   pointed in their face.

5      Q.   But in addition to guns pointed at

6   them you said threatened to murder your --

7      A.   Yes.  Yes.  If you point a gun at me,

8   especially without any legal justification,

9   that is a threat to commit a murder.  It is

10  called aggravated assault, I believe.

11     Q.   Okay.  But there's two distinctly

12  different things there.  There is you said

13  they pointed guns and they threatened to

14  murder them and threatening --

15     A.   I don't -- I don't see them as

16  distinct.  If you point a gun at me I am in

17  fear that you are about to kill me.

18     Q.   Okay.  But I'm going to give you a

19  distinction.  Pointing a gun at somebody is a

20  nonverbal act.  Threatening to murder somebody

21  presupposes a verbal statement is made.

22          Are you saying that there were verbal

23  threats to the individuals there on the date

24  of the incident we're here to talk about or

25  are you just referring to the fact of someone

Page 44

1    pointing a gun?

2        A.    They -- when they were taken into

3    custody they were given -- they were given

4    orders at gunpoint.  You know, someone way

5    smarter than probably anyone in this call once

6    said that 90 percent of communication is

7    nonverbal.  And I don't think I know of

8    anything that says -- that speaks more loudly

9    than a gun pointed at your face.

10       Q.    Okay.  You've made that incredibly

11   clear on at least three times during this one

12   question.

13             My question to you, sir, is:  Are you

14   aware of any verbal threat to murder any

15   member of Florida Carry on the date of this

16   incident, yes or no?

17       A.    No.

18       Q.    Okay.  It's my understanding that,

19   whether it's written in the policy you

20   referred to in my prior questions or it's just

21   a custom, that a notification of certain

22   members of either the police agency or the

23   municipality you're going to have an event at

24   is a policy of Florida Carry, Inc.; is that

25   correct?

1          MR. FRIDAY:  Object to form.

2          THE WITNESS:  Yeah, I would say it --

3      it has been more of a custom and a

4      courtesy than a policy.  It's -- it's not

5      something that we've demanded be done each

6      time.

7          In fact, when we first started, we,

8      you know, ten years ago, started holding

9      fishing events, you know, we wanted to be

10      sure that the departments would know we

11      were coming so if they got a

12      man-with-a-gun phone call they would know

13      that, well, it's us and doesn't really

14      require a police response.

15          So we did that as a courtesy to the

16      agencies so they wouldn't have to send out

17      officers for no good reason, just because

18      someone called and said, hey, there's

19      people on the fishing pier with a gun,

20      they'd be able to answer, yes, we know

21      they're there, they're not breaking any

22      laws, have a nice day.

23  BY MR. SWITKES:

24      Q.   Okay.  And you mentioned that this is

25  more custom than a policy?

Page 46

1              MR. FRIDAY:  Object to form.

2              THE WITNESS:  That's right.

3    BY MR. SWITKES:

4         Q.   Is it written in a document anywhere

5    or is this just something that you verbally

6    communicate to members?

7              MR. FRIDAY:  Object to form.

8              THE WITNESS:  I think we send it via

9         email.  There -- there might have been an

10        infographic or something along those lines

11        at some point telling people how to have a

12        successful meeting or get-together, but,

13        no, there is not a policy document or

14        anything along those lines.

15   BY MR. SWITKES:

16        Q.   But you have a video or a document

17   that's been sent by way of email as to the

18   custom that you're talking about, correct?

19             MR. FRIDAY:  Object to form.

20             THE WITNESS:  We've -- we've -- as I

21        said earlier, we've -- we've sent emails

22        giving people, you know, some best

23        practices and tips.

24   BY MR. SWITKES:

25        Q.   Okay.  So I'm going to ask you to

Page 47

1  preserve those and we request them, that you

2  send those to Mr. Friday.

3      A.   You know, some of -- some of those

4  emails date back to, you know, 2011 or even

5  2010, prior to the actual formation of Florida

6  Carry, so I don't know if I even have them

7  anymore.  We're talking about decade old

8  emails.  Maybe I do, maybe I don't, I'll look.

9      Q.   Well, even if the inception of those

10 emails are 10 to 11 years old, is it your

11 practice to send that out to individuals when

12 they advise you they're going to have an event

13 with Florida Carry?

14         MR. FRIDAY:  Object to form.

15         THE WITNESS:  A lot of it, especially

16     back then, was done through web forums

17     and, you know, messenger communications,

18     so not necessarily something that's going

19     to be persistent.

20 BY MR. SWITKES:

21     Q.   Well, you're aware of the date of the

22 incident we are here to talk about, correct?

23     A.   I'm sorry?

24     Q.   You're aware of the date of the

25 incident we are here to talk about today,

Page 48

1    correct?

2        A.    Yes.

3        Q.    Okay.  So on June 24, 2018, on

4    anytime prior to that, are you aware of any

5    communication to any of the individuals that

6    were going to participate in the event in the

7    City of Miami Beach that this was a policy or

8    custom that they should follow?

9        A.    Not specifically, but it's always

10   been our general guidance.  Again, we've

11   always had general guidance on, you know,

12   safety, making sure people have water and

13   shade, and, you know, where necessary, giving

14   a courtesy notification to local law

15   enforcement.

16       Q.    Do you remember if that information,

17   custom, policy, was given to any of the

18   individuals that participated in the event in

19   Miami Beach?

20       A.    Yes, they -- they've -- they have

21   been -- the organizers of that event have been

22   previously made aware of those best practices.

23       Q.    And the organizers of that event were

24   whom?

25       A.    I believe that one was Michael

Page 49

1    Taylor, I'm not a hundred percent on that.

2        Q.   Okay.  Have you seen Michael Taylor's

3    video of his travel down from his home to

4    Miami Beach that day?

5        A.   I don't believe I saw that video.

6        Q.   Okay.  Do you know if anyone that did

7    participate in the event on June 24, 2018,

8    prior to that event, complied with that

9    custom, policy or procedure of notifying

10   anybody of the intent to hold an event on

11   Miami Beach on that date?

12       A.   Yes, I know -- I know they sent

13   notifications to Miami Beach Police Department

14   and the Florida Fish and Wildlife.

15       Q.   And you said you know they sent it,

16   how do you know that?

17       A.   I've seen copies of the emails that

18   were sent.

19       Q.   Who sent you copies of the emails?

20       A.   It was one of the people there.  Let

21   me see if I can find that.

22            It was one of the participants.

23       Q.   My recollection is it was Chris

24   Philpot, but go ahead and check --

25       A.   That -- that's sound exactly right.

1    I was not positive if it was -- if it was

2    Chris or one of the other members, but that --

3    I would concede that was probably Chris

4    Philpot.

5        Q.   Can you pull that up on your

6    computer, it looked like you were dabbling

7    while I was --

8        A.   Yeah, let me see.

9             Here we go.  Yeah, it was Chris

10   Philpot.

11       Q.   Do you have a date of the document

12   you're looking at on your computer?

13       A.   June 18th.

14       Q.   And could you read that document into

15   the record, please.

16       A.   Let's see, this is -- this is one to

17   -- between him and Thomas Reinhart, Regional

18   Director FWC:  Mr. Reinhart, I sent this

19   letter to the Miami Beach City Attorney and

20   Miami Beach Police Chief.  I also wanted to

21   give you a copy because where South Point Park

22   Pier is falls within FWC South District.

23            Response from Mr. Reinhart:

24   Mr. Philpot, thank you for the advance

25   warning.  I have alerted our regional law

Page 51

1  enforcement commander; he appreciated the

2  heads up.  Sincerely Thomas Reinhart, Regional

3  Director FWC.

4      Q.   Do you have a similar copy that was

5  sent to anybody from the City of Miami Beach?

6      A.   This one references the email

7  (connection issue) and the city attorney.

8           One moment.  Let me see if I have the

9  other.

10          Here you go, this is June 7th

11  addressed to Chief Daniel J. Oats at -- and

12  with copies to Richard Nascak, Scott Whigham

13  and Dennis Fields, and to, actually, Eric

14  Friday letting them know what was going on

15  there signed by Chris Philpot.

16      Q.   Do you know if it was sent to anybody

17  else besides Mr. Oats?

18      A.   My understanding it was, it was also

19  sent to the city attorney.

20      Q.   And you've sent that to Mr. Friday?

21      A.   Yes, Eric has that.

22          MR. SWITKES:  Okay.  Mr. Friday, I

23      don't believe that's been --

24          MR. FRIDAY:  What's the date on that

25      one, Mr. Caranna?

Page 52

1          THE WITNESS:  The letter date was the

2      7th.  Here, let me just forward --

3      actually, you're the one that forwarded it

4      to me.

5          MR. FRIDAY:  What was the date on the

6      header where I sent it to you?

7          THE WITNESS:  June 24th 8 -- 8:38

8      p.m.

9          MR. SWITKES:  I certainly would

10     appreciate that being sent to me.  I have

11     not seen that to date.

12 BY MR. SWITKES:

13     Q.   And you've indicated the reason why

14 that communication is important, can you

15 repeat your reason?

16     A.   I'm sorry?

17     Q.   Can you repeat the reasons why that's

18 your custom or policy to send those

19 communications to the --

20         MR. FRIDAY:  Object to form.

21 BY MR. SWITKES:

22     Q.   -- entity you're going to have an

23 event at?

24     A.   We do it as a courtesy to law

25 enforcement, just in case someone makes a 911

Page 53

1    call or reports to a police officer that there

2    is someone with a gun, someone -- if -- if --

3    basically someone who doesn't understand that

4    what they're seeing is legal, so that the

5    police will know that it doesn't necessarily

6    necessitate a response.

7        Q.   Okay.  And you do that 'cause, based

8    upon your experience, it's a good practice to

9    notify those agencies in advance --

10           MR. FRIDAY:  Object to form.

11   BY MR. SWITKES:

12       Q.   Didn't finish yet.

13           -- to avoid contentiousality of a

14   confrontation like that, correct?

15           MR. FRIDAY:  Object to form.

16           THE WITNESS:  Usually -- actually,

17       confrontations are exceedingly rare in the

18       ten-year history of us doing this.  We

19       find that most officers who we come across

20       are very professional, polite and

21       courteous.

22           Again, we do this as a courtesy so

23       that they won't have to dispatch someone

24       if there's a-man-with-a-gun call, hey,

25       there's people on the -- out on the pier

Page 54

1     with guns.

2    BY MR. SWITKES:

3        Q.   Have you ever been to the pier where

4    this event was held?

5        A.   Yes.

6        Q.   And that was after the first event?

7        A.   Yes.

8        Q.   You had never been there prior to the

9    event?

10       A.   Not to my recollection, no.

11       Q.   Okay.  To your knowledge, has Florida

12   Carry ever had an event at either in an

13   airport or a port like this?

14           MR. FRIDAY:  Object to form.

15           Go ahead and answer.

16           THE WITNESS:  Gun Rights Policy

17       Conference in 2012 was at the Orlando

18       Airport.

19   BY MR. SWITKES:

20       Q.   Okay.  Have you ever had an event at

21   a port, like the Port of Miami, prior to the

22   date of this event?

23       A.   Yes, Port -- Port Canaveral, we've

24   had in -- we've had events at Port Canaveral,

25   we've had events on the Jacksonville port

1    waterfront, we've had events in Tampa.  So,

2    yeah, it's not that uncommon.

3        Q.   And that was before the Miami Beach

4    event?

5        A.   Yeah, we've been -- like I said,

6    we've been doing it for over a decade.

