UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-CV-22303-KMW

Florida Carry, Inc., a Florida
not-for-profit corporation, et al.

                    Plaintiffs,

vs.

City of Miami Beach, et al.,

                    Defendants.
------------------------------------/


                1700 Convention Center Drive
                Miami Beach, Florida 33139
                Wednesday, January 29, 2020
                9:18 a.m. - 2:14 p.m.




            Video Deposition

          of Michael Taylor


     Taken before Sonnia Martinez, Notary
Public in and for the State of Florida at
Large, pursuant to Notice of Taking Deposition
filed in the above cause.

                - - - - - - -


Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com

```
 1   APPEARANCES:

 2    ON BEHALF OF THE PLAINTIFFS:

 3         Kingry & Friday
           1919 Atlantic Boulevard
 4         Jacksonville, Florida 32207
           By:  Eric Friday, Esquire
 5
      ON BEHALF OF THE CITY OF MIAMI BEACH:
 6
           City of Miami Beach,
 7         1700 Convention Center Drive
           4th Floor
 8         Miami Beach, Florida 33139
           By: Robert F. Rosenwald,
 9             Assistant City Attorney

10    ON BEHALF OF THE OFFICERS:

11         Switkes & Zappala, P.A.
           407 Lincoln Road
12         Penthouse SE
           Miami Beach, Florida 33139
13         By: Robert Switkes, Esquire

14   Also present:

15         Oliver Lee, Videographer
           Video Court Reporting
16              - - - - - - -

17              I N D E X

18   Witness:  Michael Taylor

19                   Direct/Redirect Cross/ReCross

20   By Mr. Switkes         4, 234

21   By Mr. Rosenwald                 228, 239

22

23

24

25
```

1              (The following was had.)

2         THE VIDEOGRAPHER:  Okay.  In the case

3    styled Florida Carry, Inc., versus City of

4    Miami Beach, et al.

5         Case Number 19-CV-22303-KMW.

6         This is the videotaped deposition of

7    Michael Taylor.

8         This deposition is taking place at

9    1700 Convention Center Drive, Miami Beach,

10   Florida on January 29, 2020.

11        The time is now 9:18 a.m.

12        Our videographer is Oliver Lee.

13        Counsel will state their appearances

14   for the record, after which our court

15   reporter, Sonnia Martinez, will then swear

16   in the witness.

17        MR. FRIDAY:  Eric Friday, counsel for

18   the Plaintiffs.

19        MR. SWITKES:  Bob Switkes on behalf

20   of the officers.

21        Rob.

22        MR. ROSENBERG:  Rob Rosenwald on

23   behalf of the City of Miami Beach, sorry.

24        THE WITNESS:  Michael -- Michael

25   Taylor.

Page 4

```
 1            THE COURT REPORTER:  Sir, raise your
 2       right hand, please.
 3            Do you swear the testimony you will
 4       give will be the truth, the whole truth
 5       and nothing but the truth, so help you
 6       God?
 7            THE WITNESS:  I do.
 8            THE COURT REPORTER:  Thank you.
 9                 DIRECT EXAMINATION
10  BY MR. SWITKES:
11       Q.   Sir, could you please state your full
12  name.
13       A.   Michael David Taylor.
14       Q.   And have you ever been known by any
15  other name?
16       A.   Yes.  Soloyaker.
17       Q.   Excuse me?
18       A.   Solo, S-O-L-O-Y-A-K-E-R.
19       Q.   And where does that name -- what does
20  that name derive from?
21       A.   YouTube.
22       Q.   And when did you start using that
23  name?
24       A.   Probably about four years ago when I
25  was a kayak fisherman.
```

```
 1      Q.   Have you used any other names?

 2      A.   Other than Mike, simple, like

 3  Michael, Mike.

 4      Q.   Okay.  And what is your address, sir?

 5      A.   Currently it's 1558 Southeast Royal

 6  Green Circle, R203.

 7      Q.   And what the city is that?

 8      A.   Port St. Lucie, Florida.

 9      Q.   And with whom do you reside at that

10  address?

11      A.   My wife.

12      Q.   And what is her name?

13      A.   Eric?

14           MR. FRIDAY:  Yeah.

15           THE WITNESS:  Okay.  Shawna Taylor,

16      and that's S-H-A-W-N-A.

17  BY MR. SWITKES:

18      Q.   And what is your place of birth, sir?

19      A.   Phoenix, Arizona.

20      Q.   And your date of birth?

21      A.   ███████████.

22      Q.   Sir, have you had your deposition

23  taken before?

24      A.   Never -- ah, never.

25           I had it -- something when I was 18,
```

 1   but I never took a deposition.  It was more

 2   like I went through a court process and

 3   whatever.

 4        Q.   But your deposition was not taken --

 5        A.   I've never -- I've never been in this

 6   process, ever.

 7        Q.   Okay.  For the purpose of this

 8   deposition, the court reporter sitting to your

 9   right is going to take down everything that's

10   said in this room, so it's important that you

11   give your answers orally.

12        A.   Okay.

13        Q.   That is to not shake your head or

14   point to your shoulder, cause the court

15   reporter can't take that down.

16        A.   So yes and nos and things of that

17   nature.

18        Q.   Yes.  Try not to say uh-huh --

19        A.   Uh-huh, yes and nos.

20        Q.   -- which many of us do, because we

21   can't understand what that means in a

22   transcript.

23             During the course of the deposition,

24   if you don't understand any of my questions

25   please ask me to rephrase it and I'll be glad

1    to do so.

2        A.   Okay.

3        Q.   Are you under the influence of any

4    medication, alcohol or drugs that would

5    prevent you from giving truthful testimony

6    today?

7        A.   No.

8        Q.   And if during the course of the

9    deposition you need a break, just let me know,

10   okay?

11       A.   Got it.

12       Q.   Okay.  Is Shawna your wife?

13       A.   Yes.

14       Q.   And when were you married?

15       A.   July 30, 2016.

16       Q.   Have you ever been married before?

17       A.   Never.

18       Q.   Do you have any children?

19       A.   Yes.

20       Q.   And what are their names and ages?

21       A.   ███████  ███████   and then -- she's nine

22   months old.  She keeps me awake at night.

23       Q.   That's her job.

24       A.   Yeah.

25       Q.   Any other children?

1      A.   A stepson.

2      Q.   And what is his name?

3      A.   Did you I need to refer that?

4           MR. FRIDAY:  Uh-huh.

5           THE WITNESS:  Okay.  ██████  ██████.

6   BY MR. SWITKES:

7      Q.   And I didn't hear the last name.

8      A.   ██████.

9      Q.   And how old is he?

10     A.   15.

11     Q.   Okay.  Could you give me the benefit

12   of your educational background?

13     A.   About two years of college -- high

14   school diploma, and two years of college,

15   didn't graduate.

16     Q.   Where did you go to high school?

17     A.   Atlantic High School.

18     Q.   And where is that located?

19     A.   Port Orange, Florida.

20     Q.   And what year did you graduate?

21     A.   1998.

22     Q.   And you said two years of post-high

23   school college, where was that?

24     A.   Daytona State College.

25     Q.   And when were you there?

1      A.   I believe it was in 2010.

2      Q.   And you were there from 2010 to --

3      A.   I believe 2012.

4      Q.   But you did not obtain a degree?

5      A.   No, I did not.

6      Q.   Any other educational training?

7      A.   No.

8      Q.   Have you ever been party to a

9   lawsuit?

10     A.   No.

11     Q.   This is the first lawsuit you've been

12  involved in?

13     A.   Ever.

14     Q.   And have you ever been a party to a

15  workmen's compensation claim?

16     A.   No.

17     Q.   Have you ever been arrested?

18     A.   Yes.

19     Q.   When were you arrested?

20     A.   1998 or -- I think it was 1998, '94

21  -- '97, I'm sorry, I was arrested then.

22          And then I was arrested for -- I want

23  to say in 2000, maybe 2001/2002.

24     Q.   Okay.  What was the arrest for

25  2097[sic] for?

Page 10

1      A.    '97 was for cocaine.  It was a list

2  of charges, I don't remember all the charges.

3      Q.    Give me the ones you do remember.

4      A.    It was cocaine and marijuana.

5      Q.    And was it possession or --

6      A.    Possession.

7      Q.    -- possession with the intent to

8  sell?

9      A.    I honestly don't remember, because I

10 went through so many court -- like my lawyer

11 took care of most of that, so I don't remember

12 much of it.  It was --

13     Q.    Well, what were amounts of drugs you

14 were had in possession of?

15          MR. FRIDAY:  Objection, relevance.

16 BY MR. SWITKES:

17     Q.    Go ahead.

18          MR. FRIDAY:  Object to form.

19          Go ahead and answer.

20          THE WITNESS:  Small amounts, under 20

21     grams of marijuana and less than a gram of

22     -- or probably under a half a gram of

23     cocaine.

24 BY MR. SWITKES:

25     Q.    And what the disposition of that

1    case?

2        A.    Pretrial intervention.  I did my

3    probation, completed my term or whatever, and

4    everything was expunged.

5        Q.    Expunged?

6        A.    I believe it was expunged.  To my

7    knowledge, everything was expunged.

8        Q.    And where was that arrest, in what

9    county?

10       A.    Port Orange, in Volusia County.

11       Q.    And you said you were arrested again

12   in either 2001 or '02?

13       A.    Yeah, marijuana charges.

14       Q.    And what was the quantity?

15       A.    Under -- under five grams.

16       Q.    And what was the disposition of that

17   case?

18       A.    I settled it.  I went to court and I

19   just said, yeah, I want to end it today.  I'm

20   not sure what that's called.

21       Q.    Did you plead nolo?

22       A.    Yeah, no contest or whatever.

23       Q.    And was that a misdemeanor --

24       A.    Yes.

25       Q.    -- or a felony?

Page 12

```
 1        A.    All misdemeanors.

 2        Q.    Those are the only two arrests you've

 3   had in your lifetime?

 4        A.    No.  I got caught with a undersized

 5   grouper, and that was probably about five

 6   years ago.

 7        Q.    So approximately 2015?

 8        A.    Ish, yeah.

 9        Q.    And in what county was that?

10        A.    St. Lucie.

11        Q.    And what was the disposition of that

12   case?

13        A.    Paid a fine.

14        Q.    How big was the grouper?

15        A.    And once again, it wasn't an arrest.

16   It was more -- it was -- I had to go to court

17   for it.  It wasn't -- FWC doesn't arrest for

18   it.  They give you a citation to show up for

19   court.

20        Q.    Okay.

21        A.    So that would be a court --

22        Q.    What was the size of the grouper?

23        A.    Twenty -- just under twenty inches.

24        Q.    And what was the legal size?

25        A.    24.  It was -- in two years prior the
```

Page 13

1    fish would have been legal.  I didn't check up

2    on the --

3        Q.   Okay.

4        A.   -- size limits.

5        Q.   Now you've given me three arrests.

6    Are any our arrest during your lifetime?

7        A.   No, not that I can remember.

8        Q.   During the arrest in two -- 1997 or

9    '08, were you arrested at gunpoint?

10       A.   No.

11       Q.   2001/'02, were you arrested at

12   gunpoint?

13       A.   No.

14       Q.   2015, were you arrested at gunpoint?

15       A.   No.

16       Q.   You suffer any emotional damage from

17   any of those arrests?

18       A.   Let me go back, I do have another

19   one, it was 2000, maybe, eight or nine.

20            It was for disorderly conduct, I

21   believe it was called.  I don't remember the

22   exact one.  And that's when I sustained a

23   right shoulder injury then.

24       Q.   And that arrest was in what county?

25       A.   Volusia.

Page 14

1        Q.    And what was the allegation of your

2   disorderly conduct, what were you doing?

3        A.    I was walking across a crosswalk and

4   a taxi driver almost hit us.  There was an

5   altercation, he got out, he attacked me, I

6   defended myself, but because I had been

7   drinking I was arrested for it.

8        Q.    And you said he attacked you, did you

9   defend yourself?

10        A.    Yes.

11        Q.    And how long did the altercation

12   last?

13        A.    Less than 30, 40 seconds, and then --

14        Q.    Okay.  Did he punch you?

15        A.    He had tackled me.  He tried to

16   tackle me.

17        Q.    And during that time you injured your

18   right shoulder?

19        A.    It was when the police showed up,

20   when they put me in cuffs.  Because they --

21   they were trying to put me in the car and my

22   head went to the top of the door and they were

23   pushing on my hands trying to push me into the

24   car and because my hands, you know, kind of

25   pushed it up and that's how I sustained the

Page 15

1    right -- right shoulder injury.

2         Q.   Okay.  We have the videographer

3    taking down what you did but the court

4    reporter couldn't --

5         A.   Right.

6         Q.   -- do that as well.  You were

7    indicating that you were handcuffed in the

8    back and as the officers were putting you in

9    the car they were lifting your --

10        A.   My right --

11        Q.   -- hands and arms up behind your back

12   which caused an injury to your right shoulder?

13        A.   Correct.

14        Q.   And did you go to a doctor after that

15   incident?

16        A.   Yes, I did.

17        Q.   And which doctor did you go to?

18        A.    It's going to be an urgent care in

19   Ormond Beach.  I tried to look up the name.  I

20   don't believe that place is still up in

21   business.  To my knowledge -- I don't live

22   there, I haven't been there for over six

23   years, so I don't -- I tried to Google it,

24   tried to get the information but I could not.

25        Q.   And what did they do for you at

Page 16

1    urgent care?

2        A.    They put me in an arm sling and gave

3    me some pain medication for the pain.

4        Q.    Did they take an x-ray?

5        A.    No, they did not.

6        Q.    Did they taken an MRI?

7        A.    No, they did not.

8        Q.    When was the next time you sought any

9    care for your right shoulder injury?

10       A.    That would be in 2018.

11       Q.    So --

12       A.    And this is prior to Miami Beach.

13       Q.    Okay.  So between 2008 or '09 and

14   2018 you didn't see any other doctors for your

15   right are -- shoulder injury?

16       A.    From almost -- for at least eight to

17   ten years I did not see a doctor for my

18   shoulder.

19       Q.    And tell me what symptoms you had in

20   the interim from the time of the injury all

21   the way through the time you did seek some

22   treatment.

23       A.    State again.

24       Q.    What kind of symptoms did you have,

25   what problems did you have with your right

1   shoulder?

2       A.   A lot of it has to do with being able

3   to lift above my head, you know, simple

4   motions like trying to lift -- as a chef I

5   lift plates.  And if I have to lift them above

6   my head it -- that's where I see it.  And any

7   time that my arms go behind my shoulder or

8   behind my back there's -- it's just -- it's

9   just stress.  Stress on the shoulder itself.

10      Q.   When you say stress, it would put you

11  in pain?

12      A.   Yes.

13      Q.   And explain the level of pain to me

14  that you were in -- was it mild, was it

15  moderate, was it severe?

16          MR. FRIDAY:  Object to form.

17          You can go ahead and answer.

18          THE WITNESS:  The -- when it's not

19      hurting it's mild, but when it's

20      aggravated it's probably at least a seven

21      or an eight.

22  BY MR. SWITKES:

23      Q.   And the aggravation would be whenever

24  you were lifting or doing any activity over

25  your shoulder level, correct?

Page 18

1        A.    Correct, as it -- it got inflamed,

2    yes.

3        Q.    Did anybody advise you that you had a

4    rotator cuff tear?

5        A.    No, that's what some of the diagnosis

6    was in 2018 when they first looked at it.  And

7    then when I went back they diagnosed it as

8    shoulder impingement syndrome.

9        Q.    And when you went to get treatment

10   before the date of the incident in Miami

11   Beach, who did you go to, what's the name of

12   the physician?

13       A.    It's another urgent care that's near

14   -- it's in Port St. Lucie.  I am in the

15   process of getting the address and name of the

16   doctor.

17       Q.    And how many times did you go there?

18       A.    Once for my right shoulder prior to

19   Miami Beach and then once after the incident

20   with Miami Beach.

21       Q.    So --

22       A.    Two -- one was for the right

23   shoulder.  After Miami Beach was for the left

24   shoulder.

25       Q.    And tell me what they said about your

1    right shoulder before the arrest here Miami --

2    or the detaining of you in Miami Beach.

3         A.    They diagnosed it as more of a

4    rotator cuff problem.

5         Q.    Okay.  Did they do an x-ray or MRI?

6         A.    No.

7         Q.    Did they tell you you needed to have

8    an x-ray or an MRI?

9         A.    Yes.

10        Q.    And other than the urgent care center

11   in Port St. Lucie and the doctor you saw, did

12   you see any other physicians or go to any

13   other facility?

14        A.    No.

15        Q.    Since the time of the incident in

16   Miami Beach have you gone to any other

17   doctors?

18        A.    For unrelated symptoms or issues,

19   yes.  But for nothing -- I had a -- a gash in

20   my leg that I had to go look at -- get looked

21   at, but nothing related to my shoulder.

22        Q.    So you haven't gone to any doctors or

23   facilities since the incident in Miami Beach?

24        A.    Cannot afford MRI.

25        Q.    Okay.  And how would you characterize

1    the symptoms you're having before the city of

2    Miami Beach and after the city of Miami Beach

3    incident?

4            MR. FRIDAY:  Object to form.

5            Go ahead and answer.

6            THE WITNESS:  Mild to moderate,

7        depending on situations in situational

8        things that happen.  Once again, it's a

9        aggravation thing.  If it gets aggravated,

10       that when the pain level goes up.

11           The more I try to condition it and

12       strengthen it, it gets better, but it's --

13       it's a never-ending battle.

14   BY MR. SWITKES:

15       Q.   And what's the symptoms in your left

16   shoulder?

17       A.   Now?

18       Q.   Yes.

19       A.   Still it's -- there's still a little

20   bit of pain.  And, once again, it's more or

21   less as I start to reach above my head, as I

22   get to about head level, not so bad, but

23   beyond my head level the pain goes up.

24       Q.   Give me, on the scale of zero to ten,

25   the pain you have in your left shoulder?

Page 21

```
 1       A.   Right now, probably a two to -- two.

 2       Q.   Okay.  Give me your educational --

 3  excuse me, your employment history, sir, from

 4  the time you graduated high school thereafter;

 5  who have you worked for?

 6       A.   I've worked for multiple restaurants,

 7  probably too many to name.

 8       Q.   There is no such thing as too many.

 9       A.   Oh, there is.

10       Q.   Give me the names of your employers.

11       A.   Prior to that it's going to be The

12  Shores Resort and Spa in Port St. Lucie.

13       Q.   And when did you work there?

14       A.   During the -- prior -- I worked there

15  for almost a year and a half, from August to

16  August or September-ish.

17       Q.   You have --

18       A.   Of 2018.

19       Q.   And why did you leave there?

20       A.   Personal reasons.

21       Q.   What reasons?

22       A.   Not happy with working conditions.

23       Q.   Which were?

24            MR. FRIDAY:  Object to form.

25            Go ahead and answer.
```

Page 22

1          THE WITNESS:  Management was failing

2     at their job.

3   BY MR. SWITKES:

4     Q.   And before that where did you work?

5     A.   Before there?

6     Q.   The Shores Resort and Spa, which you

7   gave me, yes, sir.

8     A.   It was probably going to be Pietros

9   on the Ocean.

10     Q.   And where is that located?

11     A.   Jensen Beach.

12     Q.   And how long did you work there?

13     A.   Year, year and a half.

14     Q.   And from when to when?

15     A.   A year and a half prior to The

16   Shores.  It was kind of a transition between

17   the two.

18     Q.   So your approximate years, sir.

19     A.   2017 -- from 2016 to 2017, in that

20   area.

21     Q.   And why did you leave there?

22     A.   The owner was stealing my money.

23     Q.   And before that where did you work?

24     A.   It's probably gonna be The Landing

25   and Mark's Corner Grill.  It was the same

Page 23

1    owner and I just transferred between the two

2    jobs.

3         Q.    And where are they located?

4         A.    One was in Fort Pierce, the other one

5    was in Hutchinson Island.

6         Q.    And when did you work there, from

7    when to when?

8         A.    2016 to 2015.

9         Q.    And why did you leave those two

10   locations?

11        A.    Me and the owner didn't -- we failed

12   to get along at that point.

13        Q.    What was the nature of the dispute

14   between the two of you?

15             MR. FRIDAY:   Object to form.

16             You can go ahead and answer.

17             THE WITNESS:   I was -- we were making

18        changes and the changes weren't accepted,

19        so I had decided to leave because of those

20        reasons.   It was -- there was food quality

21        issues.

22   BY MR. SWITKES:

23        Q.    And where did you work before that?

24        A.    Probably Club Med.

25        Q.    Where was that located?

Page 24

1      A.    Port St. Lucie.

2      Q.    And you were a chef?

3      A.    Yes.

4      Q.    And how long were you there?

5      A.    I was there for about a year.

6      Q.    And why did you leave?

7      A.    I got offered a -- an executive ch --

8  executive chef position at The Landing in

9  the --

10     Q.    So you worked there from when to

11 when?

12     A.    2014 and 2015-ish.

13     Q.    And where did you work before there?

14     A.    I want to say it was 27 Fathoms in

15 Daytona -- Port Orange, Florida.

16     Q.    And you worked there from when to

17 when?

18     A.    2013 to 2014, like all a transition

19 between me moving from there to here.

20     Q.    And why did you leave there?

21     A.    I was moving.

22     Q.    And where did you work before that?

23     A.    The Plaza Ocean -- the Plaza Ocean

24 Hotel, I believe it's called.

25     Q.    In what city?

1       A.    Daytona Beach.

2       Q.    And why did you leave there?

3       A.    Had a better position offered.

4       Q.    So you worked there from when to

5    when?

6       A.    2013 to 2014.

7       Q.    And before that?

8       A.    The Shores -- or the restaurant is

9    called Azure, A-Z-U-R-E.

10      Q.    From when to when?

11      A.    2012 to 2013-ish, 2014.  I worked

12   there for almost two years.

13      Q.    And why did you leave?

14      A.    Was offered a better position because

15   I wasn't moving up through management.

16      Q.    And before that?

17      A.    Outback Steakhouse, I think.

18      Q.    What city?

19      A.    Daytona Beach.

20      Q.    From when to when?

21      A.    2012 to 2011.

22      Q.    And why did you leave there?

23      A.    I was going through culinary school

24   and I took up a job at The Shores.

25      Q.    And before that?

Page 26

1      A.   Chili's.

2      Q.   What city?

3      A.   Port Orange.

4      Q.   How long were you there?

5      A.   Six months.

6      Q.   Why did you leave there?

7      A.   Management issues.

8      Q.   What does that mean?

9      A.   Management was giving me more than

10   what my job entailed.

11      Q.   Seems like you didn't hold a job for

12   more than a year at any one place, would that

13   be fair to say?

14           MR. FRIDAY:  Object to form.

15           THE WITNESS:  Yeah.  Yes.

16   BY MR. SWITKES:

17      Q.   Okay.  Are you a member of any social

18   or other groups at the present time?

19           MR. FRIDAY:  Objection to form.

20           THE WITNESS:  What was that?

21   BY MR. SWITKES:

22      Q.   Are you a member of any social groups

23   or other groups?

24      A.   What groups, I'm not...

25      Q.   I don't know.  You'd have to tell me.

Page 27

```
 1        A.    On Florida Carry.

 2        Q.    What else?

 3        A.    Snook Lives Matters.

 4        Q.    Excuse me?

 5        A.    Snook Lives Matter.

 6        Q.    Any others?

 7        A.    My political page.

 8        Q.    Your political page?

 9        A.    Correct.

10        Q.    And what is your political page?

11        A.    Vote for Soloyaker for state

12   representative.

13        Q.    Any other groups or organizations?

14        A.    No.

15        Q.    When did you join Florida Carry?

16              MR. FRIDAY:  Object to form, and I'm

17        going to instruct him not to answer.

18              We have an associational right of

19        privacy as to his membership in that

20        organization, when he joined it, that he's

21        a member.  I should have instructed him

22        not to even answer the question that he

23        was a member.  NR -- NRA versus City of

24        South Miami dealt with that issue, so he

25        is not going to answer that -- any
```

Page 28

1        questions regarding any membership he may

2        have with Florida Carry.

3              MR. SWITKES:  In light of the lawsuit

4        I think that's an inappropriate

5        instruction --

6              MR. FRIDAY:  Certify the question

7        and --

8              MR. SWITKES:  -- but we'll deal with

9        that at a later time.

10             MR. FRIDAY:  Okay.

11   BY MR. SWITKES:

12       Q.   Have you ever served on any official

13   board or senior position with Florida Carry?

14       A.   No.

15       Q.   How do you know the other members

16   that appeared on the pier with you in Miami

17   Beach?

18             MR. FRIDAY:  Object to form.

19             Are you asking --

20   BY MR. SWITKES:

21       Q.   I think it's pretty clear.  How do

22   you know them?

23             MR. FRIDAY:  How does -- I'm going to

24       object to form and ask you to rephrase the

25       question.

Page 29

1          MR. SWITKES:  Your objection is on

2      the record.

3  BY MR. SWITKES:

4      Q.   Answer the question, please.

5      A.   Just through the -- just through what

6  --- how we organize or how we get together to

7  go fishing together.

8      Q.   Have you ever been to a demonstration

9  with Steven Jenkins before the demonstration

10  in Miami Beach?

11          MR. FRIDAY:  Object to form.

12          THE WITNESS:  Yes.

13  BY MR. SWITKES:

14      Q.   And when and where?

15      A.   I believe it was Lake Worth pier.

16      Q.   And that was when?

17      A.   In March of -- or maybe March or

18  February of 2018.  I'd have to look at my --

19  I'd have to see the -- my records to see it

20  for the date, but I have -- I know I can pull

21  that up, but I can't -- a specific date.

22      Q.   That's okay.  Any other

23  demonstrations with him?

24          MR. FRIDAY:  Object to form.

25          THE WITNESS:  Not that I can recall.

Page 30

1    BY MR. SWITKES:

2        Q.   Same question for Sean Devine.

3            MR. FRIDAY:  Object to form.

4            THE WITNESS:  Sean is -- no.

5    BY MR. SWITKES:

6        Q.   Same question for Mr. Philpot.

7            MR. FRIDAY:  Object to form.

8            THE WITNESS:  I believe so.  I

9        believe it was Lake Worth.

10   BY MR. SWITKES:

11       Q.   Any others?

12       A.   That day?

13       Q.   Obviously not that day.

14           MR. FRIDAY:  Object to form.

15   BY MR. SWITKES:

16       Q.   At any time.

17       A.   Like at any -- how many members and

18   how many people I've ever met before the

19   incident or during or, like, I'm lost on the

20   question.

21       Q.   Question was:  Any other

22   demonstrations that you appeared with the

23   individuals who are Plaintiffs in this

24   lawsuit.

25           MR. FRIDAY:  Object to form.

Page 31

1            THE WITNESS:  Yes.

2   BY MR. SWITKES:

3       Q.   Okay.  What other ones?

4       A.   October 24th, I believe, and then

5   January -- June 28th, or -- it was a year

6   later.

7       Q.   Both of those were in 2019?

8       A.   Yes.  Correct.

9       Q.   Any others that you appeared

10  before --

11      A.   We're in 2018 --

12      Q.   -- the Miami Beach incident?

13      A.   Correct, we're in 2018, prior to the

14  incident.

15      Q.   Those were prior to the incident here

16  in Miami Beach?

17           MR. FRIDAY:  Object to form.

18           THE WITNESS:  There were -- there

19      were the first times I ever meet Keith --

20      Keith Jenkins was prior to the incident

21      and it was in Lake Worth.

22           After the accident I've met him at a

23      -- the October 24th, I believe it was, and

24      June -- it was in June -- sometime in

25      June in 2019.

1   BY MR. SWITKES:

2       Q.   My question -- we were up to Philpot,

3   any others with Philpot?