7        Q.   Yeah, but my question was, at the

8    port where you had prior demonstrations, those

9    were prior to the event at Miami Beach?

10           MR. FRIDAY:  Object to form.

11           THE WITNESS:  I don't know if I'd

12       call them demonstrations, per se.  But,

13       yes, we've -- we've -- we've had numerous

14       events at places like Port Canaveral,

15       Tampa, Jacksonville waterfront, since the

16       inception of Florida Carry.

17   BY MR. SWITKES:

18       Q.   Okay.  And before the event at Miami

19   Beach is my question.

20       A.   Yes.

21       Q.   Okay.  Having been to the pier,

22   albeit after the event, can you tell me what

23   you observed about the port that is adjacent

24   to the pier?

25           MR. FRIDAY:  Object to form.

Page 56

1            You can answer.

2            THE WITNESS:  It -- it was a port,

3       pretty run of the mill.

4   BY MR. SWITKES:

5       Q.   Really?  City of --  Miami Beach --

6   the Miami port is pretty run of the mill?

7       A.   When you grew up in Houston, the Port

8   of Miami doesn't literally look all that

9   impressive.

10      Q.   Was there a Coast Guard station at

11  the Port of Houston?

12           MR. FRIDAY:  Object to form.

13           You can answer.

14           THE WITNESS:  I couldn't answer with

15      any -- I don't recall.  I'd imagine so,

16      but I don't know.

17  BY MR. SWITKES:

18      Q.   Do you know how many cruise ships

19  enter and exit the Port of Miami on a typical

20  Saturday?

21      A.   No, I don't -- I don't keep up with

22  port traffic demographics.

23      Q.   Do you have any idea of how many

24  passengers and crew members there are in a

25  typical cruise ship leaving out of the Port of

1   Miami?

2       A.   I'm sure it's substantial, having

3   been on a cruise myself a few times.

4       Q.   Okay.  What cruises have you gone on?

5       A.   Oh, I've taken -- I've done two

6   cruises on -- I think they were both Carnival

7   out of the -- and both out of Port Canaveral.

8       Q.   Okay.  Do you remember how many

9   passengers and crew members were on the ships

10  you went on?

11      A.   I have no idea.  A large number.

12      Q.   And from your experience as a cruise

13  -- as going on a cruise, when it left Port

14  Canaveral, was it the custom of the most of

15  the passengers to line up on the side of the

16  boat to look at the scenery as it leaves the

17  port?

18      A.   Yes, that is -- that is quite common.

19      Q.   And as a large port, probably one of

20  the largest ports in the United States, Port

21  of Miami has a lot of other kinds of traffic.

22  Did you see any cargo ships coming in and out

23  of the port when you were there?

24      A.   I did -- I didn't note any.  There --

25  there was a -- a wrecked boat, I believe, when

Page 58

1    we were there.

2        Q.   A wrecked boat?  Where?

3        A.   A small pleasure craft had dashed on

4    the jetty rocks.

5        Q.   I don't think that's very humorous,

6    because we've had a number of deaths on that

7    jetty in the recent past, including a member

8    of the Miami Marlins.

9            Did you notice the gantry cranes when

10   you were there?

11           MR. FRIDAY:  Object to form.

12           You can answer.

13           THE WITNESS:  I didn't pay particular

14       notice to the port hardware.

15   BY MR. SWITKES:

16       Q.   Did you notice a significant number

17   of pleasure craft that went in and out of the

18   port when you were there?

19           MR. FRIDAY:  Object to form.

20           THE WITNESS:  Again, no, I don't -- I

21       don't recall the sea traffic that -- that

22       much.  They weren't approaching the docks

23       -- if they weren't approaching the docks

24       or getting into the area where we were

25       fishing -- I would have noticed any boats

Page 59

1        that -- that, you know, perhaps our tackle

2        would have fouled props or anything like

3        that, of course, looking for that, but no

4        boats came that close to the pier where

5        they would have been interfering with the

6        fishing activities or we would have been

7        interfering with them.

8             The port traffic and the boat traffic

9        is far enough removed from the pier so as

10        not to really be that much of a concern.

11   BY MR. SWITKES:

12        Q.   My question:  Did you observe the

13   amount of traffic coming in and out of

14   Government Cut, which is what it's called?

15        A.   No, I did not keep up with the

16   traffic.

17        Q.   Did you ever look to the north of the

18   pier and see a rather large beach that is

19   adjacent to that jetty?

20        A.   Yes.

21        Q.   And was it very crowded?

22        A.   I wouldn't say particularly crowded.

23   I do live in Daytona Beach area, I'm used to

24   fairly crowded beaches.

25        Q.   Okay.  Would you admit that the Port

Page 60

1    of Miami and Government Cut, which leads into

2    the port, is a very sensitive area from a

3    standpoint of potential terrorism?

4         MR. FRIDAY:  Object to form.

5         THE WITNESS:  No, no, I wouldn't

6         necessarily concede that a -- that a -- a

7         navigable waterway is a particularly

8         sensitive area, anymore than I concede

9         that a U.S. highway is particularly

10        sensitive.

11            It's a -- it's an important piece of

12        infrastructure, but particularly

13        sensitive, no.  When it comes to the port

14        itself, while there are secure areas, just

15        like when you're taking a passenger crew

16        -- cruise there are secure areas of the

17        port and there are non-secure areas of the

18        port.

19            So I would concede that the secure

20        areas through which you must go through

21        security and usually be wanded and

22        searched and have bags x-rayed, those I

23        would concede to be sensitive areas.

24    BY MR. SWITKES:

25        Q.   Are you aware of naval vessels that

Page 61

1    specifically block traffic when cruise ships

2    are in port specifically for security

3    concerns?

4           MR. FRIDAY:  Object to form.

5           THE WITNESS:  I -- I don't keep up

6        with port operations, no.

7    BY MR. SWITKES:

8        Q.    Did you notice police vessel with a

9    blue flashing light blocking traffic to the

10   port through Government Cut while you were

11   there?

12          MR. FRIDAY:  Object to form.

13          You can answer.

14          THE WITNESS:  Not that I made any

15       mental note of.  And if -- if a police

16       boat happened by or something, I may have

17       seen it, but I don't -- nothing that

18       stands out in memory.

19   BY MR. SWITKES:

20       Q.    You're not aware of the fact that

21   while cruise ships are in port, Port of Miami,

22   that there are police vessels blocking any

23   other vessels going by those cruise ships for

24   the entire time they're in port, you're not

25   aware of that?

Page 62

1           MR. FRIDAY:  Object to form.

2           You can answer.

3           THE WITNESS:  I'm not aware to

4       confirm or deny what you say.  Not -- not

5       my area of expertise.

6   BY MR. SWITKES:

7       Q.   Okay.  So in terms of a notification

8   to the agencies that were made prior to the

9   date of the event, there were two

10  notifications that went out, one was June 18th

11  to Florida Fish and Wildlife, did you receive

12  any communication back from them?

13      A.   Yes, I just read it a minute ago.

14      Q.   Okay.  And, in fact, is that a

15  protocol, that if you don't receive something

16  back that another communication is sent

17  thereafter?

18      A.   No.

19      Q.   Do you know if the notifications to

20  the City of Miami Beach actually were

21  communicated in this case?

22      A.   About whether or not they were sent?

23      Q.   No.  Sent -- my question is:  Were

24  they received?

25      A.   I have no knowledge.

Page 63

1     Q.   So you're unaware of the fact that

2   Chris Philpot encrypted the notifications to

3   both Chief Oats and the City of Miami Beach

4   which encrypt -- encryption could not be

5   opened by either of the two entities it was

6   sent to?

7          MR. FRIDAY:  Object to form.

8          THE WITNESS:  No, I'm not aware of

9      any encryption.

10          And, in fact, the copy I have there

11      is no encryption.  There might be some

12      mis-formatting of the attachment, but

13      that's easily corrected by just fixing the

14      attachment.  There's no encryption.

15   BY MR. SWITKES:

16     Q.   Well, as you sit here today you're

17   unaware of the fact that neither the police

18   department nor the city could open the

19   communications sent by Mr. Philpot in this

20   case?

21     A.   I am not with personal knowledge of

22   that.

23     Q.   And you're unaware of the fact that

24   during the Chris Philpot deposition he was

25   given a laptop computer and asked to open his

1   own communication and he could not do so?

2        MR. FRIDAY:  Object to form,

3        attorney/client -- excuse me.

4        Objection, attorney/client privilege

5        and do not answer that question.

6        Mr. Switkes, I will let you try and

7        answer the -- ask the question a way even

8        though it might get into some

9        attorney/client privilege, but the way you

10       just asked that I'm not going to -- I'm

11       going to have to instruct him not to

12       answer.

13       MR. SWITKES:  Counsel, you're vercely

14       mistaken.  I'm referring to the videotaped

15       deposition of Mr. Philpot where he was

16       handed a laptop computer by City Attorney

17       Rob Rosenwald and he could not open up his

18       own communication.  You're not really

19       instructing this witness not to answer

20       that question, are you?

21       MR. FRIDAY:  It depends on how he got

22       that knowledge or whether he has that

23       knowledge.  I mean, if he got that

24       knowledge, how did he get it?  Did he --

25       has he seen the videotaped deposition, I

Page 65

1    guess if that's your question he can

2    answer.

3        THE WITNESS:  I have not seen the

4    videotaped deposition.

5        MR. SWITKES:  Okay.  It has nothing

6    to do with attorney/client privilege.  It

7    was a deposition that was videotaped.

8        THE WITNESS:  Yeah, look, I'm the

9    corporate representative for Florida

10    Carry.  I know Florida Carry's position as

11    to the -- the -- and what -- and what has

12    transpired with the organization.  As far

13    as what testimony may have been given by

14    the other parties, I'm -- I'm not

15    qualified to answer.

16  BY MR. SWITKES:

17    Q.   All right.  It's not -- you're not

18  answering for them.  The question was:  If

19  you're aware of the fact that Mr. Philpot,

20  during his videotaped deposition, was handed a

21  laptop computer with his material that was

22  supposedly the notice sent June 7th and he,

23  himself, could not even open it on the

24  computer during his deposition; are you aware

25  of that?

1    A.   Again, I have not seen the video; I

2 have no knowledge of this.

3    Q.   Okay.  Whether you saw the video or

4 not, you have no knowledge of that, correct?

5    A.   No.

6    Q.   Okay.  So if in fact the custom and

7 policy was not followed correctly in this case

8 because the communication to the City of Miami

9 Beach and its officials weren't notified --

10    A.   That -- wait, wait, wait, that is not

11 our -- that is -- that is not our -- our

12 custom and policy to do that in all cases.

13 That is to be determined by our local leader

14 whether or not they feel that it is prudent to

15 do so.

16         For -- for example, in Tampa, where

17 we've -- where we've had events at least on a

18 monthly basis since 2011, the police

19 department asked us to quit notifying them

20 because they knew.  Of course then later there

21 was a -- the only other incident, major

22 incident that I'm aware of, where they did

23 accost one of our members and we wound up

24 having to sue Tampa and that -- they did not

25 get qualified immunity for that violation and

1    that case was settled.

2        Q.   Let's go back to my question.  You

3    indicated that it was the custom to send out

4    the notification.  Now you are retracting that

5    and saying it isn't the custom?

6            MR. FRIDAY:  Object to form.

7            THE WITNESS:  No, no, I never said it

8        was our custom.  I said that whether or

9        not that is done has always been one of

10       our -- you know, one of the tips that we

11       give for having a successful event, but it

12       has always been up to the individual event

13       organizer to decide if doing that is

14       prudent or not.