4       A.   Yeah.

5       Q.   Those three --

6       A.   Correct.

7       Q.   -- only?

8       A.   Yes.

9       Q.   How about Carlos Gutierrez?

10      A.   I believe it was the same days after.

11           MR. FRIDAY:  Object to form.

12           THE WITNESS:  -- after the incident.

13  BY MR. SWITKES:

14      Q.   And Jonah Weiss?

15           MR. FRIDAY:  Object to form.

16           THE WITNESS:  Only up to October.  He

17      was -- it was the incident, the day of the

18      incident happened, and October.

19  BY MR. SWITKES:

20      Q.   Have you participated in any other

21  demonstrations other than the one in Miami

22  Beach, Lake Worth?

23           MR. FRIDAY:  Object to form.

24           THE WITNESS:  Yes.

25  BY MR. SWITKES:

Page 33

1     Q.   And when was your first one?

2     A.   I can't even, like -- like I can

3  legitimately can't even -- I can't -- I can

4  try to answer it but there's too -- there's

5  probably too many.

6     Q.   Okay.

7     A.   It's for almost two years I've been

8  doing it almost once a month -- once a month

9  or every other -- every couple months.

10    Q.   Okay.  Start with the first one that

11 you recall and then move forward towards the

12 Miami Beach incident.

13    A.   Or before or after the incident?

14    Q.   Before.

15    A.   Before the incident it was only Lake

16 Worth and I think it was Riviera Beach or Juno

17 Pier or something like that.

18    Q.   Who appeared with you at the Lake

19 Worth?

20    A.   It was, I believe --

21         MR. FRIDAY:  Object to form.

22         And you can go ahead and answer.

23         THE WITNESS:  I know Philpot --

24    Philpot, Keith Jenkins and Jonah Weiss,

25    but the other ones don't -- I can't recall

Page 34

1        their names.

2    BY MR. SWITKES:

3        Q.   Approximately how many members of

4    Florida Carry were there at that

5    demonstration?

6            MR. FRIDAY:  Object to form.

7            Don't answer that question because

8        you don't know if they were members of

9        Florida Carry or not.

10           MR. SWITKES:  Counsel, that's a

11       speaking objection, an improper

12       instruction and we're going to obviously

13       have to do this again if you continue to

14       do that.

15           MR. FRIDAY:  Well, you're asking -- I

16       mean --

17           MR. SWITKES:  I'm allowed to ask him

18       any question.  You're allowed to instruct

19       him not to answer if there's a privilege

20       and you haven't assert a privilege.

21           MR. FRIDAY:  Okay.

22           MR. SWITKES:  And you're allowed to

23       not make speaking objections, which you

24       just did.

25   BY MR. SWITKES:

Page 35

1      Q.   Who else was present at the Lake

2   Worth --

3      A.   Present?

4      Q.   -- demonstration with you that you

5   recall?

6      A.   Names, couldn't tell you.

7      Q.   How many, approximately?

8      A.   Anywhere between six to ten.

9      Q.   And when you went to Lake Worth was

10  it a fishing pier?

11     A.   Correct.

12     Q.   And did you notify the Lake Worth

13  government entity that you were going to

14  appear?

15     A.   Yes.  I personally did not.  It was

16  -- it was not my -- it was not something I was

17  organizing.

18     Q.   Who organized it?

19     A.   I do not know.

20     Q.   And how was the municipality

21  notified, to the best of your knowledge?

22     A.   Either a phone call or an email, one

23  of the two.

24     Q.   Okay.  And did you bring a weapon to

25  that demonstration?

Page 36

1                MR. FRIDAY:  Object to form.

2                THE WITNESS:  Yes.

3       BY MR. SWITKES:

4          Q.   Did the other people that attended

5       bring weapons?  And by that weapon I mean a

6       gun.

7          A.   Yes.

8          Q.   And did the police arrive?

9          A.   Yes.

10         Q.   And what police agency was it, to the

11      best of your knowledge?

12         A.   I'm going to say more than likely

13      local PD, local police department.

14         Q.   And when they arrived did they have

15      their guns drawn?

16         A.   No.

17         Q.   Did they ever draw their guns?

18         A.   No.  They were actually in the

19      parking lot handling everything very cordially

20      and respecting our rights.

21         Q.   Were you detained for any period of

22      time?

23         A.   Zero.  Zero minutes.

24         Q.   Okay.  And how long did you stay at

25      that pier?

Page 37

1    A.   Probably about three to four hours.

2    Q.   And did you do any fishing?

3    A.   Absolutely.

4    Q.   Did you catch any fish?

5    A.   I did not.

6    Q.   Did anybody in your group catch any

7    fish?

8    A.   I can't speak for them because I

9    wasn't paying attention to their fishing

10   poles.

11   Q.   Well, if you're on the pier with them

12   fishing, did you recognize any of them take a

13   fish out of the water?  That wouldn't be --

14   A.   No.

15   Q.   -- too hard to see if you were there.

16         MR. FRIDAY:  Object to form.

17         THE WITNESS:  I was -- I was sitting

18      there talking with my friends and fishing

19      and if somebody brought something up while

20      I wasn't there, I couldn't -- I couldn't

21      speak to that, because --

22   BY MR. SWITKES:

23   Q.   When you weren't there.  I'm talking

24   about when you were there.

25   A.   Not while I was there.

Page 38

1      Q.    Okay.  And the next time you said you

2   also did one in Riviera Beach, when was that,

3   approximately?

4      A.    I want to say it was September of

5   maybe 2017, maybe.  Like, once again, I'd have

6   to look at records and videos, because I can't

7   -- I can't recall all -- all of the -- the

8   demonstrations that I've been to.

9      Q.    How many have you been to?

10     A.    Probably close to -- over a hundred,

11  hundred plus.

12     Q.    Starting when?

13     A.    I'd say prior to the incident in

14  June.  So in probably like the beginning parts

15  of 2007 -- or the end of 2017 and then for

16  those few months leading up to the Miami Beach

17  incident.

18     Q.    So more than a hundred.  In each one

19  of those hundred occasions you don't remember

20  any of the other names of the locations where

21  you met?

22     A.    I can remember certain locations.

23  Dates, I can't remember dates.

24     Q.    Give me the locations.

25     A.    Orlando, Tampa, Naples, Riviera

Page 39

1   Beach, Port Orange, Florida, Ft. Pierce, Port

2   St. Lucie, Stuart, Florida, Jupiter inlet --

3   or Jupiter, Lake Worth, Juno, Ocala.

4        Q.   Tallahassee?

5        A.   I've never open carried there.

6        Q.   FSU?

7        A.   I've never open carried up in

8   Tallahassee.

9        Q.   Where in Tampa?

10       A.   Amway -- I think it's called the

11   Amalie Arena, downtown -- downtown Tampa.

12       Q.   At any of those other locations did

13   the police arrive with guns drawn?

14       A.   I've only had guns drawn on me one

15   other time.

16       Q.   When was that?

17       A.   Lantana.

18       Q.   And where did you demonstrate in

19   Lantana?

20            MR. FRIDAY:   Object to form.

21            Go ahead and answer.

22            THE WITNESS:   I was by myself.  I par

23       -- I parked on the public -- on the public

24       street, not in their paid parking, and I

25       walked from -- it was just off of US1

Page 40

1          towards, I believe it's called Ocean

2          Boulevard, and walked to a bridge right

3          there to fish.

4     BY MR. SWITKES:

5          Q.   And the police stopped you?

6          A.   Correct.

7          Q.   And then you had a gun drawn on you?

8          A.   Correct.

9          Q.   And how long were the guns drawn?

10         A.   It was one gun drawn, maybe 15 -- the

11    gun was drawn probably about five minutes.

12    And then he holstered it and then detained me

13    and put me in handcuffs and all that.

14         Q.   How long were you detained?

15         A.   Close to 30 minutes.

16         Q.   Any of these other 100 demonstrations

17    were you handcuffed?

18              MR. FRIDAY:  Object to form.

19              THE WITNESS:  Yes.

20    BY MR. SWITKES:

21         Q.   How many?

22         A.   Port St. Lucie, I was handcuffed

23    there, probably about 30 minutes.

24         Q.   Behind your back?

25         A.   Correct.

Page 41

1      Q.   Did it hurt your shoulder or

2   shoulders?

3      A.   Yes.

4      Q.   You see any doctors after that?

5      A.   Did not, because I could not afford

6   the MRI and that's -- that's what the doctors

7   had already told me, so I couldn't do anything

8   but try to rehab it.

9      Q.   Was it your right and left shoulder

10  in Port St. Lucie that hurt?

11     A.   Port St. Lucie was my right shoulder.

12     Q.   Okay.  Any of the other hundred plus

13  demonstrations you appeared and were you

14  placed in handcuffs?

15          MR. FRIDAY:  Object to form.

16          THE WITNESS:  No, not -- not that I

17     can recall.

18  BY MR. SWITKES:

19     Q.   In each of these demonstrations, what

20  were you demonstrating?

21          MR. FRIDAY:  Object to form.

22          THE WITNESS:  My second amendment

23     right and the right to bear arms.

24  BY MR. SWITKES:

25     Q.   In most of those did you have a

Page 42

1    fishing pole with you?

2         A.   Every -- every time I fished, yes.

3              Every time I've been to anything that

4    I've ever done I've always had a fishing pole.

5         Q.   Okay.  How often do you go fishing or

6    did you go fishing from approximately 2015 to

7    the present?

8         A.   I've -- I was fishing almost five

9    days a week.  I was a semiprofessional

10   fisherman for the IFA Kayak -- Kayak Tour.

11        Q.   And you fished in tournaments --

12        A.   Correct.

13        Q.   -- for what kind of fish?

14        A.   Red fish, trout.  Primarily red fish

15   and trout, but I've -- I fish for anything.

16   And that's -- I'm a fisherman.  I've been a

17   fisherman since I was eight years old.

18        Q.   Do you have a boat?

19        A.   Yes, a kayak, it's -- well, we call

20   it a boat, but it's a kayak.

21        Q.   How long have you had a kayak?

22        A.   Five years plus.

23        Q.   And where do you typically fish?

24        A.   Throughout the state of Florida.

25        Q.   Do you fish with anybody on a regular

Page 43

1    basis?

2         A.   No, that's why I have the name

3    Soloyaker.  Solo kayaker, that's kind of how I

4    got my name.

5         Q.   And when was the first time you

6    discussed coming to South Pointe Park prior to

7    the event?

8         A.   I didn't ever -- I never discussed

9    about going there.  It was -- it was something

10   that was discussed through our group and I

11   decided I wanted to go.

12        Q.   Okay.  When did you decide to go?

13        A.   Probably a couple of weeks, three or

14   four weeks, like, I can't remember when the --

15   when -- we usually have like a -- like a

16   little flyer, I guess it's called, a flyer

17   that comes out and says, on this day.  I can't

18   remember when that flyer came out.

19        Q.   And who authored the flyer, to your

20   knowledge?

21        A.   I'm going to say Chris Philpot.

22        Q.   And what did the flyer say?

23        A.   June 24, 2018, open carry at Miami

24   Beach South Pointe Pier.

25        Q.   And that was sent to you by email?

Page 44

1       A.   No, it was on our public forum, or

2   our Florida Carry forum.

3       Q.   And the Florida Carry forum is in

4   what form?  Is it an email, is it text?

5       A.   It's a -- it's a Facebook group.

6       Q.   Facebook?

7       A.   Correct.

8       Q.   And for these other hundred plus

9   events that you went to, did it always or did

10  most of the time you have notices similar to

11  one you just discussed?

12      A.   Um, Eric, I'm going to have to refer

13  to you because I don't know when we -- when

14  that happened.  You know what I'm discussing,

15  about when --

16          MR. FRIDAY:  I can't answer the

17      question.  You have to answer what you

18      know.

19          THE WITNESS:  Okay.  To -- to my

20      knowledge, I don't know -- there was a

21      point when -- when we stopped contacting

22      law enforcement for a constitutional right

23      here in Florida.

24  BY MR. SWITKES:

25      Q.   Okay.  My question was, do you

Page 45

1    usually receive a flyer about these hundred

2    plus demonstrations you went to?

3         A.   I either created them or went by

4    myself.  A lot -- a lot of those places that

5    you're listing are places I've gone where it

6    was just me.

7         Q.   So you said you created flyers in the

8    past?

9         A.   Correct.

10        Q.   Have you produced the flyer in your

11   response to request for production in this

12   case?

13        A.   What -- rephrase that.

14        Q.   You received not only answers --

15   questions in interrogatories, which we'll go

16   over in a little while, but you also received

17   a request for production and it requested all

18   documents relevant to the demonstration in

19   Miami Beach.

20             Did you produce the flyer --

21        A.   For Miami Beach?

22        Q.   -- in your responses?

23             Yes, sir.

24        A.   No.

25        Q.   Why not?

Page 46

1      A.   Because it was not my -- I did not

2   create -- I didn't make that one.  I didn't go

3   to Miami Beach.  Somebody else created it to

4   go to Miami Beach.  I've done my --

5      Q.   You said you didn't go to Miami

6   Beach.  You did go to Miami Beach.

7      A.   I went to Miami Beach but I didn't

8   create the flyer.

9      Q.   But you received the flyer.

10     A.   I saw the flyer.

11     Q.   Where did you see the flyer?

12     A.   Florida Carry, on the face group --

13  Facebook group.

14     Q.   So you have it on your computer, why

15  didn't you produce it?

16     A.   I didn't -- I don't have it on my

17  computer.  It was something that was put on

18  Facebook that I saw on Facebook.  It was not

19  something that I took and downloaded to my

20  phone or something.  It wasn't something that

21  I -- it was something that -- it was a -- it

22  was like a picture on social media.

23     Q.   And it said what?

24     A.   June 4 -- 24th, 2018, open carry

25  going to South Pointe Pier.

Page 47

1        Q.    Anything else?

2        A.    Time, date, carrying your holstered

3    handgun and that's -- that was about it.  It

4    was just the normal stuff that we normally put

5    out on flyers, where, when and how.

6        Q.    Okay.  And did you speak to any of

7    the other members of Florida Carry that

8    appeared with you on Miami Beach before the

9    date of the incident?

10            MR. FRIDAY:  Object to form.

11            THE WITNESS:  Directly, no.  Maybe

12        through, you know, when the flyer came up

13        and you're typing in comments, we might

14        have been talking back and forth through

15        the comment section, but I never picked up

16        the phone and called them directly.

17    BY MR. SWITKES:

18        Q.    Okay.  Do you know what you --

19        A.    No.

20        Q.    -- without using the phone wrote back

21    to them?

22        A.    Hope to see you there, that would

23    probably be the general gist of it.  I can't

24    wait.  It's going to be a good time.  Just

25    like all the other times that we ever done,

Page 48

```
 1   is, you know, it's, like, we're excited about

 2   it.

 3       Q.   And you didn't produce any of those

 4   communications back and forth in your response

 5   to request for production?

 6           MR. FRIDAY:  Objection to form.

 7           You can answer.

 8           THE WITNESS:  I never -- I never

 9       said, hey -- like it was never my -- my

10       event.  It was -- or gathering or

11       whatever, it was never mine.  So it was

12       just me communicating with people that

13       would be there.

14   BY MR. SWITKES:

15       Q.   And you haven't produced those

16   communications, correct?

17       A.   I've --

18           MR. FRIDAY:  Object to form.  Go

19       ahead and answer.

20           THE WITNESS:  If it's on -- if it's

21       on a group that I'm not -- it's a -- it's

22       a, you know, a private group that I -- we

23       just talk back and forth.  So if I'm -- if

24       I have to produce that I can -- I guess I

25       can try, but I don't know of any way to
```

Page 49

1      get all that information.

2           (Background noise.)

3    BY MR. SWITKES:

4      Q.   What do you mean you don't know how

5    to get that communication?

6           Any way you can --

7           MR. ROSENWALD:  I doubt it.

8           MR. FRIDAY:  I can tell the

9      videographer was having -- was

10     communicating an issue, so I wanted to

11     stop your question while --

12          MR. SWITKES:  I appreciate it.

13          MR. FRIDAY:  -- while we're waiting.

14          THE VIDEOGRAPHER:  Off the record?

15          Off the record at 10:03.

16          (Recess taken.)

17          THE VIDEOGRAPHER:  Okay.  We're back

18     on the record at 10:16.

19          (The question:  You haven't produced

20     those communications, correct?

21          I've --

22          Objection to the form.

23          Go ahead and answer.

24          If it's on -- if it's on a group that

25     I'm not -- it's a -- it's a, you know, a

1        private group that I -- we just talk back

2        and forth.  So if I'm -- if I have to

3        produce that I can -- I guess I can try,

4        but I don't know of any way to get all

5        that information.

6            Question:  What do you mean you don't

7        know how to get that communication, was

8        read by the reporter.)

9            THE WITNESS:  Once again, this is all

10        -- it's something that I would have to

11        really research on how -- where we've

12        posted it and how we've posted it.  But I

13        can try -- I guess I can look in to see

14        how many of these I do have.  Because it's

15        something that's not written by hand.

16        It's not written on a computer.  It's

17        written through the Facebook group itself.

18            Like you -- if you go to Facebook,

19        they have what they call their events and

20        then you create and it's -- it's like

21        creating an event.  We don't -- it's not

22        an event for Florida Carry, but it's how

23        Facebook labels it, is as an event.

24    BY MR. SWITKES:

25        Q.   Okay.  Did you personally send any

Page 51

1    communications to anybody at the City of Miami

2    Beach regarding the event?

3        A.    I've never contacted Miami Beach

4    about anything about open carry.  I do have a

5    video about Miami but not about Miami Beach.

6        Q.    When you say "a video of Miami," what

7    do you mean by that?

8        A.    I contacted Miami about when --

9    because I fish -- I fish all over the state of

10   Florida, like I said, and I called Miami to

11   make sure that they understood the open carry

12   fishing, hunting and camping, and they told me

13   that they -- that there was no open carry.

14       Q.    And who at the City of Miami did you

15   notify?

16       A.    It was the police department.

17       Q.    Did you ever notify anybody at the

18   City of Miami Beach?

19       A.    No.  I've never talked to Miami

20   Beach.

21       Q.    Do you know of anybody, in regard to

22   that demonstration at Miami Beach, that

23   contacted the City of Miami Beach or any of

24   its officers?

25            MR. FRIDAY:  Object to form.

1           MR. SWITKES:  What's wrong with the

2      form?

3           MR. FRIDAY:  You keep referring to it

4      as a demonstration.  Every time you refer

5      to a demonstration I'm going to object to

6      form.

7           MR. SWITKES:  Okay.

8  BY MR. SWITKES:

9      Q.   You can answer the question.

10     A.   It's a gathering.  We gather together

11 to go fishing to express a second amendment

12 right that we have.  It's not a demonstration.

13          When I do things by myself it may be

14 considered a demonstration, but as a group it

15 is a gathering of us going fishing.

16     Q.   So it's a gathering of a group going

17 fishing to demonstrate the Florida Carry,

18 correct?

19     A.   We're going to express our second

20 amendment rights while fishing.

21     Q.   Okay.  And as a fisherman of some

22 experience who goes fishing five days a week,

23 how many times do you go to fishing off piers

24 regarding your normal fishing experience?  Not

25 when you're doing a demonstration.

1           MR. FRIDAY:  Objection to form.

2           THE WITNESS:  If -- if I fish and I

3       have to go fish off a pier, I will fish

4       off a pier, a bridge, a seawall, wherever

5       -- wherever I can access water where I can

6       go fishing, yes, I will go fishing,

7       whether it's a pier or a dock or whatever.

8   BY MR. SWITKES:

9       Q.   The question was how often --

10      A.   Quite often.

11      Q.   -- do you go fishing off piers as

12  opposed to your kayak or in a boat?

13      A.   Off of land?

14      Q.   Off of a pier I said, if you didn't

15  understand it the first few times.

16          MR. FRIDAY:  Object to form.

17          Go ahead and answer.

18          THE WITNESS:  Fishing off piers is

19      very sporadic.  Maybe once a month, maybe,

20      compared to fishing off a bridge or other

21      places, because I don't have -- where I

22      live, I don't have a fishing pier, per se.

23  BY MR. SWITKES:

24      Q.   Okay.  What other piers have you

25  fished off of in the last year?

Page 54

1       A.    Juno, Juno Pier.

2       Q.    Are those during the demonstration

3    you're talking about?

4       A.    After --

5            MR. FRIDAY:   Object to form.

6            THE WITNESS:   After the

7    demonstration.

8    BY MR. SWITKES:

9       Q.    Okay.  While you were there at the

10   demonstration but afterwards?

11      A.    After the demonstration, before the

12   demonstration, I have -- I have fished off of

13   piers, whether I was carrying or not.

14      Q.    Okay.  And what time would you

15   typically arrive to fish off a pier?

16      A.    The earlier the better.

17      Q.    Okay.  Sunrise, basically, would be

18   the best time?

19      A.    Sunrise.  Anywhere between sunrise,

20   eight, nine o'clock.

21      Q.    And what about dusk, would that be

22   another time you would go?

23      A.    Yes.

24      Q.    You certainly wouldn't want to do

25   that fishing off a pier at noon, would you?

Page 55

1          MR. FRIDAY:  Object to form.

2          THE WITNESS:  Yes, I would fish off

3     that -- any pier, any pier because fish

4     don't care about the time.  Like fish --

5  BY MR. SWITKES:

6     Q.   What do you mean fish don't care

7  about time?

8     A.   They -- they'll eat -- if you've got

9  the right bait they'll eat at anytime of the

10  day.

11     Q.   But there are better times to fish

12  and that's sunrise and sunset, correct?

13          MR. FRIDAY:  Object --

14          THE WITNESS:  No.

15  BY MR. SWITKES:

16     Q.   No, that's not correct?

17     A.   That is not correct.

18     Q.   Okay.

19     A.   I mean, unless -- if you know the

20  secret I would love to hear it, but I've

21  caughten fish mid -- midday, two o'clock in

22  the morning, seven o'clock in the morning,

23  five o'clock in the afternoon.  I've caughten

24  fish in every hour of every part of the day,

25  so there's no --

Page 56

1      Q.   But you would say as a fisherman it's

2   better early in the morning and late in the

3   afternoon?

4      A.   No, I can't say that the morning is

5   better than the afternoon.  I can't say the

6   mid part of the day is better than the late

7   evening, like --

8      Q.   Okay.

9      A.   -- it definitely varies.  Fishing is

10   fishing, it's not catching.

11      Q.   Fishing is fishing, it's not

12   catching.

13      A.   Correct.  When you go fishing, you

14   don't know if you're going to catch a fish.

15      Q.   That's an interesting concept.

16      A.   It's fishing, it's not catching, that

17   why I call it fishing.

18      Q.   So you're not trying to catch fish.

19   You're just out there fishing to enjoy the

20   experience is what you're saying.

21         MR. FRIDAY:  Object to form.

22         THE WITNESS:  I'm trying to fish to

23      catch fish but that's -- I don't have

24      control of what the fish want to do.

25   BY MR. SWITKES:

1      Q.    Okay.  How long was your fishing

2   experience the day of the demonstration going

3   to last?  How many hours did you intend to say

4   there?

5           MR. FRIDAY:  Object to form.

6           THE WITNESS:  Our -- the entire day

7       was maybe three to four hours at most, but

8       we didn't get to fish but maybe 30 minutes

9       of the day.

10  BY MR. SWITKES:

11     Q.    Okay.  So you were intending to stay

12  three to four hours?

13     A.    Most -- most of when we go to gather

14  to go to these fishing gatherings it is for

15  about three to four hours.

16     Q.    And during these fishing gathering

17  demonstrations with Florida Carry --

18          MR. FRIDAY:  Object to form.

19  BY MR. SWITKES:

20     Q.    -- were the other members of your

21  demonstration fishermen as well, experienced

22  like yourself?

23          MR. FRIDAY:  Object to form.

24          THE WITNESS:  I can't -- I can't

25      vouch for other people's experience, when

1      I don't know them all personally and know

2      their back stories.  I've been a fisherman

3      my -- since I was eight years old.  I can

4      vouch for me.  I can't vouch for how

5      experienced those other people are.

6   BY MR. SWITKES:

7      Q.   Had you ever been fishing with any of

8   them before the date on Miami Beach?

9      A.   Maybe Chris and Steven Jenkins,

10  occasionally, other than that, but in my

11  personal life it was mostly just me going out

12  mostly by myself fishing.

13     Q.   And the exception was this was going

14  to be a Florida Carry event, correct?

15     A.   This was going to be Florida Carry

16  gathering where we all got together to express

17  our second amendment rights.

18     Q.   And when you say "express your second

19  amendment rights," you mean that all of you

20  would come to South Point Pier armed, correct?

21     A.   That was their choice.  If they

22  wanted to come unarmed and -- that was their

23  choice.  If they wanted to come armed, they

24  had to follow within the statute.

25     Q.   And when you went to South Pointe

Page 59

1   Park that day, your intent was to demonstrate

2   your right to bear arms while fishing,

3   correct?

4       A.    Correct.

5       Q.    And your intent was that you expected

6   to see authorities from the City of Miami

7   Beach meet your there, correct?

8           MR. FRIDAY:   Objection to form.

9           THE WITNESS:   No.   We don't expect

10      police to show up, especially after you

11      contact them.

12  BY MR. SWITKES:

13      Q.    And did you contact them?   I thought

14  you said you did not.

15      A.    I didn't personally.   I -- I know

16  that Chris did.

17      Q.    And how do you know that?

18      A.    It was -- because it was something

19  that we always do, we always, prior -- I can't

20  speak to after that, but that day and

21  everything prior to that, we had always

22  contacted law enforcement.

23      Q.    Okay.   You said someone contacted the

24  City of Miami --

25      A.    Yeah, it was --

Page 60

1       Q.    Did anybody contact the City of Miami

2    Beach, to your knowledge?

3       A.    Or it was -- it was the City of Miami

4    Beach, I'm -- sorry about that.  I'm -- I'm --

5    I keep referring to Miami because I think of

6    Miami as Miami Beach as well.  But it was

7    Miami Beach, the chief of police, City

8    Attorney and FWC were all contacted.

9       Q.    Well, FWC is not part of Miami Beach,

10   you --

11      A.    No, but they are a state oriented

12   entity that would check fishing licenses as

13   well.

14      Q.    And you said you're sure Chris

15   contacted the City of Miami Beach, how are you

16   sure about that?

17      A.    There was a -- I believe there was a

18   post on Florida Carry about it.

19      Q.    Okay.  And do you know when he did

20   that?

21      A.    I have no -- no recollection of the

22   day.  I just know I -- I remember seeing it.

23      Q.    Do you know how he did it?

24      A.    I believe it was through email.

25      Q.    And do you know if there was an

Page 61

1   encrypted email that was unable to be opened

2   by anybody at the City of Miami Beach?

3       A.   I have no -- no recollection -- I

4   have no -- I've never spoken to Miami Beach

5   about any -- any -- anything other than what

6   I've seen on Facebook.

7       Q.   Okay.  So you aren't sure that the

8   City of Miami Beach was contacted.

9       A.   No, they were contacted.

10      Q.   By Chris by way of email encrypted

11  that couldn't be opened, you're aware of that?

12          MR. FRIDAY:  Object to form.

13          THE WITNESS:  It was -- the email

14      wasn't directly stated to me but it was

15      from Chris it was stated it was sent to

16      the City Attorney, the chief of police and

17      FWC.

18  BY MR. SWITKES:

19      Q.   And have you seen it?

20      A.   I saw the letter that was written up.

21      Q.   Did you --

22      A.   Or the email or whatever -- whatever

23  photo that he took was posted and I did see

24  it.