15           For example, where we started, our

16       first event, where I had the first Florida

17       Open Carry fishing event, yes, I -- I -- I

18       coordinated with the local law enforcement

19       that first time.

20   BY MR. SWITKES:

21       Q.   Why?

22       A.   After that -- because it was 2010,

23   McDonald had been decided days earlier,

24   McDonald v. Chicago, or Chicago v. McDonald, I

25   forget which.  I think it's McDonald v.

1   Chicago -- had been decided just days earlier,

2   so there was finally an incorporated right to

3   bear arms.  And even though fishing, hunting

4   and camping has been legal in Florida since we

5   were a territory, you know, it has never been

6   illegal, I wanted to make sure that if someone

7   saw us out there with guns and called the

8   local police, that they would know that

9   nothing weird is going on here, they knew we'd

10  be out there fishing.

11          You know, do I think it'd be okay for

12  -- if the police got a 911 call saying,

13  there's a bunch of guys out on the water

14  openly carrying guns and have a police

15  response to that, that would be one thing.

16  But if it's, there are fishermen who are

17  fishing and have guns, really no response

18  would be necessary.  And we wanted to make

19  sure, back a decade ago, the police understood

20  this and understood that we didn't need that

21  kind of a response.

22          A decade later we've held hundreds of

23  these events all over the entire State of

24  Florida and have put out blanket

25  notifications, individual notifications to

Page 69

1   every department in the state on multiple

2   occasions.  It's well established, they should

3   have gotten the memo by now.

4       Q.   Okay.  So let's go back to my

5   question, first it was a policy, then it was a

6   custom and now it's a tip.

7           MR. FRIDAY:  Object to form.

8   BY MR. SWITKES:

9       Q.   Your answer to my question was, in a

10  very long winded answer, that you wanted to

11  make sure that they knew you were coming.  So

12  whether that's -- what do you consider that, a

13  custom, practice, tip, what word would you

14  like to use for it?

15          MR. FRIDAY:  Object to form.

16          THE WITNESS:  A good idea by any

17      other name is still a good idea.

18          MR. SWITKES:  Good idea, okay.

19          THE WITNESS:  You know, that's the

20      thing, as I said, there is -- there is no

21      document for this.  It is not an official

22      policy.  It has been an infographic or an

23      email saying, here are tips for having a

24      good and successful event.  I think I've

25      being consistent in that statement.

Page 70

1           MR. SWITKES:  And I think I've

2      credited you for doing that and I don't

3      think you should be defensive about it.

4  BY MR. SWITKES:

5      Q.   In this case there was a failure to

6  effectively communicate that.  So, in essence,

7  using your own words, if Mr. Philpot wanted to

8  make sure that they knew of the event, that

9  didn't happen in this case; you're aware of

10  that?

11      A.   If -- if they, for whatever reason,

12  had a technical issue with the email -- you

13  know, usually when I get an email and if

14  there's an attachment and I can't open it, I

15  write back to the sender and say, hey, I

16  couldn't open -- I couldn't read your email.

17           So, you know, the -- it happens all

18  the time in my work, in my professional life.

19  If -- if someone sends me something that looks

20  to me germane to my purpose and it's something

21  I can't open, I will send them an email back

22  saying, hey, sorry, couldn't open your

23  attachment, could you correct this and send it

24  to me again.  That obviously didn't happen.

25      Q.   How many emails do you get a day?

Page 71

1      A.    It'd be hard to guess, sometimes

2   hundreds.

3      Q.    You're not really saying that you

4   reply to every email you get when it's from an

5   unknown source?

6      A.    When it looks to be something germane

7   by the -- by the topic, yeah, usually within a

8   few days I've gone through all of my emails.

9      Q.    And if the City of Miami Beach Police

10  Chief received an email from a person named

11  Chris Philpot that he's never had any business

12  with and he couldn't open it, are you saying

13  there was a duty on his part to try to

14  communicate back to Mr. Philpot why he was

15  sending something encrypted that he couldn't

16  open?

17          MR. FRIDAY:  Objection to form.

18          THE WITNESS:  Again, you keep using

19      this word encrypted, and this was not

20      encrypted.

21  BY MR. SWITKES:

22      Q.    Okay.  That's your --

23      A.    I work in information technology, so

24  certain words have certain meaning.  Encrypted

25  is a -- you know, forgive my use of it, but it

1   is a technical term of art and you're misusing

2   it.

3        Q.   Okay.  It's been used by technical

4   people in the City of Miami Beach so I'm

5   repeating it, but let's just leave it at this,

6   are you aware of the fact that a City of Miami

7   Beach, both people it was sent to, could not

8   open Mr. Philpot's notification, are you aware

9   of that?

10        A.   I'm -- I'm -- I'm aware that that is

11   what they've alleged.  I have no actual

12   knowledge of whether they could actually open

13   it or not.

14        Q.   Okay.  And to your knowledge the City

15   of Miami Beach never responded to Mr. Philpot

16   to the best of your knowledge, correct?

17        A.   Not -- not to my knowledge, no.

18        Q.   And you're not aware of any other

19   communication Mr. Philpot or any other member

20   of Florida Carry, Inc. sent to the City of

21   Miami Beach other than the two -- well, other

22   than the two communications on June 7th,

23   correct?

24             MR. FRIDAY:  Objection, form.

25             THE WITNESS:  To the -- to the chief

Page 73

1          and to the city attorney, those are the

2          ones I'm aware of.

3     BY MR. SWITKES:

4          Q.   Okay.  So if those were not received,

5     are you aware of any other communication that

6     was given to anybody at the City of Miami

7     Beach of the event that was going to be held

8     on June 24, 2018?

9          A.   Give me one second.  I'm going to do

10    some quick research here.

11              Here we go, October -- October 2018

12    -- no, that's -- that's this one, never mind.

13         Q.   That would be numerous months --

14         A.   I believe there was a previous

15    communication with the City of Miami Beach

16    over an illegal sign or ordinance a few years

17    ago explaining to them the requirements of

18    Florida law and the right to bear arms.  I'm

19    looking to see if I have that.

20              Oh, that was North Miami Beach.

21              All right.  Yeah, I remembered some

22    Miami Beach communication, but that was North

23    Miami Beach that I'm thinking of, so never

24    mind.

25         Q.   Okay.  In the lawsuit, and I assume

1   central to your mission, you're familiar with

2   Florida Statute 790?

3        A.   Of the chapter, yes, I'm familiar

4   with it.

5        Q.   Okay.  And are there any exceptions

6   to the statute that you have previously read

7   about the authorization to have -- carry a

8   firearm while one is fishing, hunting or

9   camping or going to or from fishing, hunting

10  or camping?

11       A.   No, they're not.  That's contained in

12  790 -- that's contained in 790.25.  It's in

13  the exact same subsection that gives you the

14  right to have the firearm in your home and the

15  exact same section that gives police officers

16  the right to carry while on duty.

17            So there -- there are really no

18  exceptions to those provisions.

19       Q.   That's not the case, sir, are you

20  aware of 790 that prohibits persons who have

21  committed a felony from obtaining possession

22  of a firearm even if they're fishing,

23  hunting --

24       A.   I will -- I will rephrase.  For

25  anyone who is a lawful -- who is in lawful

1    possession -- who may lawfully possess a

2    firearm.

3        Q.   Okay.  But that's not the only

4    exception under 790, is it, sir?  There are a

5    number of exceptions, correct?

6        A.   For -- for what we generally term as

7    prohibited individuals, that -- that would be

8    felons and the like.

9        Q.   Well, there's also provisions if

10   using a firearm while one is under the

11   influence of alcoholic beverages, chemicals --

12       A.   That's -- that's -- that's using a

13   firearm.  Use of a firearm has a very distinct

14   legal meaning.  The use of a firearm is a term

15   -- is a legal term of art and I think you're

16   misusing it.

17            THE COURT REPORTER:  Excuse me,

18       gentlemen, you're -- you're cutting each

19       other off.  I'm not getting the end of a

20       sentence, the beginning of an answer.  Can

21       you just take one second and let each

22       other finish your thoughts.

23   BY MR. SWITKES:

24       Q.   Mr. Caranna, I didn't give you the

25   typical scenario when I first started that I

Page 76

1    give in a deposition because you indicated

2    you've given depositions before.  But not for

3    my benefit, but before -- before we give any

4    response, please let my question be fully

5    asked and then take a breath and then I'll

6    give you the opportunity to answer as long as

7    you have, but the poor court reporter can't

8    take us both down when we speak over each

9    other, okay?

10       A.   Certainly.  Never done it by Zoom

11   before, so the timing is a little bit

12   different than eyeball to eyeball.

13       Q.   The court reporter can't kick you

14   under the table to tell you to wait until I'm

15   finished, so you have to do that on Zoom

16   voluntarily.

17       A.   It would not be the first time that

18   Eric has had to kick me.

19       Q.   Yeah.  There are other prohibitions

20   under 790 that specifically felons are not

21   allowed to possess a firearm even if they're

22   fishing, hunting or camping or going to and

23   from, correct?

24            MR. FRIDAY:  Object to form.

25            THE WITNESS:  Unless -- unless it's

Page 77

1      an antique firearm.

2    BY MR. SWITKES:

3      Q.   Delinquents, under 790.23, are

4    prohibited from doing that, correct?

5           MR. FRIDAY:  Object to form.

6           THE WITNESS:  The -- the -- yes,

7       depending on how -- how delinquent --

8       delinquent is defined, but that is one --

9       that is one of the exceptions.

10   BY MR. SWITKES:

11     Q.   Under 790.33, possession of a firearm

12   and ammunition is prohibited when a person is

13   subject to an injunction against committing

14   acts of domestic violence, stalking or cyber

15   stalking; isn't that correct?

16     A.   Yes, those -- those are -- I think

17   the law speaks for itself there.

18     Q.   Okay.  There's another provision for

19   possession of a firearm or ammunition by a

20   violent career -- violent career criminal is

21   unlawful, correct?

22     A.   Again, I think that law speaks for

23   itself.

24     Q.   So when one is on a fishing pier

25   and/or camping or hunting, police authorities

Page 78

1   still are authorized to make additional

2   inquiries about whether or not that person is

3   prohibited from having a firearm; isn't that

4   correct?

5       A.   No, that's not correct.

6       Q.   Okay.  So if a felon is -- got a

7   fishing rod in the water and holding the

8   fishing rod and he has a firearm on his hip --

9       A.   If they know him to be a felon before

10  they approach him, then absolutely they can

11  effectuate an arrest.  However, you have to

12  have a reasonable articulable suspicion that

13  someone is in the commission of a crime in

14  order to conduct an investigatory stop, that's

15  step one of Terry.

16      Q.   Okay.  So you're saying that if five

17  people show up on a pier where tens of

18  thousands, if not well over a hundred thousand

19  people are going to go in and out of that

20  port, the officer doesn't have a reasonable

21  suspicion when complaints are made by

22  individuals that there's armed individuals on

23  the pier overlooking the port?

24           MR. FRIDAY:  Object to form.

25           You may go head and answer.

1           THE WITNESS:  City of Miami Beach is

2      already been -- been in court on improper

3      stops such as these and lost at the 11th

4      Circuit.  They should well know that this

5      goes to -- it is a totality of the

6      circumstance standard and when you have

7      someone who is prima facia engaged in

8      fishing, they're holding fishing poles in

9      their hands, they're on a fishing pier

10     with gear in the water, that given the

11     totality of the circumstance then, no,

12     there's no reasonable suspicion that a

13     crime is afoot.