25      Q.   Did you send it to the City of Miami

Page 62

1    Beach?

2        A.    I have never sent anything to Miami

3    Beach.

4        Q.    Did you send it in response to the

5    request for production that was sent to you in

6    regard to this litigation?

7            MR. FRIDAY:  Object to form.

8            THE WITNESS:  No, I --

9    BY MR. SWITKES:

10       Q.    Why not?

11       A.    I -- I don't have that -- that

12   letter.  I didn't collect that letter.  It

13   wasn't like a letter.  It was a picture of a

14   letter.

15       Q.    That you received, why couldn't

16   you --

17       A.    I didn't receive it.  I didn't

18   receive it.  It was not sent to me directly.

19   It was something I saw on Facebook through the

20   Florida Carry page.

21       Q.    And why can't you produce it from the

22   Facebook page that you saw it from?

23       A.    We're talking about thousands and

24   thousands of posts that -- I mean, I could try

25   to find it, but it was never directly sent to

Page 63

1    me.

2       Q.   Why didn't you try to find it before

3    today?

4       A.   I didn't know I needed to produce

5    that.  I thought it was already in your hands.

6       Q.   You're unaware that the -- you filed

7    a lawsuit in this matter?

8       A.   What was that?

9       Q.   You're unaware of the fact that you

10   filed a lawsuit in this matter?

11      A.   I understand the lawsuit, but --

12      Q.   You understand your obligation to

13   produce all physical evidence or all verbal --

14      A.   That I have.

15      Q.   -- or posts or you have access to,

16   yes, sir.

17      A.   Oh, if I have to get access to all

18   that then, yes, I'll -- I guess I'll do my

19   best to get all that information.

20      Q.   You didn't understand that until

21   today?

22      A.   I did not.

23      Q.   Okay.  What kind of rod and reel did

24   you bring on the date of Miami Beach?

25      A.   I want to say it was a Shimano 5000

Page 64

1    series reel on an ugly stick seven-foot rod.

2        Q.   And what kind of line did you have?

3        A.   50 or -- I want to say it was 40

4    pound braid and probably about 40 pound leader

5    monofilament.

6        Q.   And what kind of weight were you

7    using?

8        A.   Probably about an ounce.

9        Q.   And was it your intent to bottom

10   fish?

11       A.   Correct.  I had shrimp and squid with

12   me.

13       Q.   And would it be fair to say that you

14   didn't catch anything on the day on Miami

15   Beach?

16       A.   Yeah, I was too busy in handcuffs.

17       Q.   Did you see any traffic in Government

18   Cut while you were there?

19       A.   Other than the park ranger.  When I

20   walked up the only law enforcement or somebody

21   I thought was law enforcement was the park

22   ranger.

23       Q.   Government Cut is the waterway that

24   you were supposedly fishing in.

25       A.   Oh.

Page 65

1      Q.   Did you see any traffic on the

2   waterway?

3      A.   Boats.

4      Q.   And what kind of boats?

5      A.   Average.  Maybe fishing boats.

6      Q.   How about cruise ships?

7      A.   No, I didn't see cruise -- there may

8   have been a cruise ship but I don't -- I don't

9   -- my -- I was facing the beach side or where

10  the people are on the beach, so I don't -- I

11  couldn't tell you if there were any boats

12  passing me behind.

13     Q.   Do you see any Coast Guard cutters?

14     A.   I do not recall.  My face -- I was

15  faced in a different direction.

16     Q.   Did you see any pleasure craft,

17  boats, passing by Government Cut?

18     A.   I don't know what pleasure boats are.

19     Q.   You don't know what a pleasure boat

20  is?  Then let's just make it boats, did you

21  see any boats?

22     A.   I did see some boats.

23     Q.   Did you see any skidoos?

24     A.   A few, yeah.

25     Q.   Okay.  How far were you from the --

Page 66

1    where the beach was when you were fishing?

2        A.   We were on the pier, but in the

3    direction that I was sitting, lower -- sitting

4    on the pier, I was facing the beach where the,

5    you know, people are on the beach.

6        Q.   I said how far from the beach?

7        A.   I -- 50 yards, a hundred yards, I

8    don't know.  I couldn't tell you how far I

9    was.

10       Q.   Did you do a video of driving down

11   from where you were coming from on the date of

12   the incident?

13       A.   I started my video out, yes, that's

14   how I started my video.

15       Q.   You started the video in what city?

16       A.   It was probably Port St. Lucie or

17   Stuart area.

18       Q.   And it took you approximately how

19   long to get to Miami Beach?

20       A.   About two, two and a half hours.

21       Q.   And you continuously videotaped and

22   commentated on your way down?

23       A.   Partially, yes.  I was videotaping

24   specific -- like as I was going through, you

25   know, as I hit Jupiter I would take a video of

Page 67

1    the Jupiter sign as I passed it showing people

2    my direction, kind of.

3         Q.    And besides showing people a

4    direction, what were you saying about arriving

5    on Miami Beach and what were you going to do

6    there?

7         A.    We were going to go out and open

8    carry while we were fishing.

9         Q.    And you're going out and open carry

10   hoping that you would meet some people that

11   would confront you about carrying, correct?

12        A.    No.  We go out to educate the public

13   about their gun rights and open carry rights

14   here in Florida.  We don't go out looking for

15   police interactions.

16        Q.    And how were you going to educate

17   people about your open gun rights?  Did you

18   have any signs with you that you were carrying

19   to show people about gun rights?

20        A.    We did have a flyer that had the

21   Florida statute stated on it at -- at that --

22   our fishing gathering.

23        Q.    You did make copies of it to hand out

24   to people on the beach?

25        A.    Yes, we did.

Page 68

1      Q.   Did you hand it out to anybody?

2      A.   We were unfortunately detained.  We

3   tried to hand it to the park ranger but he did

4   not care about the words that were written on

5   the paper.

6      Q.   Did you hand it out to anybody that

7   was walking up and down the beach beside the

8   park ranger?

9      A.   I want to say we handed out a couple

10  prior to us being detailed.

11     Q.   Okay.  In the other 100

12  demonstrations that you participated in with

13  Florida Carry, were you confronted by police

14  agencies?

15          MR. FRIDAY:  Object to form.

16          Go ahead and answer.

17          THE WITNESS:  Yes, I've been

18      confronted by police on numerous

19      occasions.

20  BY MR. SWITKES:

21     Q.   Okay.  When you say "numerous," of

22  the hundred demonstrations you participated

23  in, tell me approximately what percentage of

24  the time you were confronted by police

25  agencies?

Page 69

1          MR. FRIDAY:  Object to form.

2          THE WITNESS:  Probably maybe under

3      three percent of my videos I've been --

4      I've had police interactions probably

5      about six to seven times, maybe.  Once

6      again, I have to refer to my videos, but I

7      think it was about six or seven times that

8      I've had police interactions, including

9      Miami Beach.

10  BY MR. SWITKES:

11      Q.   Okay.  And you said on video, I'm not

12  talking about only on video.  How many times

13  have you been confronted by any police agency

14  when you're out on a fishing trip with Florida

15  Carry?

16          MR. FRIDAY:  Object to form.

17          THE WITNESS:  Every time I go out and

18      open carry I carry a GoPro with me.  So

19      every time that I've -- anything that you

20      -- all my videos are -- there's probably

21      not too many instances where there's not a

22      video out.  So I'm saying six to seven

23      times and they're all on video.  There's

24      not -- I'd almost say there's maybe been

25      three or four times I didn't -- either

Page 70

1       didn't record or didn't post the video.

2   BY MR. SWITKES:

3       Q.   So you have approximately how many

4   videos of your interaction with police during

5   your hundred demonstrations?

6       A.   Out of the --

7            MR. FRIDAY:  Object to form.

8            THE WITNESS:  -- six times -- I'd say

9       six to seven times out of a hundred, a

10      hundred videos.

11           Approximately.  It could be -- it

12      could be less, it could be more, but I'm

13      not -- it's not going to be much more than

14      six or seven.

15  BY MR. SWITKES:

16      Q.   And you have all those videos?

17      A.   They're all on YouTube, yes.

18      Q.   Okay.  So you can produce them,

19  correct?

20      A.   Yes.

21      Q.   And during your arrests that you

22  described previously, did you suffer any

23  emotional trauma while being arrested?

24      A.   Emotional, only on the -- the first

25  one when I was 18, and that was only because I

Page 71

1    was young and I didn't understand the gravity

2    of what I've gotten into or the problems that

3    I ran into that day.

4         Q.   When you say you didn't understand

5    the gravity, when you're in possession of

6    cocaine and marijuana --

7         A.   Yeah.

8         Q.   -- what in that possession didn't you

9    understand was the gravity of possession of

10   drugs?

11        A.   I just didn't understand how much

12   trouble that came along with -- with the

13   possession of that.   I thought --

14        Q.   You didn't know before you got

15   arrested that --

16        A.   I knew that --

17        Q.   -- you were breaking -- excuse me,

18   you can't talk over me.

19        A.   Sorry, buddy.

20        Q.   I'll give you all the time you need

21   to answer but don't talk over us, because the

22   court reporter can't take us down at the same.

23        A.   I got you, man.

24        Q.   You didn't understand by being in

25   possession of cocaine and marijuana, if you

Page 72

1    were stopped you would be arrested and the

2    consequences of carrying those drugs?

3         MR. FRIDAY:  Object to form.

4         THE WITNESS:  I had an idea, just

5       didn't -- as being young, just didn't

6       understand the severity of what I had done

7       wrong.

8    BY MR. SWITKES:

9       Q.   And because you didn't understand the

10   severity of what you had done wrong the first

11   time you did it again some five or six years

12   later when you did understand the gravity,

13   correct?

14      A.   Yeah.

15        MR. FRIDAY:  Object to form.

16        THE WITNESS:  I dealt with -- instead

17      of messing with a felony I was -- I had

18      smoked some weed.  I stopped doing -- I

19      stop -- I tried to stop doing really bad

20      stuff, you know, me, personally, it's,

21      like, you know, I have a different outlook

22      on how marijuana is.  I mean, I understand

23      it's illegal, but...

24   BY MR. SWITKES:

25      Q.   And the disorderly conduct in 2008 or

Page 73

1    '09, you were not concerned emotionally about

2    that arrest?

3         A.    No.  Because I defended myself.  I

4    wasn't -- there -- I wasn't -- other than the

5    pain, I was -- there was no emotional after

6    that.

7         Q.    Were you arrested and taken to jail?

8         A.    Yes.

9         Q.    And how long did you spend in jail?

10        A.    I guess it -- they said I was --

11   until they said -- I guess it was like the

12   detox, like three or four hours or whatever.

13   I sat in their holding tank for four hours and

14   they released me.

15        Q.    And that didn't affect you

16   emotionally at all?

17        A.    No.

18        Q.    But somehow being detained in Miami

19   Beach affected you emotionally?

20             MR. FRIDAY:  Object to form.

21             You can answer the question.

22             THE WITNESS:  Absolutely.  When

23        you're looking down the barrel of three

24        firearms for doing a legal right, yes, it

25        is emotionally disturbing that somebody

Page 74

1          would end your life for doing nothing

2          wrong.

3     BY MR. SWITKES:

4          Q.   But that's not unexpected, because --

5          A.   It is unexpected -- sorry.

6          Q.   -- that had happened to you multiple

7     times before, correct?

8          A.   To that day, no.  Before Miami Beach

9     it had never happened.  The only -- I had one

10    police interaction where they didn't draw

11    guns, they came and talked to me like a human

12    being.

13         Q.   And you're saying the City of Miami

14    police officer didn't talk to you like a human

15    being?

16         A.   They didn't talk.  They -- they

17    wanted to talk with a weapon and tried to end

18    my life.

19         Q.   How long was the weapon drawn on you,

20    let's -- give me some time frame, four hours

21    five hours?

22         A.   At least --

23              MR. FRIDAY:  Object to form.

24              THE WITNESS:  The gun was pointed at

25         me for at least a minute as they walked

Page 75

1      up.  And then I believe that the firearm

2      was flagged behind me as well where they

3      -- they kind of took the firearm and

4      passed it along me, like along my backside

5      as well.

6   BY MR. SWITKES:

7      Q.   What do you mean you believed it was

8   flagged behind you?

9      A.   Well, it was flagged.

10      Q.   What do you mean by flagged?

11      A.   I've seen the body cam footage and

12   when they -- when we say flagging, when you

13   bring your firearm up, the muzzle of the

14   firearm grazed my back while it was loaded

15   when they disarmed me.

16      Q.   And who was it that did that?

17      A.   I don't know the officer's name.

18      Q.   Were you handcuffed?

19      A.   I was handcuffed.

20      Q.   And who were you handcuffed by?

21      A.   I don't know the officer's name.

22      Q.   Do you know if you filed a complaint

23   which alleges the name of the officer that

24   handcuffed you?

25      A.   I did not file -- I, personally, did

Page 76

1    not file a complaint.

2        Q.    Have you read the complaint?

3        A.    I have not read any complaints.

4        Q.    And so if the officer held a gun on

5    you for, let's say, a minute, were you

6    intimidated by that?

7        A.    Absolutely.

8        Q.    And your intimidation was displayed

9    in what manner?

10       A.    My intimidation?

11       Q.    Yeah.

12       A.    The fear of my life.

13       Q.    And you expressed that how?  What did

14   you say in regard to your intimidation?

15       A.    I don't even know what's going on.

16       Q.    Okay.  Well, that's pretty --

17       A.    That's -- that's --

18       Q.    -- interesting.  You came down to the

19   City of Miami Beach with Florida Carry --

20       A.    Correct.

21       Q.    -- to demonstrate your right to bear

22   arms while you were fishing, correct?

23       A.    Correct.

24            MR. FRIDAY:  Object to form.

25   BY MR. SWITKES:

Page 77

1        Q.    And you've done that a hundred times

2   and you did that for the sole purpose of being

3   able to demonstrate your right to bear arms,

4   correct?

5             MR. FRIDAY:  Object to form.

6             THE WITNESS:  Prior to Miami Beach,

7        before you say a hundred, I had probably

8        been out to three -- three of these open

9        carry gatherings.  I had three -- I was --

10       maybe three -- I had done three with a

11       group and then I had done a couple by

12       myself.

13  BY MR. SWITKES:

14       Q.    Excuse me, you told me you did a

15  hundred plus demonstrations.

16       A.    I have a hundred plus videos after

17  the fact, after -- after Miami Beach on

18  June 24, 2018, there is probably about a

19  hundred more videos of me doing open carry

20  throughout the State of Florida.

21       Q.    So six or seven demonstrations before

22  Miami Beach and then almost a hundred after?

23       A.    It was about, I'd say, three with a

24  group and maybe three by myself.

25       Q.    Before Miami Beach?

Page 78

1     A.   Correct.

2     Q.   And then after Miami Beach a hundred?

3     A.   Over the last two years, yes.

4     Q.   Okay.

5     A.   Or year and a half or however long.

6     Q.   So you were so intimidated by the

7   event that you did it a hundred times more,

8   correct.

9     A.   I was not --

10          MR. FRIDAY:  Object to form.

11          Go ahead and answer.

12          THE WITNESS:  There's not -- it's not

13      about the intimidation.  It was about

14      trying to express the right and educating

15      the public that it is a legal right.

16   BY MR. SWITKES:

17     Q.   So when the officers arrived because

18   you were so upset and so emotionally

19   distraught about it, what did you tell the

20   officers?

21     A.   Can you read that piece of paper, it

22   has the Florida statute on it.

23     Q.   What else did you say?

24     A.   Um, I catch bigger fish than you are

25   tall.

Page 79

1    Q.   That's sound like someone that's very

2  intimidated.

3         MR. FRIDAY:  Object to form.

4  BY MR. SWITKES:

5    Q.   That comment was made in what regard?

6         MR. FRIDAY:  Object to form.

7  BY MR. SWITKES:

8    Q.   Go ahead, answer the question.

9         MR. FRIDAY:  I do not appreciate,

10      Mr. Switkes, the argumentative nature of

11      the questions you are asking.

12         Go ahead and answer the question.

13  BY MR. SWITKES:

14    Q.   Answer the question.

15    A.   I said numerous things.  I mean, it

16  was between this is a bunch of BS.

17    Q.   Wait a second.  You didn't say BS.

18  You said bullshit.

19    A.   Okay.  Yeah, I don't -- bullshit,

20  yeah.

21    Q.   So you were so intimidated by the

22  presence of the police officers that you said,

23  This is bullshit, in a very loud tone,

24  correct?

25         MR. FRIDAY:  Object to form.

Page 80

1            THE WITNESS:  I did say "This is bull

2        shit," because I had never been treated

3        like that ever out of the six times that

4        I've been out before.

5    BY MR. SWITKES:

6        Q.   Is that what you said on the video or

7    did you say, This is bullshit, without, "I've

8    never been treated" six or seven times before?

9            MR. FRIDAY:  Object to form.  The

10       video speaks for itself.

11           MR. SWITKES:  Counsel, that's a

12       speaking objection.  Make your objections

13       to the form or a privilege.  Don't make

14       speaking objections.

15   BY MR. SWITKES:

16       Q.   Do you remember my question?

17       A.   Yeah.

18       Q.   Okay.

19       A.   I said, This is bullshit.  I didn't

20   say this is --

21       Q.   So I'm asking you what you said.  So

22   I'd ask you not to make commentary on what you

23   said now in the deposition.  When I ask you

24   what you said at the time, I want you to tell

25   me what you said, okay.  Do you understand the

Page 81

1    question?

2        A.   Yeah, I understand it.

3        Q.   Okay.

4        A.   And, once again, I'd have to really

5    refer back to it because the video speaks for

6    itself.

7        Q.   Okay.  Did you --  see, that's why we

8    don't have speaking objections, because then

9    you're going to mimic what your attorney said.

10            So you have to answer my questions.

11       A.   I'm trying to answer them --

12       Q.   Okay.

13       A.   -- but it's been a year and a half.

14       Q.   Did you in a loud voice say to the

15   officers, You are nuts?

16       A.   Yeah, I said, This is crazy -- or I

17   think it was crazy, but it could be nuts.

18       Q.   Does that in anyway, in your opinion,

19   show you were intimidated by the officers?

20            MR. FRIDAY:  Object to form.

21            THE WITNESS:  Yes, that is

22       intimidation.  When you come and show up

23       with guns and I think it's crazy that you

24       would show up and point a gun at somebody

25       that's following the law.

Page 82

1    BY MR. SWITKES:

2        Q.   Okay.  But, sir, we're talking about

3    you're intimidated and your emotional upset.

4             Typically when people are emotionally

5    upset and intimidated they either don't talk

6    or they display some kind of emotion

7    indicating they're upset.

8        A.   Yeah.

9        Q.   You were actually egging on the

10   police by yelling at them continuously during

11   the whole time you're on video, weren't you?

12           MR. FRIDAY:  Object to form.

13           Go ahead and answer.

14           THE WITNESS:  I was angry and that

15       was me showing my -- my frustrations about

16       what was going on, because it was not

17       acceptable.

18   BY MR. SWITKES:

19       Q.   What else were you saying to them, do

20   you remember?  You're going to make me rich?

21       A.   No, never said that.

22       Q.   Weren't the other members of your

23   demonstration essentially trying to calm you

24   down by saying --

25           MR. FRIDAY:  Object to form.

Page 83

1    BY MR. SWITKES:

2        Q.    -- Mr. Friday is going to take care

3    of this, repeatedly?

4            MR. FRIDAY:  Object to form.

5    BY MR. SWITKES:

6        Q.   Didn't you hear that from your other

7    members?

8        A.   They might have said it.  But, once

9    again, I -- if they said it, obviously I

10   wasn't listening to what they were saying.

11       Q.   You weren't going to stop yelling at

12   the officers even if your fellow members were

13   trying to calm you down, correct?

14       A.   I was frustrated with the officers

15   and what I personally, how I felt.  I wanted

16   to let them know how -- my frustrations, yes.

17       Q.   Okay.  That doesn't sound like

18   intimidation, yelling at the officers sounds

19   like you're trying to provoke the officers,

20   doesn't it?

21           MR. FRIDAY:  Object to form.

22           THE WITNESS:  I think it's

23       intimidation for law enforcement to point

24       a gun at somebody that's not breaking the

25       law.

Page 84

1    BY MR. SWITKES:

2        Q.    Okay.  But this is long after the

3    guns were put back in their holsters, right?

4    You're saying in your complaint, and we'll go

5    through that, that you were there for some two

6    hours plus.

7        A.    Uh-huh.

8        Q.    Correct?  You can't say uh-huh.

9        A.    Yes.  Yes.

10       Q.    And during that time this one

11   person's voice is continuing to harangue the

12   officers and that's your voice, correct?

13            MR. FRIDAY:  Object to form.

14            THE WITNESS:  Do I not have a first

15       amendment right to speak how I want?

16   BY MR. SWITKES:

17       Q.    The question is not whether you have

18   a right.  The question is you continually were

19   yelling at the officers, correct?

20            MR. FRIDAY:  Object to form.

21            THE WITNESS:  I won't say it was

22       yelling but it was definitely --

23   BY MR. SWITKES:

24       Q.    What would you characterize it as?

25       A.    It was voicing my opinion.

Page 85

1      Q.   In a very loud voice?

2      A.   It was -- it was loud enough for me

3   to speak to my -- my microphone could hear it.

4      Q.   So your what could hear it?

5      A.   The microphone on my camera.

6      Q.   So you were, in essence,

7   broadcasting --

8      A.   No.

9      Q.   -- for future reference the comments

10   and making it loud enough for your video feed

11   to pick it up?

12           MR. FRIDAY:  Object to form.

13           THE WITNESS:  No.

14   BY MR. SWITKES:

15      Q.   What do you mean, no?  You just said

16   that?

17      A.   No.  I make sure that, because of

18   documentation, I don't know if your officers'

19   body cams or anything like that would have

20   shown up or would have been accessible, so my

21   video is my protection against things like

22   that.

23      Q.   Okay.  Your constantly yelling at the

24   officers is protection from what?

25           MR. FRIDAY:  Object to form.

1          THE WITNESS:  That was my frustration

2     with the officers for doing what they had

3     done.

4  BY MR. SWITKES:

5     Q.   Okay.  Were the other members of your

6  demonstration yelling at the officers like you

7  were?

8          MR. FRIDAY:  Object to form.

9          THE WITNESS:  Don't know.

10  BY MR. SWITKES:

11     Q.   Okay.

12     A.   I can't speak for all of them.  I can

13  only speak for myself.  I can't -- I can't

14  remember hearing any of them about anything.

15  I can't remember if they said anything.

16     Q.   Well, you have heard and watched the

17  video, haven't you, since the time you took

18  it?

19     A.   I haven't watched that video for

20  almost a year and a half.

21     Q.   Okay.  But you watched it since the

22  incident how many times?

23     A.   Prior -- after the incident?

24     Q.   Yes, sir.

25     A.   I watched it for a good, maybe, three

Page 87

1    days after the fact and posted the video and

2    tried not to watch it because it always

3    brought back that -- the -- when they pulled

4    the guns on us that I was that close to my

5    life being taken.

6         Q.   When you say that close to your life

7    being taken --

8         A.   Correct.

9         Q.   -- are you serious?

10        A.   Yes.  That was -- I was a trigger

11   pull, I was four and a half pounds away from

12   losing my life.

13        Q.   You're a gunman, correct?

14        A.   I'm a -- I know about guns.

15             MR. FRIDAY:  Object to form.

16   BY MR. SWITKES:

17        Q.   How long have you had a gun?

18        A.   Probably just over two years, two or

19   three years.

20        Q.   So the first time you bought a gun

21   was in what year?

22        A.   2017-ish, I think.

23        Q.   Have you had any training in guns?

24        A.   Yes.

25        Q.   And where did you do your training?

Page 88

```
 1      A.   At the gun range.

 2      Q.   The gun range is located where,

 3   what's its name?

 4      A.   Lotus Gunworks.

 5      Q.   Lotus?

 6      A.   Lotus Gunworks.

 7      Q.   And where is that located?

 8      A.   Jensen Beach.

 9      Q.   And how often do you go there?

10      A.   At least maybe twice to three times a

11   month.

12      Q.   And what kind of guns do you own?

13           MR. FRIDAY:  Object to form.  I'm

14      instructing you do not answer that

15      question.

16   BY MR. SWITKES:

17      Q.   Okay.  What kind of gun did you have

18   on your person on the day of the

19   demonstration?

20      A.   I had a Glock 23.

21      Q.   And how familiar are you with that

22   weapon?

23           MR. FRIDAY:  Object to form.

24           THE WITNESS:  Very -- very capable

25      and understanding of my firearm.
```

Page 89

1    BY MR. SWITKES:

2         Q.    Have you ever fired that firearm?

3         A.    Only at targets.

4         Q.    And what kind of ammunition did you

5    have on the day?

6         A.    Forty caliber ammunition.

7         Q.    How many --

8         A.    I believe it was --

9         Q.    -- in the clip.

10        A.    I don't -- I don't know what a clip

11   is.

12        Q.    Do you know what a magazine is?

13        A.    I do know what a magazine is.  I

14   don't know what a clip is.  But I -- I believe

15   I had 27 rounds with me that day.

16        Q.    And your magazine on that weapon when

17   it was holstered had how many bullets?

18        A.    It was 13 in the magazine.

19        Q.    And one in the chamber?

20        A.    Yes.

21        Q.    Have you ever shot your gun during a

22   fishing event?

23        A.    Never.

24        Q.    Have you ever shot your gun in other

25   than at a range?

Page 90

1       A.   No.

2       Q.   Do you ever go hunting?

3       A.   No.

4       Q.   Do you ever go camping?

5       A.   Yes.

6       Q.   Do you take your gun with you on

7   camping trips?

8       A.   Yes.

9       Q.   When was the last time you went

10  camping?

11      A.   2019, and I want to say it was in

12  March.

13      Q.   And where did you go?

14      A.   February or March.  I can't remember

15  the exact month.

16      Q.   Where did you go camping?

17      A.   Dunnellon Springs.

18      Q.   Before the date of the demonstration

19  had you ever been to South Pointe Park?

20           MR. FRIDAY:  Object to form.

21           THE WITNESS:  Yes.

22  BY MR. SWITKES:

23      Q.   When prior to the demonstration had

24  you been at South Pointe Park?

25           MR. FRIDAY:  Object to form.

```
 1              THE WITNESS:  I'm going to -- I want
 2         to say in 2016 on our way down to the
 3         Keys.
 4    BY MR. SWITKES:
 5         Q.   And you said on "our way down," who
 6    was with you?
 7         A.   My wife.
 8         Q.   And what did you do at South Pointe
 9    Park?
10         A.   We just came to South Beach for,
11    like, I'd say five hours, four or five hours
12    just to kind of take in some sites and hang
13    out in South Beach for -- before our final
14    trip all the way down to the Keys.
15         Q.   Okay.  You didn't fish?
16         A.   Didn't fish.  Just came down to take
17    in -- you know, I was on our honeymoon.
18         Q.   Had you ever fished in Dade County
19    before the date of the demonstration?
20         A.   Yes.
21         Q.   And where did you fish?
22         A.   I can't even -- it was a retention
23    pond in -- it's gonna go back in 2000 -- I
24    want to say 2012.
25         Q.   So --
```

Page 92

1        A.   But it -- that one's been so long, so

2   I can't -- I can't even be really specific,

3   and it was just a retention pond at a buddy's

4   house.

5        Q.   Okay.  And that's the only other time

6   you've fished in Miami?

7        A.   In Miami, yes.

8        Q.   So you personally did not advise

9   anyone at the City of Miami Beach that you

10  were coming to demonstrate before the

11  demonstration, correct?