14          There's multiple cases, longstanding

15     cases saying that it is a totality of the

16     circumstance standard and that seeing a --

17     seeing an armed fisherman does not rise to

18     suspicion of a crime.

19          There's tons of case law.  I'm sure

20     Eric will wind up at some point pointing

21     that case law out, so, yes, it's well

22     established.

23          And again, we've been doing this for

24     over ten years, the -- the -- how we've

25     been doing this over ten years in

Page 80

1         educating the public, educating the police

2         departments and educating our own members,

3         a decade is certainly enough notice of

4         something that was never illegal.

5              You know, saying they have a right to

6         just come and check somebody, that's like

7         saying you can pull over every car you see

8         and see if they've got a valid driver's

9         license or if maybe they're carrying

10        drugs.  We've -- the only fishing

11        expedition that's authorized here is the

12        one with our guys with fishing licenses.

13   BY MR. SWITKES:

14        Q.   Are you done?

15        A.   I am.

16        Q.   Okay.  You mentioned the term

17   "totality of the circumstances," are you

18   saying that that is not law?

19        A.   I'm saying --

20             MR. FRIDAY:  Object to the form.

21             THE WITNESS:  -- it is law.

22   BY MR. SWITKES:

23        Q.   Okay.  So you're making an individual

24   determination of what the totality of the

25   circumstances are.  If individuals had

Page 81

1    complained to the City of Miami Beach

2    authorities that there were five armed men on

3    the fishing pier -- you're aware of some

4    terrorist activities that have taken place in

5    the recent past?

6              MR. FRIDAY:  Object to form.

7              You can answer.

8              THE WITNESS:  Am I aware of terrorist

9         activities?  Yeah, I didn't tell you what

10        I did -- did in the military.  I am an

11        infantryman with multiple combat

12        deployments, I know a thing or two about

13        terrorism.

14   BY MR. SWITKES

15        Q.   Okay.  As an infantryman, did you

16   confront terrorists?

17        A.   I have -- I have confronted

18   terrorists overseas, yes.

19        Q.   For which --

20        A.   I have done anti-terrorism duty, I've

21   done dignitary protection duties.

22        Q.   Okay.  And what --

23        A.   I'm -- I'm well -- I'm -- I'm well

24   aware of many terrorist modus operandi.

25        Q.   What does a terrorist look like?

Page 82

1      A.   You or me, unfortunately.

2      Q.   And there are certain places that are

3   more sensitive and dangerous than others,

4   would you admit that?

5      A.   I would admit that there are -- there

6   are places that are sensitive.

7      Q.   And would you admit that the Port of

8   Miami, with tens of thousands of cruise ship

9   passengers going right past the pier on any

10   given day poses a significant terrorist

11   threat, potentially?

12          MR. FRIDAY:  Object to form.

13          THE WITNESS:  You've asked me this

14      exact question earlier and I will give you

15      the same answer, I don't think that the

16      waterway attached to the port is anymore

17      sensitive than the road attached to the

18      airport.  I don't think that the port --

19      the area surrounding the secure sensitive

20      area where there is security and

21      background -- and -- and checks, that --

22      that is the sensitive place inside the

23      secure area.  The nonsecure areas have not

24      been designated by the government as

25      sensitive places, otherwise, they would

Page 83

1      have been secured.

2    BY MS. SWITKES:

3        Q.    How far is the pier at South Pointe

4    Park from the waterway which is the exit and

5    entrance to the Atlantic Ocean, to your

6    knowledge?

7            MR. FRIDAY:  Object to form.

8            THE WITNESS:  I -- I could not tell

9        you.

10   BY MR. SWITKES:

11       Q.    Weren't you there?

12       A.    I wasn't -- I wasn't taking geography

13   notes at the time.

14       Q.    Well, I'm asking you from simple

15   observing.

16       A.    Not -- not something that I made any

17   particular note of.

18       Q.    Did you notice that the port -- the

19   entrance to the port, which is called

20   Government Cut, has rock jetties on both sides

21   of that entrance?

22       A.    Yes, yes, I noted --

23           MR. FRIDAY:  Object to form.

24           THE WITNESS:  -- the jetty.

25   BY MR. SWITKES:

Page 84

1      Q.   And that's incredibly close to the

2   pier where you went subsequent to this event;

3   correct?

4          MR. FRIDAY:  Object to form.

5          THE WITNESS:  Yes.  In fact, some --

6      I believe some people were fishing off of

7      the jetty.

8   BY MR. SWITKES:

9      Q.   Okay.  But I'm talking about distance

10   rather than people fishing.

11      A.   Yes, it -- yes, it was very nearby.

12      Q.   Okay.  And as a former military

13   individual, would you admit that someone who

14   was wanting to commit an act of terrorism

15   could stand on that pier with a fishing rod

16   and pose a serious threat to the traffic

17   coming in and out of that port?

18          MR. FRIDAY:  Object to form.

19          THE WITNESS:  Actually it'd be kind

20      of -- no, if -- if I was -- if I was

21      coordinating protection of the port --

22      and, you know, facility protection was one

23      of the additional duties that we had from

24      time to time -- no, that's -- that's not

25      going to be my biggest concern, my biggest

1          area of concern.

2               If it's the only way in and out of

3          the port, then, as a potential chokepoint

4          that might be some kind of an issue, but I

5          don't believe it is the only way in and

6          out of the port.  And a -- honestly, a guy

7          -- a guy on the pier or the jetty, it's an

8          awfully big waterway there, it's going to

9          take a lot more than just one person to

10         knock out that entire waterway.  We're

11         talking some major military hardware to do

12         -- to effectuate that kind of an attack.

13    BY MR. SWITKES:

14         Q.   What do you mean take out --

15         A.   Well, you're -- you're -- you're

16    asking about the security, whether that's a

17    large security concern given my military

18    experience.  And if you're talking about that

19    type of security, I'm talking about what would

20    be done to deny use and destroy something.

21         Q.   What about potential harm to tens of

22    thousands of passengers that you admit line up

23    on the side of the ship watching the city

24    they're leaving as they're coming and going

25    out of that one entrance to the cruise ship

Page 86

1  port --

2         MR. FRIDAY:  Object to form.

3  BY MR. SWITKES:

4      Q.   -- do you see any potential threat to

5  those people by people on that pier with

6  weapons?

7      A.   No, none whatsoever.

8      Q.   Really?

9      A.   I carry -- I carry a gun every day,

10  and is anyone at -- at risk because I own a

11  gun?

12     Q.   What does that have to do with the

13  threat --

14         MR. FRIDAY:  Objection,

15     argumentative.

16         THE WITNESS:  Who's making a threat?

17  BY MR. SWITKES:

18     Q.   So if individuals on the beach or

19  individuals on the pier felt threatened by the

20  five members of Florida Carry on the pier that

21  day, you're saying that fear is irrational?

22         MR. FRIDAY:  Object to form.

23         THE WITNESS:  Precisely.  I -- I

24     can't speak to someone else's focus.

25  BY MR. SWITKES:

Page 87

1        Q.    Well, why do you send a notice out?

2              I thought you were saying if you

3    don't send a notice out, experience has

4    indicated to you, that sometimes, when people

5    complain about seeing armed men, the police

6    are called, I thought that was your prior

7    testimony?

8              MR. FRIDAY:  Object to form.

9              THE WITNESS:  That -- actually --

10        actually that's very rare, but should it

11        happen, and we know from other states or

12        incidents where that has happened, we --

13        we generally want to make sure the police

14        know that if they get a false report --

15        there was an incident in Tampa many years

16        ago where someone called, made a false

17        report to police saying that a bunch of

18        guys were on the pier and they kidnapped

19        two little girls.  Those two little girls

20        belonged -- were the daughters of one of

21        my board of directors members and they

22        were out there enjoying a day of fishing.

23        It was a false police report.

24              The police in that -- in that

25        incident walked out to the pier, had a big

Page 88

1       smile, had a laugh about the false report

2       and I believe gave the person who gave

3       them the false report a warning.

4    BY MR. SWITKES:

5       Q.   Okay.  So let's assume in your

6    scenario you just gave, there is an individual

7    that presumes there's a kidnapping and the

8    people that are in custody of those two

9    individuals are armed.  Are you saying that

10   the officers would not be justified in taking

11   their arms out and holding those alleged

12   kidnappers at gunpoint until they determine

13   that it was not in fact what it was reported?

14        MR. FRIDAY:  Object to form.

15        THE WITNESS:  Based on -- based on an

16     unreliable witness report, no, that would

17     not be justified and there's plenty of

18     case law on that.

19        Pardon me, could we just take a quick

20     break?

21        MR. SWITKES:  Oh, of course.  We'll

22     take a five-minute break.

23        THE WITNESS:  All right.  Thank you.

24        (Recess taken.)

25   BY MR. SWITKES:

Page 89

1        Q.    So, sir, when you previously used the

2    term "totality of the circumstances," you're

3    -- you're not professing that you have any law

4    degree or an expert in constitutional law, are

5    you?

6        A.    No, I do not have a law degree.  I

7    have been certified as a court expert on the

8    legislative history and statutory construction

9    of Chapter 790, though.

10       Q.    Okay.  And certainly your definition

11   of reasonable suspicion is not made based upon

12   any expertise in law enforcement, correct?

13       A.    Only from my previous criminal

14   justice classes and experience but, again, I'm

15   not an attorney.

16       Q.    Criminal justice courses you took in

17   undergraduate?

18       A.    Yes.

19       Q.    Okay.  Questions that were asked of

20   you, and I believe you are the person --

21   although these were not sworn, I don't think,

22   your answers to interrogatories, do you recall

23   being asked:  Have you heard or are you aware

24   of any oral, written or recorded statements --

25   it's Number 6, rather than me reading the

Page 90

1    whole question, do you recall that question?

2        A.    Let's see.  You're not talking about

3    the one on the -- the deposition, you're

4    talking about the previous request for

5    production?

6        Q.    Interrogatories, the written ones.

7        A.    Interrogatories?  Let me see if I

8    have those handy.

9            Okay.  And you should have a signed

10   copy.  You -- perhaps you got a -- got the

11   wrong version, but there is a signed copy.

12       Q.    Good.

13       A.    So if -- if -- if that was just

14   a-sent-the-wrong-version error, I think that's

15   all that was, because I did -- I did -- I'm

16   looking at the one I signed.

17       Q.    Number 6.

18       A.    Number 6.

19       Q.    On page five.

20       A.    Thank you.

21       Q.    The question's actually on four, the

22   response is on five.

23       A.    Okay, this is a bit lengthy.  Have

24   you heard or are you aware of any oral,

25   written or recorded statements, including, but

Page 91

1    not limited to, affidavits, narrative

2    statement, report, recording, memorandum, or

3    other document made by any person concerning

4    any issue in this lawsuit?  If so, identify

5    them by name.

6             Okay.

7        Q.   So if you turn to page five --

8        A.   Uh-huh.

9        Q.   -- look at what you've said, you then

10   quoted Chief Oats in, I believe A; is that

11   correct?

12       A.   Yes, these were public statements

13   that he made.

14       Q.   And you totally -- well, let me ask:

15   What's your opinion of his answer, Number A --

16   Letter A?

17       A.   I think it's fairly tone deaf.  When

18   you're talking about people assembled for

19   First Amendment purposes, who are also

20   exercising their Second Amendment right, but

21   there -- there's a lot going on in this

22   country right now about First Amendment

23   rights, the right to assembly, and, honestly,

24   for some police misbehavior where they haven't

25   taken proper respect for people's rights.