12            MR. FRIDAY:  Object to form.

13            Asked and answered.

14            THE WITNESS:  I have never -- I had

15       -- I've never contacted anybody about

16       coming, other than through our Facebook

17       group, other than saying I'm going, hope

18       to see you there.

19  BY MR. SWITKES:

20       Q.   Okay.  You were asked in

21  interrogatories what you did in the 24 hours

22  before coming to Miami Beach, can you answer

23  that question for me now?

24       A.   I had worked from three -- I want to

25  say about three o'clock until 11 p.m.  I got

Page 93

1    home, started charging GoPros, packing fishing

2    gear, getting the fishing poles ready, and I

3    had been drinking some beers as well.

4         Q.    How many?

5         A.    I think I had maybe five to six

6    beers.

7         Q.    Between what hours?

8         A.    From eleven o'clock until two,

9    three o'clock in the morning.

10        Q.    And then you got up at what time?

11        A.    6:00.  Six-ish.  6:00, 6:30.

12        Q.    And what time did you leave your

13   home?

14        A.    Right around that same time, 6:00 --

15   when I woke up my wife was getting ready for

16   -- for work and then when she woke me up my

17   stuff was already packed and I loaded my

18   stuff, took her to work, and then drove

19   directly to Miami Beach.

20        Q.    How long did it take you to get to

21   Miami Beach?

22        A.    Two, two and a half hours.

23        Q.    And so you arrived approximately what

24   time?

25        A.    Around 9:00, 9:15ish, I think.

Page 94

1      Q.   And you were videotaping on your way

2    down?

3      A.   I did videotape on the -- on parts of

4    the way down, yes.  Not the whole way down but

5    parts.

6      Q.   And what were you videotaping?  What

7    were you commenting about?

8      A.   Signage.  I didn't so much comment on

9    anything.  It was me kind of starting out.  On

10   my YouTube videos I always start out with,

11   hey, this is Soloyaker, I'm heading to Miami

12   Beach, and just kind of letting -- kind of

13   narrating the video.

14     Q.   You were asked in your

15   interrogatories your employment history, the

16   last ten years before this, you gave Lusa,

17   L-U-S-A.

18     A.   That's current.  Right, that's

19   current.

20     Q.   That's your current employer?

21     A.   Correct.

22     Q.   And then you said you worked at

23   Hoodz, H-O-O-D-Z.

24     A.   Correct.

25     Q.   You didn't mention that when I asked

Page 95

1    you previously.

2         A.   Yeah, sorry about that.  Like I said,

3    I was trying to recall all the jobs prior.

4    And Hoodz was a cleaning -- exhaust fan

5    cleaning job that I did.

6         Q.   Why did you leave there?

7         A.   Just wasn't my cup of tea.

8         Q.   Okay.  So you worked at Lusa,

9    according these sworn answers, from

10   January 7th to the present.  And before that

11   you worked at Hoodz from July to September of

12   '19 and then before that you worked at Sam

13   Sneads this says.

14        A.   Oh yeah.

15        Q.   You didn't mention that when I asked

16   you.

17             MR. FRIDAY:  Object to form.

18   BY MR. SWITKES:

19        Q.   Why?

20        A.   Once again, I've -- you were asking

21   about a lot of jobs and...

22        Q.   You would certainly remember the last

23   few, wouldn't you?

24        A.   Yeah, I definitely don't -- once

25   again, a lot of jobs and some of them I wish I

Page 96

1  had never worked at, so I kind of forget about

2  them.

3      Q.   When you say you wished you never

4  worked at, what do you mean by that?

5      A.   That place, Sam Sneads was serving

6  food that was almost ten days old.  I had said

7  something to management numerous times and

8  they failed to listen and I wish I'd never

9  worked there.

10     Q.   You certainly gave me a lot more

11  names than you gave under oath in these

12  answers.  You stopped at 2017 in this.  Why

13  couldn't you remember those dates when you

14  answered these under oath but remembered them

15  today?

16     A.   Once again, you were asking for a

17  bunch of stuff and I'm sitting here trying to

18  remember everything, so --

19     Q.   When --

20     A.   And like you said, there's a lot

21  of --

22     Q.   Not when you're sitting here.  This

23  is when you had the ability to go over your

24  records and meet with your attorney and answer

25  them under oath.  How was it that you forgot

Page 97

1    all of the jobs before August of 2017 under

2    oath?

3         A.   Because I thought you were only

4    asking about jobs prior to the incident.

5         Q.   So you didn't read the question that

6    said for the ten years before the incident?

7         A.   Must have just -- nah, I guess not.

8         Q.   When I asked you in Question 7, did

9    you consume any alcoholic beverages or take

10   any drugs, medication or other substances that

11   might affect your physical or mental ability

12   within 72 hours, you didn't say under oath

13   that you had five or six beers within that

14   period of time, did you?

15          MR. FRIDAY:  Object to form.  I'm

16       going to instruct him not to answer until

17       I have a chance to review exactly what

18       that answer is myself.

19          MR. SWITKES:  It has nothing to do

20       with your client answering.

21   BY MR. SWITKES:

22        Q.   Answer the question.

23          MR. FRIDAY:  No, he's not going to

24       answer the question.  I'm looking -- I'm

25       looking up the answer that was provided.

Page 98

1          MR. SWITKES:  Okay.  Counsel, that's

2     totally inappropriate.  I have no idea how

3     you think you can tell the witness not to

4     answer a question until you look up his

5     answers.

6          MR. FRIDAY:  Mr. Switkes, I'm not

7     going to coach him on his answer.  I am

8     trying to review something.  I'm asking

9     for a minute to review my records, it's

10     all I'm asking for.

11          THE WITNESS:  Can I use the restroom?

12          MR. SWITKES:  We'll take a

13     five-minute break.

14          THE VIDEOGRAPHER:  Off the record at

15     10:59.

16          (Recess was taken.)

17          THE VIDEOGRAPHER:  Back on the record

18     at 11:02.

19          MR. FRIDAY:  Madam Court Reporter,

20     could you read back the last question for

21     me.

22          (The question:  When I asked in

23     Question 7 did you consume any alcoholic

24     beverages or take any drugs, medication or

25     other substances that might affect your

Page 99

1      physical or mental ability within 72

2      hours, you didn't say under oath that you

3      had five or six beers within that period

4      of time, did you, was read by the court

5      reporter.)

6           MR. FRIDAY:  Object to the form.

7   BY MR. SWITKES:

8      Q.   Answer the question.

9           MR. FRIDAY:  I'm going to object to

10      the form of the question.

11          MR. SWITKES:  Don't make a speaking

12      objection, Counsel.

13          You can object to the form.  I think

14      you've done that.

15          MR. FRIDAY:  I'm going to object to

16      the form of the question and I am going to

17      ask that if you are going to ask him about

18      the interrogatories, that you either

19      provide him with a copy or accurately

20      quote both the objection and what was said

21      in response to that interrogatory,

22      Mr. Switkes.

23   BY MR. SWITKES:

24      Q.   Go ahead, answer the question, sir.

25      A.   Before -- I didn't know it was

Page 100

1    72 hours.

2        Q.   What do you mean you didn't know?  I

3    just read the question to you, it specifically

4    says within 72 hours preceding the incident

5    described in your complaint.

6        A.   Yeah, I took no drugs or anything,

7    but the alcohol, I drank five beers prior to

8    that --

9        Q.   Five to six you said.

10       A.   Five to six, yes.

11       Q.   Okay.  Why didn't you put that down

12   under oath when you answered these?

13            MR. FRIDAY:  Object to form.

14       Mr. Switkes it discloses on there he drank

15       alcohol.  I don't know why --

16            MR. SWITKES:  Counsel, you are making

17       speaking objections.

18            MR. FRIDAY:  You're mischaracterizing

19       what his answer says, sir.

20            MR. SWITKES:  Excuse me, you're in

21       federal court in this lawsuit and the

22       rules specifically provide there are no

23       speaking objections.  You've done it

24       multiple times.  I don't want to terminate

25       the deposition and ask the judge to

Page 101

1        instruct you that you can't do that, you

2        should know that.

3             You can't -- making speaking

4        objections.  You have a chance to

5        cross-examine the witness when I finish

6        and you can then do whatever you'd like to

7        do.

8             During my examination you can object

9        to the form, you can instruct him if

10       there's a privilege, other than that

11       you're not supposed to make speaking

12       objections.

13            MR. FRIDAY:  If you're going to sit

14       here and mischaracterize what the answer

15       in the interrogatory is, then I'm going to

16       -- I'm going to object to it.

17            MR. SWITKES:  You can object, but you

18       can't do so with a speaking objection.

19   BY MR. SWITKES:

20       Q.   In fact, in these answers to

21   interrogatories you dealt with -- you did that

22   with the assistance of your counsel, didn't

23   you?

24       A.   What's that?

25       Q.   Answer these questions under oath.

Page 102

1      A.   I answered the questions in -- in the

2   way I was supposed -- like when I was asked

3   the questions I answered the questions to the

4   best --

5      Q.   Did you answer them with the

6   assistance of your counsel, yes or no?

7      A.   No.  I -- I was -- he didn't tell me

8   what to say, if that's what you're asking.

9      Q.   I didn't ask you that.  I said with

10   the assistance of your counsel.

11      A.   He asked the questions, I answered

12   them.

13      Q.   Question Number 10, I asked you:  Did

14   you have or were you suffering from any

15   physical, mental or other medical infirmity,

16   condition, injury, disorder, disability, pain,

17   sickness or other limitation at or around the

18   time of the incidents described in your

19   complaint or at any time in the ten years

20   prior to the incidents described in your

21   complaint?

22           If yes, please describe with

23   specificity (including the nature of the

24   infirmity, the diagnosis and prognosis, the

25   full name and address of the treating

1  physician and/or mental health provider,

2  facility, and the dates of treatment).

3          Do you remember that question, sir?

4      A.   Vaguely.  I do remember it, because I

5  explained that I had shoulder impingement

6  syndrome, I had gone to the urgent care in

7  Port St. Lucie, and that's -- and I didn't

8  know I had shoulder impingement.  I thought it

9  was a rotator cuff issue until they

10 rediagnosed it as shoulder impingement

11 syndrome.

12     Q.   But you specifically went to treat

13 for physical, mental or other medical

14 infirmities, correct?

15     A.   Yes, I went to --

16     Q.   And your answer was:  Plaintiff had a

17 prior shoulder impingement syndrome to the

18 right shoulder.  Plaintiff was not currently

19 under treatment and does not recall the last

20 treatment date or location.

21          Today you gave us you that you had an

22 urgent care visit or two, correct?

23     A.   There was an urgent care in Port

24 St. Lucie for the right shoulder and there was

25 -- there was an incident in Daytona Beach.

Page 104

1    Q.   So why did you say that you not

2    recall the location?

3    A.   Because I don't know -- because I

4    can't find it.

5    Q.   You just told us the location, you

6    gave us two cities --

7    A.   Well, I gave you the city --

8    Q.   Excuse me, you're interrupting my

9    question.  Take a breath, let me finish my

10   question and you can answer.

11        You just give us the cities where you

12   visited the urgent care centers, why didn't

13   you do that under oath?

14   A.   I thought I did.  I -- to my

15   knowledge I thought I said I went to one in

16   Ormond for the incident that happened that I

17   explained about --

18   Q.   I just read word for word your

19   answer, would you like to look at it?

20   A.   Sure.

21   Q.   See if you put down Ormond -- Number

22   10 there, sir.  Did you put down out any

23   locations there?

24   A.   Once again, I don't -- I didn't have

25   the addresses.

1      Q.   The question was:  Did you put down

2   any locations?

3      A.   I thought I had did.

4      Q.   But the answer is you didn't,

5   correct?

6      A.   Correct.

7      Q.   But you have records of those,

8   correct?

9      A.   I don't have personal -- they're not

10   in my possession.  I can get them from the --

11   one -- one of the urgent cares I can't.  I

12   don't know if it's still open, but the other

13   one is right around the corner from my house.

14      Q.   And the next question, Number 11, is:

15   Identify and provide the name, address and

16   phone number for each and every healthcare

17   provider, including, but not limited to,

18   medical doctors, physicians, psychiatrists,

19   dentist, psychologists, therapists, licensed

20   social workers, faith healers, hospitals,

21   clinics, substance abuse treatment centers and

22   other institutional providers of health care

23   who have treated, council or examined you at

24   any time within the last ten years preceding

25   the date of your response and state as to

Page 106

1   each, the dates of examination or treatment,

2   the nature of the care or treatment, the

3   condition or injury for which you were

4   examined or treated and the

5   diagnosis/prognosis for each condition or

6   injury (or disability if applicable, for which

7   you were examined or treated.

8           You were objected to that, correct?

9       A.   I don't know.

10      Q.   This interrogatory is overbroad and

11  unduly burdensome and is subject to privilege.

12          Now you put down, Defendant

13  previously treated at an, A-N, urgent care

14  facility in Daytona Beach.  It doesn't list

15  the name and address, the phone number, the

16  names of the healthcare providers or anything

17  else that you had the ability to obtain before

18  you answered these under oath, correct?

19      A.   I could not obtain the ones from

20  Daytona Beach because, once again, it was -- I

21  looked for it and I could not find it.

22      Q.   So the other one you gave us?

23      A.   Was Port St. Lucie.

24      Q.   And you couldn't locate it but you

25  could say it today?

Page 107

1       A.    I -- yes.

2       Q.    Number 13 is:  Do you contend you

3   have lost any income, and it goes into great

4   length.

5             And your answer to that question,

6   without saying the whole question, was:  Yes,

7   the amount of lost wages is still being

8   determined.  I'm awaiting information from a

9   prior employer.  Will supplement this

10  response.

11            Number 1, who were you working for

12  that you claim you lost income from?

13      A.    The Shores Resort and Spa.

14      Q.    And why couldn't you determine how

15  much time you missed from work?

16      A.    Because I have not -- I haven't

17  worked there in over -- almost a year and a

18  half.

19      Q.    So you worked there from when to

20  when?

21      A.    I worked there up until, I believe,

22  in July.  I believe it was July of that year.

23      Q.    Of that year being 2018?

24      A.    2018, correct.

25      Q.    And the incident in Miami Beach was

Page 108

1    June 24, 2018?

2         A.    Correct.

3         Q.    Are you contending that you missed

4    any time whatsoever after that incident as a

5    result of the incident?

6         A.    Yes, I'm just waiting on the -- the

7    -- from the general manager there.

8         Q.    You're waiting for what?

9         A.    I'm trying to see if I -- how many

10   days I missed after the incident, because I

11   had gone to the doctor and I was -- I believe

12   I was put in a sling, you know, was on

13   steroids.

14        Q.    You had gone to what doctor?

15        A.    To that urgent care in Port

16   St. Lucie.

17        Q.    And it's your best recollection that

18   you missed how much time?

19        A.    It might have been a few days.  I --

20   I don't want to state how many.  It just -- it

21   was probably a few days until my shoulder felt

22   a little bit better so I can -- and, once

23   again, I was on limited duty, I believe, as

24   well.

25        Q.    A few days is how many days?

Page 109

1       A.    Maybe two.

2             MR. FRIDAY:  Object to form.

3             THE WITNESS:  I -- I really don't

4       know.  Three days -- three to five days.

5       I don't -- I don't know.

6   BY MR. SWITKES:

7       Q.    Two to three to five?

8       A.    Yeah.  It's somewhere in there.  I

9   don't -- I don't know.

10      Q.    How much were you earning at that

11  time?

12      A.    Fourteen an hour.

13      Q.    And how many days a week were you

14  working before the incident?

15      A.    I was working five days a week 40

16  hours plus a week.

17      Q.    And what days of the week were you

18  working?

19      A.    They were -- they were -- they

20  varied.  Mostly through the -- mostly through

21  weekends, but, then again, that's, you know,

22  it was --

23      Q.    And June 24, 2018 was what day of the

24  week?

25      A.    I believe it was a Saturday.

Page 110

1      Q.    So you weren't going to work?

2      A.    I requested the day off.

3      Q.    What hours were you working?

4      A.    I was working at night.

5      Q.    From what hours to what hours?

6      A.    Three to -- three to 11, three to

7   10:30, three to 11:00-ish.

8      Q.    So three p.m. to 11:00 p.m.-ish?

9      A.    Yeah, it -- it varied, depending on

10   how quick we got our -- our station cleaned

11   and cleaned the kitchen.

12      Q.    And your requested Saturday off, so

13   the next day you would have been working would

14   have been Sunday?

15      A.    Correct.

16           MR. FRIDAY:  Object to form.

17   BY MR. SWITKES:

18      Q.    And then you would have been off what

19   days of the week thereafter normally?

20           MR. FRIDAY:  Object to form.

21   BY MR. SWITKES:

22      Q.    Is the restaurant closed on Monday?

23      A.    No, it -- my schedule varied

24   depending on -- on what days.  I didn't have

25   like you're working Monday through Friday,

1   that wasn't my schedule.  My schedule -- I

2   could have had Tuesday and Saturday off or

3   Wednesday and Thursday off.  It varied.  I

4   couldn't -- there was no set schedule.

5        Q.   And who set your schedule, you or

6   your --

7        A.   The chef.

8        Q.   The chef.  And your position was

9   what?

10       A.   Line chef.

11       Q.   Who was the chef?

12       A.   I believe his name was Mike Vogler.

13       Q.   V-O-G-L-E-R?

14       A.   I believe so, yes.

15       Q.   And he was the one who set your

16   schedule?

17       A.   Correct.  He was the chef, he was in

18   control of scheduling and everything.  He's

19   the manager, basically.

20       Q.   Did you have a problem with him?

21       A.   Not at the beginning.

22       Q.   How about at the end?

23       A.   When -- yes.

24       Q.   What was your problem?

25       A.   False -- he told me that I would be

Page 112

1    -- I would be getting a promotion and -- and

2    ended up giving the promotion to somebody

3    else.

4        Q.   And you thought that was unfair?

5        A.   That was one of the reasons why I

6    left.

7        Q.   Okay.  So your total sum of lost

8    wages would be the number of days immediately

9    pri -- subsequent to the incident in Miami

10   Beach for as many days as you're off, you

11   think it's two or three up to a maximum five?

12           MR. FRIDAY:  Object to form.

13           THE WITNESS:  Possibly.  Once

14       again --

15   BY MR. SWITKES:

16       Q.   What do you mean possibly?

17       A.   I just have to get -- I'm trying to

18   still get that information.

19       Q.   But the maximum would be five?

20       A.   At most, yeah.

21       Q.   Okay.

22       A.   Max.

23       Q.   And after you left there where did

24   you go work?

25       A.   I want to say -- I want to say it was

Page 113

1    -- I want to say it was Spotos.

2        Q.    Can you spell that for me?

3        A.    S-P-O-T-O-S, I believe it was.

4        Q.    And that's located where?

5        A.    In Stuart, Florida.

6        Q.    And what was your job there?

7        A.    Line chef -- or a sous chef.

8        Q.    And when you applied there did you

9   tell them that you had any physical

10  limitations whatsoever?

11       A.    No.

12       Q.    How long were you there?

13       A.    I was there nine months.

14       Q.    And after that?

15       A.    Oh, man, I'm trying -- I'm really

16  trying to think.

17       Q.    We're talking the most recent jobs,

18  this shouldn't be too hard for you.

19           MR. FRIDAY:  Object to form.

20           THE WITNESS:  The one directly after

21       that I -- I honestly, like, I'm trying to

22       think of what job I had after that, after

23       Spotos.

24  BY MR. SWITKES:

25       Q.    You left Spotos in 2018?

Page 114

1       A.    I think so.

2       Q.    You don't remember where you worked

3   after that?

4       A.    To be perfectly honest, I don't

5   remember.  Like once I leave a job I kind of

6   forget of when I've worked there.  It's

7   something I put in the past.  It's not

8   something I just recall, you know, it's not

9   like I have a --

10      Q.    You're talking about last year,

11  right?

12      A.    Yeah.

13      Q.    You can't remember where you worked

14  last year?

15      A.    I've had several jobs over the last

16  couple of, like --

17      Q.    Give me the jobs you had over the

18  last year or so.

19      A.    We got Luso's, we got Hoodz, we got

20  Spotos.

21      Q.    At any of those jobs did you tell

22  them you had any physical limitations

23  whatsoever?

24      A.    No.

25      Q.    Did you tell them that you had any

Page 115

1    mental limitations whatsoever?

2        A.    No.

3        Q.    Were you able to perform your jobs at

4    those locations?

5        A.    Absolutely.

6        Q.    Now, Question Number 14 in those same

7    interrogatories stated:  State in full detail

8    the entire factual basis for your claims

9    against each Defendant officer in your

10   complaint, including all facts, actions or

11   omissions that you allege form the basis for

12   each of your claims against each Defendant

13   officer in this lawsuit and upon which you

14   rely in support of your contentions that each

15   or any of these officers unlawfully stopped,

16   searched, detained, arrested, battered or

17   assaulted you and/or lawful -- unlawfully

18   searched and seized your property and

19   committed any other wrongdoing or improper act

20   or omission that has harmed you in any way.

21           Do you recall that question?

22       A.    Yes.

23       Q.    Okay.  Let's start with the officers,

24   what officer do you claim in any way violated

25   your individual rights?

Page 116

1        A.    Every one of them.

2        Q.    Okay.

3        A.    The fact that none of them knew the

4    law and they were all -- they're all comp --

5    compliant in violating my rights because they

6    could've stopped it at any point.

7        Q.    Okay.  But how many individual

8    officers did you sue, sir?

9        A.    I believe it's twelve plus the city

10   manager and the chief.

11       Q.    Okay.  I want you to start with

12   Officer Michael Garcia.  I want you to tell me

13   what, in any way, did Michael Garcia do to you

14   that violated your rights in any way.

15       A.    Failure to understand the law,

16   violating my second amendment right.

17       Q.    How did he do that?

18       A.    By not knowing the law.

19       Q.    Well, tell me what he did to you.

20   Don't tell me what he didn't know.  I want to

21   know what Officer Michael Garcia did to you

22   that you claim violated the law.

23       A.    He didn't stop the other officers

24   from detaining me unlawfully.

25       Q.    When did he arrive?

Page 117

1      A.   I don't know.  I don't know -- the
2   first four officers that showed up, those are
3   the ones that basically pointed guns at me, or
4   us.
5      Q.   All four of them?
6      A.   I believe it was -- it was definitely
7   three of them.  The other one had his gun to
8   his side and I don't know if he had pointed it
9   at anybody.
10      Q.   Did he point -- did he, being Officer
11   Michael Garcia, point the gun at you?
12      A.   I don't know the officers' names that
13   pointed the guns at me.
14      Q.   Did Officer Kenneth Bolduc point his
15   weapon at you?
16      A.   I don't know any of the officers'
17   names that day because they -- none of them
18   ID'ed themselves, except for Officer Mitchell.
19   That was the one officer that I -- that
20   actually engaged with me and gave me his name
21   -- or actually I saw his name.
22      Q.   Did you have an opportunity to look
23   at the uniforms while you were there?
24      A.   Even if I can read their names, I
25   didn't -- I don't, per se, remember it because

1    I was sitting on the ground.

2        Q.   So as you sit here today you have no

3    idea how Office Kenneth Bolduc --

4        A.   I don't know --

5        Q.   -- violated your rights; is that

6    correct?

7        A.   I don't know any of the officers'

8    names that were -- I can't ver -- determine

9    who was who that day.  I still don't.  Like

10   the only way I knew any of their names was if

11   they were in my -- within eyes, like, five

12   feet away from me where I could see their

13   name.

14       Q.   Did you see any of their names?

15       A.   I saw Officer Mitchell and I think it

16   was Vilamon or Villa something.

17       Q.   Villamil?  Gustavo Villamil?

18       A.   Yeah, I guess that was --

19       Q.   And what, if in anyway, did Officer

20   Villamil do to, in any way, violate your

21   rights in your opinion?

22       A.   I believe he was one of the officers

23   that pointed a gun at me.

24       Q.   Anything else he did at that day?

25       A.   I can't recall because my back was

Page 119

1    turned when I got put in handcuffs and after

2    that I don't really know directly who...

3        Q.   Were you blindfolded?

4        A.   I wasn't blindfolded.

5            MR. FRIDAY:   Object to form.

6    BY MR. SWITKES:

7        Q.   So what do you mean you couldn't see

8    anything after you were handcuffed --

9        A.   Well, once I was --

10       Q.   After you were handcuffed you were

11   still able to visually observe what was

12   transpiring on the pier, correct?

13       A.   Correct, I could see what was going

14   on but I could not see their names and I could

15   not see their -- I couldn't see their names.

16       Q.   Can you tell me what, if in any way,

17   Officer Brian Rivera did to violate your

18   rights?

19       A.   I have no clue who -- I have no clue

20   -- I couldn't see his name and I don't know

21   when he showed up.

22       Q.   Can you tell me what in any way

23   Lieutenant Eduardo Garcia did to violate your

24   rights?

25       A.   Once again, all the officers that

Page 120

1   showed up that were there, I do not have a

2   recollection of any of their names that day.

3   I did not look at their names.  I didn't even

4   know their names until after the fact.

5       Q.   Do you know what Officer Errol Vidal

6   did to violate your rights in any way?

7       A.   Again, don't know when he showed up.

8       Q.   Can you tell me what Officer Manuel

9   Cano did to violate your rights?

10      A.   I have no clue when he showed up.

11      Q.   Can you tell me what Officer Jessica

12  Salabarria did to violate your rights?

13      A.   All these officers all violated my

14  second amendment right and I don't know when

15  they showed up.

16      Q.   Can you tell me how Officer Robert

17  Mitchell violated any of your rights?

18      A.   He, once again, violated my second

19  amendment right and stood there and accepted

20  it.

21      Q.   Do you know how Officer Nahami

22  Bicelis violated your rights in any way?

23      A.   They all violated my second amendment

24  right.

25      Q.   You say I -- all, I'm asking you

Page 121

1    individually one at a time --

2        A.    Right.   They're all -- yes.

3        Q.    -- and if you know what that

4    individual did, you can tell me, that's the

5    question I'm asking.

6            Do you know how Lavaniel Hicks

7    violated your rights in any way?

8        A.    They violated my second amendment

9    right.

10       Q.    In what way?

11       A.    By detaining me and holding me at

12   gunpoint I -- once again, I don't know when he

13   showed up.  I don't know.

14       Q.    So you said he held you at gunpoint,

15   though, are you telling me you know that

16   Officer Lavaniel Hicks --

17       A.    I don't know --

18       Q.    -- held you at gunpoint, yes or no?

19       A.    I don't know.

20       Q.    Okay.  Do you know if Officer

21   Elizabeth Vidal in any way violated your

22   rights?

23       A.    I don't know.  I know they violated

24   my second amendment right.

25       Q.    Okay.  Now, in your answer to that

Page 122

1   question, Number 14, the factual basis for

2   your claim, the first letter you've put down

3   is A, states:  Defendant officers detained

4   individuals on the pier without reasonable

5   suspicion of any criminal activity, in

6   violation of clearly established statutory law

7   and Florida case law precedent.

8           What do you mean by that?

9       A.   That is you can't violate -- without

10  a crime they have -- they can't do what they

11  did.

12      Q.   When you say "without a crime," the

13  question is where they had reasonable

14  suspicion of criminal activity.  You

15  understand that's your answer you gave?

16      A.   We -- there was no criminal -- we had

17  -- didn't do anything wrong.

18      Q.   Well, were you on a pier overlooking

19  Government Cut where thousands, if not tens of

20  thousands, of passengers on cruise ships go on

21  a regular basis out of that port?