1     Q.   Try to limit --

2     A.   Yeah, this -- this isn't, obviously,

3  unique to us.

4     Q.   -- to this case.  I really don't want

5  to hear a commentary on what's going on in the

6  United States right now, okay?

7          MR. FRIDAY:  Object to form.  He's

8     answering the question.

9          THE WITNESS:  I'm -- I'm sorry, you

10    said you would allow me to answer and not

11    interrupt me.  Can we please stick to

12    that?

13  BY MR. SWITKES:

14    Q.   Well, I want to -- we'll be going all

15  day if you're giving me your interpretation of

16  what's going on in the United States today,

17  but go right ahead.

18    A.   You're asking me about the public

19  statements of the chief of police on their

20  actions in assaulting my members, so I think a

21  lot of what's going on here and my impressions

22  with this state -- with his statement, then

23  and now, are colored by current events.

24    Q.   We're talking about his statement

25  about the events of June 24, 2018, so

Page 93

1    commentary on current events is really not

2    necessary.

3               I'm asking you about his statement.

4         A.   My impression of the statement is

5    that it is completely tone deaf, it gives no

6    respect to peoples' First or Second Amendment

7    rights, and this presumption that all who

8    aren't -- that anyone who we don't know, that

9    we're going to presume that they are a felon

10   or a criminal or a terrorist is frankly the --

11   it's -- it's sickening.

12        Q.   Is Florida Carry[sic] an open carry

13   state?

14        A.   I'm sorry, is Florida an open carry

15   state, is that -- was that your question?

16        Q.   Yes, sir.

17        A.   Generally, no.

18        Q.   Okay.  If Florida Carry is not an

19   open carry state --

20             MR. FRIDAY:  Object to form.

21             Bob, do you want to rephrase what you

22        said, because that's not even going to

23        work.

24   BY MR. SWITKES:

25        Q.   I didn't even ask it yet, so --

Page 94

1      A.   You asked if Florida Carry is a

2   state.

3      Q.   Okay.  An open carry -- thank you for

4   correcting me.  It's late on a Friday

5   afternoon.

6      A.   Understandable.

7      Q.   Open carry is not the law in the

8   State of Florida, correct?

9      A.   Well --

10         MR. FRIDAY:  Object to form.

11         THE WITNESS:  -- it is when you are

12      hunting, camping, fishing, at your own

13      home, or at a range or going to and from

14      any of those activities.

15   BY MR. SWITKES:

16      Q.   Okay.

17      A.   Also with a long gun in -- in your

18   vehicle.

19      Q.   Okay.  Other than that, this is not

20   an open carry state, like Texas is; correct?

21      A.   Funny enough, Texas wasn't really an

22   open carry state until fairly recently.

23   They're one of the more restrictive in that

24   they require a license to open carry a

25   handgun, but no license to open carry a rifle.

1   Open carry rifle has always been legal in

2   Texas.

3       Q.    And so if officers believe that six

4   individuals, or five individuals

5   (inaudible) --

6           MR. FRIDAY:  Object to form.

7           THE COURT REPORTER:  I'm sorry, I

8       need that question again because it was

9       broken up.

10          MR. SWITKES:  I don't know if I'm

11      going to say it correctly.  What did you

12      get to, Sonnia?

13          (Question read back.)

14  BY MR. SWITKES:

15      Q.    -- are on a pier and have open carry

16  weapons visible to the public who have now

17  called their attention to it and are concerned

18  and in fear of those individuals, that doesn't

19  create reasonable suspicion in your mind?

20          MR. FRIDAY:  Object to form.

21          THE WITNESS:  Again, there is case

22      law out of South Florida that an

23      unreliable tip that someone is armed does

24      not justify a stop.  Even -- even if they

25      were concealing it and that was even

Page 96

1        before licensure became an element of the

2        crime, when it was just an affirmative

3        defense, it always went to the totality of

4        the circumstance whether or not it is more

5        likely than not that someone is breaking

6        the law.

7   BY MR. SWITKES:

8        Q.   What about reasonable suspicion,

9   you're saying officers don't have reasonable

10  suspicion when it's reported that individuals

11  saw five armed men on the pier and they're

12  afraid of them --

13           MR. FRIDAY:  Object to form.

14           THE WITNESS:  So it's my

15       understanding that the park -- that the

16       city employee, the park -- the park ranger

17       reported the men on the pier.  I did not

18       -- I was not aware that he said that he

19       was in fear of them, because he came out

20       and had quite a -- quite a long and

21       friendly conversation with our -- with our

22       members out there, that's on the video.

23       So I'm not sure where this -- this report

24       that someone was in fear is coming from.

25  BY MR. SWITKES:

Page 97

1      Q.    You think that the park ranger just

2  happened to show up on the pier or that

3  somebody called his attention to the people on

4  the pier with weapons?

5          MR. FRIDAY:  Object to form.

6          THE WITNESS:  I'm -- I'm not going to

7      speculate on -- I wouldn't have knowledge

8      of that.

9  BY MR. SWITKES:

10     Q.    According to the complaint,

11 notification was given to the City of Miami

12 Beach approximately three weeks prior to

13 June 24, 2018, do you now know that's not the

14 case?

15         MR. FRIDAY:  Object to form.

16         THE WITNESS:  No, I don't know that

17     that's not the case, whether they

18     successfully read it or not.  You know,

19     giving notification and whether or not you

20     read it are two different things.  I think

21     you deal with that a lot in legal practice

22     where notifications are sent.  It doesn't

23     matter if it's read or not.  You got

24     things like the mail rule, the email rule,

25     and, you know, here we're dealing with law

Page 98

1      enforcement and attorneys --

2   BY MR. SWITKES:

3      Q.   I don't understand what that shrug

4   means.

5      A.   I'm sorry?

6      Q.   I don't understand what your shrug

7   meant.  You answered -- you started giving an

8   answer and then you shrugged your shoulders,

9   which I told you the court reporter can't --

10     A.   That was to indicate that -- that --

11  the shrug was to indicate that I'm surprised

12  that you asked -- are confusing the difference

13  between a notification and whether or not that

14  notification gets read.

15          You're asking -- you're saying that

16  they didn't get the notification.  Actually

17  their email server logs prove that they did in

18  fact receive it.  Whether or not they read it

19  is another issue.

20          But did they receive the

21  notification, I think they've actually

22  admitted that they received it, it's just

23  whether or not they read it.

24     Q.   So the evidence is, is that the

25  format that Mr. Philpot sent it in somehow

1   could not be opened, that's what the evidence

2   is, that's --

3       A.   Right.  And -- and if -- and if they

4   were unable to read it then that's certainly

5   regrettable.

6       Q.   Certainly you understood when I told

7   you before that poor Sonnia is trying to take

8   us down simultaneously and that can't happen.

9       A.   I'm -- I'm sorry, that was a little

10  muffled or...

11      Q.   You are talking over my question.

12  Both of us can't talk at the same time.

13      A.   Wasn't my intent.  There may have

14  been some delay.

15      Q.   Okay.  So wait until you see me stop

16  talking and then you can give your response,

17  okay?

18      A.   Certainly.

19          THE COURT REPORTER:  Mr. Switkes,

20      what's happening is you're continuing with

21      your question and when he starts talking,

22      he just cuts you off, so I'm not getting

23      the end of your question because I can't

24      hear it, it's not because there are two

25      voices.

1          MR. SWITKES:  Okay.  So in this

2     method you're just cutting off my

3     question, which is not going to be any

4     worse than actually talking over me but

5     it's the same thing, she can't get us both

6     down.  So please give me the courtesy of

7     letting my question be completely asked

8     before you interrupt, okay?

9          THE WITNESS:  Certainly.  It was not

10     my intent, I apologize.

11  BY MR. SWITKES:

12     Q.   Okay.  The evidence, as indicated in

13  Mr. Philpot's deposition is, the method he

14  used to send it could not be opened by either

15  the city attorney or the police department.

16  There's a difference between receiving

17  something and not reading it and a message

18  being sent in a form that can't be opened,

19  would you admit that?

20     A.   Yes.

21     Q.   Okay.  You admit that all of the

22  Florida Carry members that were there, except

23  Mr. Devine, had firearms, correct?

24     A.   To the best of my knowledge.  I

25  haven't taken an inventory of what they were

Page 101

1    carrying or weren't carrying.

2        Q.   Well, that's in the complaint that

3    you have filed, sir.

4        A.   Again, that -- that's for their

5    individual part of the complaint.  I'm -- I'm

6    testifying what I have actual knowledge of.

7        Q.   Well, Florida Carry is the plaintiff

8    in this case, sir.

9        A.   I'm sorry, you -- you cut off.

10       Q.   Florida Carry is a Plaintiff in this

11   case and those are the communal facts that

12   have been pled, sir, are you aware of that?

13       A.   If -- if -- if that was a part of the

14   facts in common then that -- you know, then so

15   be it.  I am merely stating that I did not

16   keep an inventory of what -- of precisely who

17   was carrying what.

18       Q.   All you have to do is look at your

19   complaint, sir, but let's move on to the next

20   one.

21       A.    In that case I believe the complaint

22   speaks for itself.

23       Q.   Okay.  In another section you talk

24   about photos of the serial numbers of the

25   weapons was taken.  And you believe that's a

Page 102

1    violation of their rights?

2        A.   Yes, we have a -- a statute that --

3    that prohibits -- no more can you necessarily

4    take photos of -- of people's firearm serials

5    -- serial numbers, than can an officer turn

6    around their television set to take pictures

7    of the serial numbers on the back of the TV.

8        Q.   Under 790 officers have a right to do

9    a reasonable investigation as to whether the

10   person's a felon, don't they?

11           MR. FRIDAY:  Object to form.

12           THE WITNESS:  I think you're calling

13       for a legal conclusion, but I would -- but

14       I would say that would be given the

15       totality of the circumstance if there's

16       been -- if something has given rise to a

17       reasonable suspicion that someone may be a

18       felon.  You can't just assume that people

19       are felons because you see them.

20   BY MR. SWITKES:

21       Q.   Do officers have a right to determine

22   whether or not there's an outstanding domestic

23   violence injunction against individuals open

24   carrying?

25           MR. FRIDAY:  Object to form.

Page 103

```
1              THE WITNESS:  There are many things
2         that people with injunctions against them
3         can't do.  Just because you see someone
4         doing something that could be potentially,
5         hypothetically enjoined by a court doesn't
6         mean that you can search everyone.
7    BY MR. SWITKES:
8         Q.   Could you answer my question?
9              MR. FRIDAY:  I believe he did, Bob.
10   BY MR. SWITKES:
11        Q.   Would the officers have a right to
12   determine someone open carrying, whether they
13   have a domestic violence injunction against
14   them, yes or no?
15             MR. FRIDAY:  Object to form.
16             THE WITNESS:  Not -- not without some
17        reasonable suspicion that this is a person
18        who is the subject of a domestic violence
19        order, then no.
20   BY MR. SWITKES:
21        Q.   Do they have the right to verify
22   whether the person has an active fishing
23   license?
24             MR. FRIDAY:  Object to form.
25             THE WITNESS:  Depending on the day,
```

1          perhaps.  If there -- and I'm not sure on

2          the exact FWC law whether that's

3          enforceable by local officials or not.