22          MR. FRIDAY:  Object to form.

23          THE WITNESS:  I don't know why

24      expressing -- like for me to express a

25      right, I don't understand there -- I don't

Page 123

1       -- I don't understand that.  I don't

2       understand your question.  I honestly --

3  BY MR. SWITKES:

4       Q.   Do you understand that through

5  Government Cut --

6       A.   There's thousands of people.

7       Q.   -- thousands of passengers are on

8  board cruise ships that leave from that port

9  on virtually a daily basis; do you understand

10 that?

11           MR. FRIDAY:  Object to form.

12           THE WITNESS:  Okay.

13 BY MR. SWITKES:

14      Q.   Okay.  Do you understand that Coast

15 Guard ships use Government Cut to come in and

16 out of port to the Coast Guard station which

17 is located on Government Cut --

18           MR. FRIDAY:  Object to form.

19 BY MR. SWITKES:

20      Q.   -- adjacent to where you were

21 standing with a handgun?

22           MR. FRIDAY:  Object to form.

23           THE WITNESS:  I still -- I don't

24      understand -- yes, if there's boats and

25      stuff that pass through Government Cut...

Page 124

1    BY MR. SWITKES:

2        Q.   Do you understand there are cargo

3    ships with hundreds of crew members that come

4    in and out of the port of Miami every day

5    adjacent to where you were standing with a

6    handgun?

7            MR. FRIDAY:  Object to form.

8            THE WITNESS:  I -- I was expressing

9        my rights as an American.

10   BY MR. SWITKES:

11       Q.   The question was, are you aware of

12   the fact --

13       A.   Sure.

14       Q.   -- yes or no?

15       A.   There is -- there was thousands of --

16   probably thousands of onlookers that were all

17   up and down the beach, yes, there's people

18   there, yes.

19       Q.   The question was not on the beach.

20   The question was --

21       A.   Or on the boats.

22       Q.   -- on the boats, yes.

23       A.   On the waters.

24       Q.   On the side you were fishing off --

25       A.   Yes.

Page 125

1      Q.   -- according to your testimony,

2   there'd be thousands of beach-goers on the

3   beach at the time you were standing on the

4   pier with a handgun in -- on your person,

5   correct?

6      A.   Yeah.  Yes, I was.

7      Q.   You -- you understand that there are

8   pleasure boats and fishing commercial boats

9   that go out of Government Cut on a daily basis

10  while you were standing on the pier with a

11  loaded handgun, correct?

12           MR. FRIDAY:  Object to form.

13           THE WITNESS:  Yes, there...

14  BY MR. SWITKES:

15     Q.   Okay.  So when you say there was no

16  reasonable suspicion, did the police officers

17  know you prior to the date you went to that

18  demonstration on Miami Beach --

19           MR. FRIDAY:  Object to form.

20  BY MR. SWITKES:

21     Q.   -- on June 24, 2018?

22           MR. FRIDAY:  Object to form.

23           THE WITNESS:  Can you rephrase the

24      question, please.

25  BY MR. SWITKES:

Page 126

1      Q.   Did any of the police officers know

2   you before the date of your demonstration on

3   Miami Beach?

4      A.   No.

5           MR. FRIDAY:  Object to form.

6   BY MR. SWITKES:

7      Q.   If people on the beach saw you with a

8   handgun and complained about it, can you

9   believe that that would cause an officer to

10  have a reasonable suspicion about what your

11  purpose was on the beach?

12          MR. FRIDAY:  Object to form.

13          THE WITNESS:  No.

14  BY MR. SWITKES:

15     Q.   If people passing you on the pier saw

16  your handgun and were concerned about that,

17  does that give you a basis to believe that a

18  police officer might have reasonable suspicion

19  of what you were doing there at the time?

20          MR. FRIDAY:  Object to form.

21          THE WITNESS:  No.

22  BY MR. SWITKES:

23     Q.   So an officer doesn't have a right to

24  stop somebody in a situation where in this

25  community -- are you aware of the shooting at

Page 127

1    Parkland High School?

2              MR. FRIDAY:  Object to form.

3              THE WITNESS:  I am aware of what

4        happened in Parkland.

5    BY MR. SWITKES:

6        Q.   Are you aware of what has happened in

7    synagogues in South Florida where shooting of

8    individuals have taken place?

9              MR. FRIDAY:  Object to form.

10             THE WITNESS:  Yes.

11   BY MR. SWITKES:

12       Q.   Are you aware of churches that have

13   -- have been the subject of shootings --

14             MR. FRIDAY:  Object to form.

15   BY MR. SWITKES:

16       Q.   -- in the recent past?

17       A.   I've also seen churches the subject

18   of saving hundreds of lives as well.

19       Q.   Have you seen malls that have been

20   the subject to mass shootings?

21             MR. FRIDAY:  Object to form.

22             THE WITNESS:  I've seen malls subject

23       to one person saving a bunch of lives as

24       well, yes.

25   BY MR. SWITKES:

Page 128

1       Q.   I didn't ask you about somebody

2   saving lives.  My question was:  Have you --

3   are you aware of and have you witnessed on the

4   TV or in the media, individuals that have been

5   the subject of mass shootings in shopping

6   malls?

7             MR. FRIDAY:  Object to form.

8             THE WITNESS:  Yes.

9   BY MR. SWITKES:

10      Q.   Have you been aware of shootings at

11  movie theaters?

12            MR. FRIDAY:  Object to form.

13            THE WITNESS:  Yes.

14  BY MR. SWITKES:

15      Q.   Are you aware of terrorist acts on

16  military bases?

17            MR. FRIDAY:  Object to form.

18            THE WITNESS:  Yes.

19  BY MR. SWITKES:

20      Q.   So if a police officer were to

21  encounter a number of individuals standing on

22  the pier where tens of thousands of people are

23  going to pass them, do you think that might

24  raise a reasonable suspicion in an officer as

25  to determine what those individuals had in

Page 129

1    mind on the day you were detained?

2          MR. FRIDAY:  Object to form.

3          THE WITNESS:  No.

4    BY MR. SWITKES:

5    Q.   So they would know that you were not

6    somebody that would potentially expose all of

7    those people of the community that we've just

8    described to potentially being in range of

9    your shooting them?

10         MR. FRIDAY:  Object to form.

11         THE WITNESS:  Rephrase.

12   BY MR. SWITKES:

13   Q.   How would those officers know that

14   your intent was to fish and not to commit an

15   act, a criminal act or a terrorist act?

16         MR. FRIDAY:  Object to form.

17         THE WITNESS:  With the way other

18      officers have treated us, I would expect

19      that's how they would respond.

20   BY MR. SWITKES:

21   Q.   Okay.  My question was how would the

22   officers know that you weren't there to

23   comment a criminal act or a terrorist act?

24         MR. FRIDAY:  Object to form.

25         THE WITNESS:  With no -- with no

Page 130

1          victim, there is no crime.

2     BY MR. SWITKES:

3          Q.   So you would first have to shoot

4     somebody before an officer could have a

5     reasonable suspicion that potential criminal

6     activity is occurring?

7               MR. FRIDAY:  Object to form.

8     BY MR. SWITKES:

9          Q.   Is that your testimony?

10         A.   If -- unless somebody has done

11    something criminal it -- law enforcement

12    should have respect and dignity for the

13    constitution.

14         Q.   Okay.  My question is:  Reasonable

15    suspicion does not require there to be a

16    criminal and a victim of that criminal

17    activity.

18         A.   There has --

19         Q.   Do you understand that concept?

20         A.   Yeah --

21              MR. FRIDAY:  Object to form and

22         argumentative.

23              THE WITNESS:  Yeah, reasonable

24         suspicion of a crime, there has to be

25         either I'm in the commission, I've already

1        committed, or I'm about to commit.  If I'm

2        -- if we're sitting and fishing on a pier

3        and we're not pointing guns, we're not --

4        we didn't do anything to anybody.

5    BY MR. SWITKES:

6        Q.   When the officers arrived how many of

7    the fi -- four, five or six of you, because it

8    varied at times in your complaint, you've

9    indicated different numbers of the members of

10   Florida Carry were present, how many of them,

11   when the police arrived, were actually

12   physically in possession of their fishing

13   rods?

14           MR. FRIDAY:  Object to form.

15           THE WITNESS:  All of us.

16   BY MR. SWITKES:

17       Q.   Every one of them was holding the

18   fishing rod at the time?

19       A.   You don't have to hold a fishing rod

20   to be fishing.

21       Q.   But that's my question.  See, don't

22   rephrase my question.

23           I asked you, not whether you have to.

24   My question was, how many members of the

25   Florida Carry group that were there on

Page 132

1    June 24, 2018 were holding the fishing rods

2    when the officers arrived --

3         MR. FRIDAY:  Object to form.

4    BY MR. SWITKES:

5    Q.   -- do you understand the question?

6    A.   I can only speak for myself and the

7    gentleman that was, I believe, next to me, and

8    we were both were standing next to our fishing

9    rods, but we --

10   Q.   But I didn't ask you that.

11   A.   We did not have them in our hands but

12   they were right next to us.

13   Q.   Okay.  So why would an officer not

14   have a reasonable suspicion that the five of

15   you intended to commit an act of violence

16   against the tens of thousands of people in

17   close proximity to where you had a loaded

18   handgun --

19        MR. FRIDAY:  Object to form.

20   BY MR. SWITKES:

21   Q.   -- with one in the chamber?

22        MR. FRIDAY:  Object to form.

23        THE WITNESS:  Because the park ranger

24        was the only one that was -- that started

25        all of this.  It was the park ranger that

Page 133

1          -- nobody -- nobody was -- we had already

2          talked to multiple people that day and it

3          was the park ranger that didn't care about

4          the law.

5     BY MR. SWITKES:

6          Q.   Okay.  So what did the park ranger

7     communicate to the police department, do you

8     know?

9          A.   I have -- I have no clue.  I have

10    actually done a public records request to try

11    to get that information and that information

12    is yet to be disclosed to me.

13         Q.   Okay.  So you don't know what the

14    park ranger communicated to the officers?

15         A.   Other than what I could hear as he

16    was giving a des -- a description of who -- of

17    me, because I did not have a concealed

18    weapon's license at the time, he said the guy

19    with the afro or the African American or

20    something to that effect, he doesn't have a

21    concealed weapon's license and he said it was

22    going to be a problem.

23         Q.   Who was "he"?

24         A.   The park ranger.

25         Q.   And did you ask him what he meant by

Page 134

1   that?

2       A.   I -- I tried to.

3       Q.   Well, I asked you whether you asked

4   him.

5       A.   I did, I tried to tell him to refer

6   to me as a white male instead of a African

7   American or whatever he referred to me as, as

8   he was giving a description of me.

9       Q.   What does that have to do with what

10  he told the police?

11      A.   What -- what did -- why did he have

12  to refer me as a black male.  Why couldn't he

13  just refer to me as a person.

14      Q.   What's your race?

15      A.   White male.

16      Q.   Okay.  You resent the fact that he

17  called you a black male?

18      A.   I resent the fact that anybody puts a

19  color on anybody.

20      Q.   Okay.  Are you dark complected?

21      A.   I have a -- a darker skin tone, yes.

22      Q.   Does anybody ever mistaken you for a

23  blank individual?

24      A.   Occasionally, yes.

25      Q.   Okay.  Are you offended by that?

Page 135

1      A.    I'm not offended by much, but I don't

2  like labels like that.

3      Q.    Did you correct him?

4      A.    I tried to.

5      Q.    What did you say?

6      A.    I said, can you refer to me as a

7  white male.

8      Q.    And what did he respond?

9      A.    Nothing.

10     Q.    Okay.  Now, my original question was:

11 Did you hear his communication over his

12 hand-held --

13     A.    Not his entire -- not his entire

14 phone call.

15     Q.    Okay.  Tell me what you recall

16 hearing.

17     A.    He was talking to somebody,

18 explaining there is a few people out here, the

19 African American male doesn't have a concealed

20 weapon's license, something to that effect.

21 Like I said, it -- he had distance between me

22 and him and it's all on the audio or what

23 little audio I do have of the video.

24     Q.    Of what little audio I have of the

25 video, you have the video and the audio.

Page 136

1      A.   Of the talking.  With the audio,

2  because he was eight to ten feet away from me,

3  the audio on my camera doesn't pick up that

4  well.  So it's not like I could, hey, speak

5  louder, to him.  It was only whatever I could

6  kind of -- and, once again, he was talking to

7  somebody and I don't even know if it was the

8  police.  I think it was either his boss or

9  something to that effect.

10     Q.   And I've asked a few times, to the

11 best of your recollection, tell me what you

12 remember him saying.

13     A.   Him saying that the guy that had the

14 -- the African -- or the afro or African

15 American, I'm not sure how he said it, it was

16 something afro, doesn't have a concealed

17 weapon's license and that was -- that's what I

18 heard.

19     Q.   Did he mention anything about the

20 other members of your demonstration having

21 guns?

22          MR. FRIDAY:  Object to form.

23          THE WITNESS:  I do believe he did.

24 BY MR. SWITKES:

25     Q.   And do you recall what he said about

Page 137

1   that?

2       A.   There was other people out there.

3       Q.   I don't understand what that --

4       A.   He was saying there was other --

5   there were other individuals with firearms,

6   but then he went in to give a description of

7   just me.

8       Q.   Okay.  But he broadcast there are

9   multiple people on South Pointe Pier with

10  firearms, correct?

11      A.   I believe it was there are people out

12  here but the African or afro or whatever

13  doesn't have a concealed weapon's license.

14      Q.   Okay.  And how long after that did

15  you first see a police presence?

16      A.   It was -- I'm guessing 15 to 20

17  minutes, maybe.

18      Q.   Okay.  And in that 15 to 20 minutes

19  what were you doing?

20      A.   Fishing.

21      Q.   Okay.  And when the officers arrived

22  how many were there?

23           MR. FRIDAY:  Object to form.

24           THE WITNESS:  The initial was four.

25  BY MR. SWITKES:

Page 138

1      Q.   And you don't recall the names of

2  those four?

3      A.   No, I do not.

4      Q.   And what was the first thing any of

5  those four officers said upon arrival?

6      A.   Hands up, hands down, don't touch

7  your gun, while all guns were pointed at us.

8      Q.   And how many of those officers

9  pointed their gun at you?

10     A.   Three.

11     Q.   And were all of you sitting next to

12 each other?

13     A.   I was sitting next to -- I believe it

14 was Carlos Gutierrez or I was standing next to

15 him.  And then I can't say who was left of

16 him.  I just remember it was Carlos next to

17 me.  I was in the front and it was Carlos and

18 then I can't remember who else was left of

19 that or behind me.

20     Q.   Well, were all of you fishing at that

21 time off the north side of the pier?

22     A.   The south side.

23     Q.   You were fishing off the south side?

24     A.   I'm guessing it's the south side.

25 The one towards the channel of the -- that

Page 139

1    pier.  So if the pier is like this, we were

2    facing --

3        Q.   I'm not going to tell you how to

4    answer, but I don't want you to answer with

5    your hands.

6        A.   Right.

7        Q.   Answer verbally.

8        A.   I'm guessing it's the south side,

9    because it was facing where the boats -- we

10   were fishing on the boats -- where all the

11   boats travel.

12       Q.   Okay.  All five of you?

13       A.   I -- I can't say.  I didn't -- I

14   can't speak for them, but I definitely know

15   that myself and Carlos were definitely -- our

16   lines were in the water.  The others, they

17   probably had theirs but I can't say for sure.

18       Q.   When you "lines in the water," --

19       A.   Fishing lines.

20       Q.   -- I want you to use north/south.  On

21   the south side, correct?

22       A.   The fishing lines were on the south

23   side in the water.

24       Q.   Okay.  And if you don't even know

25   where the other members of the demonstration

Page 140

1    were, there are approximately four officers,

2    do you know who was pointing at whom?

3              MR. FRIDAY:  Object to form.

4              THE WITNESS:  They -- after they

5         dealt with me, they were definitely

6         pointed at others, other individuals.

7    BY MR. SWITKES:

8         Q.   And when you say "they," were all

9    four officers were pointing a gun at you?

10        A.   Or -- no, three officers were

11   pointing at me and the -- me, Carlos and I

12   believe as they put me in cuffs their guns

13   were still drawn at Chris and Keith Jenkins as

14   well.

15        Q.   How about Devine?

16        A.   Who?

17        Q.   Devine, Sean Devine, do you know who

18   he is?

19        A.   He was -- he was -- he was behind me,

20   so I don't recall if he had a gun pointed at

21   him.

22        Q.   How long was it between the time the

23   officers arrived and the time you were placed

24   in handcuffs?

25        A.   Instantaneously.  When they -- when

Page 141

1    they were making their walk up the pier they

2    started sending people away and that's when I

3    started -- that's when I was record -- I

4    started recording.  And as soon as they got

5    within, I'd say, twenty something feet, thirty

6    feet, that's when they drew their firearms,

7    told us to put our hands up, hands down, don't

8    touch the firearm, and then put us in cuffs.

9         Q.   Okay.  Instantaneously?

10        A.    Instant -- like from that 30 feet as

11   they walked up guns drawn, our hands -- my

12   hands were up.  I can't speak for others, but

13   my hands were up in the air and they grabbed

14   my arms, pulled them behind my back, which

15   made my -- made me throw my phone on the

16   ground and I was put in cuffs.

17        Q.   Okay.  And you were handcuffed behind

18   your back?

19        A.   Correct.

20        Q.   The other times that you've been

21   arrested, were you handcuffed behind your

22   back?

23        A.   Yes.

24        Q.   And do you know why police officers

25   handcuff individuals behind their back?

Page 142

1              MR. FRIDAY:  Object to form.

2              THE WITNESS:  No.

3    BY MR. SWITKES:

4        Q.   Do you know if that's standard

5    operating procedures when someone is

6    handcuffed?

7              MR. FRIDAY:  Object to form.

8              THE WITNESS:  When they've done

9         something criminal, possibly, but...

10   BY MR. SWITKES:

11       Q.   I didn't ask you that.  I said, do

12   you understand that that's standard operating

13   procedure, to handcuff --

14       A.   No.

15       Q.   -- arrestees or detainees behind

16   their back, yes or no?

17             MR. FRIDAY:  Object to form.

18             THE WITNESS:  No.

19             THE VIDEOGRAPHER:  We need to take a

20        break to change the video.

21             MR. SWITKES:  Sure.

22             THE VIDEOGRAPHER:  Off the record at

23        11:44.

24             (A recess was taken.)

25             THE VIDEOGRAPHER:  We're back on the

Page 143

1       record at 12:05.

2   BY MR. SWITKES:

3       Q.   Sir, is there any way that you think

4   physically an officer would be able to discern

5   the difference of your group from criminals?

6           MR. FRIDAY:   Object to form.

7           THE WITNESS:   Yes.

8   BY MR. SWITKES:

9       Q.   Okay.  Explain how physically you

10  think officers can tell when looking at you

11  versus someone else that you and your group

12  are not criminals versus what criminals look

13  like?

14      A.   They would be more or less what they

15  are doing with their firearm compared to what

16  -- that would be the number one thing that I

17  would think that the officers would be able to

18  discern, is to see what they're doing with

19  their firearm.  If they -- obviously, if

20  they're waving it around or pointing it, that

21  -- that's criminal activity.  But when it's

22  holstered, like it -- like it was that day and

23  it was not in -- other than being out in the

24  open, the gun wasn't in any way, shape or form

25  hurting anybody.

Page 144

1     Q.    What do you mean out in the open?

2  You were all wearing guns --

3     A.    Openly.

4     Q.    -- in holsters, correct?

5     A.    Correct.  Correct.

6     Q.    And there were at least five or six

7  of you, correct?

8     A.    Correct.

9     Q.    And we've gone through all of those

10 thousands of people that use Government Cut

11 and go through there on a daily basis,

12 physically looking at you, forgetting about

13 where the guns were, how would an officer be

14 able to determine whether you're a criminal or

15 you're not a criminal --

16        MR. FRIDAY:  Object to form.

17 BY MR. SWITKES:

18    Q.    -- just by looking at you?

19    A.    What has that person done?  That is

20 how you discern a criminal from a law abiding

21 citizen.

22    Q.    Okay.  And would you think when

23 somebody's in a movie theater and they have a

24 gun, if they're not taking out the gun,

25 someone wouldn't have suspicion that maybe

Page 145

1    someone was doing something improper?

2            MR. FRIDAY:  Object to form.

3            THE WITNESS:  If they're in a movie

4        theater, as you say, and they were to pull

5        a gun or open carry a gun, that would be

6        against the law.

7    BY MR. SWITKES:

8        Q.   You were open carrying a gun, right?

9        A.   But we were following the law.

10       Q.   I didn't ask you that.  I asked you

11   if you were open carrying?

12       A.   Yes, we were.

13       Q.   Is open carrying in the state of

14   Florida without fishing, hunting or camping

15   legal?

16       A.   No.

17       Q.   Okay.  So you know the law is that

18   open carrying in Florida is illegal.

19       A.   With exceptions.

20           MR. FRIDAY:  Object to form.

21   BY MR. SWITKES:

22       Q.   And officers, when they respond to a

23   scene with six people that are standing on a

24   pier next to a Government Cut which has tens

25   of thousands of people going through it on a

Page 146

1   daily basis, do you think maybe they might be

2   suspicious of six people standing on a pier

3   with gun?

4           MR. FRIDAY:  Object to form.

5           THE WITNESS:  There was -- no, there

6       was 14 other officers that were open

7       carrying that day.  And the same law that

8       we have to follow is the same law that

9       they have to follow.

10  BY MR. SWITKES:

11      Q.   Excuse me, I want to make sure I

12  understood your answer.  There were 14 other

13  officers that were open carrying?

14      A.   Or twelve, sorry, twelve.

15      Q.   Okay.

16      A.   On that pier that day.

17      Q.   Police officers.

18      A.   They were people -- they're officers

19  that --

20      Q.   I want to make sure I understand you.

21      A.   Yeah, police officers.

22      Q.   Was there any other nonpolice officer

23  on the pier with a gun other than members of

24  your group?

25      A.   I can't speak for other people there.

Page 147

1       Q.   Did you see any -- I didn't ask you

2   to speak for anybody.  I asked you from your

3   observation, were there any other members of

4   the public that were on the pier that weren't

5   police officers that had guns that were

6   visible to you?

7       A.   No.

8       Q.   Okay.  So it wouldn't be unusual for

9   you to suspect that maybe the officers were

10  going to look suspiciously at you, correct?

11          MR. FRIDAY:  Object to form.

12          THE WITNESS:  It's not suspicious to

13       -- it's not.

14  BY MR. SWITKES:

15      Q.   Okay.  And the fact that -- you're

16  aware of there's an exception at airports?

17      A.   Are you -- pertaining to?

18      Q.   Carrying a weapon near an airport, an

19  open carry near an airport.

20          MR. FRIDAY:  Object to form.

21          THE WITNESS:  I can carry -- as long

22       as -- as long as I'm not on airport

23       property I'm good to go.

24  BY MR. SWITKES:

25      Q.   What about on airport property?

Page 148

```
 1      A.   I don't -- that -- I don't know the

 2  laws pertaining to being on airport property,

 3  because it -- once again, I don't know --

 4  that's going to be -- we don't go fishing at

 5  the airport.

 6          I've never gone fishing at the

 7  airport.

 8      Q.   Did anybody in your group say

 9  anything about being locked and loaded on the

10  date of the incident?

11      A.   I did.

12          MR. FRIDAY:  Object to form.

13  BY MR. SWITKES

14      Q.   Did anybody in your group was the

15  question.

16      A.   Oh, I can't speak for them.  I can't

17  recall anybody saying anything other than me.

18      Q.   You don't recall any -- anybody

19  saying anything that day except for what you

20  said?

21      A.   I -- I -- I may recall some of the

22  things they said, but I can't recall them

23  saying -- if they said if it was locked and

24  loaded.  I know I said, when they were

25  disarming me, that my firearm was locked and
```

Page 149

1   loaded.

2        Q.   And why did you say that?

3        A.   Because it was.  It was ready -- it

4   was hot and...

5        Q.   Why were you carrying it hot?

6        A.   Because I'm not going -- if I had to

7   defend myself, I'm not going -- I don't want

8   to waste time trying to put a round into my

9   firearm.  I'm going to have a fi -- a round

10  ready to go if I -- if it's needed.

11       Q.   How many years have you been fishing?

12            MR. FRIDAY:  Object to form.

13            THE WITNESS:  Thirty-two.

14  BY MR. SWITKES:

15       Q.   And you first purchased your first

16  gun two years ago?

17       A.   I've been around firearms for a

18  while, but I purchased my own personal firearm

19  about two -- two years ago, three years ago.

20       Q.   So of the thirty plus years you were

21  fishing, it's only in the last two years that

22  you've carried a gun?

23       A.   Correct.

24       Q.   And you were -- felt you were in

25  danger the other 30 years?

Page 150

1      A.   When I was almost robbed under a

2   bridge while I was fishing, yes, that's when I

3   decided to start open carrying, because I did

4   not have a fishing license -- or a, sorry not

5   a fishing license, a concealed weapon's

6   license.

7      Q.   Okay.  When was this incident under

8   the bridge?

9      A.   Probably about two months prior, a

10  month and a half prior, two months prior-ish.

11     Q.   To your purchasing the gun?

12     A.   No, to the incident in Miami Beach.

13     Q.   So the question is:  Prior to

14  purchasing the gun two years ago for more than

15  30 years you fished without a gun, correct?

16     A.   Correct.

17     Q.   Okay.  And you didn't feel vulnerable

18  those 30 years?

19          MR. FRIDAY:  Object to form.

20          Go head.

21          THE WITNESS:  I did feel vulnerable

22       but I never -- usually while I was

23       fishing, I never saw the need until the

24       day I almost was robbed.

25  BY MR. SWITKES:

Page 151

1      Q.    Which was a couple years ago?

2      A.    A couple years ago, yeah.

3      Q.    Okay.  Now, did you or anybody in

4  your group say anything about, the city is not

5  happy that we're coming?

6      A.    To those -- verbatim that what you

7  just said?

8      Q.    Not verbatim.  Approximately that or

9  something similar to that, yes, sir.

10      A.    The only thing that I may have said

11  was in the -- in my video where I said -- I

12  had mentioned the phone call that I had made

13  to Miami, not realizing Miami Beach was

14  different, and I had said, we'll see what --

15  you know, we'll see what happens.

16      Q.    Okay.  But that's not my question.

17  Do you remember some -- saying something

18  similar to, they are not happy we're coming?

19      A.    I do not recall that, no, I do not.

20      Q.    Okay.  And who did you speak to

21  Miami?

22      A.    Miami -- Miami Police Department.

23      Q.    And what did you tell the Miami

24  Police Department?

25      A.    I asked them if they -- if they knew

Page 152

1    about the open carry while you were fishing,

2    hunting or camping.

3        Q.   And what did the person you spoke to

4    say?

5        A.   They kind of bounced me around for a

6    couple of officers, but they all were in

7    agreeance that they -- you could not open

8    carry in Florida while you're fishing, hunting

9    or camping.

10       Q.   Okay.  And you realize you were

11   talking to the wrong department --

12       A.   But this is --

13       Q.   -- when?

14       A.   The phone call that I had made was,

15   I'm going to guess, about eight months prior

16   to Miami Beach.

17       Q.   Okay.

18       A.   Six to eight months, somewhere in

19   that range.

20       Q.   Prior to the date that you came to

21   Miami Beach, did you speak to anybody at the

22   city of Miami Beach?

23            MR. FRIDAY:  Object to form.

24            THE WITNESS:  No.

25   BY MR. SWITKES:

Page 153

1      Q.   Did you send any communication to

2  anybody at the city of Miami Beach?

3           MR. FRIDAY:  Object to form, asked

4      and answered.

5           THE WITNESS:  Nope.

6  BY MR. SWITKES:

7      Q.   Did anybody in your group tell you

8  that they had?