4               There are some state statutes that

5          are not necessarily enforceable by local

6          police officials.  I'd have to know more

7          about that.  I think it kind of calls for

8          a legal conclusion, though.

9     BY MR. SWITKES:

10         Q.   One of the members that day had a

11    concealed weapon, do they have a right to

12    check whether they have an active and current

13    concealed firearms license?

14              MR. FRIDAY:  Object to form.

15              You can answer.

16              THE WITNESS:  Not without more, no.

17              In fact, we just had a case on

18         exactly that point out of the -- out of

19         the 1st DCA.

20    BY MR. SWITKES:

21         Q.   You mentioned before that the pier

22    was closed and you gave the reason being that

23    it was specifically so your members that were

24    there on June 24, 2018 couldn't fish any

25    longer.  What is that based on?

Page 105

1      A.   I'm not saying it's so they couldn't

2  fish any longer.  I'm saying it was to disrupt

3  their right to assembly, and including going

4  fishing while they were doing so.

5           But, yeah, they closed the pier and

6  did not reopen it until everyone who they

7  suspected to be our members left.  Once they

8  left someone else, who they were not aware of

9  who was affiliated with us, reported that the

10  pier was reopened once everyone that they knew

11  about left.

12     Q.   Who is that?

13     A.   The police --

14     Q.   No, no, no, who was the person that

15  reported that they waited for all of the

16  Florida Carry members to leave before they

17  reopened?

18     A.   I do not recall the name off the top

19  of my head.  I'd have to go back and -- I'd

20  have to go back and research that.

21     Q.   You have documents to that effect?

22     A.   I'm sorry?

23     Q.   Do you have any documentary evidence

24  of that?  Email?

25     A.   I've -- I've -- I've got -- I spoke

1    to them on the phone.  I don't know that I

2    have any video or anything along those lines.

3        Q.   I'm not talking about video, I'm

4    talking about some communication, email, fax,

5    text message?

6            THE WITNESS:  Eric, I think you're

7        going to have privilege here.

8            MR. FRIDAY:  Sorry.  Object --

9        objection, attorney/client privilege if

10       it's something I told him, Bob --

11           MR. SWITKES:  No, no, I'm not talking

12       -- he didn't indicate that Eric Friday was

13       there and saw that the pier was reopened.

14       He specifically referred to an individual

15       that contacted him that he was there and

16       that the pier was reopened after it was

17       certain that all of the Florida Carry

18       members had left, it's the person that

19       gave him that communication, not you,

20       Mr. Friday.

21           MR. FRIDAY:  Oh, I got you.

22           Mr. Caranna, do you -- do you

23       remember if somebody other than myself

24       gave you some information about whether or

25       not the pier was reopened?

```
 1              THE WITNESS:  I -- I believe we were

 2       both talking to this individual at the

 3       same time.  It's been a while.

 4  BY MR. SWITKES:

 5       Q.   My question was:  Do you have an

 6  email, fax, text message or anything to

 7  indicate who that individual was?

 8       A.   I don't know for sure.  I'd have to

 9  search my records.  I will search my records.

10  I will make sure that anything that I have

11  gets to Eric and we --

12              MR. FRIDAY:  Bob, just -- sorry, go

13       ahead, Mr. Caranna.

14              THE WITNESS:  Yeah, and -- and we can

15       just move forward with that as

16       appropriate.

17              MR. FRIDAY:  Mr. Switkes, I honestly

18       do not recall where that information came

19       from.  I will check my notes as well and

20       as long as it's something that's not

21       privileged or I can identify the exact

22       source -- it may even have been from one

23       of your documents or news report, I don't

24       recall exactly.  But I will see if I can

25       find the underlying basis for that
```

Page 108

1        allegation in the complaint and let you at

2        least know where it came from or that it's

3        privileged in some way and give you a

4        privilege log on it.

5             MR. SWITKES:  I don't think the

6        identity of the person can possibly be --

7             MR. FRIDAY:  I don't -- I don't

8        remember.

9             MR. SWITKES:  Okay.

10             MR. FRIDAY:  It may be, I -- I just

11        don't remember.  I will find out and get

12        you some answer somehow of some type on

13        that particular question as to basis for

14        that allegation.

15             THE WITNESS:  I will say this, there

16        were a number of voices on the phone that

17        day with us getting a lot of information

18        very quickly, so -- so it may be hard to

19        sort out, but I will see if we took any

20        specific notes on that.

21   BY MR. SWITKES:

22        Q.   Just so you're aware, Mr. Friday is

23   aware, that Rule 26 requires you to produce

24   that information even if it hadn't been

25   originally produced --

1    A.    Sure.

2    Q.    -- so you'll do that and we'll move

3 on.

4    A.    Certainly.  Your -- your question

5 spurred that memory, so we -- we will

6 certainly look into it.

7    Q.    Are you aware of any of the fishermen

8 or anywhere of any Florida Carry members that

9 stayed in Miami Beach and fished after the

10 incident with the police officers?

11    A.    I really didn't keep track of their

12 subsequent -- their subsequent activities,

13 except for the event that we had a few weeks

14 later.

15    Q.    Okay.  So you're unaware of the fact

16 that one of the members of Florida Carry that

17 was there that day went out onto the jetty and

18 fished after the incident?

19    A.    I am -- I am aware of that one.

20    Q.    Do you know who that individual was?

21    A.    I don't recall off the top of my head

22 which one it was.

23    Q.    There's another allegation that the

24 City of Miami Beach had a policy of detaining

25 lawfully armed citizens, what basis do you

Page 110

1    have for that allegation?

2        A.    The chief's public statements that

3    they would continue to do as they did to our

4    lawfully armed members.

5        Q.    But my question is preceding the

6    event on June 24, 2018, the allegation is that

7    the City of Miami Beach had a policy and

8    practice of unlawfully detaining armed

9    citizens, do you have any factual basis for

10   that allegation, sir?

11       A.    The statements of the police chief

12   that -- that what they did was consistent with

13   their policy.

14       Q.    So the answer is you have no

15   individual circumstances that you're aware of

16   that the City of Miami Beach detained someone,

17   an armed citizen, prior to June 24, 2018 and

18   that was the policy?

19            MR. FRIDAY:   Object to form.

20            You can answer.

21            THE WITNESS:   I'll -- I'll have to

22       look at the case, but there is a previous

23       case where City of Miami Beach unlawfully

24       stopped someone who was -- who was

25       carrying and that was one of the DCA

Page 111

1       cases.  So, yeah, it's not unprecedented

2       there.

3              And given the statements of the chief

4       of police saying that what they did was

5       consistent with their existing policy,

6       that certainly leads me to believe that if

7       the chief says it's consistent with their

8       existing policy, then that means that it

9       predated the moment that they arrived on

10      the pier.

11  BY MR. SWITKES:

12      Q.   But my question is:  Do you have any

13  facts of any time the City of Miami Beach had

14  a policy of detaining armed citizens other

15  than your supposition on what the chief said?

16             MR. FRIDAY:  Object to form.

17             You can answer.

18             THE WITNESS:  I'm -- I'm not aware

19      of, off the top of my head, of any

20      specific arrest other than -- and, again,

21      I'm a little fuzzy on the case I read but

22      I believe it was Miami Beach where this

23      had previously happened.  So I think the

24      facts of a case is certainly referenceable

25      as reliable facts on an appellate case.

Page 112

1    BY MR. SWITKES:

2         Q.   Are you aware of any other Florida

3    Carry event where notification was given to a

4    municipality but the notification was

5    ineffective like it was in the case that we're

6    talking about?

7              MR. FRIDAY:  Object to form.

8              You can answer.

9              THE WITNESS:  Yeah, the -- Freeman v.

10       Tampa.

11   BY MR. SWITKES:

12        Q.   So that Tampa case was before the

13   City of Miami Beach case?

14        A.   Yes.

15        Q.   And what was the problem with the

16   notification in the Tampa case?

17        A.   No, there was no problem with the

18   notification other than the fact that -- that

19   after years of us submitting them -- or our

20   local representative submitting them a monthly

21   notification they asked us to stop sending the

22   notification because they well knew that this

23   was legal and there was an incident where two

24   -- two officers got a little overzealous and

25   came out and seized one of my members

1   illegally.

2       Q.   And that was not because the

3   notification was sent and it couldn't be

4   opened.  That was because you ceased sending

5   the notifications because they told you to,

6   that's my understanding of what your answer

7   just was.

8       A.   No, it's not because we ceased

9   sending the notifications.  It was because

10  they failed to properly train their officers

11  despite the notifications that they said that

12  they no longer needed for us to send.

13      Q.   So try to follow me, let's try to

14  nail down this one question that I've asked a

15  couple of times and we're not getting an

16  answer.  Maybe it's my question, so I'll be

17  glad to rephrase it.

18          Are you aware of another circumstance

19  where Florida Carry had an event and sent

20  notification to the municipality but the

21  notification could not be opened by the

22  municipality, yes or no?

23          MR. FRIDAY:  Object to form.

24          THE WITNESS:  No.

25  BY MR. SWITKES:

Page 114

1      Q.   Do you have any information about the

2  sign that was on the pier that day?

3      A.   I believe we have a picture of it.

4           It appears to be far newer than the

5  preemption law.

6      Q.   And do you have any photographs of

7  any other sign in the City of Miami Beach at

8  or around before the time of this event?

9      A.   I have not searched my records for --

10 for any previous violations with that.

11 Certainly I can conduct that review.

12     Q.   The signs, the signs themselves, do

13 you have pictures of any other signs posted

14 regarding the -- any weapons on public areas

15 of Miami Beach other than the one sign on the

16 pier that day?

17          MR. FRIDAY:  Object to form.

18          You can answer.

19          THE WITNESS:  Again, I have not

20      searched for possible signs at other

21      locations throughout the city, I haven't

22      searched my records for that.  We get

23      literally hundreds -- in the early days,

24      maybe 2010/2011, we used to get hundreds

25      of these types of pictures every couple of

1        months.  Lately we get far fewer because

2        we've had a lot of those signs taken down.

3              Whether I have any records of that,

4        not something that I've been searching in

5        the context of this case up to now, but

6        happy to conduct a records' review and

7        find out if we have any others.

8              MR. SWITKES:  Please do.  It's

9        specifically for signs in the City of

10       Miami Beach on the date of June 24, 2018

11       and/or prior to that date regarding

12       weapons, and specifically citing Florida

13       Statute 790.  If you have any of those

14       photographs please forward them to

15       counsel.

16             THE WITNESS:  I will.

17             MR. SWITKES:  Thank you so much.

18   BY MR. SWITKES:

19       Q.   In regard to -- we touched on this

20   before, terrorist acts, an officer approaching

21   someone with a weapon, I think we can agree

22   that you cannot identify a terrorist by

23   looking at them, they come in different shapes

24   and sizes, wouldn't that be fair to say?

25             MR. FRIDAY:  Object to form.

1          THE WITNESS:  Not -- not always.

2   BY MR. SWITKES:

3      Q.   I don't understand what that means.

4      A.   You asked if you can identify a

5   terrorist by looking at them and I responded,

6   not always.

7      Q.   Sometimes?

8      A.   Yes, sometimes you can.

9      Q.   Okay.  And what would be the

10  prototype of a terrorist?

11     A.   The gentleman with a --

12          MR. FRIDAY:  Object to form.

13          THE WITNESS:  -- suicide bomb vest on

14      holding a -- a wired placard in his hand

15      with certain writing adorning his clothing

16      is usually a dead giveaway.