9      A.   Yes.

10     Q.   And who was that?

11     A.   Chris Philbot -- Philpot.

12     Q.   And when did he tell you he sent any

13 communication?

14     A.   It was -- it had to have been at

15 least like a month or so.  He gave -- it was

16 like -- I think it was three weeks to a month

17 he had sent the email to the city attorney,

18 chief of police and FWC.

19     Q.   Did you ever see those emails?

20     A.   I never saw the direct emails.  I saw

21 the photo of the email that was sent.

22     Q.   Where did you see the photo?

23          MR. FRIDAY:  Object to form, asked

24     and answered.

25          Go ahead and answer.

Page 154

1          THE WITNESS:  Florida Carry.

2    BY MR. SWITKES:

3        Q.    What do you mean Florida Carry?

4        A.    On Florida Carry -- the Florida Carry

5    Facebook group.

6        Q.    Okay.  Did Mr. Philpot ever told you

7    -- tell you that he spoke to anybody at the

8    City of Miami Beach before June 24, 2018?

9        A.    Other than through Facebook, that was

10   the only way until the day of and he

11   reverified that he had sent the letter to FWC,

12   city attorney and FWC.

13       Q.    Okay.  My question was:  Did he tell

14   you he spoke to anybody --

15       A.    Directly, no.

16       Q.    -- at the --

17       A.    Other than through Facebook.

18       Q.    Did he receive any response through

19   Facebook from anybody at the City of Miami

20   Beach?

21       A.    FWC was the only one that responded

22   to the email.

23       Q.    So the answer is no, nobody from the

24   City of Miami Beach ever responded?

25       A.    I don't know if there's a Miami --

Page 155

1    Miami Beach FWC, because they're spread out

2    through the state and they have regions, so I

3    don't know if they're affiliated with Miami

4    Beach or not.

5         Q.    FWC is a state agency --

6         A.    State agency.

7         Q.    -- are you aware of that?

8         A.    They have -- they have different

9    places throughout the State of Florida.

10        Q.    My question is, let me ask it for the

11   last time:  Are you aware of anybody from the

12   City of Miami Beach responding to Mr. Philpot,

13   yes or no?

14        A.    To my knowledge, no.

15        Q.    Okay.  Now, in Paragraph 24 -- excuse

16   me, 25 of your complaint, the complaint

17   states:  All the citizens except Devine were

18   in possession of lawfully carried firearms.

19              Devine was not carrying?

20        A.    Who?

21        Q.    Sean.

22        A.    I'm guessing his name is Sean, I

23   don't know him by his last name.

24        Q.    Sean Devine, yes.

25        A.    He was not carrying.

Page 156

1      Q.   And you said --

2           MR. FRIDAY:  Can I seek

3      clarification, you're looking at the

4      complaint or the amended complaint?

5           MR. SWITKES:  This is -- I believe

6      this is the amended, but I'll read them

7      just so there's no confusion.

8           MR. FRIDAY:  Okay.

9           MR. SWITKES:  How about that?

10  BY MR. SWITKES:

11     Q.   On page 6 of this complaint it says:

12  An unknown employee of Miami Beach, who was a

13  park ranger, approached the six fishermen.

14          Were there six fishermen when the

15  park ranger approached?

16     A.   I believe it was five or six.

17     Q.   Who wasn't there at the time the park

18  ranger --

19     A.   I believe it was Jonah.

20     Q.   And approximate --

21     A.   He showed up -- Jonah, I think his

22  last name is Sam or West or -- Jonah West or

23  Sam, I can't remember.  I don't know, I

24  mostly --

25     Q.   Jonah Weiss is the --

1      A.   Weiss, that's it.

2      Q.   -- individual listed on the

3   complaint.

4      A.   Jonah Weiss, that's it.  I know most

5   of them by their first name, not so much by

6   their last names.

7      Q.   Okay.  And when, approximately, did

8   he show up?

9      A.   I'd say maybe 15 to 20 minutes after

10   the -- after the initial interaction.

11      Q.   Okay.  Did any officer express to you

12   or express on the date of this incident that

13   they were operating under a city ordinance?

14      A.   Rephrase that again.

15      Q.   Did any officer say to you that they

16   were there pursuant to a city ordinance?

17      A.   No.  To me directly, no.

18      Q.   Whether it was you to directly or to

19   some other member of your party.

20      A.   Yes, yes, they did.  I don't know who

21   they were directing the question to, but it

22   was mentioned through the body cams that I've

23   seen and they had mentioned it.  And, once

24   again, for what I know, that goes against the

25   preemption law, 790.33 of the Florida

Page 158

1    statutes, which basically says the city,

2    county, town, cannot create their own gun

3    laws.

4        Q.   Okay.  But you're saying one of or

5    more than one officer said --

6        A.   It was -- it was definitely one

7    officer, but I do not know who said it.

8        Q.   And he said what?

9        A.   That they had a sign that did not

10   allow firearms onto that -- to that pier.

11       Q.   Okay.  You have said in your right to

12   supplement the response that you gave to

13   Question Number 14 of the interrogatories:

14   The defendants committed a battery by

15   offensively touching and handcuffing the

16   individual plaintiffs without a legal basis

17   for the officer's action in number five --

18   letter five.

19           What do you mean by that?

20       A.   Without a crime they have no reason

21   to touch us.  They have -- that's battery.  If

22   I were to touch you without your consent it's

23   battery.

24       Q.   So if an officer has a reasonable

25   suspicion to detain a person with a firearm

Page 159

1    and they touch you by putting you in

2    handcuffs, you think that's a crime?

3        A.    That is a crime.

4        Q.    Okay.  You think it's a crime.

5        A.    That is a crime.

6        Q.    Okay.  When you were planning on

7    coming to Miami Beach to do this demonstration

8    on June 24, 2018, did you apply for a permit

9    to demonstrate?

10           MR. FRIDAY:  Object to form.

11           THE WITNESS:  You do not need a -- a

12       permit to assemble.

13   BY MR. SWITKES:

14       Q.    Did you apply for a permit to

15   demonstrate was my question?

16           MR. FRIDAY:  Object to form.

17           THE WITNESS:  Don't need a permit.

18   BY MR. SWITKES:

19       Q.    Did you apply for a special event

20   permit?

21       A.    Don't need a special event permit.

22           MR. FRIDAY:  Object to form.

23   BY MR. SWITKES:

24       Q.    So you're answering your question and

25   I'm going to have you answer my question.

Page 160

1           You can say yes, no or I don't know,

2    and then you could an explain it, but I've now

3    asked you twice and you have refused to answer

4    it.

5           Did you apply for a special event

6    permit, yes or not?

7           MR. FRIDAY:  Object to form.

8           THE WITNESS:  No, we do not need a

9       permit.

10   BY MR. SWITKES:

11      Q.   Did you apply for a demonstration

12   permit, yes or no?

13          MR. FRIDAY:  Object to form.

14          THE WITNESS:  No, we do not need a

15      permit under the first amendment.

16   BY MR. SWITKES:

17      Q.   Now, you said you took -- taken place

18   since that date --

19          THE COURT REPORTER:  I'm sorry, sir,

20      start that one over again.

21   BY MR. SWITKES:

22      Q.   You have stated that since the

23   incident on June 24, 2018, you have taken

24   place in approximately more than a hundred of

25   these since then?

Page 161

```
 1      A.    It's going to be --

 2            MR. FRIDAY:  Object to form.

 3            THE WITNESS:  -- broken up between

 4      with -- with a group and going out by

 5      myself.

 6  BY MR. SWITKES:

 7      Q.    Okay.  In Paragraph K you said:  The

 8  Defendant officers' actions interfered with

 9  future gatherings of Florida Carry members.

10            You've gone on how many before Miami

11  Beach; six?

12      A.    Before Miami, it was about six.

13      Q.    And you've gone on over a hundred

14  since, correct?

15      A.    Yes.

16      Q.    So how has the actions of the

17  Defendant officers interfered with further

18  gatherings?

19      A.    Fear for other people's safety.

20      Q.    So you were so fearful that you only

21  went to six in your entire life before

22  June 24th of 2018 and because of your fear

23  you've now taken place in over a hundred,

24  correct?

25            MR. FRIDAY:  Object to form.
```

Page 162

1              THE WITNESS:  Yes, I have taken over

2        a hundred but none have come back to

3        Miami, other than with large groups of --

4        of indiv -- like with large groups of our

5        individuals of Florida Carry.

6   BY MR. SWITKES:

7        Q.   Okay.  V states:  At no time did

8   officers have a reasonable belief or

9   apprehension of fear for their safety.

10             Are you telling me the officers --

11   you understood what was in the mind of the

12   officers at the time they approached you?

13        A.   Yeah, because we were all just

14   standing there minding our own business, yes.

15        Q.   Now, you were standing there all

16   except for one with guns, correct?

17        A.   Correct.

18        Q.   So how do you know what belief and

19   apprehension the officer had about approaching

20   five armed men on Government Cut pier that

21   day?

22             MR. FRIDAY:  Object to form.

23             THE WITNESS:  We were --

24   BY MR. SWITKES:

25        Q.   You're not a mind reader, are you?

Page 163

1       A.   I'm not a mind reader.

2            MR. FRIDAY:  Object to form.

3            THE WITNESS:  It -- it was more their

4       --  their -- as they approached us, their

5       demeanor, that's what -- that's what was

6       -- that's how I took their mindset.

7  BY MR. SWITKES:

8       Q.   What was their demeanor?

9       A.   As they started pushing away and

10 telling people to go the other way, like they

11 were ready to get into a confrontation.

12      Q.   So if they were ready to get into

13 confrontation, that means that they perceived

14 you as a danger, correct, that's why they were

15 pushing people away.

16           MR. FRIDAY:  Object to form.

17           THE WITNESS:  That was their

18      perception.

19 BY MR. SWITKES:

20      Q.   Okay.  X:  Defendant officers used

21 excessive force in handcuffing Plaintiff

22 Jenkins and Taylor resulting in physical

23 injury to them.  I want you to tell me what

24 you -- describe how the officers placed you in

25 handcuffs.

Page 164

1    A.   When they approached they told us put

2    our hands up or put -- they said, put your

3    hands up, put your hands down.  My hands were

4    up.  I was holding a phone, which I was on a

5    Facebook live -- I was -- it was a Facebook

6    live video to document what was going on.  And

7    when the officer came up from behind, grabbed

8    my arm, and pulled down on both my arms, and

9    then placed me in handcuffs from that point.

10   And that's where -- that's where the physical

11   part of it came from, from the pulling, from

12   pulling behind my back.

13   Q.   He pulled your arms down and placed

14   them behind your back and placed you in

15   handcuffs, correct?

16   A.   Correct.

17   Q.   There was no further physical contact

18   with your person, was there?

19   A.   Other than when they -- they tried to

20   assist me up.  And then the other contact that

21   they had was when they unlawfully took me off

22   the pier.

23   Q.   So let's talk about that.  Now,

24   you've described the physical handcuffing.

25   Now you've said when they physically helped me

Page 165

1    up.

2        A.    Well, they -- because I was

3    complaining about my shoulder and I was asking

4    for relief and they wouldn't cuff me in the

5    front, so I -- I asked to be placed up against

6    the -- there's a pole that has, I believe it's

7    an awning or some kind of little shade area,

8    and they lifted me up and they placed me up

9    against that -- that pole.

10       Q.    Okay.  Do you see anything improper

11   in the way they lifted you up?

12       A.    Only the fact that they were pulling

13   on my left shoulder, the shoulder that was

14   injured.

15       Q.    Did you ask them to help you up?

16       A.    No.  They said they were going to get

17   me up because they were trying to help -- I

18   guess help me get up and relieve the stress

19   off my shoulder.

20       Q.    So they were trying to help you get

21   up to release the stress from your shoulder,

22   correct?

23       A.    Yes.

24             MR. FRIDAY:  Object to form.

25             THE WITNESS:  Yes.

 1   BY MR. SWITKES:

 2       Q.   Okay.  And then you said the next

 3   instant when they touched you was when?

 4       A.   They didn't, like, I guess, what I

 5   was saying, and they decided they wanted to

 6   take me to their car and I didn't ask to go

 7   anywhere.  They decided they'd take -- they'd

 8   take me off the pier and put me in the back of

 9   the cruiser.

10       Q.   Okay.  Did you complain when you were

11   on the pier?

12       A.   Yes.

13       Q.   What did you complain about?

14       A.   About shoulder injury -- my shoulder

15   injury and my shoulder starting to hurt.  And

16   then that's when I -- after they didn't want

17   to listen, I then asked for medical attention.

18       Q.   And did they call for medical --

19       A.   After.

20       Q.   -- personnel to come to the pier?

21       A.   I think it was after about three or

22   four minutes, four to five minutes of me keep

23   reiterating the same thing, saying I need --

24   I need help for my shoulder.

25       Q.   And thereafter they helped you up and

Page 167

1    placed you in the back of a police car?

2         A.   They were on their way to take me to

3    the police car when the ambulance showed up.

4         Q.   So they never did place you in the

5    police car.

6         A.   They did place me in the police car

7    after the -- the medical people could not --

8    they couldn't -- they weren't going to be able

9    to help my shoulder.  And then they said they

10   couldn't -- they said that they couldn't have

11   him take the cuffs off.  And I said, I don't

12   want the cuffs off, I just need it be placed

13   around the front so that it can relieve the

14   stress off my shoulder.

15        Q.   And did they do that?

16        A.   No.

17        Q.   Never?

18        A.   Never.

19        Q.   Okay.  And do you understand what the

20   protocol is for -- I asked you before, why

21   they don't do that?

22             MR. FRIDAY:  Object to form.

23             THE WITNESS:  I don't know your

24        policies.

25   BY MR. SWITKES:

1    Q.    Okay.  Do you know that the policy is

2    because officers' been murdered by subjects by

3    strangulation when they're handcuffed in the

4    front?

5            MR. FRIDAY:  Object to form.

6    BY MR. SWITKES:

7    Q.    You're not aware of that?

8            MR. FRIDAY:  Object to form.

9            THE WITNESS:  If that's happened, I'm

10        sorry it's ever happened, but I'm not a

11        violent person, I wasn't violent that day.

12   BY MR. SWITKES:

13   Q.    Okay.  How soon after they summoned

14   the officer that they did within three or four

15   minutes of your request, did the paramedic

16   show up?

17   A.    I'm going to guess 10 to --

18   10 minutes, 10, 15 minutes.

19   Q.    Okay.  And did you say anything about

20   that?

21   A.    About what?  About them taking a long

22   time?

23   Q.    Yeah.

24   A.    Yes, I did.

25   Q.    What did you say?

Page 169

1       A.   I said something to the fact that --

2  that if it would -- would have been one of

3  them that had been hurt they would have showed

4  up a lot quicker.

5       Q.   Did you say hurt or shot?

6       A.   I said hurt.  I believe it was hurt.

7  I did not say shot, because nobody was shot

8  that day.

9       Q.   Okay.  But that's not what you were

10  talking about.

11       A.   I said if --

12       Q.   You were talking about you thought

13  they were not -- the paramedics were not

14  getting there fast enough and that you were

15  implying that if one of the officers had been

16  shot or hurt maybe the paramedics would have

17  shown up faster, correct?

18            MR. FRIDAY:  Object to form.

19            THE WITNESS:  I did not -- I did not

20        imply shot.  I -- I -- if -- if I -- my

21        memory recalls, it was, if it would have

22        been one of them hurt or something to that

23        effect, they would have been there a lot

24        quicker.

25  BY MR. SWITKES:

Page 170

1      Q.   And that's based upon what?

2      A.   Just on -- just common knowledge, I

3  guess you would say.

4      Q.   Common knowledge is is that

5  paramedics show up to the scene when someone's

6  complaining of shoulder pain how fast?

7           MR. FRIDAY:  Object to form.

8           THE WITNESS:  Anywhere from six to

9      15, 20 minutes.

10 BY MR. SWITKES:

11     Q.   And you said they showed how soon?

12     A.   15 -- 15 minutes.

13     Q.   So it was right within the timeframe

14 you said.

15     A.   But--

16     Q.   Why would you have said that they are

17 delaying it and if one of you were hurt they

18 would have come faster, if they came within

19 the time that you said is reasonable when they

20 normally come?

21     A.   I never said that was reasonable.

22 That's -- that's -- that's a statistic, an

23 average time of first responders responding to

24 an incident.

25     Q.   So you think because it was you they

Page 171

1    should have shown up faster?

2        A.   No, I was --

3            MR. FRIDAY:  Object to form.

4            THE WITNESS:  I -- I was implying

5        that law enforcement/first responders

6        respond to first responders a little bit

7        quicker.

8    BY MR. SWITKES:

9        Q.   And you were saying that because you

10   were in fear of the first responders again?

11       A.   The first responders that showed up

12   drew guns at us, so, yes, I was in fear of my

13   life from those first responders.

14       Q.   So you were saying to them, if it was

15   for you it would have come faster to show your

16   fear?

17       A.   If they would --

18           MR. FRIDAY:  Object to form.

19           THE WITNESS:  If they would have had

20       an injury, yes, I do believe that the

21       paramedics would have showed up to assist

22       that officer a lot quicker than the

23       average person.

24   BY MR. SWITKES:

25       Q.   Weren't you talking and antagonizing

Page 172

1       the police the entire time they were there --

2               MR. FRIDAY:  Object to form.

3       BY MR. SWITKES:

4          Q.   -- despite the fact that you seemed

5       to imply that somehow you were in fear of

6       them?

7               MR. FRIDAY:  Object to form.

8               THE WITNESS:  I was in fear of them.

9          They just -- they had just pointed guns at

10         me.

11      BY MR. SWITKES:

12         Q.   We've got past that.  The question

13      is, if you were in fear of them why were you

14      continually antagonizing them the whole time

15      they were there?

16              MR. FRIDAY:  Object to form.

17              THE WITNESS:  I was -- I was using my

18         first amendment right.

19      BY MR. SWITKES:

20         Q.   You were using your first amendment

21      right --

22         A.   Right.

23         Q.   -- despite the fact that you're

24      saying you were afraid of them but you kept

25      antagonizing them the whole time they were

Page 173

1    there.  That doesn't sound like fear to me.

2         MR. FRIDAY:  Object to form.

3    BY MR. SWITKES:

4         Q.   Does it sound like fear to you?

5         MR. FRIDAY:  Object to form.

6         THE WITNESS:  You can say that was me

7    using my first amendment right.

8    BY MR. SWITKES:

9         Q.   Were the other members of the party

10   talking as much as you and as antagonistic as

11   you were to the officers?

12        MR. FRIDAY:  Object to form.

13   BY MR. SWITKES:

14        Q.   Yes or no, and then you can explain.

15        No?

16        A.   I -- to be honest --

17        Q.   Yes or no, and then explain.

18        A.   Yes, I guess they -- no, they were

19   not as loud as -- or talk as much as I did.

20        Q.   In answer to Number 15 you say you

21   have suffered emotional distress.  Explain the

22   manifestation of the emotional distress that

23   you claim you have suffered.

24        A.   It would definitely be the two weeks

25   of probably lack of sleep.  It just -- the

Page 174

1   whole situation in it getting replayed in my

2   head did not -- like I won't say -- I wasn't

3   mentally unstable, but it was a mental thing

4   that I -- I just couldn't back -- like I was

5   -- I was -- I almost got shot that day and I

6   was --

7       Q.   And you never anticipated by going on

8   the pier with the five other members that you

9   would be confronted by police officers; is

10  that what you're saying?

11      A.   No.  Never.

12           MR. FRIDAY:  Object to form.

13           THE WITNESS:  I never prior to that I

14      had never experienced anything like that,

15      so, no, I was -- that was not my

16      expectation of that day.

17  BY MR. SWITKES:

18      Q.   Your expectation was just to sit on

19  the pier and fish and nobody would notice that

20  the five of you had firearms at a location

21  with tens of thousands of people going by?

22           MR. FRIDAY:  Object to form.

23           THE WITNESS:  That is some of the

24      things that we do, is to educate the

25      public and law enforcement when needed,

Page 175

1          but our end -- end of our goal is to

2          educate and let people know that the

3          firearm isn't the problem.

4     BY MR. SWITKES:

5          Q.   Did you ever seek any psychological

6     care --

7          A.   No.

8          Q.   -- after this incident?

9          A.   No, I did not.

10         Q.   Have you ever had any psychiatric or

11    psychological or mental healthcare in your

12    lifetime?

13         A.   No.

14         Q.   Have you ever been in an accident

15    before the date of this incident?   An

16    accident.

17         A.   Like a car accident?

18         Q.   Yeah.

19         A.   Only one, and I think I was in my

20    20s.

21         Q.   And where did that accident take

22    place?

23         A.   South Daytona.

24         Q.   And were you a driver?

25         A.   Yes.

Page 176

1    Q.   And was it a severe accident?

2    A.   No, the brakes failed and I -- I had

3    hit a -- a convenient store window and broke

4    the window.

5    Q.   Were you emotionally upset about

6    that?

7    A.   I was -- I was kind of shooken up by

8    it because I had just -- it was a good friend

9    of mine's store, so I was kind of shooken up

10   that just broke my -- a friend or acquaintance

11   of mine's business window.

12   Q.   Did you lose any sleep?

13   A.   I didn't -- I would say it was -- I

14   lost sleep when I saw him on Christmas because

15   I felt bad.

16   Q.   Did you lose sleep by the fact that

17   you had a car that brakes failed and you could

18   have died?

19   A.   I was moving at five miles an hour,

20   if that.  It was -- it was kind of just a -- I

21   was kind of bumped and rolled into it.

22   Q.   You were you injured?

23   A.   No, I was not.

24   Q.   Suffer any other automobile

25   accidents?

```
 1      A.   No.

 2      Q.   Suffer any other injuries during your

 3  lifetime?

 4      A.   I had a neck injury in Costa Rica.

 5      Q.   What type of neck injury?

 6      A.   It was -- I don't know what they

 7  called it, but I just -- I got put in a neck

 8  brace for like a month.

 9      Q.   What was the nature of the injury to

10  your neck?

11      A.   Surfing accident.

12      Q.   What was the nature of the injury?

13      A.   It was a neck injury.  I don't --

14  they spoke it in Spanish, I don't speak

15  Spanish.

16      Q.   I assume you came back to the United

17  States and got care for that injury if you

18  were immobilized for a month.

19      A.   No.

20      Q.   You stayed in Costa Rica?

21      A.   Yes, I did.

22      Q.   And did you go to a hospital?

23      A.   Yes, I did.

24      Q.   Did they take x-rays?

25      A.   Yes, they did.
```

Page 178

1       Q.    Did they tell you what it was?

2       A.    The guy that was there translating,

3   he just said it was kind of like whiplash,

4   something to that effect.  They -- when they

5   took the picture of my neck, the -- I guess

6   the neck has an S-shape curve in it, and mine

7   was almost straight as a pencil.

8       Q.    So you had straight -- straightening

9   of the cervical spine.

10      A.    I couldn't -- I want to tell you but

11  I can't because I don't --

12      Q.    Did you see any other doctors after

13  you went to the hospital?

14      A.    No, I did not.

15      Q.    Did you see any doctors when you came

16  back to the United States?

17      A.    No, I did not.

18      Q.    Any other injuries, sports, slip and

19  falls, trip and falls or otherwise?

20      A.    I had Osgood-Schlatter disease in

21  both my knees and that's going back to when I

22  was a teen.

23      Q.    You play any sports in high school?

24      A.    Yeah, baseball, soccer, football,

25  basketball, bowling.

Page 179

1      Q.    Did you get injured in any of those

2   activities?

3      A.    Ever -- the occasional, you know,

4   soccer ball to the face or a bruised, you

5   know, a bruise, but nothing severe.

6      Q.    No surgeries?

7      A.    No surgeries.

8      Q.    Any hospitalizations?

9      A.    No.

10     Q.    Who is your family physician?

11     A.    Don't have one.

12     Q.    When was the last time you had one?

13     A.    Probably my teens.

14     Q.    Who do you go to for colds and those

15  type of things, nobody?

16     A.    Good old Benadryl.

17     Q.    You've been to any urgent care

18  centers other than the two you told me about?

19     A.    Those are gonna -- I may have been to

20  -- I was at the emergency room for, like I

21  said, I had a gash in my -- in my shin.

22     Q.    How did that happen?

23     A.    I fell fishing, I slipped on a -- a

24  rock and fell on a rock and it gashed my shin

25  open.

Page 180

1      Q.    Any other hospitalizations?

2      A.    I want to say no, not that I can

3   recall.

4      Q.    Were all the members of your group

5   handcuffed?

6      A.    I believe everybody except for Sean.

7   And maybe -- and I want to say Jonah but I --

8   I -- I'm not a hundred percent on that.

9      Q.    Was Sean carrying a weapon?

10      A.    No he was not.

11            MR. FRIDAY:  Object to form.

12            THE WITNESS:  No he was not.

13   BY MR. SWITKES:

14      Q.    And you said the other person was?

15      A.    Jonah.

16      Q.    Was he carrying a weapon?

17            MR. FRIDAY:  Object to form.

18            THE WITNESS:  Yes he was.

19   BY MR. SWITKES:

20      Q.    Why did you choose South Pointe Park?

21      A.    I didn't choose South Pointe.

22      Q.    Who did?

23      A.    Chris.

24      Q.    Why did he choose South Pointe Park?

25      A.    We go -- we go across the state of

Page 181

1   Florida and we pick random areas to go and

2   fish and that was a pier, it was a free

3   fishing pier, other than paying the entrance

4   fee to get into the park.

5       Q.   By entrance fee you mean parking fee?

6       A.   Or parking fee, whatever.  I'm sorry

7   about that.

8       Q.   And when you have these

9   demonstrations, you've now been to hundreds of

10  them, your point is to make what point?

11          MR. FRIDAY:  Object to form.

12          THE WITNESS:  Educate the public

13      about their second amendment rights, talk

14      about, you know, pol -- political -- what

15      they're doing politically with our

16      firearms and the second amendment.  Just a

17      general overview of the second amendment

18      to anybody that has questions about why

19      we're out there.

20  BY MR. SWITKES:

21      Q.   Did are participate in the

22  demonstration at FSU?

23          MR. FRIDAY:  Object to form.

24          THE WITNESS:  Did I demon -- did I go

25      to FSU to demonstrate?

Page 182

1   BY MR. SWITKES:

2       Q.   With Florida Carry.

3       A.   It -- was it a gun ra -- like I'm

4   lost on what you're --  what you're talking --

5   I've been -- I've been to FSU but I've never

6   been to a gun rally, other than the Rally in

7   Tally, but that wasn't a -- that was a -- it

8   wasn't a open carry gathering.  It was just a

9   -- it was at the state capital, it wasn't even

10  at FSU.

11      Q.   You went to the Rally in Tally?

12      A.   That's what they called it, it was

13  called Rally in Tally, yes.

14      Q.   And when was that, approximately?

15      A.   I -- I don't recall.

16      Q.   Give me your best estimate.

17      A.   Maybe November, maybe.  Like I said,

18  I'm just guessing --

19      Q.   November of, what year?

20      A.   2018.

21      Q.   Did you go to a rally in Tampa?

22      A.   I have been to a open-carry gathering

23  in Tampa.

24      Q.   When was that?

25      A.   2019, and I want to say March, if I'm

Page 183

1   not -- once again, there's so many videos that

2   I have, I'm trying to guess on a month.

3       Q.   Did you go to the rally at the

4   University of Florida?

5           MR. FRIDAY:  Object to form.

6           THE WITNESS:  I've never -- never

7       been there.