17  BY MR. SWITKES:

18     Q.   You've also seen individuals like

19  that that have decided they want to die at the

20  hands of the authorities, too, correct?

21  You're aware of those cases?

22     A.   I'm -- I'm -- I'm sorry, you were a

23  little bit muffled there.

24     Q.   Are you aware of cases of people

25  holding phoney bomb kits and essentially --

Page 117

1    you've heard the term suicide by cop?

2         A.   It's pretty -- it's pretty rare.

3    Never heard of it being done in a group of

4    people, but I'm -- I'm aware of suicide by

5    cop.  I don't know that I recall anyone

6    adorning themselves with a mock suicide vest,

7    but I wouldn't be surprised to learn that that

8    had happened at some point.  There are some --

9         Q.   (Unintelligible).

10        A.   -- there are of course some crazy

11   people out there.

12        Q.   Okay.  And by acknowledging that,

13   would you admit that policing is a very, very

14   very difficult job?

15             MR. FRIDAY:  Object to form.

16             THE WITNESS:  It -- it certainly is a

17        difficult job.

18   BY MR. SWITKES:

19        Q.   And I think your previous statement

20   was that security concerns for a port are only

21   as to secure areas.

22             MR. FRIDAY:  Object to form.

23             THE WITNESS:  Everywhere has a secure

24        concern, my home, the -- the oak tree down

25        the street, it'd have security concerns.

Page 118

1          It's just whether or not something is a

2          designated -- a designated sensitive

3          place.

4     BY MR. SWITKES:

5          Q.    I didn't quite get the analogy about

6     the oak tree down the street, you want to

7     explain that one to me?

8          A.    Your question was if a place can have

9     a security concern.  Any place could have a

10    security concern.  My -- my attorney here is a

11    -- is an Auburn grad and they have a -- they

12    had a huge security concern with the poisoning

13    of some trees on the university campus a few

14    years ago.  So any place can have a security

15    concern.

16         Q.    Would you say that some place --

17    places have higher security risks than others?

18         A.    Of course.

19         Q.    And would you agree that a port has a

20    far greater security concern than you used the

21    analogy of driving down the street, any

22    street?

23              MR. FRIDAY:  Object to form.

24              THE WITNESS:  Actually I was talking

25          about the waterway leading to the port

Page 119

1       with that analogy, to be fair.  But, yes,

2       it is -- it is a -- any piece of

3       infrastructure is certainly a place where

4       you have -- where you have certain

5       security precautions, just like the road.

6  BY MR. SWITKES:

7       Q.   Have you gone to a sporting event any

8  time in the last ten years?

9       A.   Yes.

10       Q.   Have you encountered that going into

11  a stadium, they have metal detectors, they

12  have pat-downs, and they require people to

13  only carry in Ziploc food bags and they

14  require every woman to have their pocketbook

15  checked?

16           MR. FRIDAY:  Object to form.

17           THE WITNESS:  Some do; some don't.

18       That -- not in all cases.

19  BY MR. SWITKES:

20       Q.   Which major stadium that you've

21  attended didn't have all of those procedures?

22       A.   I'm sorry, you -- you didn't ask me

23  if I went to a major stadium.  You asked me if

24  I had attended any sporting events, as I

25  recall.

Page 120

1      Q.   I assume that those kind of

2   procedures aren't at a high school baseball

3   game.  I'm specifically referring to a

4   professional sport where it's a major stadium.

5           Have you experienced going through

6   the security at a major sporting event like

7   that?

8           MR. FRIDAY:  Object to form.

9           THE WITNESS:  I think in the past ten

10      years I've been to one football game,

11      however, I regularly go to the minor

12      league baseball games, that is a

13      professional sport and rarely is there any

14      -- that type of security.

15   BY MR. SWITKES:

16      Q.   But the one time that you went was to

17   what stadium?

18      A.   It was Jacksonville.

19      Q.   And you went to go see the

20   Jacksonville football team?

21      A.   Jaguars versus Texans.

22      Q.   And did you go through a security

23   check similar to what I described previously

24   which is what I was referring to?

25      A.   No, I don't recall any magnetometers.

Page 121

1    They did have someone looking in bags, but

2    mostly taking away people's outside snacks.

3        Q.   Did they pat you down?

4        A.   No.

5        Q.   Okay.  Are you aware that that's the

6    NFL protocol at this time?

7        A.   I'm not aware of their policies and

8    procedures.

9        Q.   And would you think that that is

10   maybe different -- how old are you, sir?

11       A.   I'm 46.

12       Q.   So did you ever go to a major

13   sporting event in your childhood?

14       A.   Yes.

15       Q.   Would you say that the security

16   procedures are very different now than they

17   were when were you a child?

18       A.   Absolutely.

19       Q.   And that's predicated upon the fact

20   that we've had terrorist acts and threats in

21   this country that have made many, many venues

22   more conscious of security than they were when

23   you were a child?

24            MR. FRIDAY:  Object to form.

25            THE WITNESS:  This -- this is true,

Page 122

1       however, at none of these places do we

2       merely presume that everyone is a

3       terrorist.

4   BY MR. SWITKES:

5       Q.   I think that's a fair assumption

6   but --

7       A.   And terrorists who are attempting to

8   infiltrate such a place take -- go to great

9   lengths to conceal their weapons, bombs,

10  whatever they intend to use to kind of -- to

11  conduct an attack.  You -- you don't see,

12  outside of, you know, you -- you don't see a

13  stealthy terrorist attack by someone

14  advertising, hey, look, I have a gun, that --

15  that just doesn't happened.

16      Q.   Very interesting observation.

17           Are you aware of the attack at

18  Parkland High School in Broward County?

19      A.   I am aware of that fact.

20      Q.   And are you aware of the individual

21  who committed that atrocity dressing like a

22  terrorist?

23      A.   I'm not -- I am not familiar with his

24  exact manner of dress that day.

25      Q.   Do you remember what he was

1    carrying --

2        A.    What -- what --

3        Q.    -- as he went into the school?

4        A.    I'm sorry?

5        Q.    Do you remember what he was carrying

6    as he went into the school?

7        A.    From what I understand, there was a

8    duffle bag full of guns which then he produced

9    a firearm from the duffle bag.

10       Q.    Okay.  And when he was in the school

11   did he take out a long rifle?

12       A.    Yes, he removed it from the

13   concealing bag and then committed an atrocity.

14       Q.    And we've had Columbine, correct,

15   you're aware of that circumstance?

16       A.    Yes, the gentlemen who concealed

17   their firearms in their trench coats.

18       Q.    And you're aware of the fact that --

19       A.    Well, I'm sorry, can I strike calling

20   them gentlemen, 'cause they're not.

21       Q.    Okay.  You're aware of an elementary

22   school being attacked by another individual in

23   Connecticut?

24           MR. FRIDAY:  Objection, object to

25       form.

Page 124

```
 1              Go ahead and answer.
 2              THE WITNESS:  Yes, I'm -- I'm aware
 3         of a number of horrific acts by sick, sick
 4         people.
 5    BY MR. SWITKES:
 6         Q.   And certainly one can't tell the
 7    sanity of the individual just by looking at
 8    them, correct?
 9         A.   No, sir, I cannot tell your sanity by
10    sitting here looking at you anymore than you
11    can tell mine or someone walking down the
12    street.
13         Q.   And, therefore, in this era of many,
14    many instances of terrorism, I don't have to
15    go through all of them, there's a heightened
16    sense of security in public places, especially
17    where large people -- large amount of people
18    are going to gather or go through a
19    thoroughfare; wouldn't that be fair to say?
20              MR. FRIDAY:  Object to form.
21              THE WITNESS:  I believe that
22         Mr. Jefferson said it best when he said
23         that anyone who would give up essential
24         liberties for -- and I'm paraphrasing a
25         bit, but -- but for some temporary sense
```

1       of security deserves neither.

2            No, I don't -- I don't believe that

3       we give up our First Amendment, Second

4       Amendment, Fourth Amendment, Article 1,

5       Section 23; Article 1, Section 12;

6       Article 1, Section 8, Florida

7       Constitution, I don't believe we give up

8       all of those rights because there is some

9       instability in the world.  In fact, I

10      think that makes those rights even more

11      important.

12  BY MR. SWITKES:

13      Q.   I believe my question was:  Would you

14  agree that some areas where large numbers of

15  people are going to be using a thoroughfare,

16  security concerns are greater than one would

17  have in one's own home?

18           MR. FRIDAY:  Object to form.

19           THE WITNESS:  No, I take -- I take

20      the security of my own home very

21      seriously.  There is no place, I think,

22      that has a higher security necessity than

23      my home.  That is part of the castle

24      doctrine, is it not?

25  BY MR. SWITKES:

1      Q.   I think the question presupposes that

2    there are going to be areas, airports, ports,

3    stadiums, where there are going to be tens of

4    thousands of people and one presumes you don't

5    have that amount of people in your home, would

6    that be a fair statement?

7            MR. FRIDAY:  Object to form.

8            THE WITNESS:  No, there are not tens

9        of thousands of people in my home.

10   BY MR. SWITKES:

11     Q.   And so, therefore, in terms of the

12   threat assessment, since you were in the

13   military, certain locations have greater

14   threat assessments than one's home, wouldn't

15   that be fair to say?

16           MR. FRIDAY:  Object to form.

17           Go ahead.

18           THE WITNESS:  Depending on the -- on

19       the location there is a -- there is a full

20       analysis that goes into that.

21   BY MR. SWITKES:

22     Q.   I think that was almost a yes?

23           MR. FRIDAY:  Object to form.  He's

24       asked -- he's answered the question.  If

25       you want to ask it a different way.

1                   THE WITNESS:  Yeah, please rephrase

2          because you're asking about no particular

3          place at all, you're just saying a place

4          with a lot of people, does that deserve

5          more security than your home.  And if

6          that's the question, then I would say no,

7          my home gets the utmost security.  So

8          please re-specify the question.

9    BY MR. SWITKES:

10         Q.   I indicated specifically a port, an

11   airport, a professional football stadium where

12   large numbers, tens of thousands of people are

13   going to be assembled, those create unique

14   terrorist assessment and threats that are much

15   greater than in one's home, would you agree

16   with that or not?

17              MR. FRIDAY:  Object --

18              THE WITNESS:  Yes.

19   BY MR. SWITKES:

20         Q.   There we go.

21              Do you have police officers that are

22   members of your organization?

23         A.   We do not discuss our individual

24   members.  That is -- that is -- they have, in

25   Article 1, Section 23, right to privacy in

Page 128

1   their association, then through the

2   organization we assert -- we assert that as

3   their associational right to privacy and

4   privilege.

5        Q.   I didn't ask you the name of any of

6   your members.  I asked you generically, do you

7   have law enforcement members of your

8   organization, yes or no?

9            MR. FRIDAY:  Objection; asked and

10       answered.  He's told you he's not going to

11       give demographics, right of associational

12       privacy.  Whether or not we have police

13       officer members is a privileged matter for

14       the organization under associational

15       privacy.

16           MR. SWITKES:  I couldn't disagree

17       more, Counsel.  If I asked him to identify

18       somebody by name, that generic question,

19       there's no way you can instruct him not to

20       answer, but we're not going to terminate

21       at this time, we'll take it up.

22           MR. FRIDAY:  Okay.

23   BY MR. SWITKES:

24        Q.   Would you agree that law enforcement

25   officers are often gun owners?