8   BY MR. SWITKES:

9       Q.   Did you go a rally at Daytona?

10      A.   No.

11          MR. FRIDAY:  Object to form.

12          THE WITNESS:  In Daytona?

13  BY MR. SWITKES:

14      Q.   In Daytona.

15      A.   No.

16      Q.   Did you to a rally at St. Petersburg

17  College?

18          MR. FRIDAY:  Object to form.

19          THE WITNESS:  No.

20  BY MR. SWITKES:

21      Q.   Did you go to a rally at University

22  of North Florida?

23          MR. FRIDAY:  Object to form.

24          THE WITNESS:  No.

25  BY MR. SWITKES:

Page 184

1       Q.   Are you involved as a party in any

2   other lawsuits with any other members of

3   Florida Carry?

4       A.   No.

5       Q.   Do you know if any of the members of

6   the demonstration in Miami Beach were at any

7   of those rallies?

8            MR. FRIDAY:  Object to form.

9            THE WITNESS:  I cannot -- I do not

10       know.

11   BY MR. SWITKES:

12       Q.   Did you ever discuss the experiences

13   of other demonstrations with any of the

14   members you were in Miami Beach on June 24,

15   2018 --

16            MR. FRIDAY:  Object to form.

17   BY MR. SWITKES:

18       Q.   -- before or after that

19   demonstration?

20            MR. FRIDAY:  Object to form.

21            THE WITNESS:  Have I ever talked to

22       anybody about it?

23   BY MR. SWITKES:

24       Q.   Not anyone.  The members that were

25   with you the day in Miami Beach.

Page 185

1      A.   Sporadically at the beginning for the

2   -- when the incident happened in -- for

3   probably about the first month after it

4   happened we -- we talked about it and then we

5   kind of put it behind us, because we wanted to

6   kind of -- because the more we talked about it

7   the more it just kept bringing back all the --

8   all the negative that we had that day.

9      Q.   Were you searched --

10     A.   Yes.

11     Q.   -- by the Miami Beach police?

12     A.   Yes, I was.

13     Q.   When you say searched, can you

14  describe for me what the search consisted of?

15     A.   They -- they took my firearms, they

16  went through my -- my backpack, after I told

17  them that I did not give consent to any of it.

18     Q.   Anything else?

19     A.   Those were the only -- they searched

20  myself, my pockets and -- and my bag.

21     Q.   What was in your backpack?

22     A.   Fishing gear.  Fishing gear, a fillet

23  knife and hooks.

24     Q.   Did they confiscate any of those

25  temporarily?

Page 186

1       A.   No.

2       Q.   What was -- did you bring a cooler?

3       A.   I did not have a cooler but I believe

4   there was a cooler there.

5       Q.   Okay.  Where did they place your

6   firearm?

7       A.   I do not know.

8       Q.   Do you remember your conversations

9   with the officers that you haven't told me

10  about yet?

11      A.   Not real -- I mean, not really.  I

12  think I've told you about pretty much all the

13  conversations that I had about -- with

14  Mitchell and I believe the officer that put me

15  in -- in his vehicle.

16      Q.   What did you say to the officer that

17  put you in his vehicle?

18      A.   That I -- that I just didn't

19  understand what was going on.  And then he

20  was, he was -- he's the one that said

21  something about me drinking.  And I explained

22  to him that -- the same thing I spoke to you

23  about, that I -- I hadn't been drinking and I

24  quit drinking at like two, three o'clock in

25  the morning the day before.

Page 187

1      Q.    You told him you had five or six

2  beers the evening before?

3      A.    I -- I -- I said -- I mentioned -- I

4  don't know if I mentioned how many beers or if

5  I -- I just said I'd -- I think I remember

6  just saying I've been drinking the night

7  before until like two, three o'clock in the

8  morning.

9      Q.    Anything else that you recall?

10     A.    Other than telling the officers not

11 to touch my stuff, other than -- I think

12 that's -- I think that's it.

13     Q.    When you were looking at yourself on

14 the video did it appear to you that you looked

15 pretty calm?

16     A.    No.

17     Q.    How would you describe the way you

18 looked?

19     A.    Frustrated.

20     Q.    Aggressive?

21     A.    No, frustrated.

22     Q.    Argumentative?

23     A.    No.  I was trying to let them know

24 about the law and they were argumentative

25 towards me because they didn't want to hear

Page 188

1   what I had to say.

2        Q.    And did they ask you to stop talking

3   a number of times?

4        A.    I don't recall that.

5             MR. FRIDAY:  Object to form.

6   BY MR. SWITKES:

7        Q.    You don't remember your friends

8   telling you, leave it alone, Mr. Friday will

9   take care of it?

10       A.    That -- you asked if the officers --

11       Q.    Now I'm asking you about your

12   friends.

13       A.    Oh, yeah.

14       Q.    Did you perceive that as telling you

15   to stop talking and stop --

16       A.    No.

17       Q.    -- aggravating the circumstance?

18       A.    No.

19       Q.    Why do you think they were saying

20   that to you?

21            MR. FRIDAY:  Object to form.

22            THE WITNESS:  That's their right.

23   They can say whatever they want to say.

24   BY MR. SWITKES:

25       Q.    Why do you think they were saying

Page 189

1    that to you?

2         A.   I don't know.  You have to ask them.

3         Q.   You can't image why?

4         A.   No.

5              MR. FRIDAY:  Object to form.

6    BY MR. SWITKES:

7         Q.   Now, you said your gun was in a

8    holster?

9         A.   Correct.

10        Q.   Which hip?

11        A.   Right.  It -- it was actually more --

12   if anything, it was more at like the

13   two o'clock.  It wasn't so much, like, on the

14   side of my hip at, like, three or four

15   o'clock.  It was more at, like, two, one

16   o'clock.

17             So it was more in front of me than it

18   was on the side of me.

19        Q.   Does your holster have a clip?

20        A.   The holster has a -- it's a Level II

21   SERPA holster.

22        Q.   And when did you buy that?

23        A.   Right around the same time I

24   purchased the firearm.

25        Q.   Where did you purchase it?

Page 190

1          A.    Lotus Gunworks.

2          Q.    Do you know which officer took your

3    gun?

4          A.    No, I do not.

5          Q.    What was done with your gun once it

6    was taken from you?

7          A.    I do not know.  They just -- they

8    took it and they were running serial numbers,

9    that's all I do know.  I don't know who -- who

10   took it and how it got to where it got, but I

11   do know they were taking photos and they were

12   running serial numbers of firearms.

13         Q.    Do you know who took the photos?

14         A.    No, I do not.

15         Q.    Do you know who ran serial numbers?

16         A.    No, I do not.

17         Q.    How many total officers appeared, to

18   the best of your knowledge?

19         A.    I believe it was twelve in total.

20         Q.    Okay.  Do you know why in your

21   complaint you said it was 20?

22         A.    Well, I didn't say 20.  I don't

23   believe I ever said 20.  I believe it was 12

24   and then there's the chief of police -- chief

25   of police and the city attorney.

Page 191

1        Q.    Showed up at the scene?

2        A.    At that scene, yes.  The chief of

3   police did not show up.  The city attorney did

4   not -- or the city manager or city attorney, I

5   can't remember which one, they weren't there.

6        Q.    Eventually approximately twenty

7   officers would be present at the fishing venue

8   is what's in the complaint; are you aware of

9   that?

10        A.    I was not aware of -- if it was 20, I

11   thought -- I could have said it was twelve,

12   because even in the video I say it was twelve,

13   or 10 to 12 or something around there.

14        Q.    When in the course of the events did

15   Weiss show up?

16        A.    It was 15 or so minutes after the --

17   the initial contact.

18        Q.    And the length of time that you were

19   in handcuffs, your best approximation?

20        A.    At least an hour and a half to two

21   hours.

22        Q.    Then again, you wouldn't know who

23   took the handcuffs off you or put them on?

24        A.    No.

25        Q.    Do you know how many coolers were at

Page 192

1   the scene?

2       A.   I believe there was just one.

3       Q.   And do you know whose that was?

4       A.   I believe it was Mr. Jen -- Steven

5   Jenkins.

6       Q.   And do you know what was in the

7   cooler?

8       A.   Water, water and bait, and ice.

9       Q.   Did the officers look in the cooler?

10      A.   I don't know.

11      Q.   You didn't see that?

12      A.   I did not.

13      Q.   Do you know if the officers took

14  anything out of the coolers?

15      A.   They -- I don't believe they did.

16      Q.   Were there any fish in the coolers?

17      A.   We never -- we never had the chance

18  to fish.

19      Q.   What do you mean by that?

20      A.   We were there for about 30 minutes

21  before we were in handcuffs for two hours.

22      Q.   And in those 30 minutes no one ever

23  fished?

24      A.   I -- I -- in -- in -- in my video

25  you'll see me actually get -- getting ready to

Page 193

1    -- I'm like literally putting my lines

2    together so that I could start fishing and the

3    park ranger showed up and then about 15, 20

4    minutes later the police showed up and we were

5    in handcuffs from that point forward.

6        Q.   On the other six occasions when you

7    went on these demonstrations did anybody catch

8    any fish?

9            MR. FRIDAY:  Object to form.

10           THE WITNESS:  Yes.  I -- I've -- I've

11       caughten numerous fish, Snook, bluefish,

12       trout.  I believe a tarpon's been caught.

13       I believe a mutton snapper's been caught.

14   BY MR. SWITKES:

15       Q.   On the six prior occasions where you

16   appeared with Florida Carry, you caught those

17   fish?

18       A.   I caught fish that were not with

19   Florida Carry.

20       Q.   Oh, I -- see, that's my not question.

21       A.   You asked if we had caught fish and I

22   said yes.

23       Q.   Okay.  I want to know during any of

24   the times when you gathered six times before

25   June 24, 2018, in any of those occasions did

Page 194

1    you catch fish?

2        A.    I believe a croaker was caught.

3        Q.    Amongst how many members?

4        A.    Maybe six, six to ten, at most.

5        Q.    And in how many hours on each one of

6    those six occasions were you fishing?

7        A.    Three to four hours per -- three to

8    four hours and for about three -- with the

9    Florida Carry members it was three events or

10   three gatherings prior to June 28th.

11          And then there were probably about

12   three or four other ones I had done by myself

13   where I had caughten fish.

14       Q.    In the three or four gatherings that

15   you had spent with other members of Florida

16   Carry, in the three to four hours that you

17   were present at those three to four locations,

18   you were recall one croaker being caught by

19   all of the participants on all of those dates,

20   correct?

21       A.    Correct.  That's why it's called

22   fishing, not catching.

23       Q.    Would you agree that the primary

24   purpose of those gatherings was not to fish

25   but to demonstrate?

Page 195

1          MR. FRIDAY:  Object to form.

2          THE WITNESS:  No.  Our main goal is

3      to go out and fish and express our second

4      amendment right and then education of the

5      public is just a secondary byproduct of --

6      of it.

7  BY MR. SWITKES:

8      Q.   As a lifelong fishermen, you would

9  say -- how many fishermen were at these three

10  or four other gatherings?

11     A.   Anywhere from six to ten.

12     Q.   For six to ten people fishing for

13  three to four hours at these prior gatherings,

14  you would admit that one croaker is a pretty

15  meager haul for that amount of fishermen,

16  wouldn't you?

17         MR. FRIDAY:  Object to form.

18         THE WITNESS:  Catching one croaker is

19      a meager -- no.  I guess -- I don't think

20      that's a meager, that's a -- that's --

21      unless you're some kind of better

22      fishermen than we are, or I am, if you can

23      show us the way, I'm -- I'm all ears, man.

24      I would love to see how -- if you know the

25      secret, I would love to know it.

Page 196

1    BY MR. SWITKES:

2        Q.    When you go out fishing, how many

3    fish do you catch approximately when you're

4    not with Florida Carry?  Give me an average

5    day.

6        A.    It could be no fish.  It could be

7    twenty fish.  It all -- it's all going to --

8    it varies.

9        Q.    I asked you for the average.

10       A.    There is no average.  I can't --

11       Q.    You can't -- you don't know what an

12   average is?

13       A.    I do know what an average is.

14       Q.    Why can't you average.  If you go out

15   regularly fishing --  and I go fishing in the

16   Everglades and I can tell you what my average

17   is, and it's a hell of a lot more than what

18   you're expressing.

19       A.    Okay.

20       Q.    Are you telling me that on most of

21   the occasions when you go out fishing you

22   don't catch any fish?

23            MR. FRIDAY:  Object to form.

24            THE WITNESS:  Yeah, fish are caught

25       just not all the time.

Page 197

1   BY MR. SWITKES:

2        Q.    And no one said all the time.

3        A.    I can't give you an average when --

4   there -- there -- there's no average.  There's

5   no average.  It's not like golf where you have

6   an average score that you're always going to

7   score.  Fishing is fishing.  Some days it's

8   zero.  Some days it's a hundred.  It varies.

9   It's a variable, that's why it's fishing, not

10  catching.

11       Q.    One for ten people --

12       A.    If you've got a better --

13       Q.    -- on three different occasions, you

14  think that's normal?

15       A.    Yes.

16       Q.    Okay.  What's the organization you

17  belong to for fishing?

18       A.    I don't belong to any organization.

19       Q.    I thought you said you go in

20  tournaments --

21       A.    Yes, I did.  In past tense, not

22  anymore.

23       Q.    Okay.  What was that organization's

24  name?

25       A.    It's IFA.

1      Q.   IFA?

2      A.   Uh-huh.  Redfit -- or IFA Kayak, it's

3   the kayak division.

4      Q.   And -- so they have -- did you

5   participate in tournaments?

6      A.   Uh-huh.

7      Q.   Say yes or no.

8      A.   Yes.

9      Q.   And during those tournaments you

10   would have zero fish a lot of the times when

11   you were in those tournaments?

12      A.   I -- I had been to -- I've fished, I

13   think it was, eight to -- eight tournaments

14   and three or four of them I caught zero fish.

15      Q.   Is that why you stopped with those

16   tournaments?

17      A.   I actually placed eighth in the state

18   of Florida.  I was ranked number eight and I

19   did catch fish that almost got me to place.  I

20   just missed the cutoff of placing in the money

21   two times.

22      Q.   In one tournament?

23      A.   In -- I think it was two tournaments

24   I just missed the cutoff.

25      Q.   Okay.  How long were you on the pier

Page 199

1   in total?

2       A.   I'm guessing it was probably about

3   three hours, four hours.  Because when we --

4   I'm guessing it was around like one o'clock

5   when he left, but I don't really recall the

6   time, the time we left or after we got out of

7   the cuffs.  It was -- I just know that we were

8   there in cuffs for almost two hours, or

9   roughly two hours.

10      Q.   Well, I'm a little confused.  You

11  said three to four hours --

12      A.   Correct.

13      Q.   -- and now you just said two hours.

14      A.   That day that you're speaking about

15  we were in handcuffs until -- until they

16  closed down the pier.

17      Q.   Okay.  My question is, what is the

18  amount of time you were on the pier?  You've

19  given widely different numbers now.

20      A.   Our normal fishing --

21      Q.   No, no, no, no.

22      A.   On that pier we were scheduled --

23      Q.   I don't want to know normal fishing.

24  I asked you a very simple question, what is

25  your best estimate about the length of time

1   you were on the fishing pier in Miami Beach on

2   June 24, 2018?

3        A.    Three -- three to four hours.

4        Q.    So if your complaint said that you

5   were there for approximately two hours and

6   26 minutes --

7        A.    That was the detainment.  We were

8   there from nine o'clock -- 9:15-ish, that's

9   when I got there, the park ranger showed up,

10  30 minutes after that the police showed up, so

11  we were already there for almost 40 minutes

12  before the police even showed up.  Once the

13  police showed up, we're talking about a

14  two-hour detainment.  So, yes, it was about

15  three hours to four hours.  I don't know --

16  recall what time we left.  I just know we

17  showed up, we barely got any -- we were barely

18  fishing and then we were in handcuffs for

19  almost -- for two hours.

20       Q.    Were you ever told you were under

21  arrest?

22       A.    I asked if we were being detained and

23  they never told us why we were being detained.

24       Q.    Okay.  Did I -- now see if you can

25  answer my question.

Page 201

1      A.   Oh, yeah, no, they never said we were

2  under arrest.

3      Q.   Do you remember any other

4  conversations with the officers on the pier,

5  before I go to off the pier?

6      A.   No.

7      Q.   Do you remember any of the officers

8  threatening you while you were on the pier?

9      A.   Yes.

10     Q.   What did they say?

11     A.   They pointed guns at us.

12     Q.   Okay.  I didn't ask you that.  I

13 said --

14     A.   You asked if they threatened us, and

15 that was a threat.

16     Q.   Okay.

17     A.   With deadly force.

18     Q.   Listen to my question, and I think

19 they're pretty simple.  And remember at the

20 beginning I told you, if you don't understand

21 them ask me to rephrase to you.

22     A.   Okay.

23     Q.   Did any of the officers say anything

24 that you thought was a threat?

25     A.   No.

Page 202

1      Q.    During the time when you were on the
2 pier as they were standing there, do you
3 believe the officers did anything physically
4 threatening as you were handcuffed sitting
5 there?
6      A.    Physically threatening me?
7      Q.    As the officers were standing there
8 -- I've watched the video, I'm sure you have
9 multiple times, weren't the officers just
10 standing there?
11     A.    Most of them, yes.
12     Q.    Okay.  They weren't saying anything
13 to you.  They weren't threatening you.  They
14 weren't doing anything but just standing
15 there, correct?
16     A.    Some of them, yes.
17     Q.    Okay.  And the other ones?
18     A.    They were walking around trying to
19 figure out -- trying to figure out the law.
20     Q.    Okay.  You didn't -- you wouldn't
21 construe that as a threat, would you?
22     A.    They -- they could have possibly been
23 conspiring to arrest us for something.
24     Q.    They could have been possibly doing
25 anything.

1    A.    Yeah.

2    Q.    Did you hear anything that would

3 indicate to you that they were conspiring in

4 someway?

5    A.    When they shut their body cams off,

6 yes.

7    Q.    And who was it that shut the body cam

8 off?

9    A.    I'm guessing it was one of the -- I

10 -- I -- I honestly don't know his name.  I

11 couldn't -- I just know that he shut off his

12 camera and I believe he was either one of the

13 sergeants that approached us that day.

14    Q.    Describe him for me.

15    A.    White male, tall, blonde hair, I

16 believe.  I'd say medium build, too.  He's

17 probably about 200, 225.

18    Q.    And age, approximately?

19    A.    Maybe in his 30s, 40s.

20    Q.    And did he say anything to you that

21 you recall?

22    A.    Yeah, he was the one that asked me

23 why I needed medical attention.

24    Q.    And you responded?

25    A.    Or he responded why.  And I told him

Page 204

1   about my shoulder injury.

2        Q.   And he said?

3        A.   He didn't really respond but he -- I

4   believe he did eventually get the paramedics

5   to start coming.

6        Q.   Okay.  Any other conversations that

7   you recall?

8        A.   No.

9        Q.   Did you request the return of your

10  gun at anytime while on the pier?

11       A.   I definitely said that it was against

12  my second amendment and my fourth amendment

13  rights, which is illegal search and seizures

14  and my firearm --

15       Q.   Did you at any time request the gun

16  be given back to you was the question.

17       A.   At the end of the day or at the end

18  when we were in the parking lot trying to get

19  it -- going through the process to get our

20  firearms back.

21       Q.   Okay.  How did you get from the pier

22  to the parking lot?

23       A.   After I was taken out of the cruiser

24  and walked back to -- to the pier where

25  everybody was, that's when they took us out of

Page 205

1    handcuffs, they told we -- they were shutting

2    the pier down for the day, they walked us back

3    to the cars and that's when they started

4    returning firearms.

5        Q.   And do you know who returned your

6    firearm?

7        A.   No, I do not.

8        Q.   And what kind of car were you driving

9    at the time?

10       A.   I want to say a grey -- grey Ford.

11       Q.   And you came alone, correct?

12       A.   Correct.

13       Q.   And you don't know who accompanied

14   you to your car?

15       A.   No.

16       Q.   How was the gun returned to you?

17       A.   All the magazines were empty and the

18   ammo was put in, I believe, a rubber glove, if

19   I'm not mistaken, and they were returned to --

20   returned into my trunk.

21       Q.   And you can't describe the officer

22   that did that?

23       A.   No.

24       Q.   Did he say anything to you?

25       A.   No.

Page 206

1       Q.    Okay.  And then what happened after

2   he returned your gun and the ammo to your

3   trunk?

4       A.    That was when we decided to -- some

5   of us decided to stay and some decided to

6   leave, and I decided to leave.

7       Q.    Who decided to stay and who decided

8   to leave?

9       A.    I believe Jonah was the only one that

10  stayed, but you're going to have to ask him

11  because I don't know if he stayed that long or

12  if he even did stay.  I just know he was

13  talking about staying.

14      Q.    And did you leave with anybody else?

15      A.    Nope, I left on -- I left by myself.

16      Q.    Okay.  Did you get your fishing gear

17  back?

18      A.    Yes.

19      Q.    When did you get that?

20      A.    While we were on the pier when they

21  started walking -- when they closed the pier

22  down.

23      Q.    And did they close the pier down just

24  for your or did they close the pier for

25  everybody?

Page 207

1        A.    For everybody.

2        Q.    Okay.  Did they tell you why they

3    were doing that?

4        A.    No.  Other than because we were out

5    there open carrying, I mean, that's the only

6    -- the only reason I know that they shut the

7    pier down.

8        Q.    Okay.  My question was:  Did they

9    tell you why they --

10        A.    No.  And if they did, I don't recall

11    it.

12        Q.    Did you ask to return to the pier?

13        A.    Yeah, we -- we wanted to continue to

14    fish but they said they were shutting the pier

15    down.

16        Q.    You asked the officers?

17        A.    We wanted -- yes, we told them --

18        Q.    Not we wanted to.  I asked you, did

19    you ask the officers?

20        A.    It was asked as the group.

21        Q.    Did you?

22        A.    It didn't so much come out of my

23    mouth, no.

24        Q.    Okay.  Did someone else ask?

25        A.    Yes.

Page 208

1      Q.    Who was that?

2      A.    I don't know.

3      Q.    And do you know who said the pier was

4    going to be closed?

5      A.    It's probably going to be one of the

6    sergeants or lieutenants or whoever showed up

7    that day, I don't know.

8      Q.    How often are you going fishing now,

9    presently?

10     A.    Recently, probably about two to three

11   times -- more two times a week, if I'm really

12   lucky.

13     Q.    And what kind of fishing gear do you

14   use?

15     A.    Artificial, live, whatever --

16   whatever is -- whatever gets them biting.

17     Q.    And what kind of pole and reel do you

18   use?

19     A.    Most of my gear is all about seven

20   foot -- seven-foot rods and the reels vary

21   between 3000 series up to 6000s.

22     Q.    What's the biggest fish you've caught

23   in the last two years?

24     A.    Probably about a five and a half foot

25   tarpon.

Page 209

1      Q.    How long did you take to get -- to

2  bring it in?

3      A.    Probably about 25, 30 minutes.

4      Q.    Were you a boat or were you on --

5      A.    I was on land.

6      Q.    Where was that?

7      A.    Port St. Lucie.

8      Q.    What kind of pound string were you

9  using?

10     A.    They all vary.

11     Q.    For that tarpon.  I assume it's a

12  pretty thick line.

13     A.    It was -- I believe it was 50-pound

14  braid, 80-pound leader.

15     Q.    What were you using for bait?

16     A.    Artificial.

17     Q.    Were you able to do that with no

18  problem?

19     A.    It's fishing, man, it goes up and

20  down.  Some days you're lucky, some days

21  you're not.  I got lucky.

22     Q.    How much would you say that five and

23  a half foot tarpon weighed?

24     A.    Probably in the hundred pound, 110

25  pound range, probably.

Page 210

1        Q.   Didn't bother your shoulder?

2        A.   I believe this, when I caught the

3    tarpon, was prior to -- prior to Miami.  It

4    was probably going back seven years, six

5    years.

6        Q.   I asked you if you've gone since and

7    you told me you went since.

8        A.   Oh, sorry, I was sorry -- I was -- I

9    heard what's your biggest fish and that's what

10   I thought.  That's why I talked about the

11   five-foot.

12       Q.   Yeah.

13       A.   I didn't realize you were still

14   talking about recently.

15       Q.   Yeah.

16       A.   So if it was just recently then it's

17   probably going to be about a 40-inch snook.

18       Q.   How long did it take you to take that

19   out?

20       A.   About, say, five minutes, six

21   minutes.

22       Q.   Where did you catch the snook?

23       A.   Stuart, Florida.

24       Q.   Did you keep it?

25       A.   No.

Page 211

1      Q.   You're not allowed to keep it, are

2   you?

3      A.   No.  It's illegal.

4      Q.   Have you ever been the subject of a

5   domestic violence situation?

6      A.   Never.

7      Q.   You ever been in the military?

8      A.   Never.

9      Q.   Ever been in law enforcement?

10      A.   Never.

11      Q.   Ever held a security job?

12      A.   Never.

13      Q.   Have you ever been required to have a

14   security check?

15      A.   Background check or security check,

16   I'm not sure which -- what the difference

17   would be.  Like I've -- I've had background

18   checks on my, you know, through jobs and

19   things of that nature, but I don't know if

20   that's a security check.

21      Q.   Now, you said you went back to South

22   Pointe Pier on two occasions after June 24,

23   2018, correct?

24      A.   Correct.

25      Q.   What were the reasons for the return?

Page 212

1      A.    In October it was just a revisit to

2   the pier, because we -- we were,

3   unfortunately, not able to fish that day, so

4   we went back to go fishing.  And a mutton

5   snapper was caught that day.

6      Q.    I'm having trouble understanding your

7   response.  You said we went back that day --

8      A.    On October --

9      Q.    -- unfortunately we weren't allowed

10  -- we weren't able to fish and we caught --

11  and then you said you caught a fish.

12     A.    On June 24th we were unable to fish

13  so we went back in October to go fishing and

14  we were able to fish and caught a mutton

15  snapper.

16     Q.    Okay.  And on both those times you

17  went there for an open carry gathering,

18  correct?

19     A.    Yeah.  Yes.

20     Q.    You weren't in fear to go back there

21  again?

22     A.    No, because they knew the law now.

23     Q.    Okay.  You said in your answers to

24  interrogatories in Question Number 22, I'll

25  give you the question:  For each weapon

Page 213

1    identified in response to Interrogatory 21,

2    please explain how the weapon was carried on

3    the date of the incident from the time you

4    arrived in Miami Beach to the moment you left

5    Miami Beach.  For all relevant time periods

6    state whether the weapon was holstered, held

7    in your hand, placed on a bench against a

8    railing or otherwise.

9         Your answer was:  I was not in

10   possession of any weapon.  I was in possession

11   of a holstered firearm prior to it being

12   seized by the officers of the Miami Beach

13   Police Department.  The only time my firearm

14   was not on my side in my holster was after it

15   was seized by the officers who later placed it

16   in my vehicle unloaded and in a conti -- in a

17   condition useless for self-defense, correct?

18        A.   Correct.

19        Q.   Were you afraid to be in your car

20   without a gun on your holster on your hip?

21        A.   Yes.

22             MR. FRIDAY:  Object to form.

23             THE WITNESS:  Yes.

24   BY MR. SWITKES:

25        Q.   Do you -- you always drive your car

Page 214

1    with a weapon on your -- in your holster on

2    your hip?

3                MR. FRIDAY:  Object to form.

4                THE WITNESS:  Yes.

5    BY MR. SWITKES:

6        Q.    You always do?

7        A.    Everywhere I go, except for if I have

8    to go into like a school, that's pretty much

9    the only places that I'm not really allowed.