Page 129

1      A.   Yes.

2      Q.   Do you --

3      A.   Yes, quite often.

4      Q.   And you would not be surprised at law

5   enforcement officers being very strong

6   advocates for Second Amendment rights,

7   wouldn't that be fair to say?

8      A.   Many are.

9           MR. SWITKES:  I'm going to take a

10      five-minute break and I think we're going

11      to be close to finish.

12           MR. FRIDAY:  All right.  Thanks.

13           Be right back.

14           (Recess taken.)

15           MR. SWITKES:  Let's go back on.

16   BY MR. SWITKES:

17      Q.   After having reviewed the material

18   you have reviewed, do you have any particular

19   complaints about any of the individual

20   officers that are named in this lawsuit?

21      A.   Particular --

22           MR. FRIDAY:  Object to form.

23           Go ahead and answer.

24           THE WITNESS:  -- about the individual

25      officers.  Certainly, their -- their

Page 130

1       treatment of our members, their disruption

2       of our event, and denial of our access to

3       the pier after they were crystal clear

4       that no laws had been broken.

5   BY MR. SWITKES:

6       Q.   Well, do you know if it was the

7   officers that closed the pier?

8       A.   That is -- that is my understanding,

9   yes.

10      Q.   Which officer?

11      A.   I don't know if that's in the

12  complaint.  I don't recall off the top of my

13  head.

14      Q.   And do you know if the pier was

15  closed for the entire day?

16      A.   Based on the information I received

17  it was not closed the entire day.  Once our

18  members left -- once our members left the park

19  it was reopened.

20      Q.   When?  At what time?

21      A.   I do not know the exact time off the

22  top of my head.

23      Q.   Were your members still present when

24  it was reopened, sir?

25      A.   From what I understand, we did have a

Page 131

1    member who was not involved in the incident

2    who was present at the time when it was

3    reopened.

4         Q.   And who was that?

5         A.   I'm going to get you that information

6    as soon as I can pull it up.

7         Q.   Okay.

8         A.   I'll submit that through counsel.

9         Q.   Okay.  I'm not going to wait for

10   that.

11        A.   It won't be long.

12        Q.   You're aware of the fact that

13   officers many times, when they make arrests,

14   people cite their innocence?

15            MR. FRIDAY:  Object to form.

16            THE WITNESS:  I suppose.

17   BY MR. SWITKES:

18        Q.   Are you aware of many times people

19   give phoney proof of IDs to officers?

20            MR. FRIDAY:  Object to form.

21            THE WITNESS:  I think I've seen a

22        fake ID a time or two when I -- when I did

23        some extra work as a doorman at the

24        Houston Rodeo.

25   BY MR. SWITKES:

Page 132

1      Q.   And with regularity people, young

2  people going into bars seem to have access to

3  IDs that make them older than they really are?

4      A.   It's gotten a lot harder now than it

5  used to be.  The IDs have a lot of

6  anti-counterfeiting features that didn't exist

7  decades ago, so that's getting a lot harder to

8  have a decent ID that -- especially, you know,

9  that, you know, that would -- that would fool

10  even a clerk or a doorman.

11      Q.   Are you aware that officers often

12  encounter people who say they are doing

13  something absolutely legal when in fact they

14  are committing crimes?

15          MR. FRIDAY:  Object to form.

16          THE WITNESS:  I -- I'm sure that

17      happens regularly.

18  BY MR. SWITKES:

19      Q.   And are you aware of the fact that

20  officers oftentimes make an independent

21  verification of the claims of the individuals

22  before -- after detaining them until they let

23  them go?

24          MR. FRIDAY:  Object to form.

25          THE WITNESS:  If you've lawfully

Page 133

```
 1      detained someone that necessarily means
 2      that you have a suspicion that they're
 3      committing a crime.  Exercising a Second
 4      Amendment fundamental right isn't --
 5      doesn't give rise to reasonable suspicion
 6      that a crime is being committed.
 7           I'm -- I'm sorry, I'm not following
 8      the -- the question if you're asking for
 9      something else.
10  BY MR. SWITKES:
11      Q.  Well, the question is pretty simple,
12  if you're going into your discussion of your
13  thought process of what is a reasonable
14  suspicion of an officer.  Officers oftentimes
15  are faced with unpredictable events and have
16  to make split-second decisions; are you aware
17  of that?
18           MR. FRIDAY:  Object to form.
19           THE WITNESS:  I am aware.
20  BY MR. SWITKES:
21      Q.  And are you aware of the fact that
22  sometimes the individuals, what appears to be
23  innocent actions, could in fact be very
24  dangerous criminal incidents?
25           MR. FRIDAY:  Object to form.
```

Page 134

```
 1                THE WITNESS:  I would say you could
 2        make that observation about anyone doing
 3        anything at anytime.  That doesn't give --
 4        just the fact that someone could
 5        potentially be violating a law doesn't
 6        give rise to an investigatory detention,
 7        stop, arrest or harassment because there's
 8        a hypothetical that it's possible that
 9        someone may be breaking the law or
10        thinking about breaking the law or maybe
11        broke a law once in their life.
12  BY MR. SWITKES:
13        Q.   Do you think it's possible that
14  someone who wants to commit a criminal act
15  could take a fishing rod and put it in the
16  water and have a weapon and say they're
17  fishing when their actual purpose is to commit
18  a crime?
19                MR. FRIDAY:  Object to form.
20                THE WITNESS:  I'm not aware of that
21        ever happening, period.  I've studied
22        these laws back to the -- back to the
23        inception of these laws, back to the slave
24        codes, back to the pre-revolutionary war,
25        the Antebellum period, again, I've been
```

Page 135

1        certified as an expert on the legislative

2        history and statutory history behind these

3        laws, I've researched every case that's

4        available and every book, every secondary

5        source, accounts of legislators, their own

6        books from the 1800s till today, and I'm

7        aware of no cases where a hunter, a camper

8        or a fisherman used hunting, camping or

9        fishing in order to conceal their criminal

10       intent, beyond the occasional poacher who

11       was hunting without a license.  But, you

12       know, the gun had nothing to do with that

13       other than as a means to fish and game.

14            So, yeah, your hypothetical, is it

15       possible?  Many, many things are possible.

16            Is it reasonable to expect?  I think

17       not.

18            MR. SWITKES:  I move to strike as

19       totally unresponsive but interesting

20       observation of your knowledge.

21            MR. FRIDAY:  You asked about his

22       knowledge but okay.

23   BY MR. SWITKES:

24       Q.   Sir, officers are often faced with

25   circumstances that require there to determine

1   whether or not criminal activity has occurred,

2   correct?

3        A.   I'm sorry, can you repeat that.

4        Q.   Officers are often faced with

5   difficult circumstances in determining whether

6   criminal activity has occurred, wouldn't that

7   be a generic statement even you can agree to?

8             MR. FRIDAY:  Object to form.

9             THE WITNESS:  Certainly.

10  BY MR. SWITKES:

11       Q.   And six people on a pier where tens

12  of thousands of people are going to pass poses

13  a danger of some kind even you could agree to,

14  wouldn't you?

15            MR. FRIDAY:  Object to form.

16            THE WITNESS:  No, not at all.

17  BY MR. SWITKES:

18       Q.   Okay.

19       A.   I know of no incident where five guys

20  on a fishing pier with firearms ever caused

21  any sight of an incident sitting in a park on

22  a fishing pier just because they were within

23  eyeshot of -- of a port or --

24       Q.   Eyeshot?

25       A.   -- any -- any other sensitive place.

...Page 137

1              I'm sorry?

2       Q.    You used the term eyeshot?

3       A.    Yes, you can see it from a certain

4   place.

5       Q.    And in terms of eyeshot, how far are

6   the cruise ships from that pier?  Is it

7   something you have to really get a pair of

8   binoculars to observe?

9       A.    As -- as they pass out of the port

10  they're not so far, they're not that far from

11  the pier.  Neither are city buses as they

12  drive by, neither are cars, people walking

13  down the street or the other fishermen.

14      Q.    Do you (inaudible) any buses that

15  carry 10,000 people?

16      A.    I'm -- I'm sure it would take a

17  number of buses passing, but they pass with

18  much more regularity than cruise ships.

19             MR. SWITKES:  I have no further

20      questions, sir.

21             You have any questions, Counsel?

22             MR. FRIDAY:  Is Mr. Rosenwald not on?

23             MR. SWITKES:  No, Mr. Rosenwald is --

24      has no questions.

25             MR. FRIDAY:  Okay.  I have no

Page 138

1       questions.

2            MR. SWITKES:  Do you waive or read?

3            MR. FRIDAY:  We'll read.

4            MR. SWITKES:  Okay.  I'm ordering a

5       copy.

6            MR. FRIDAY:  All right.

7            MR. SWITKES:  Have a nice weekend.

8            THE WITNESS:  You as well.

9            (Deposition was concluded at 4:09

10      p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE
 2   STATE OF FLORIDA:
              :  SS.
 3   COUNTY OF MIAMI-DADE:

 4        I, SONNIA MARTINEZ, COURT REPORTER AND
     NOTARY PUBLIC, IN AND FOR THE STATE OF FLORIDA
 5   AT LARGE, DO HEREBY CERTIFY THAT SEAN CARANNA
     WAS BY ME FIRST REMOTELY DULY SWORN TO TESTIFY
 6   TO THE WHOLE TRUTH; THAT I WAS AUTHORIZED TO
     AND DID REPORT SAID DEPOSITION IN STENOTYPE;
 7   THAT THE FOREGOING PAGES, NUMBERED FROM 1 TO
     139, INCLUSIVE, ARE A TRUE AND CORRECT
 8   TRANSCRIPT OF MY SHORTHAND NOTES OF SAID
     DEPOSITION.
 9
              I FURTHER CERTIFY THAT SAID
10   DEPOSITION WAS TAKEN AT THE TIME AND PLACE
     HEREINABOVE SET FORTH AND THAT THE TAKING OF
11   SAID DEPOSITION WAS COMMENCED AND COMPLETED AS
     HEREINABOVE SET OUT.
12
              I FURTHER CERTIFY THAT I AM NOT AN
13   ATTORNEY OR COUNSEL OF ANY OF THE PARTIES, NOR
     AM I A RELATIVE OR EMPLOYEE OF ANY ATTORNEY OR
14   COUNSEL OF ANY PARTY CONNECTED WITH THE
     ACTION, NOR AM I FINANCIALLY INTERESTED IN THE
15   ACTION.

16        THE FOREGOING CERTIFICATION OF THIS
     TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION
17   OF THE SAME BY ANY MEANS UNLESS UNDER THE
     DIRECT CONTROL AND/OR DIRECTION OF THE
18   CERTIFYING REPORTER.

19        DATED IN MIAMI, MIAMI-DADE COUNTY,
     FLORIDA, THIS 12th DAY OF AUGUST, 2020
20

21

22

23   ------------------------
     SONNIA MARTINEZ, NOTARY PUBLIC
24   STATE OF FLORIDA, AT LARGE.
     MY COMMISSION #GG969119
25   EXPIRES:  03/12/2024
```

Page 140

1

2                    CERTIFICATE

3

4    THE STATE OF FLORIDA,

5    COUNTY OF BROWARD.

6

7

8         I hereby certify that I have read the

9    foregoing deposition by me given, and that the

10   statements contained herein are true and

11   correct to the best of my knowledge and

12   belief, with the exception of any corrections

13   or notations made on the errata sheet, if one

14   was executed.

15

16         Dated this _____ day of ___, 2020.

17

18

19

20

21

22         _____

23              (Deponent's name)

24

25