10   Other -- like I can't go to -- to like a

11   Carnival Cruise Line and drive my vehicle in

12   with a firearm, I mean, other than the school,

13   I -- I pretty much carry my firearm with me

14   every day everywhere I go.

15       Q.    Open carry?

16       A.    Not openly.  Concealed.  I have a

17   concealed weapon's license now.

18       Q.    When -- when did you obtain that?

19       A.    I want to say it was a few weeks

20   after the Miami Beach incident.

21       Q.    Did you ask for the weapon to be

22   placed in your vehicle?

23       A.    No, I did not.

24       Q.    Did any members of your party who

25   came that day to Miami Beach continue to fish

Page 215

1    from a seawall?

2         A.   I'm -- I'm guessing it was Jonah but

3    I did not see him fishing off -- fishing.  I

4    just -- he was talking about staying and I

5    left.

6         Q.   Did anybody make any threat to you as

7    you were leaving?

8         A.   No.

9         Q.   The total time you were in handcuffs

10   was approximately how long?

11        A.   Right around -- it was right around

12   two hours.

13        Q.   So if you had one hour and 18

14   minutes, would that be correct, or is it two

15   hours?

16        A.   It was roughly about two hours.  It

17   was -- I -- I couldn't tell you because I --

18   even with my camera shutting off I don't -- I

19   don't know the exact time of how long we were

20   in cuffs, I just know it was right around two

21   hours.

22        Q.   Who has told you your shoulder injury

23   is permanent?

24        A.   Permanent?

25        Q.   Yes.

1      A.    That would be the urgent care.  And

2   it's something that all I can do is try to

3   strengthen, it's not --

4      Q.    So what do you do to strengthen it?

5      A.    I try to -- I basically just do

6   lightweights, five pounds, and I usually do --

7   I don't know what they're called, they're

8   called butterflies, I guess, so that I can

9   strengthen the arm or the shoulder itself.

10     Q.    How often do you do that?

11     A.    Probably about four times a week.

12     Q.    Explain what you mean by butterflies.

13     A.    If you could imagine a butterfly,

14  just like a butterfly, like, you know, I don't

15  know, like you're flap -- like you're flapping

16  your wings type of -- like that, but you're

17  with weights.

18     Q.    With weights?

19     A.    Yeah, like two to five pound weights

20  and I just sit there and I lift up and -- to

21  strengthen the -- the shoulder itself.

22     Q.    Any other exercise you perform?

23     A.    No.

24     Q.    Have you had an MRI?

25     A.    No, I have not.

Page 217

1      Q.   So who's diagnosed any of the

2   injuries you've had in terms of the rotator

3   cuff or -- has anybody told you you have a

4   tear?

5      A.   Urgent care, and that's why they were

6   trying to send me to an MRI.

7      Q.   Okay.

8      A.   But I, unfortunately, could not pay

9   for it.

10      Q.   Are you working presently?

11      A.   Yes, I am.

12      Q.   Where are you working presently?

13      A.   Luso.

14      Q.   And you don't have any health

15   benefits?

16      A.   No, I do not.

17      Q.   When was the last time you saw any

18   doctor relating to your shoulder?

19      A.    It -- it was probably -- it's

20   probably going to be right around the -- right

21   around June, June 24, 2018.  It was a cou --

22   like the day after.  It was either that -- I

23   think the urgent care was closed on Sunday, so

24   I had to go on Monday.  So the 26th, I think,

25   is probably the last day I ever saw a doctor

Page 218

1   about it.

2       Q.   The 26th of?

3       A.   Of June, 2018.

4       Q.   2018?

5       A.   I believe so, re -- re -- regarding

6   my shoulder.

7       Q.   Do you have any plans to return to

8   any doctors?

9       A.   If I can afford an MRI I would -- I

10  would go probably get an MRI to see exactly

11  where my shoulder is and how sev -- how bad or

12  severe the injury is.

13      Q.   The first time you injured it was --

14      A.   My -- I believe it was --

15           MR. FRIDAY:   Object to form.

16  BY MR. SWITKES:

17      Q.   Answer the question.

18      A.   It was probably my right shoulder and

19  I believe that was, like, going back ten

20  years.  It goes back to the -- the disorderly

21  conduct.

22      Q.   And did you have it examined,

23  x-rayed, MRI?

24      A.   I can't recall if there was an x-ray

25  done.  They looked at the shoulder and then

Page 219

1    they gave me a arm sling to wear.

2         Q.    And when you say "they," who is they?

3         A.    The doctors.

4         Q.    At?

5         A.    The urgent care.  But this is in

6    Daytona Beach -- or Ormond Beach or Daytona,

7    one of the two.

8         Q.    Do you have records pertaining to

9    that so you can tell me which of the two it is

10   or where you went?

11        A.    Yes, if I -- once again, the -- that

12   urgent care I believe is no longer there.

13   That's why I can't track them down.  I tried

14   to and I can't, I can't --

15        Q.    Did you have any treatment for the

16   shoulder between ten years ago and the time

17   you were arrested or detained in Miami Beach,

18   excuse me?

19        A.    No.

20        Q.    Have you been detained in any of your

21   subsequent Florida Carry events?

22        A.    Have I been arrested?

23        Q.    Detained.

24        A.    Yes.

25        Q.    Where?

Page 220

1      A.    Port St. Lucie.

2      Q.    Explain to me what happened.

3      A.    I was walking to a fishing pond, the

4   officers didn't know the law, put me in

5   handcuffs, kept me in handcuffs, and until

6   their -- their supervisor showed up and told

7   them what I was doing was lawful and then they

8   released me.

9      Q.    Was that a Florida Carry event?

10     A.    No, it was not.

11     Q.    And when did this occur?

12     A.    2019, January 1st.

13     Q.    How long were you in handcuffs?

14     A.    About 20 minutes, 20, 30 minute-ish.

15     Q.    Did it affect your arm?

16     A.    No, it did not.

17     Q.    You handcuffed in the back?

18     A.    I was handcuffed in the back.

19     Q.    Any other times when you were

20  detained in any other event?

21     A.    Yes -- at an event, no.  No.

22     Q.    Or not an event.

23     A.    Yes.

24     Q.    When was that?

25     A.    That was at -- in Lantana.

Page 221

1      Q.   Approximately when?

2      A.   Like -- I want to say July, August,

3  maybe.

4      Q.   Of 2019?

5      A.   Correct.

6      Q.   And who detained you?

7      A.   The officer, Lantana -- Lantana

8  Police Department, don't know the officer's

9  name.

10      Q.   And were you placed in handcuffs?

11      A.   Yes.

12      Q.   For how long?

13      A.   For, I want to say, about 20 -- 20 to

14  30 minutes, 20 minutes.

15      Q.   Did it affect your shoulder?

16      A.   It did.

17      Q.   How did it affect your shoulder?

18      A.   They were, once again, when I was on

19  the ground, the pain started and then they,

20  once again, proceeded to grab my arm and when

21  -- when they grabbed my arm to, I guess, pull

22  me up, they pulled on my arm and that's when

23  they -- they injured my shoulder again.

24      Q.   Did you see any doctors?

25      A.   No, I did not.

Page 222

1      Q.    Okay.  Any other time you've been

2   detained?

3      A.    Yes, Lake Worth.

4      Q.    And what department detained you

5   there?

6      A.    I want to say it was Palm Beach

7   County or Palm Beach Sheriff's Office.

8      Q.    And were you arrested?

9      A.    No.

10      Q.    Were you put in handcuffs?

11      A.    No.

12      Q.    How long did they detain you?

13      A.    Seven minutes.

14      Q.    Was that a Florida Carry event?

15      A.    No.

16      Q.    And any other times you've been

17   detained?

18      A.    Yes, in Melbourne Beach.

19      Q.    And what department detained you?

20      A.    I'm guessing it's Melbourne Beach PD.

21      Q.    And were you handcuffed?

22      A.    No.

23      Q.    How long were you detained?

24      A.    15, 20 minutes.

25      Q.    And it was a Florida Carry event?

Page 223

1       A.   No.

2       Q.   But you were -- you had a sidearm on

3   you?

4       A.   And -- and a rifle.

5       Q.   Any other times?

6       A.   Detained, no, not to my knowledge or

7   not that I can remember.  I think those are

8   pretty much it.

9       Q.   There was what?

10      A.   I think those were -- that was pretty

11  much all the detainments that I've had.  I've

12  had other police interactions where they've

13  been respectful and talked to me and then they

14  went about their day.

15      Q.   Where else did you have police

16  interaction?

17      A.   Riviera Beach.

18      Q.   Approximately when?

19      A.   May, maybe.

20      Q.   May of '19?

21      A.   Yeah, yes.

22      Q.   And were you with a Florida Carry

23  event?

24      A.   No.

25      Q.   And what was the interaction?

Page 224

1       A.   It was -- actually that was a Florida

2   Carry gathering and they just showed up while

3   we were fishing, we were getting ready to

4   fish.

5       Q.   And?

6       A.   Nothing, they just sat there and

7   watched us for two hours, three hours.

8       Q.   The police watched you the whole

9   time?

10       A.   Yeah.

11       Q.   Why do you think did they that?

12       A.   To give the public the mind of

13   safety.

14       Q.   Why would the public fear you?

15           MR. FRIDAY:   Object to form.

16           THE WITNESS:   I don't -- I don't know

17       why they would.   They -- they -- I don't

18       know why.

19   BY MR. SWITKES:

20       Q.   How many Florida Carry members were

21   there?

22       A.   I believe it was 10 to 12, maybe.

23       Q.   Any other similar incidents?

24       A.   Fort Pierce.

25       Q.   When?

1     A.    What was that?

2     Q.    When?

3     A.    There's multiple days starting in

4  2018.  I -- once again, I don't -- I couldn't

5  tell you exactly what months.  I've been to

6  Fort Pierce probably about close to a dozen

7  times.

8     Q.    And how many of those dozen times

9  were there police interaction with you?

10    A.    Three.

11    Q.    Start with the first one, what

12 happened?

13    A.    Nothing.  It was actually a Florida

14 Carry sanc -- Florida Carry gathering and the

15 police were notified, they showed up, and the

16 same flyer that we had at Miami Beach is the

17 same flyer that we got from Fort Pierce.

18    Q.    And what did the police do when they

19 arrived?

20    A.    They just sat around handing out the

21 Florida statute to the public and answered the

22 questions if people -- or if people walked up

23 and asked how we could carry, the police were

24 there just to kinda reaffirm that we were

25 allowed to do that.

Page 226

1      Q.    And they stayed the whole time you

2  were there?

3      A.    They stayed for, I believe, about two

4  hours.  They weren't there the whole four --

5  four hours that we were there that day.  Or if

6  they were still there, we didn't see them.

7      Q.    And you would say they stayed around

8  to assure the public again?

9      A.    Yes, yes.

10     Q.    Okay.  And then the next time -- when

11  was that?

12     A.    I was by myself.

13     Q.    When was the first time you just

14  discussed, when in time frame, date, month?

15     A.    2018 and I -- I really don't know.  I

16  honestly --

17     Q.    What part of the year?  Beginning of

18  the year?

19     A.    I'll say the end of the year.

20  There's so many of them that I couldn't -- I

21  can't be really specific.

22     Q.    Okay.  And the second time, there's

23  three, so go through all three.  Second time?

24     A.    And then there was a couple in 2019.

25     Q.    A couple in 2019?

Page 227

1      A.   Uh-huh, two.

2      Q.   And was it a Florida Carry event?

3      A.   No, it was by myself.

4      Q.   And police arrived?

5      A.   Correct.

6      Q.   And what happened when the police

7   arrived?

8      A.   Just verified that I was fishing and

9   they went about their day.

10      Q.   Did they stay while you fished?

11      A.   No, they did not.

12      Q.   How about the third time?

13      A.   Same thing, showed up, made sure I

14   was fishing, and from what I saw, they left.

15   They may have been in the parking lot but to

16   my knowledge, they left.

17      Q.   Any other police interactions that

18   you recall?

19      A.   That's all I can -- that's all I can

20   think of right now.

21      Q.   When you say the police stayed to

22   assure the public, you understand people are

23   some -- some people are concerned when they

24   see groups of men and women gathering with

25   guns?

Page 228

1           MR. FRIDAY:  Object to form.

2           THE WITNESS:  I can't help other

3      people's feelings.

4   BY MR. SWITKES:

5      Q.   I didn't ask you whether you can help

6   other people's feelings.

7      A.   Okay.

8      Q.   The question was:  Do you understand

9   how some people might be concerned when they

10  see a gathering of people with guns?

11          MR. FRIDAY:  Object to form.

12          THE WITNESS:  No.

13          MR. SWITKES:  Let's take a short

14     recess, I'm not too much longer.

15          THE VIDEOGRAPHER:  Okay.  Off the

16     record at 1:30.

17          (A recess was taken.)

18          THE VIDEOGRAPHER:  We're back on the

19     record at 2:01.

20          MR. ROSENWALD:  Good afternoon.

21     My name is Rob Rosenwald, I represent

22     the City of Miami Beach and I just have a

23     few additional questions for you.

24                CROSS-EXAMINATION

25  BY MR. ROSENWALD:

1      Q.    First, you testified that Christopher

2   Philpot had sent a letter to the City of Miami

3   Beach city attorney, chief of police, and then

4   to the Fish and Wildlife Commission; is that

5   correct?

6      A.    Uh-huh.  Yes, it was -- it was sent

7   to the city attorney -- I believe the city

8   attorney, chief of police and FWC.

9      Q.    Are you aware that that letter

10  contained -- I'm sorry, that email contains

11  the letter that you're referring to in a

12  format that was unopenable?

13     A.    I have no -- no clue.

14     Q.    Did Christopher Philpot ever tell you

15  that he had trouble sending his email to City

16  of Miami Beach representatives?

17     A.    Not -- me directly, no, he's never

18  said anything that he had trouble.  He's --

19  all he stated was that there was an email sent

20  to the three people or three organizations,

21  the chief, city attorney and FWC.

22     Q.    You said he didn't say anything to

23  you directly, have you heard him say anything

24  to that effect to anyone?

25     A.    Never.

Page 230

1      Q.   Have you seen his emails to the City

2   of Miami Beach wherein he states that he had

3   trouble sending the letter in an openable

4   format?

5      A.   No.

6      Q.   Did you have alcohol with you on the

7   pier on the day that you were doing your

8   demonstration and then you had your

9   interaction with the Miami Beach police?

10          MR. FRIDAY:  Object to form.

11          THE WITNESS:  No.

12   BY MR. ROSENWALD:

13      Q.   I'm sorry, you can answer.

14      A.   No.

15      Q.   No alcohol.  The -- have you ever

16   been adjudged mentally incompetent?

17      A.   No.

18      Q.   Have you ever been addicted to the

19   use of narcotics?

20          MR. FRIDAY:  Object to form.

21          THE WITNESS:  No.

22   BY MR. ROSENWALD:

23      Q.   Have you ever been addicted to the

24   use of any drug?

25          MR. FRIDAY:  Object to form.

Page 231

1          THE WITNESS:  No.

2    BY MR. ROSENWALD:

3        Q.   Are you a habitual or chronic

4    alcoholic?

5        A.   Do I drink beer, yes; but am I an

6    alcoholic, I don't think so.

7        Q.   Now, let me ask you a slightly

8    different question.

9          Did you present any evidence to any

10   Miami Beach police officer on the date of your

11   demonstration, on the date that you interacted

12   with them, that you had never been adjudged

13   mentally incompetent?

14          MR. FRIDAY:  Object to form.

15          THE WITNESS:  I'm sorry, can you re--

16      restate that.

17   BY MR. ROSENWALD:

18       Q.   Did you present any evidence to any

19   Miami Beach police officer that you had never

20   been adjudged mentally incompetent?

21          MR. FRIDAY:  Object to form.

22          You can answer.

23          THE WITNESS:  No.

24   BY MR. ROSENWALD:

25       Q.   Did you present any evidence to any

Page 232

1   officer of the City of Miami Beach that you

2   were not addicted to the use of narcotic --

3   narcotics or any similar drug?

4        A.   No.

5             MR. FRIDAY:  Object to form.

6   BY MR. ROSENWALD:

7        Q.   Did you present any evidence on that

8   day or at any time to any Miami Beach police

9   officer that you were not a habitual or

10  chronic alcoholic?

11            MR. FRIDAY:  Object to form.

12            THE WITNESS:  The only thing -- no,

13       the only thing I did say is that I had

14       been drinking the night before.

15  BY MR. ROSENWALD:

16       Q.   Did you present any evidence to any

17  Miami Beach police officer on that day

18  establishing that you were not using your

19  weapons or firearms in violation of Section

20  790.07 to 790.115 --

21            MR. FRIDAY:  Object to form.

22  BY MR. ROSENWALD:

23       Q.   -- or 790.145 to 790.19 --

24            MR. FRIDAY:  Object to --

25  BY MR. ROSENWALD:

Page 233

1      Q.    -- or 790.22 to 790.24?

2            MR. FRIDAY:  Object to form.

3            THE WITNESS:  No.

4   BY MR. ROSENWALD:

5      Q.    When you were on the pier fishing on

6   the day that you interacted with the police,

7   where on the pier were you located?

8      A.    I was next to the -- the little

9   awning.  I guess there's only one awning out

10  there.  And we were mostly underneath that

11  where the -- the bench is.  And I was, I'm

12  going to say, the further -- I was the first

13  person west as -- if they're coming up the

14  walkway, I was the furthest west away from --

15  I was closest to the entrance of that

16  boardwalk or that -- the coming up onto the

17  pier.

18     Q.    And you say there's only one awning

19  on the pier.

20     A.    I believe so, yes.

21     Q.    If the -- if you could just describe

22  the pier in length, like how long is the pier?

23     A.    Probably close to maybe two to 300

24  yards.

25     Q.    And where in relation, in yards from

Page 234

1    the beginning to the end, were you?

2         A.    We were probably about 150 to 200

3    yards.  We were -- we weren't all the way at

4    the end but we were more than -- we were about

5    halfway onto that pier underneath that awning.

6              MR. ROSENWALD:  I don't have anything

7         further.

8                   REDIRECT EXAMINATION

9    BY MR. SWITKES:

10        Q.    Were you under the awning during the

11   time you expended on the beach?

12        A.    At one point we were underneath the

13   awning as I was gearing up my line to start

14   fishing I was underneath the awning.

15   Periodically we would just, like, you know,

16   within the twenty minutes or so as we were

17   waiting for law enforcement, because we knew

18   they were coming, we may have stepped

19   underneath it, but we were -- most of the time

20   we were up against the railing.

21        Q.    So you weren't in the shade?

22        A.    We were a little bit -- we'd hop back

23   and forth because it was hot that day.

24              We would -- if we got hot we would

25   kind of sit under the awning while our fishing

Page 235

1   poles were waiting to get bit.

2       Q.   After the police arrived were you

3   under the awning?

4       A.   I was not under the awning.

5       Q.   Okay.  Mr. City Attorney asked you a

6   question about drinking beer and are you an

7   alcoholic, you said, I don't believe I'm a

8   alcoholic.

9       A.   I like -- I drink beer.

10      Q.   Well, I understand that, but there's

11  a very big difference between being an

12  alcoholic and drinking beer.  How much beer do

13  you drink on an average day?

14          MR. FRIDAY:  Object to form.  Do not

15      answer that.

16          MR. SWITKES:  You got to be kidding

17      me, Counsel.  You're instructing him not

18      to answer under what theory?

19          MR. FRIDAY:  Unless there is some

20      suggestion that he is an alcoholic --

21          MR. SWITKES:  There is a suggestion

22      on the record between the questions.

23      You're going to really instruct him not to

24      answer that question?

25          MR. FRIDAY:  I believe the statute

Page 236

1      actually has at least one definition where

2      there's a presumption of alcoholism under

3      the statute.

4           MR. SWITKES:  Counsel, are you going

5      to cite a privilege that there is not to

6      answer that question, because I'm aware of

7      some privileges but not one pertaining to

8      that question.

9           MR. FRIDAY:  I'm going to object to

10      the form and I'll allow him to answer.

11           MR. SWITKES:  Oh, that's --

12           THE WITNESS:  Restate the question,

13      please.

14  BY MR. SWITKES:

15      Q.   How much beer do you drink on a daily

16  basis?

17      A.   Between four and five, six beers,

18  four to six beers a day.

19      Q.   Every day.

20      A.   Not every day but in general most of

21  the time.  If I do drink beer it's four to six

22  beers a day or in that -- for that day or

23  whatever.

24      Q.   Have you ever been treated for

25  alcohol intoxication?

1      A.    No, never.

2      Q.    Have you been arrested for DUI?

3      A.    No.

4      Q.    Ever had any incidents relating to

5  alcohol where you were drunk and did something

6  you were ashamed of?

7      A.    Never ashamed of, but --

8      Q.    Or embarrassed about.

9      A.    Never.  I had the incident, like I --

10 I was telling you, where I was almost hit by a

11 taxi driver, he attacked me, I defended

12 myself, but I ended up going to jail because I

13 had been drinking that day.

14     Q.    Had been drinking or were drunk?

15     A.    I was -- I was -- I was probably --

16 they didn't breathalyze me so I can't say if I

17 was legally drunk, but I had been drinking.

18     Q.    How many beers did you consume, to

19 the best of your recollection?

20     A.    Right around the same amount, four to

21 six beers.  I was hanging out with my friends

22 at a bar.

23     Q.    And do you -- how tall are you?

24     A.    Six-one.

25     Q.    How much do you weigh?

Page 238

```
 1       A.   About -- about 158 pounds.

 2       Q.   And you've been that weight

 3   approximately in your adult life?

 4       A.   For most of it.  It goes up and down.

 5   I gain ten pounds, 15 pounds, lose 10 pounds

 6   here and there.  It goes up and down.

 7       Q.   And you've never been treated for

 8   alcoholism?

 9       A.   Never.

10       Q.   What's the longest time you've gone

11   through without drinking alcohol?

12       A.   A -- a week.

13       Q.   Did you consume any water while you

14   were on the pier?

15       A.   I did ask for water and was denied.

16       Q.   So you didn't have any water on the

17   time --

18       A.   We had water in the cooler but we --

19   I asked for it and nobody wanted to give us a

20   bottle of water.

21       Q.   So in answer to my question --

22       A.   No.

23       Q.   -- you didn't have any water while

24   you were on the pier?

25       A.   No, I was not -- I asked for water
```

Page 239

1   and was not given it.

2       Q.   Did you have any water before the

3   officers arrived?

4       A.   Yes, I did.

5       Q.   How much water did you consume?

6       A.   I had a -- I don't know how many

7   ounces that is, like a bottle of water like

8   that, 16 to 20 ounces.

9       Q.   Okay.  What did you eat that day?

10      A.   I had a Pop-Tart before I left when I

11  woke up.  That was my breakfast.

12          MR. SWITKES:  Okay.  I have no

13      further questions.

14          Read or waive?

15              RECROSS EXAMINATION

16  BY MR. ROSENWALD:

17      Q.   I have a few.

18          Have you ever been to an AA meeting?

19      A.   Never.

20      Q.   Have you ever been to an NA meeting?

21      A.   Never.

22      Q.   Were you, as part of your drug

23  arrests, ever placed into a drug court program

24  or a rehabilitation program as a result of the

25  diversion programs that you said you entered?

Page 240

1      A.   The one when I was 18, no, it was

2   just court appointed where you go -- you see a

3   -- what do they -- what do they call that?

4      Q.   A counselor?

5      A.   Not a counselor.  Your -- he's your

6   officer while -- not on parole but -- oh, your

7   probation officer.

8      Q.   Right.

9      A.   That's the only -- I had a probation

10  officer and one of the other marijuana things

11  they sent you to a -- it was a one-day class

12  and it was like wrapped into between anger

13  management and drug counseling type stuff, but

14  it wasn't like a drug -- like it wasn't like

15  an NA meeting type of thing.  It was more of

16  like sit down, this is how you might be able

17  to control this, and it -- it was mixed

18  between anger and drug-related stuff.

19      Q.   And that was a one-day course?

20      A.   That was a one-day -- I believe it

21  was a one-day or two-day course, at most.

22      Q.   How long did the days last?

23      A.   They were -- I believe they were six

24  hours.

25      Q.   And I thought you had said that you

Page 241

1    were put into diversion both times you were

2    arrested for drugs, did I misunderstand?

3        A.    No, the first time -- the first one,

4    the one that I went through the -- it was

5    pretrial intervention, that one was -- I did

6    that by itself.

7            And then the other ones, it was two

8    other separate marijuana charges, and both of

9    them were just, you know, I went and pled no

10   contest, court costs.  But the first time -- I

11   think it was the first marijuana charge, they

12   sent me to that class and I still paid court

13   cost and things of that nature.

14       Q.    So it was just the first one that you

15   went into diversion --

16       A.    Correct.

17       Q.    -- and then the next two you just

18   pled no contest?

19       A.    Yes.

20            MR. ROSENWALD:  Got it.  Okay.

21            I don't have anything further.

22            MR. SWITKES:  Nothing further.

23            MR. FRIDAY:  We read.

24            THE VIDEOGRAPHER:  Okay.

25            Off the record at 2:14.

Page 242

1                          CERTIFICATE

2    STATE OF FLORIDA:
                 :  SS.
3    COUNTY OF BROWARD:

4         I, SONNIA MARTINEZ, COURT REPORTER AND
     NOTARY PUBLIC, IN AND FOR THE STATE OF FLORIDA
5    AT LARGE, DO HEREBY CERTIFY THAT MICHAEL
     TAYLOR WAS BY ME FIRST DULY SWORN TO TESTIFY
6    THE WHOLE TRUTH; THAT I WAS AUTHORIZED TO AND
     DID REPORT SAID DEPOSITION IN STENOTYPE; THAT
7    A FOREGOING PAGES, NUMBERED FROM 1 TO 243,
     INCLUSIVE, ARE A TRUE AND CORRECT TRANSCRIPT
8    OF MY SHORTHAND NOTES OF SAID DEPOSITION.

9         I FURTHER CERTIFY THAT SAID
     DEPOSITION WAS TAKEN AT THE TIME AND PLACE
10   HEREINABOVE SET FORTH AND THAT THE TAKING OF
     SAID DEPOSITION WAS COMMENCED AND COMPLETED AS
11   HEREINABOVE SET OUT.

12        I FURTHER CERTIFY THAT I AM NOT AN
     ATTORNEY OR COUNSEL OF ANY OF THE PARTIES, NOR
13   AM I A RELATIVE OR EMPLOYEE OF ANY ATTORNEY OR
     COUNSEL OF ANY PARTY CONNECTED WITH THE
14   ACTION, NOR AM I FINANCIALLY INTERESTED IN THE
     ACTION.
15
          THE FOREGOING CERTIFICATION OF THIS
16   TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION
     OF THE SAME BY ANY MEANS UNLESS UNDER THE
17   DIRECT CONTROL AND/OR DIRECTION OF THE
     CERTIFYING REPORTER.
18
          DATED IN MIRAMAR, BROWARD COUNTY,
19   FLORIDA, THIS 15th DAY OF FEBRUARY, 2020.

20

21

22   _____
23   SONNIA MARTINEZ, NOTARY PUBLIC
     STATE OF FLORIDA, AT LARGE.
24   MY COMMISSION #FF960975
     EXPIRES:  03/10/2020
25

1

2                       CERTIFICATE

3

4    THE STATE OF FLORIDA,

5    COUNTY OF BROWARD.

6

7

8            I hereby certify that I have read the

9    foregoing deposition by me given, and that the

10   statements contained herein are true and

11   correct to the best of my knowledge and

12   belief, with the exception of any corrections

13   or notations made on the errata sheet, if one

14   was executed.

15

16           Dated this _____ day of ____, 2020.

17

18

19

20

21

22           _____

23                   (Deponent's name)

24

25