UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-CV-22303-KMW

Florida Carry, Inc., a Florida
not-for-profit corporation, et al.

                    Plaintiffs,

vs.

City of Miami Beach, et al.,

                    Defendants.
------------------------------------/


                    1700 Convention Center Drive
                    Miami Beach, Florida 33139
                    Thursday, January 30, 2020
                    1:07 p.m. - 4:19 p.m.




          Video Deposition

        of Christopher Philpot


     Taken before Sonnia Martinez, Notary

Public in and for the State of Florida at

Large, pursuant to Notice of Taking Deposition

filed in the above cause.

          - - - - - - -

```
                                                    Page 2

  1   APPEARANCES:

  2    ON BEHALF OF THE PLAINTIFFS:

  3        Kingry & Friday
           1919 Atlantic Boulevard
  4        Jacksonville, Florida 32207
           By:  Eric Friday, Esquire
  5
       ON BEHALF OF THE CITY OF MIAMI BEACH:
  6
           City of Miami Beach,
  7        1700 Convention Center Drive
           4th Floor
  8        Miami Beach, Florida 33139
           By: Robert F. Rosenwald,
  9            Assistant City Attorney

 10    ON BEHALF OF THE OFFICERS:

 11        Switkes & Zappala, P.A.
           407 Lincoln Road
 12        Penthouse SE
           Miami Beach, Florida 33139
 13        By: Robert Switkes, Esquire

 14   Also present:

 15        Oliver Lee, Videographer
           Video Court Reporting
 16               - - - - - - -

 17               I N D E X

 18   Witness:  Christopher Philpot

 19                    Direct    Cross

 20   By Mr. Switkes           4

 21   By Mr. Rosenwald                 139

 22            E X H I B I T S

 23   Defendant's

 24       No.  1 Page  34        No.  2 Page 140

 25
```

```
 1              (The following was had.)
 2          THE VIDEOGRAPHER:  Okay.  In the case
 3      styled Florida Carry, Inc., et al., versus
 4      City of Miami Beach, et al.  Case
 5      Number 19-CV-22303-KMW.
 6          This is the videotaped deposition of
 7      Christopher Philpot.
 8          This deposition is taking place at
 9      1700 Convention Center Drive, Miami Beach,
10      Florida on January 30, 2020.
11          The time is now 1:07 p.m.
12          Our videographer is Oliver Lee.
13          Counsel will state their appearances
14      for the record, after which our court
15      reporter, Sonnia Martinez, will then swear
16      in the witness.
17          MR. FRIDAY:  Eric Friday for
18      Plaintiffs.
19          MR. SWITKES:  Bob Switkes on behalf
20      of the officers.  And Rob Rosenwald on
21      behalf of the City of Miami Beach.
22          THE COURT REPORTER:  Sir, raise your
23      right hand, please.
24          Do you swear the testimony you will
25      give will be the truth, the whole truth
```

1      and nothing but the truth, so help you
2      God?
3              THE WITNESS:  I do.
4              THE COURT REPORTER:  Thank you.
5                  DIRECT EXAMINATION
6  BY MR. SWITKES:
7      Q.   Sir, could you please state your full
8  name.
9      A.   Christopher Michael Philpot.
10      Q.   And have you ever gone by any other
11  name?
12      A.   No, sir.
13      Q.   Mr. Philpot, have you ever had your
14  deposition taken before?
15      A.   For this event?
16      Q.   For any event.
17      A.   No, sir.
18      Q.   Okay.  The court reporter sitting to
19  your right is going to take down everything
20  that's said in this room.  And even though we
21  also have a videographer, it's important that
22  you give all your responses verbally.
23      A.   Okay.
24      Q.   That is, you can't nod your head or
25  point in any direction, because the court

1    reporter can't take that down, okay?

2         A.    Okay.

3         Q.    Try to keep your voice up.  You're

4    speaking a little bit on the low tone, and --

5    so everybody in the room can hear you.

6         A.    Okay.

7         Q.    If during the course of the

8    deposition you don't understand any of my

9    questions, please ask me to rephrase it and

10   I'll be glad to do so.

11             Okay?

12        A.    Yes, sir.

13        Q.    If you need a break, just let us

14   know.

15             Are you under the influence of any

16   alcohol, medication or drugs that would

17   prevent you from giving honest testimony?

18        A.    No, sir.

19        Q.    Okay.  What is your home address,

20   sir?

21        A.    191 Loganderry, that's one word,

22   L-O-G-A-N-D-E-R-R-Y Lane, Apartment 102, Plant

23   City, that's two words, Florida 33563.

24        Q.    And with whom do you reside at this

25   address?

Page 6

1    A.   I'm there by myself.

2    Q.   And your date of birth?

3    A.   ████ ███ █████

4    Q.   And the place of birth?

5    A.   Point Pleasant, New Jersey.

6    Q.   And have you ever been married?

7    A.   No, sir.

8    Q.   You have any children?

9    A.   No, sir.

10   Q.   Can you give me a brief description

11   of your educational background starting with

12   high school?

13   A.   I have a high school diploma.

14   Q.   From?

15   A.   Central Regional High School.

16   Q.   Where is that located?

17   A.   Bayville, New Jersey.

18   Q.   And when did you graduate?

19   A.   2004.

20   Q.   And do you have any other educational

21   training thereafter?

22   A.   No, sir.

23   Q.   Have you ever been a party to a

24   lawsuit?

25   A.   No, sir.

1      Q.   Have you ever been injured on the

2   job?

3      A.   No, sir.

4      Q.   Have you ever been arrested?

5      A.   No, sir.

6      Q.   Have you ever been the subject to a

7   domestic violence situation?

8      A.   No, sir.

9      Q.   Do you remember a lawsuit versus a

10   Henderson Mental Health Center?

11      A.   I'm sorry, sir, can you repeat that?

12      Q.   Yes.  Christopher Philpot versus

13   Henderson Mental Health Center, et al, filed

14   in February 10th of 1999, it was an auto

15   negligence case.

16      A.   No, sir.  I was in a car accident

17   that -- but I wasn't ever in court or anything

18   for it.

19      Q.   What do you mean you weren't ever in

20   court or anything?  Was a lawsuit filed on

21   your behalf?

22      A.   No, sir.

23      Q.   Was the lawsuit in 1999 -- I mean was

24   the automobile accident in 1999?

25      A.   No, sir.

1      Q.    When was the accident?

2      A.    To the best of my recollection, 2004.

3      Q.    And where did the accident happen?

4      A.    Lakewood, New Jersey.

5      Q.    And were you injured in that

6   accident?

7      A.    No, sir.

8      Q.    Are you involved in any other

9   automobile accidents?

10     A.    No, sir.

11     Q.    You involved in any slip and fall or

12   any other kind of accidents?

13     A.    No, sir.

14     Q.    Have you ever been hospitalized?

15     A.    No, sir.

16     Q.    Ever been the subject of a domestic

17   violence case?

18     A.    No, sir.

19     Q.    Do you know another Christopher M.

20   Philpot?

21     A.    No, sir.  My stepmother is Christine

22   Philpot and she has before gone by the name

23   Chris Philpot, but not Christopher or M.

24     Q.    And you don't have any children?

25     A.    No, sir.

1    Q.   Did you ever have a lawsuit with the
2  Department of Revenue?
3    A.   No, sir.
4    Q.   Do you know an Azzetta
5  Gathers(phonetic)?
6    A.   No, sir.
7    Q.   Do you know a Carrie B. Nestle?
8    A.   No, sir.
9    Q.   Have you ever been the -- when did
10  you move to Florida?
11    A.   2014, to the best of my recollection.
12    Q.   And have you lived at the address you
13  previously gave for all that time?
14    A.   Can you repeat the question, sir?
15    Q.   You gave the address at the beginning
16  of the deposition at 901 Loganderry Lane,
17  Apartment 201, Plant City, Florida 33563.
18    A.   Correct.  That's where I live now.
19    Q.   Okay.  Where did you live before
20  then?
21    A.   I've lived at 2130 Northeast 42nd
22  Street, Lighthouse Point, Florida.  I'm unsure
23  of the ZIP.  I think it's 33064.
24    Q.   And when did you live there?
25    A.   Let's see.

Page 10

1      Q.    From when to when?

2      A.    2016 to -- I'm sorry, 2015 to 2017, I

3   believe, to the best of my recollection.

4      Q.    And then you moved to Loganderry?

5      A.    No, sir.

6      Q.    Where did you move next?

7      A.    I -- it wasn't a permanent residence,

8   I was transferred for my job to Philadelphia,

9   Pennsylvania.  It wasn't a permanent address.

10   I still held a lease at that location.

11      Q.    And where did you live in

12   Philadelphia?

13      A.    AirBnBs, hotel rooms, it was for

14   work.

15      Q.    Okay.  And before the Lighthouse

16   Point where were you living?

17      A.    I lived in Delray Beach, Florida.  I

18   don't remember the specific address.  All I

19   know it was Fiore Way.

20      Q.    And when was that, from when to when?

21      A.    That was for one year, so 2015 to

22   '16, I believe.

23      Q.    And prior to that?

24      A.    I lived in Seaside Park, New Jersey.

25      Q.    What was the address?

Page 11

1      A.    42 I Street.

2      Q.    I, the letter I?

3      A.    I as in the letter I, yes, sir.  And

4   that's in Seaside Park, 08752.

5      Q.    And you mentioned you were traveling

6   for employment, give me your employment

7   history from high school forward.

8      A.    Oh, okay.  So right out of high

9   school I worked for a laborers union.

10     Q.    What union?

11     A.    Local 172, heavy highway laborers

12  union.

13     Q.    And that was in New Jersey?

14     A.    Correct.

15     Q.    And what did you do for them?

16     A.    I was an apprentice, so I assisted in

17  whatever.  At the time we had a contract with

18  Verizon to put in innerduct to protect the

19  fiberoptic lines in neighbors, so we would

20  entrench the pipe into the curbside so that

21  the fiber optic line was protected.  So

22  basically digging holes, just mostly labor,

23  just, you know, any kind of labor.

24     Q.    And worked for that labor union from

25  when to when?

Page 12

1      A.    The best of my recollection, 2014 to

2  2016 -- oh, no, no, excuse me, I'm sorry.

3            2005 to around 2007, my apologies.

4      Q.    And who did you work for after that?

5      A.    After that I worked for Spirits

6  Unlimited, which was a liquor store.

7      Q.    And in what town?

8      A.    That was in Brick, New Jersey.

9      Q.    And you did that from when to when?

10     A.    Best of my recollection, 2008 to

11  2010.

12     Q.    Why did you leave the union?

13     A.    It just wasn't for me.

14     Q.    And then why did you leave Spirits?

15     A.    Better opportunity with a different

16  job.

17     Q.    With whom?

18     A.    Sunburst Motel.

19     Q.    And where was that located?

20     A.    Seaside Heights, New Jersey.

21     Q.    And what did you do there?

22     A.    I was the front desk attendant.

23     Q.    And you were there from when to when?

24     A.    The best of my recollection, the end

25  of 2008/2009 to approximately September of

1    2012.

2        Q.    And why did you leave?

3        A.    Well, Hurricane Cindy hit New Jersey

4    and our city was completely decimated and the

5    business closed.

6        Q.    What did you do next?

7        A.    I then worked for a company called

8    JDM Engineering in Freehold, New Jersey.

9        Q.    What did you do for them?

10       A.    Basically just a shop hand.  I

11   cleaned up and just any kind of errands they

12   needed run.

13       Q.    From when to when?

14       A.    Let's see, approximately 2012 to

15   2013.

16       Q.    And why did you leave there?

17       A.    I just didn't like the job anymore.

18       Q.    So your next job was?

19       A.    My next job would be when I got to

20   Florida at Cracker Barrel.

21       Q.    And which Cracker Barrel?

22       A.    In Deerfield Beach, Florida.

23       Q.    And what did you do there?

24       A.    I was a waiter.

25       Q.    And how long did you do that?

Page 14

1       A.   Two months.

2       Q.   From when to when?

3       A.   Let's see, March of 2014 to May of

4    2014, the best I can remember.

5       Q.   And why did you leave?

6       A.   Better opportunity.

7       Q.   And where did you go next?

8       A.   Brandmart USA.

9       Q.   Which location?

10      A.   Deerfield Beach.

11      Q.   And what did you do there?

12      A.   I was a TV specialist.

13      Q.   And you were there from when to when?

14      A.   Let me see, 2016 to 2017.

15      Q.   And why did you leave?

16      A.   Again, another opportunity.

17      Q.   Where?

18      A.   GHL Insurance.

19      Q.   And where is that located?

20      A.   Boca Raton, Florida.

21      Q.   And what do you do there?

22      A.   I was an insurance agent.

23      Q.   Did you obtain a license?

24      A.   Yes, sir.

25      Q.   What kind of license?

Page 15

1    A.   Florida 215, health, life and

2   annuities.

3    Q.   And how long were you there?

4    A.   Let's see, approximately one year.

5    Q.   And why did you leave?

6    A.   Better opportunity back in Florida.

7    Q.   When you say "back in Florida," Boca

8   Raton is in Florida.

9    A.   I understand, they transferred me to

10   Philadelphia, though.

11    Q.   When was that?  Is that the one you

12   were talking about going back and forth?

13    A.   Correct.  So they transferred me --

14   let's see, September -- when was it?

15        Yeah, they transferred me -- I'm

16   sorry, just let me think here.  September of

17   2018 they transferred me to Philadelphia.

18    Q.   And you were there till?

19    A.   January of 2019.

20    Q.   And what happened then?

21    A.   I was offered a job in Tampa, Florida

22   -- or Plant City, Florida.

23    Q.   And what job was that?

24    A.   It's my current occupation, I work

25   for WhiteSands Treatment Center.

Page 16

1      Q.   Couldn't understand that.

2      A.   WhiteSands Treatment Center.

3      Q.   And what type of treatment do they

4   provide?

5      A.   Drug and alcohol, and mental health.

6      Q.   And your position there is?

7      A.   I'm the outpatient facilities

8   manager.

9      Q.   And what does that job entail?

10      A.   So we have 51 locations, outpatient

11   locations across Florida, small offices for

12   outpatient therapy for when a patient gets out

13   of inpatient.  My job is to oversee all those

14   offices, make sure they're tiptop, up to fire

15   code, up to building code.  I meet with

16   inspectors, make sure they have all the

17   supplies they need.

18      Q.   Do you hold any licenses in

19   engineering or building trade?

20      A.   No, sir.

21      Q.   And that's where you're currently

22   working exclusively?

23      A.   Yes, sir.

24      Q.   And who is your immediate supervisor

25   there?

1      A.   Louis Pompeo.

2      Q.   L-E-W OR L-O-U?

3      A.   L-O-U-I-S Pompeo, P-O-M-P-E-O.

4      Q.   And his position is?

5      A.   He is the director of outpatient.

6      Q.   How long have you been a member of

7  Florida Carry?

8           MR. FRIDAY:  Object to form and do

9      not answer that question.

10  BY MR. SWITKES:

11     Q.   Have you ever been a -- on the board

12  of directors of Florida Carry?

13     A.   No, sir.

14     Q.   Do you belong to any church or social

15  organizations?

16     A.   No, sir.

17     Q.   Of the members of Florida Carry that

18  came with you to Miami Beach, how did you --

19  did you know any of them before coming to

20  Miami Beach?

21          MR. FRIDAY:  Object to form.

22          THE WITNESS:  I don't know if they

23     were members of Florida Carry or not.

24  BY MR. SWITKES:

25     Q.   But I asked you if you knew them

1    before you came to Miami.

2         A.   I knew one person, yes.

3         Q.   And which person was that?

4         A.   Sean Devine.

5         Q.   And how did you know him?

6         A.   Sean Devine and I have been friends

7    for quite sometime.  And we were also

8    neighbors at 2130 Northeast 42nd Street.

9         Q.   He lived in an apartment in that same

10   complex?

11        A.   Yeah, below me.

12        Q.   Okay.  You don't make a lot of noise,

13   do you?

14        A.   No.

15        Q.   And you've known Sean for

16   approximately how long?

17        A.   Fifteen years.

18        Q.   And your first met him in New Jersey?

19        A.   Yes.

20        Q.   And describe your relationship with

21   him.

22        A.   We -- he -- just always been good

23   friends, you know.

24        Q.   Doing what kind of activities outside

25   of work?

1      A.    Fishing, kayaking, you know, playing

2   some basketball.

3      Q.    How long have you been fishing?

4      A.    Since I can remember, sir, since I

5   was a kid.

6      Q.    What type of fishing did you do?

7      A.    Well, I was raised in Seaside Park,

8   New Jersey and it's a coastal town and it's a

9   fishing town and we would always surf fish off

10  the beach.  We would fish off -- we had this

11  pier in Seaside that went out into the ocean,

12  so I've fished pier.  My uncle had a boat, I

13  would go out on the boat and fish.

14     Q.    That pier in Seaside, did it have a

15  tackle and bait shop on the pier?

16     A.    No.

17     Q.    And my understanding is, is that it's

18  been alleged that you wrote or authored some

19  kind of communication to the City of Miami

20  Beach prior to the demonstration on Miami

21  Beach; is that correct?

22           MR. FRIDAY:  Object to form.

23           You can answer.

24           THE WITNESS:  Can you repeat the

25      question.

Page 20

1           MR. SWITKES:  Why don't you read it

2      back.

3           (The question was:  And my

4      understanding is, is that it's been

5      alleged that you wrote or authored some

6      kind of communication to the City of Miami

7      Beach prior to the demonstration on Miami

8      Beach; is that correct, was read by the

9      court reporter.)

10          THE WITNESS:  Well, it wasn't a

11     demonstration.

12  BY MR. SWITKES:

13     Q.   What was it?

14     A.   A gathering of friends to go fishing.

15     Q.   Had you ever been to South Pointe

16  Park before?

17     A.   Yes.

18     Q.   When had you been to South Pointe

19  Park before?

20     A.   Approximately two months before.

21     Q.   And why did you come two months

22  before?

23     A.   I just -- I was visiting a friend and

24  we took -- we took a walk outside of their

25  condo and we walked through the park.

Page 21

1      Q.   Who is your friend?

2      A.   Fiorella.

3      Q.   Spell that for us.

4      A.   F-I-O -- I am not sure on the

5   spelling.  She goes by Fio, F-I-O.

6      Q.   Give me your best approximation of

7   the spelling.  We won't hold you to it.

8      A.   F-I-O-E-R-L-L-A.

9      Q.   And her last name?

10      A.   Panzita.

11      Q.   P-A-N --

12      A.   -- Z-I-T-A.

13      Q.   And she lives here in the beach?

14      A.   No, not anymore.

15      Q.   She was living in the beach?

16      A.   Yes, sir.

17      Q.   And you came to visit her

18   approximately two months before the visit

19   we're here to talk about?

20      A.   Before the visit to the pier you

21   mean?

22      Q.   Yes.

23      A.   Yes, sir.

24      Q.   And you walked on the pier, correct?

25      A.   Yes, sir.

Page 22

1      Q.   And you walked on the pier, can you
2  give me a description of what is the
3  surrounding area of the pier?
4      A.   So to get into South Pointe Park, to
5  get to the pier you would go through an area
6  of like bathrooms, like grass areas, grassy
7  areas.  There's a sidewalk that runs along the
8  -- I'm not sure what that canal is called or
9  if it's an inlet.  There's a sidewalk with a
10 jetty there.  It's just -- there's a
11 restaurant, I believe.  I don't know if it's
12 part of that property but it's further down,
13 so.
14     Q.   Smith and Wollensky?
15     A.   I'm sorry, sir, what --
16     Q.   Smith and Wollensky, is that the name
17 of the restaurant you're referring to?
18     A.   I don't recall.
19     Q.   Okay.  And across the water from that
20 walkway, what is there?
21     A.   Condos, apartments.
22     Q.   And you noticed any gantry cranes?
23     A.   Can you define a gantry crane?
24     Q.   It's a crane that's used to unload
25 cargo from cargo ships.  They're very large,

Page 23

1    they probably go in the air more than a

2    hundred feet.

3         A.    I wouldn't --

4         Q.    It's be hard to miss if you walked on

5    the walkway.

6         A.    I wouldn't know what one of those --

7    a gantry crane is, so I can't say that there's

8    gantry cranes across the water.

9         Q.    What did you observe -- did you

10   observe large metal structures that were from

11   the ground that reached heights over a hundred

12   feet?

13        A.    Not to my recollection.

14        Q.    Did you notice any cruise ships?

15        A.    No.

16        Q.    Did you notice any boats going in and

17   out of that waterway?

18        A.    Yes.

19        Q.    What kind of boats?

20        A.    Fishing boats.  I noticed there was a

21   speedboat, like a chartered like speedboat

22   they do.  They go out in the ocean, you know,

23   do like a bunch of 360s, I guess.

24        Q.    Did you notice any Coast Guard boats?

25        A.    At the time of this walk with

Page 24

1    Fiorella?

2        Q.   Yes, sir.

3        A.   No, sir.

4        Q.   Did you do the walk during the

5    daytime hours?

6        A.   Yes, sir.

7        Q.   Okay.  You didn't notice any large

8    buildings on the other side of that waterway

9    that housed cruise lines?

10       A.   I don't recall ever seeing a cruise

11   ship.  I think I would know if I did.

12       Q.   Okay.  But did you notice those large

13   industrial type buildings on the other side of

14   the water from where you were walking?

15       A.   Well, I -- to my recollection I don't

16   know if they're industrial or not, but they

17   are structures.

18       Q.   And did you look at any of the signs

19   on those structures?

20       A.   No, sir.

21       Q.   Did you happen to notice Royal

22   Caribbean, Norwegian Caribbean?

23       A.   No, sir.

24       Q.   None of those, MCM?

25       A.   No, sir.

1    Q.   Okay.  Despite not knowing that --
2  what a gantry crane is, did you notice any
3  large metal structures protruding from the
4  ground up into the air?
5         MR. FRIDAY:  Object to form.
6         THE WITNESS:  No, sir.
7  BY MR. SWITKES:
8    Q.   Okay.  But you didn't fish on the
9  first time you came down, correct?
10   A.   No, sir.
11   Q.   Did you walk on the pier the first
12 time you came down?
13   A.   Yes, sir.
14   Q.   And what did you observe people doing
15 that time?
16   A.   Joggers, walkers, towards end of the
17 pier there was fishermen, because -- there was
18 fishermen towards the end of the pier, yes, a
19 few fishermen.
20   Q.   Give me a quantification of a few,
21 two, three?
22   A.   I'd say more, maybe half dozen.
23   Q.   Okay.  Maybe six?
24   A.   Yeah.
25   Q.   Okay.  But the vast majority of the

Page 26

1    people were just walking, jogging, or biking

2    or skateboarding?

3        A.   Correct, doing the same thing that we

4    were doing.

5        Q.   And what you were doing is walking?

6        A.   Yes, sir.

7        Q.   Okay.  Had you ever fished in Dade

8    County before?

9        A.   Miami-Dade County, no, sir.

10       Q.   Have you ever fished in Broward

11   County?

12       A.   Yes, sir.

13       Q.   Where in Broward County?

14       A.   All over.  One of my favorite spots

15   would be Hillsborough inlet on the border of

16   Pompano Beach and Lighthouse Point, or

17   Hillsborough Mile.

18       Q.   And when you went fishing what were

19   the times you went fishing on the Hillsborough

20   inlet?

21       A.   10 a.m. to approximately three or

22   4 p.m.

23       Q.   Did you catch any fish?

24       A.   I caught a lady fish.  I've caught

25   lady fish.  I've caught mutton there.  No

1   snook, though.

2        Q.   No snapper, no grouper?

3        A.   No, there wouldn't be grouper there.

4        Q.   So the question might be why would

5   you come to South Pointe Park?  At the time

6   you were living in -- where?

7        A.   Lighthouse Point, Broward County.

8        Q.   Do you know Haulover Pier?

9        A.   Repeat that, sir.

10       Q.   Do you know Haulover Pier?

11       A.   No, sir.

12       Q.   Do you know there's a pier probably

13  ten, 15 miles north that has a pier that jets

14  into the ocean and has a bait store right on

15  the pier?  You've never heard of that?

16            MR. FRIDAY:  Object to form.

17            THE WITNESS:  No, sir.

18  BY MR. SWITKES:

19       Q.   So why would you come with a group of

20  members of Florida Carry to South Pointe Park?

21            MR. FRIDAY:  Object to form.

22            THE WITNESS:  Why would I come here

23       to fish is what you're asking?

24  BY MR. SWITKES:

25       Q.   Why would you come here, yes.

1      A.   To fish.

2      Q.   Okay.  Were you wearing any kind of

3 Florida Carry shirt or identification on you?

4      A.   Yes, I was wearing a black Florida

5 Carry shirt.

6      Q.   And how about the other members of

7 the demonstration?

8      A.   I don't --

9           MR. FRIDAY:  Object to form.

10          THE WITNESS:  I don't recall.

11 BY MR. SWITKES:

12     Q.   My understanding is some of them came

13 from a pretty long distance away; is that

14 correct?

15     A.   I'm not a one hundred percent how far

16 everyone traveled.

17     Q.   Well, where does Steve Jenkins live?

18     A.   To the best of my recollection, I

19 believe he lives in Fort Lauderdale or...

20     Q.   Michael Taylor, where does he live?

21     A.   Michael Taylor, I'm not like -- I

22 think he lives in Palm Beach County somewhere,

23 I don't know.

24     Q.   Carlos Gutierrez, where does he live?

25     A.   I believe Carlos is a Miami native.

1      Q.   And Jonah Weiss?

2      A.   I have no recollection where Jonah

3   lived.

4      Q.   So again the question is, with so

5   many places to choose where to fish -- did you

6   choose Miami Beach?

7           MR. FRIDAY:  Object to form.

8           THE WITNESS:  What do you mean choose

9      Miami Beach?

10  BY MR. SWITKES:

11     Q.   Well, someone had to make a decision

12  or a group of you had to make a decision to

13  come to Miami Beach on the day you came,

14  that's what the question is.  Who made that

15  decision and what was discussed about it?

16     A.   I made the decision to fish there,

17  because, from my understanding, there's not a

18  wall around Miami Beach and you're allowed to

19  fish wherever you want.

20     Q.   Okay.  But why living in Lighthouse

21  Point at the time?

22     A.   Because the fishing is good there.

23     Q.   The fishing is good on the Miami

24  Beach pier?

25     A.   On South Pointe Beach at South Pointe

Page 30

1  Pier, yes.

2      Q.   Who told you that?

3      A.   Fishing blogs.

4      Q.   And what type of fishing blogs did

5  you look up before you chose Miami Beach?

6      A.   I don't recall the exact name of

7  them.  Facebook -- Florida Fishing Club on

8  Facebook.  Florida Hunting Network.

9           I also listen to a radio show every

10  weekend on -- I'm not sure the exact call

11  numbers, but it's a captain that does a radio

12  show every weekend and he was talking about

13  the fishing being good in that area.

14      Q.   In that area or on the South Pointe

15  Pier?

16      A.   Well, he specifically mentioned South

17  Pointe Pier, yes, and the surrounding areas of

18  Miami Beach.

19      Q.   Well, there's a lot of fishing off

20  the coast of Miami Beach, but I'm talking

21  specifically South Pointe Pier.

22      A.   He specifically mentioned South

23  Pointe Pier, yes.

24      Q.   And do you know who that host is?

25      A.   I don't.

Page 31

1      Q.   Was there any other reason besides

2    fishing that you chose to come to Miami Beach?

3      A.   No, sir.

4      Q.   Some of the other members have

5    indicated it was also to show support for

6    Florida Carry and being able to have a weapon

7    while fishing and alert the public about that.

8    You're saying that had nothing to do with your

9    coming?

10           MR. FRIDAY:  Object to form.

11           You can go ahead and answer.

12           THE WITNESS:  The main reason we came

13       to South Pointe Pier was to fish.

14   BY MR. SWITKES:

15      Q.   Okay.  And the other reasons?

16      A.   Is to exercise our God-given right to

17   open carry while fishing in the State of

18   Florida, and to inform the public and educate

19   the public on their rights also.

20      Q.   And you said "God-given right"?

21      A.   Yes, sir, it is.  It's a God-given

22   right.

23      Q.   And you base that upon what?

24           MR. FRIDAY:  Object to form.

25           THE WITNESS:  I base that upon my

1         understanding of being an American

2         citizen, the rights that we're born with.

3    BY MR. SWITKES:

4         Q.   Okay.  But American law and God-given

5    rights seem to be two different things -- are

6    you a religious man?

7              MR. FRIDAY:  Object to form.

8              THE WITNESS:  I believe in God, yes.

9    BY MR. SWITKES:

10        Q.   Okay.  Do you belong to any church?

11        A.   Not any organized church, not

12   necessarily, no.

13        Q.   Are you referring to any scripture of

14   God-given right to bear arms?

15             MR. FRIDAY:  Object to form.

16             THE WITNESS:  No, sir.

17   BY MR. SWITKES:

18        Q.   Okay.  So I just want to understand

19   what you meant by God-given right.

20        A.   Well, the way I see it, what I

21   learned in my minimal high school education is

22   that when our founding fathers founded this

23   country, the rights that they gave us they

24   considered God-given rights, that people were

25   born with these rights, that it's not

Page 33

1    something that government gives you, that you

2    were born with these rights, which is the

3    first amendment, second amendment, third

4    amendment, fourth amendment.

5        Q.   And somehow you link that to a

6    God-given right to carry a weapon?

7        A.   Well, that's how it was outlined by

8    our founding fathers.

9             Every creature on this earth has a

10   way to protect itself that God has given it.

11       Q.   Okay.  And it's my understanding that

12   you attempted to contact someone in the City

13   of Miami Beach prior to coming.  How did you

14   do that?

15       A.   I wrote an email with a Word document

16   attachment.

17       Q.   And you sent it to whom?

18       A.   I sent it to, at the time, the chief

19   of police, Chief Daniel Oates, and carbon

20   copied the city attorney at the time.  I

21   believe his last name starts with an A.

22       Q.   And was it encrypted in anyway?

23       A.   No, sir.  It was just a Word document

24   attached to an email.

25       Q.   Are you aware of the fact that

Page 34

1    members of the City of Miami Beach could not

2    open your email?

3         MR. FRIDAY:  Object to form.

4         THE WITNESS:  When I originally sent

5         the email it was sent back to me that --

6         it was like mailer-daemon, this email

7         wasn't accepted.  And then I re-sent it

8         again apologizing to whoever was the

9         correspondent of the email that -- that

10        the first email might have gone through

11        and I apologize if this is redundant but I

12        just wanted to make sure I sent it again.

13   BY MR. SWITKES:

14        Q.   Did you ever hear from anybody at the

15   City of Miami Beach --

16        A.   No, sir.

17        Q.   -- after sending it?

18        A.   No, sir.

19        Q.   Did you ever attempt to contact them

20   in any other way at any other time?

21        A.   No, sir.  The only other contact I

22   made was with Florida Fish and Wildlife,

23   Southern Command.

24        MR. SWITKES:  I'm going to mark this

25        Defendant Officers Exhibit 1.

1           Hand that to Counsel, please.

2           (Defendant Officers Exhibit Number 1

3       was marked for identification and is

4       attached hereto.)

5   BY MR. SWITKES:

6       Q.   Is that another document that you

7   authored, which has now been marked as

8   Defendant Officers Exhibit 1?

9       A.   I'm sorry, sir, can you repeat the

10  question?

11      Q.   Did you prepare the document that's

12  now been marked Exhibit 1?

13      A.   Yes.  I thought I cc'ed him but I

14  guess I sent it to him individually, to -- I

15  can't pronounce his last name.  But this is

16  the city attorney that I sent it to.

17      Q.   And did ever you communicate with him

18  after this?

19      A.   No, sir.

20      Q.   Did he ever contact you?

21      A.   No, sir.

22      Q.   Were you ever able to confirm that

23  anybody in the City of Miami Beach actually

24  received your communication?

25      A.   Not from the City of Miami Beach.

Page 36

1     Q.   And by that you mean you sent a copy

2  to someone else other than a representative of

3  the City of Miami Beach?

4     A.   Yes, sir, the same letter.

5     Q.   To?

6     A.   Florida Fish and Wildlife, Southern

7  Command.

8     Q.   Okay.  Did you ever get any

9  communication from them?

10    A.   Yes, immediately.

11    Q.   And what was the response?

12    A.   Basically they gave us their blessing

13 and they thanked us for letting them know.

14    Q.   Okay.  Do you understand that that

15 agency is not related to the City of Miami

16 Beach?

17    A.   Yes, it's a state entity.

18    Q.   Okay.  Now, I have a question for

19 you, why is it that you sent any communication

20 attempting to communicate with the city

21 attorney or the city police chief regarding

22 your going fishing on Miami Beach?

23    A.   At the time Florida Carry, it's just

24 something that we would do.  It was something

25 they required.

Page 37

1    Q.   Who required?

2    A.   That Florida Carry would require that

3  we just send a letter just to, you know, be on

4  the same page with the police.

5    Q.   And where does that come from?  Is

6  there a document that says you're supposed to

7  do that?  I mean, you were told you're

8  supposed to do that?

9    A.   No, sir, just in conversation with --

10   Q.   With whom?

11   A.   -- the board of directors.

12   Q.   And who on the board of directors did

13 you speak to about it?

14   A.   Kevin Sona.

15   Q.   Can you spell the last name for me?

16   A.   S-O-N-A.

17   Q.   And where does he live?

18   A.   Ocala, Florida, I believe.

19   Q.   And what's his position?

20   A.   I don't know his exact position.  I

21 think he's the liaison for the leads.  I'm not

22 sure his official title.

23   Q.   He's the liaison for the -- and I

24 missed the last word?

25   A.   Region leads.

Page 38

1     Q.    Region leads?

2     A.    Yes.

3     Q.    L-E-A-D-S?

4     A.    Yes.

5     Q.    And he verbally told you you should

6  notify a municipality when you're coming to

7  fish there?

8     A.    It was discussed, yes, and he

9  suggested it as -- to do it and I did it.

10    Q.    Did you ask him why?

11    A.    No.

12    Q.    When you normally go fishing do you

13  normally contact the police chief and the city

14  attorney of the municipality where you're

15  intending to fish?

16    A.    I don't recall every doing it, no.

17    Q.    And you've been fishing since what

18  age?

19    A.    Eight years old.

20    Q.    And you are now currently how old?

21    A.    Thirty-four.

22    Q.    So in all those years you've fished,

23  that you've gone to various locations, you've

24  never called or contacted the police chief to

25  tell them, I, Christopher Philpot, is coming

Page 39

1   to fish in your town --

2           MR. FRIDAY:  Object to form.

3   BY MR. SWITKES:

4       Q.   -- have you?

5       A.   I don't recall.

6       Q.   Why would you have done that?

7       A.   Because it was just something that

8   Florida Carry suggested and asked of me, so I

9   did it.

10      Q.   So when I asked you before why you

11  were coming to Miami Beach, you said to fish.

12      A.   First and foremost.

13      Q.   You have fished almost all of your

14  life since you're eight years old.

15      A.   Uh-huh.

16      Q.   You've never called or written to or

17  communicated with a police chief and a city

18  attorney of any other municipality you went to

19  fish in, why did you do it this time?

20          MR. FRIDAY:  Object to form.

21          You can answer.

22          THE WITNESS:  It was just a

23      suggestion that was given to me to do it.

24  BY MR. SWITKES:

25      Q.   Okay.  But what was the logic behind

Page 40

1    -- I mean, I could see if you were Shaquille

2    O'Neal and you were concerned when you went

3    fishing off the pier that there would a large

4    group of fans that might gather that might

5    cause a disturbance.

6            Are you a celebrity that I'm not

7    aware of?

8            MR. FRIDAY:  Object to form.

9            THE WITNESS:  In my own mind I'm a

10       celebrity.

11   BY MR. SWITKES:

12       Q.   I guess that would be common for a

13   lot of people.  But in the context of

14   reality --

15       A.   I --

16       Q.   -- you've never been on a reality

17   television show, you've never been a

18   professional athlete or a celebrity in the

19   entertainment industry, have you?

20           MR. FRIDAY:  Object to form.

21           You do need to let him finish his

22       question before you try to respond.

23           THE WITNESS:  Okay.

24           No, sir.  I was homecoming king in my

25       high school and that's the extent of my

Page 41

1          celebrity status.

2     BY MR. SWITKES:

3          Q.    And since your homecoming crowning,

4     have you ever notified anybody that you intend

5     to travel to their municipality to fish?

6          A.    Not that I recall, no.

7          Q.    So your homecoming crown famous

8     appointment was fleeting, would you agree?

9          A.    No, sir, my mother thinks I'm still

10    the greatest, so.

11         Q.    It's good to know.

12                In the context of the rest of the

13    world, have you ever done anything, such as

14    have a TV show or done anything in the fishing

15    world that makes you a celebrity?

16               MR. FRIDAY:  Object to form.

17               THE WITNESS:  No, sir.

18    BY MR. SWITKES:

19         Q.    So tell me, why in the world, for the

20    first time in all of your life since you're

21    eight years old, would you notify a police

22    chief and a city attorney that, I, Christopher

23    Philpot, is coming to fish in your city?

24               MR. FRIDAY:  Object to form.

25               THE WITNESS:  Because it was

Page 42

1        suggested to me.

2    BY MR. SWITKES:

3        Q.    And it was suggested to you because

4    you weren't coming to fish, you were coming to

5    what you perceived to be a demonstration of

6    your right to fish while bearing arms with

7    fellow Florida Carry members in which you

8    anticipated the possibility that there could

9    be police involvement; isn't that correct?

10           MR. FRIDAY:  Object to form.

11           THE WITNESS:  Incorrect.  It wasn't a

12       demonstration.  You keep saying

13       demonstration, it's not --

14   BY MR. SWITKES:

15       Q.    Well, it wasn't just a fishing

16   trip --

17       A.    Yes, it was.

18       Q.    Well, it's not just a fishing trip

19   because you've --

20       A.    That's your opinion --

21       Q.    Excuse me.  And I think your counsel

22   tried to tell you --

23       A.    Okay.

24       Q.    -- when you are talking I won't

25   interrupt and when I'm talking you shouldn't

Page 43

1    interrupt.

2         A.    Okay.

3         Q.    Especially with some deference to our

4    court reporter that can -- is very good, but

5    she can only take down one of us at a time.

6         A.    Okay.

7         Q.    So we just went through a scenario

8    whereby you've admitted since you're eight

9    years old you're a regular fisherman and at no

10   time during your lifetime have you ever

11   notified a municipality's official that you're

12   coming to their town to fish, but on June 24,

13   2018 you and fellow Florida Carry members had

14   every intention of going to South Pointe Pier

15   to fish and you took it upon yourself to

16   notify the police chief, or attempted to do

17   so, and the city attorney, that obviously is

18   not consistent with your lifetime experience

19   of just going to fish, would that be a fair

20   statement?

21              MR. FRIDAY:   Object to form.

22              THE WITNESS:   No, sir, because my

23         whole lifetime I have not been affiliated

24         or known anybody in Florida Carry until

25         this point.

Page 44

1    BY MR. SWITKES:

2         Q.   Okay.  And isn't that an admission

3    that this was different than every other

4    fishing trip you've done during your lifetime?

5              MR. FRIDAY:  Object to form.

6              THE WITNESS:  No.

7    BY MR. SWITKES:

8         Q.   Oh, so you notified the police chief

9    and the city attorney when you fished every

10   other time in your life?

11             MR. FRIDAY:  Object to form.

12             Asked and answered.

13             THE WITNESS:  No, sir.

14   BY MR. SWITKES:

15        Q.   Okay.  So why is this fishing trip,

16   that you had on June 24, 2018, different from

17   every other fishing trip in your entire life?

18             MR. FRIDAY:  Object to form.

19             THE WITNESS:  The only -- well, the

20        difference is, is I was with a few people,

21        I usually fish alone.  And Florida Carry's

22        suggestion was to do it.

23   BY MR. SWITKES:

24        Q.   Okay.  But I want you to look in that

25   camera that's directly across from you.

Page 45

1      A.    Okay.

2      Q.    Have you ever fished with anybody

3   else in your life prior to June 24, 2018?

4      A.    Yes.

5      Q.    So you haven't only fished alone

6   prior to that date, correct?

7      A.    Most of the time when I fish it's

8   alone.

9      Q.    But you have fished with other

10  people, correct?

11     A.    Yes.

12     Q.    And the fact that you were going to

13  fish with four other people or five other

14  people, do you think the police chief and the

15  city attorney is required to know when you

16  come in a group of four or five people to fish

17  to the City of Miami Beach?

18         MR. FRIDAY:  Object to form.

19         THE WITNESS:  I don't know what the

20      protocol would be for letting them know if

21      we should fish or not.

22  BY MR. SWITKES:

23     Q.    Well, you do know the protocol,

24  because you've said you fished every -- very

25  often since you're eight.

Page 46

1      A.    Uh-huh.

2      Q.    And the protocol for you has been,

3  whenever I've fished I've never called the

4  city police chief and said, hey, chief, I'm

5  going fishing in your city, is that okay?  Do

6  you need permission of the police chief to

7  fish in a municipality?

8          MR. FRIDAY:  Object to form.

9          THE WITNESS:  I don't know if you

10      need permission to fish in any

11      municipality.  I'm not sure of other

12      municipalities or...

13  BY MR. SWITKES:

14      Q.    You've never done it before, correct?

15      A.    No, sir.

16      Q.    And when you fished all your life

17  until that day, you've never called up a city

18  attorney to notify them that you've gone

19  fishing, correct?

20      A.    No, sir.

21      Q.    So the real reason you were notifying

22  or attempting to notify those two city

23  officials is because you were coming with a

24  group that's associated with Florida Carry and

25  you knew that either all or most of you

Page 47

1    intended to come to the beach with your

2    fishing gear and a firearm; isn't that

3    correct?

4            MR. FRIDAY:  Object to form.

5            You can answer.

6            THE WITNESS:  I can't speak for the

7        other members, but I know when I fish in

8        Florida that I open carry.

9    BY MR. SWITKES:

10       Q.   Okay.  And you've never notified

11   anybody at any municipality when you've fished

12   and open carry before, have you?

13           You've already said the answer to

14   that is no because --

15       A.   No.

16       Q.   -- you never did it before.

17       A.   I've done it after, yes.

18       Q.   Okay.  After.

19       A.   Yes.

20       Q.   But not before.

21       A.   No, sir.

22       Q.   Okay.  So the only thing that

23   differentiates this time from all the other

24   times you've fished is you were coming with

25   members from Florida Carry.  That's not a hard

Page 48

1    thing to admit.

2              MR. FRIDAY:  Object to form.

3    BY MR. SWITKES:

4         Q.   You can't admit that?

5         A.   I don't know if they're members of

6    Florida Carry or not.

7         Q.   Okay.  I thought you were going there

8    to hand out pamphlets and try to inform people

9    about the right to carry while you're fishing.

10   That wasn't one of the things you're coming

11   there for?

12        A.   I wasn't there to hand out pamphlets,

13   no.

14        Q.   Were you there to educate people

15   about the Florida statute and the right to

16   carry while you're fishing, camping and

17   hunting?

18        A.   If they asked.

19        Q.   Okay.  And just in case they asked,

20   you had materials with you from Florida Carry

21   that spoke about that right, correct?

22        A.   I personally did not, no.

23        Q.   Did members of your group have that?

24        A.   Yes.

25        Q.   And who were those members?

Page 49

1      A.   I don't recall exactly who was --

2   who's property that was, but I believe it was

3   Steven Keith Jenkins.

4      Q.   And do you at anytime have you seen

5   the video that Michael Taylor made on the way

6   down to Miami Beach that day?

7      A.   The video that he made on the way

8   down?

9      Q.   Yeah, in his car with his cell phone

10   talking about going to South Beach with

11   Florida Carry and having arms and anticipating

12   we might have some incident down there?

13           MR. FRIDAY:  Object to form.

14           THE WITNESS:  I don't recall him

15       being in a car or that part of that -- any

16       video of him being in a car.

17   BY MR. SWITKES:

18      Q.   Did you see anybody that came to that

19   demonstration in a car using a cell phone or a

20   camera to videotape and talk about his trip to

21   Miami --

22           MR. FRIDAY:  Object to form.

23   BY MR. SWITKES:

24      Q.   -- Beach?

25      A.   Not that I recall.

Page 50

1      Q.    From all the time since that date

2   you've never seen it?

3      A.    The only video I have ever watched of

4   Michael Taylor was when this incident happened

5   on the pier.

6      Q.    Okay.  Now, where did you park your

7   vehicle?

8      A.    On the South Pointe Pier parking lot.

9      Q.    And --

10      A.    It wasn't my vehicle.

11      Q.    Whose vehicle --

12      A.    Sean Devine.

13      Q.    So you came with Sean?

14      A.    Yes.

15      Q.    And you were in the passenger seat?

16      A.    Yes.

17      Q.    And you exited the vehicle, what did

18   you have with you that day?

19      A.    I had a fishing pole, a tackle bag,

20   and a cooler.

21      Q.    What was in the cooler?

22      A.    Ice and water, and bait.

23      Q.    What kind of bait did you have with

24   you?

25      A.    Squid.

1      Q.   And what was in your tackle box?

2   Prototypical fishing gear, line --

3      A.   Line, pliers --

4      Q.   -- leader --

5      A.   I'm sorry.

6      Q.   -- pliers, various items you use in

7   fishing?

8           MR. FRIDAY:  Object to form.

9           THE WITNESS:  For the most part,

10      yeah, everything -- everything in that bag

11      is meant for fishing.

12   BY MR. SWITKES:

13      Q.   Okay.  Did you have a knife?

14      A.   In the bag, yes.

15      Q.   What kind of knife?

16      A.   Just like a little, like, flip knife,

17   like -- a pen knife, basically.

18      Q.   Did you have a fillet knife?

19      A.   No, sir.

20      Q.   Okay.  And what did he bring with

21   him?

22           MR. FRIDAY:  Object to form.

23           THE WITNESS:  When you refer to "he"

24      who -- who is that?

25   BY MR. SWITKES:

Page 52

1      Q.   The person you drove down with --

2      A.   Sean Devine.

3      Q.   -- and get in the car with you, Sean

4  Devine.

5      A.   He had his fishing pole and his

6  tackle -- his tackle bag.

7      Q.   Did he have a cooler?

8      A.   I don't recall.

9      Q.   Okay.  How long did it take you from

10  the time you left your home to get to South

11  Pointe?

12      A.   Approximately 45 minutes to an hour.

13      Q.   And you arrived at approximately what

14  time?

15      A.   Approximately 10 a.m. -- nine --

16  between 9:30 and 10 a.m.

17      Q.   And was anybody from your group there

18  at the time?

19      A.   Not in the parking lot, no.

20      Q.   Was anybody on the pier ahead of you?

21      A.   Yes, I believe Steve Keith Jenkins

22  was.

23      Q.   Okay.  So you went onto the pier,

24  what did you do when you got to the pier?

25      A.   I -- I put my stuff down on the

Page 53

1   bench, proceeded to get my bait out.  I pulled

2   a leader with a hook on it out of my bag, out

3   of my tackle bag.  I cut some squid into

4   strips, put the squid on the hook, and casted

5   my line into the water.

6       Q.   Okay.  Did you continue holding your

7   fishing rod?

8       A.   I held it on and off as I was right

9   by it the whole time.

10      Q.   Okay.  When you weren't holding it it

11  was just -- the butt of it was on the ground?

12      A.   Not on the ground, sir.  There's like

13  notches on the pier, like where you can kind

14  of set a fishing pole, just set it there, so

15  it's leaning and it's still in the water.

16      Q.   Okay.  And how many members of

17  Florida Carry were there when you put your

18  line in the water?

19          MR. FRIDAY:  Object to form.

20          THE WITNESS:  I don't know who, if

21      any, of these people were actual members

22      of Florida Carry.

23  BY MR. SWITKES:

24      Q.   How many members of your group were

25  there?

Page 54

1      A.    Three, Sean Devine, myself and Steve
2   Keith Jenkins.   And then ten minutes later
3   Michael Taylor arrived.
4      Q.    And that was the extent of your group
5   or did more people show up?
6      A.    One more person showed up, Carlos.
7      Q.    And when did he show up?
8      A.    Approximately 10 to 20 minutes after
9   Michael Taylor arrived.
10     Q.    Okay.   What did you -- what did he
11  do, that you observed him doing?
12     A.    He had his fishing pole and his
13  tackle and he proceeded to bait his line and
14  put it in the water.
15     Q.    So there were five of you?
16     A.    At this time, yes.
17     Q.    Did anybody else show up thereafter?
18     A.    There was one other people that
19  showed up, but I didn't -- I was in handcuffs
20  by the time they were there -- by the time I
21  knew they were there.   And that was a
22  gentleman named Jonah.
23     Q.    Do you knows his last name?
24     A.    Jonah -- I don't.   I don't.
25     Q.    Do you recall the name Weiss?

Page 55

1      A.    Yeah, that's it, yes.

2      Q.    And he didn't show up until after you

3    were handcuffed?

4      A.    From my memory, that's what it seemed

5    like, that he -- I turned around, I was

6    handcuffed and I turned around and he was

7    there.

8      Q.    Okay.  Now, tell me, when was the

9    first time in the sequence of events that any

10   representative of the City of Miami Beach came

11   on the pier and spoke to you or your fellow

12   members?

13     A.    Could you repeat the question, sir?

14          MR. SWITKES:  Could you read it back?

15          (The questions:  Now, tell me, when

16      was the first time in the sequence of

17      events that any representative of the City

18      of Miami Beach came on the pier and spoke

19      to you or your fellow members, was read by

20      the court reporter.)

21          MR. FRIDAY:  Object to form.

22          THE WITNESS:  To my recollection, I

23      don't know the exact time because I didn't

24      have a watch or anything like that.

25          Approximately 30 to 45 minutes we had

1      been there and I believe he was a park

2      ranger for the city.

3  BY MR. SWITKES:

4      Q.   And can you describe him for me?

5      A.   Between the ages of 20 to 26, in that

6  range, young fellow.  He was on a bicycle with

7  a helmet and just had like slacks on and I

8  believe a City of Miami Beach shirt.

9      Q.   Do you recall --

10     A.   Like parks --

11     Q.   -- anything he said?

12     A.   He was -- he went up the pier on his

13  bike and then when he was coming back he

14  stopped short when he saw us and he said, you

15  guys are carrying handguns, you can't do that

16  in the State of Florida.

17     Q.   And did you respond to him?

18     A.   I didn't respond to him, no.

19     Q.   Did you hear any member of your group

20  respond to him?

21     A.   Yes.

22     Q.   And who was that?

23     A.   Michael Taylor was there and he told

24  him, no, I'm sorry, you're -- from what I

25  remember, not word for word, something in the

Page 57

1    -- like, no, sir, you're incorrect, and he

2    tried giving him a piece of paper with the

3    Florida statute that allows open carry while

4    fishing, hunting or camping.

5        Q.   And did he take it?

6        A.   No, sir.  He disagreed with us and he

7    put his kickstand on his bike and he went on

8    his cell phone.

9        Q.   What happened next?

10       A.   We continued to just be on the

11   railing fishing and he kind of, at this point,

12   moved his bike a little bit, like maybe ten

13   feet away from us, and he was on his cell

14   phone.

15       Q.   And which side of the pier were you

16   fishing from, the south or the north side?

17       A.   I'm not sure on my bearings there.

18   So if you're going down the pier, we were on

19   the right-hand side.

20       Q.   So you'd be facing --

21       A.   I believe it would be south.  We were

22   facing south.

23       Q.   And that's where the body of water

24   goes between the body of land that you

25   described as having apartments and those big

Page 58

1  buildings?

2     A.   Correct.  So there's a waterway that

3  -- the mouth of the waterway is where we were

4  fishing, where that opens up into the Atlantic

5  Ocean.

6     Q.   Okay.  And again, the day that you

7  were fishing there was Saturday, wasn't it?

8     A.   Yes, sir.

9     Q.   And you didn't notice any cruise

10  ships that day?

11     A.   The only cruise ships I remember

12  seeing is when I went over the causeway into

13  Miami Beach.

14     Q.   And what did you see when you went

15  over the causeway?

16     A.   Just like a Carnival cruise ship -- I

17  believe it was Carnival, because it had the

18  red tail, and maybe two other cruise ships.  I

19  don't know which company.

20     Q.   And you still didn't see those metal

21  structures?

22     A.   I don't recall the metal structures,

23  I really don't.

24     Q.   Okay.  Do you remember seeing a Coast

25  Guard station?

Page 59

1      A.    No.

2      Q.    Do you remember seeing Coast Guard

3   boats?

4      A.    No.

5      Q.    And when you saw those cruise ships

6   this time, did you see any of them going past

7   you leaving out of the port?

8      A.    No, sir.

9      Q.    Did you now recognize that that pier

10   is opposite of the Port of Miami when you saw

11   all those cruise ships there?

12          MR. FRIDAY:  Object to form.

13          THE WITNESS:  No, sir, I don't know

14      where the Port of Miami is.

15   BY MR. SWITKES:

16      Q.    Well, do you know that cruise ships

17   dock at ports?

18      A.    I know they dock at cruise terminals.

19      Q.    And didn't those buildings next to

20   the cruise ships look like terminals to you?

21      A.    No, they looked like buildings.

22      Q.    Have you ever gone on a cruise?

23      A.    I have.

24      Q.    Where did you go on a cruise?

25      A.    Bermuda.

Page 60

1      Q.    And when -- you left from where?

2      A.    New York City.

3      Q.    And when you went on the cruise ship

4  do you remember what line it was?

5      A.    Norwegian.

6      Q.    And Norwegian, do you remember going

7  into a cruise terminal and having to be

8  identified and giving your official documents

9  and --

10      A.    At the time I went, New York City was

11  just starting to have cruise ships going out

12  of the harbor, the harbor in New York.  I

13  don't know what harbor it is.  So it's very --

14  there wasn't much structure built yet.  It was

15  very --

16      Q.    Well, how did you get on the cruise

17  ship?

18      A.    They had like -- basically it was a

19  temporary structure, like a -- I guess I could

20  describe it as almost like a tent, like a

21  party tent, but very large.  And, you know,

22  they had all the baggage checks and stuff set

23  up there.

24      Q.    Did they a passageway from even this

25  temporary terminal onto the cruise ship?

1      A.   Well, yeah, there was a -- a walkway

2   you have to walk up to get to the cruise ship,

3   because it's much higher than the dock.

4      Q.   And did you see those kinds of

5   structures near the cruise ships?

6      A.   No, not that I -- which cruise ships

7   are you talking?

8      Q.   The ones you saw on the date of

9   June 24, 2018.

10      A.   I didn't recognize -- I mean, it

11   wouldn't have stood out to me because I was

12   driving, one, and it was just kind of like

13   look over to the side, oh, there's some cruise

14   ships.  I wasn't like analyzing structures and

15   stuff.

16      Q.   Is there any doubt in your mind that

17   when you see cruise ships lined up like that,

18   that that is a port where the cruise ships

19   dock?

20           MR. FRIDAY:  Object to form.

21           THE WITNESS:  I -- I don't know the

22       policies of those cruise lines and what

23       they consider a terminal.

24   BY MR. SWITKES:

25      Q.   As you came over the causeway did you

Page 62

1    happen to notice signs saying Port of Miami?

2        A.   No.

3        Q.   Did you happen to notice the tunnel

4    signs when you came across -- did you come

5    across 395, which is adjacent to 5th Street in

6    Miami Beach?

7            MR. FRIDAY:  Object to form.

8            THE WITNESS:  I don't recall the

9        roadway.  I just know it's a --

10   BY MR. SWITKES:

11       Q.   But the cruise ships were on your

12   right, correct?

13       A.   From my -- off the causeway that I

14   was going on?

15       Q.   Yes.

16       A.   Yes, I believe so, yes.

17       Q.   Yeah.  And when you see multiple

18   cruise ships parked, did that indicate to you

19   may be that's the Port of Miami?

20       A.   No.

21       Q.   Okay.  You just thought it was cruise

22   ships tying up to dock somewhere?

23           MR. FRIDAY:  Object to form.

24           THE WITNESS:  Well, from my

25       understanding, what a port is is where

Page 63

1          commerce comes in with container ships,

2          not cruise ships.

3     BY MR. SWITKES:

4          Q.   And -- oh, there's a separation

5     cruise ships and cargo ships don't use the

6     same port?

7          A.   I don't know if they do.

8          Q.   That's why I asked you about those

9     metal structures.  Those are called gantry

10    canes and they're specifically designed to

11    unload cargo ships which come in and out of

12    the Port of Miami every single day.  You

13    didn't know notice any of those cargo ships?

14             MR. FRIDAY:  Object to form.

15             THE WITNESS:  Not -- no, sir.

16    BY MR. SWITKES:

17         Q.   Okay.  How big were those cruise

18    ships?  Very, very, very large?

19             MR. FRIDAY:  Object to form.

20             THE WITNESS:  Yes.  Yeah.

21    BY MR. SWITKES:

22         Q.   Holds thousands of passengers?

23         A.   I don't know how many passengers they

24    hold.

25         Q.   How many passengers were on the

Page 64

1    cruise ship that you went on?

2            MR. FRIDAY:  Object to form.

3            THE WITNESS:  I don't recall.

4    BY MR. SWITKES:

5        Q.   Your best estimate.

6            MR. FRIDAY:  Object to form.

7            THE WITNESS:  Two to 300.

8    BY MR. SWITKES:

9        Q.   Okay.  And the ships that you saw in

10   port, were they bigger than that one?

11       A.   Than the ship I took from New York

12   City?

13       Q.   Yeah.

14       A.   Much bigger.

15       Q.   Much bigger.  And how many decks did

16   you notice?

17           MR. FRIDAY:  Object to form.

18           THE WITNESS:  I don't know.

19   BY MR. SWITKES:

20       Q.   Give me your best estimate.  At least

21   ten, twelve?

22       A.   Again, it wasn't I'm analyzing cruise

23   ships going over a causeway.  It was...

24       Q.   It's hard to miss a very large cruise

25   ship --

Page 65

1        A.    I know.

2        Q.    -- as you're coming cross the

3   causeway.  In fact, on a regular basis the

4   people that go across that causeway suffer the

5   consequence of almost everybody that comes

6   across that's not familiar with it slowing

7   down, many of them take pictures of it,

8   because those ships are so large.  You

9   wouldn't say those ships were very, very large

10  in your experience?

11            MR. FRIDAY:  Object to form.

12            THE WITNESS:  I believe they're large

13      for cruise -- for a boat, yeah.

14  BY MR. SWITKES:

15       Q.    Uh-huh.  And what is your

16  understanding of the modern cruise ships, how

17  many passengers and crew do they have?

18            MR. FRIDAY:  Object to form.

19  BY MR. SWITKES:

20       Q.    Do you have any idea?

21       A.    I have no understanding of modern

22  curse ships and how many people they hold.

23       Q.    Are you aware that some of them have

24  upwards of 5000 guests and an equal number of

25  crew?

1           MR. FRIDAY:  Object to form.

2           THE WITNESS:  I'm not aware of that,

3      no.  I didn't know it could hold that

4      many.

5  BY MR. SWITKES:

6      Q.   Were those cruise ships you were

7  looking at, are they approximate length of a

8  football field?

9           MR. FRIDAY:  Object to form.

10  BY MR. SWITKES:

11      Q.   You know the size of a football

12  field, right?

13      A.   About 120 yards.

14      Q.   Right.  Are those cruise ships about

15  that long?

16           MR. FRIDAY:  Object to form.

17           THE WITNESS:  Possibly, with not

18      knowing the scale of it being far away,

19      you know.  I only have a high school, you

20      know, education so.

21  BY MR. SWITKES:

22      Q.   Well, when you say far away, that's

23  relative.  How far away from those cruise

24  ships were you?  How wide is that body of

25  water you're talking about?

Page 67

1           MR. FRIDAY:  Object to form.

2           THE WITNESS:  I have no idea the

3      exact width of it.

4   BY MR. SWITKES:

5      Q.   I didn't ask the exact width.  I

6   wouldn't ask anybody the exact width.  I asked

7   you approximately how wide is that body of

8   water that separated the causeway from where

9   the cruise ships were?

10          MR. FRIDAY:  Object to form.

11          THE WITNESS:  Again, going off my

12      high school education and not knowing

13      distance that well, I would say

14      approximately two football fields.  If

15      we're using that as a point of

16      measurement.

17          MR. SWITKES:  Okay.  That's fair.

18          MR. FRIDAY:  Can we take a break?

19          MR. SWITKES:  Sure.

20          THE VIDEOGRAPHER:  Off the record at

21      2:16.

22          (Recess taken.)

23          THE VIDEOGRAPHER:  We're back on the

24      record at 2:31.

25   BY MR. SWITKES:

Page 68

1      Q.   Are you aware of various mass

2   shooting scenes that have occurred in the

3   United States in the last ten years?

4      A.   Yes.

5      Q.   And in South Florida you're aware of

6   the Parkland High School shooting?

7      A.   Yes.

8      Q.   You're aware of the recent Walmart

9   shooting in Texas?

10          MR. FRIDAY:  Object to form.

11          THE WITNESS:  Yes.

12   BY MR. SWITKES:

13      Q.   Okay.  Columbine and other tragedies

14   that have occurred, you're familiar with them,

15   aren't you?

16          MR. FRIDAY:  Object to form.

17          THE WITNESS:  To the best of my

18      knowledge, yes.

19   BY MR. SWITKES:

20      Q.   Okay.  And so when a group of the

21   armed people are together in a location where

22   they haven't been seen before, can you

23   understand why law enforcement would be

24   concerned?

25          MR. FRIDAY:  Object to form.

Page 69

1                THE WITNESS:  No.

2    BY MR. SWITKES:

3        Q.    How do you differentiate those

4    tragedies that have occurred and the group of

5    four or five people being armed in a location

6    where tens of thousands of people are going to

7    use that waterway on a Saturday in any given

8    day of the year in Miami Beach?

9                MR. FRIDAY:  Object to form.

10               THE WITNESS:  How do I differ --

11           like the difference between a mass

12           shooting event and armed people on a pier,

13           is that what you're asking?

14   BY MR. SWITKES:

15       Q.    How would law enforcement or the

16   public know that your intensions were just to

17   fish that day?

18               MR. FRIDAY:  Object to form.

19               THE WITNESS:  Because we weren't in a

20           threatening manner.

21   BY MR. SWITKES:

22       Q.    That's not the question.  If you see

23   -- not you, but if the public sees five armed

24   men on a pier with direct access to cruise

25   ships with tens of thousands of people going

Page 70

1   to enter and exit that port, how would they

2   know your intent is just to fish, as opposed

3   to potentially being there to commit an

4   atrocity?

5        MR. FRIDAY:  Object to form.

6        THE WITNESS:  The only thing I can

7        say is from my experience it would be the

8        same as if I saw an undercover police

9        officer open carrying his firearm.

10  BY MR. SWITKES:

11  Q.   Any --

12  A.   And he wasn't wearing a uniform.

13  Q.   And what -- how do you equate that

14  what you we're talking about?

15  A.   Because it would be the same if I saw

16  like an undercover police officer with his

17  weapon holstered in a nonthreatening manner.

18  Like he didn't have it drawn and pointed at

19  anybody.

20  Q.   Assuming that he didn't have it

21  pointed at anybody, if an undercover officer

22  is in plain clothes, does that get your

23  attention when you see a weapon in his --

24  under -- in his pants in the back pant or on

25  the side?

Page 71

1      A.   Well, frankly, it's none of my

2   business what -- what any other person does.

3      Q.   Does that alert you to the fact that

4   someone is there with a firearm?

5      A.   I may notice it but it wouldn't alert

6   me or scare me, you know, like -- it wouldn't

7   alert me or make me feel uneasy if it was a

8   holstered handgun, no.

9      Q.   Do you think that other people might

10  be alarmed if they saw someone, not in a

11  police uniform, with a handgun?

12         MR. FRIDAY:  Object to form.

13         THE WITNESS:  I can't speak for other

14     people.

15  BY MR. SWITKES:

16     Q.   Is that a regular occurrence in

17  Miami-Dade County, that people walk around

18  with a holstered handgun?

19         MR. FRIDAY:  Object to form.

20         THE WITNESS:  I don't know what's a

21     regular occurrence in Miami-Dade County.

22  BY MR. SWITKES:

23     Q.   Well, you live in Broward County, on

24  a regular basis as you go to the mall or you

25  go to the store, you fill up in gas, do you

1   regularly encounter people with a holstered

2   sidearm on their person?  Yes or no.

3           MR. FRIDAY:  Object to form.

4           THE WITNESS:  I don't know if people

5       have holstered sidearms on them or not.

6   BY MR. SWITKES:

7       Q.   I didn't ask you whether you know.

8   Do you see that on a regular basis is my

9   question.

10          MR. FRIDAY:  Object to form.

11  BY MR. SWITKES:

12      Q.   In Broward County, Florida.

13          MR. FRIDAY:  Object to form.

14          THE WITNESS:  None --

15  BY MR. SWITKES:

16      Q.   It's okay to say no, because you know

17  that's the truth, isn't it?

18      A.   Well --

19          MR. FRIDAY:  Object to form.

20          THE WITNESS:  Anywhere I would go in

21      Broward County, someone could have a

22      holstered handgun concealed and I wouldn't

23      know, so.

24  BY MR. SWITKES:

25      Q.   That's a different situation.  If

Page 73

1   they have a holstered weapon that you can't

2   see you couldn't perceive it and be in fear of

3   it if you didn't see it.  That's a pretty

4   obvious thing.

5           I'm saying you pull up to Walmart and

6   there's a person that's walking in the parking

7   lot and he has a holstered gun, do you think

8   that would draw attention?

9           MR. FRIDAY:  Object to the form.

10          THE WITNESS:  For me, no.

11  BY MR. SWITKES:

12      Q.   How about for the average person?

13          MR. FRIDAY:  Object to form.

14          THE WITNESS:  I can't speak for the

15      average person.

16  BY MR. SWITKES:

17      Q.   You don't know if the average person

18  would be somewhat on alert if they saw someone

19  walking in the parking lot of a Walmart in

20  Broward County with a holstered handgun?

21          MR. FRIDAY:  Object to form.

22          THE WITNESS:  No.

23  BY MR. SWITKES:

24      Q.   That's an everyday occurrence, you

25  see that every single day in Broward, right?

Page 74

1            MR. FRIDAY:  Object to form.

2            THE WITNESS:  What's that do I see?

3    BY MR. SWITKES:

4       Q.   People walking around with a

5    holstered firearm on their hip.

6            MR. FRIDAY:  Object to form.

7            THE WITNESS:  I'm don't walk around

8        Broward County looking at people's hips.

9    BY MR. SWITKES:

10      Q.   You know, sir, we can dance around

11   this or we can go right to it.  How many times

12   in the last 365 days have you traveled in your

13   normal business or private life, how many

14   individuals, of the million eight in Broward

15   County, have you seen walking around with a

16   gun in a holster in the normal course of a

17   day?

18           MR. FRIDAY:  Object to form.

19   BY MR. SWITKES:

20      Q.   Never?

21      A.   I have seen people with a holstered

22   open carry pistol but I don't know if they

23   were law enforcement or not.

24      Q.   Okay.  How much times in a year?

25   Once?

Page 75

1           MR. FRIDAY:  Object to form.

2    BY MR. SWITKES:

3       Q.   Twice?

4           MR. FRIDAY:  Object to form.

5           THE WITNESS:  Without like specific,

6       around one to three times.

7    BY MR. SWITKES:

8       Q.   Okay.  So if people that were bathing

9    in the beach next to the pier or people that

10   were jogging by you saw five armed men, do you

11   think that might have concerned some of those

12   citizens?

13          MR. FRIDAY:  Object to form.

14          THE WITNESS:  I don't see why it

15      would concern anybody.

16   BY MR. SWITKES:

17      Q.   Okay.  And then we got to the point

18   -- what, did you have anything to drink that

19   day?

20      A.   Oh, no, sir, just water.

21      Q.   Did you anything to drink within

22   24 hours of this?

23      A.   No, sir.

24      Q.   Do you know if any of the other

25   Florida Carry members had?

Page 76

1          MR. FRIDAY:  Object to form.

2          THE WITNESS:  I don't know if they

3     were Florida Carry members.  And I don't

4     know their -- what they did the night

5     before.

6  BY MR. SWITKES:

7     Q.   Have you been with Michael Taylor

8  before?

9     A.   Before this or after this?

10    Q.   Before this.

11    A.   Yes.

12    Q.   And does he regularly drink beer?

13         MR. FRIDAY:  Object to form.

14         THE WITNESS:  I've never seen Michael

15    drink a beer in my life.

16  BY MR. SWITKES:

17    Q.   Are you aware of the fact that he

18  testified he usually has four to six beers a

19  day?

20         MR. FRIDAY:  Object to form.

21  BY MR. SWITKES:

22    Q.   When you've been with him that hasn't

23  been the case?

24    A.   No, sir, and I'm not -- unaware of

25  his testimony.

Page 77

1       Q.   Okay.  I think I just told you what
2   his testimony was.
3       A.   Okay.  Well --
4       Q.   That's not consistent with your
5   experience with him?
6       A.   No, sir.
7       Q.   Okay.  So the park ranger leaves,
8   correct?
9       A.   At this time he was on his cell phone
10  while we were fishing.
11      Q.   And then he left?
12      A.   Correct.
13      Q.   Did he come back again?
14      A.   Not that I remember.
15      Q.   Okay.  When was the next time you
16  encountered anybody that you perceived as
17  working for the City of Miami Beach?
18      A.   Approximately seven to 12 minutes
19  after that gentleman left police officers were
20  at the end of the pier.
21      Q.   Okay.  And what happened next?
22      A.   We continued to fish with our poles
23  in the water.  And --
24      Q.   Did anybody mention there are police
25  officers on the pier?

Page 78

1      A.    Correct, Carlos noticed that the
2    police had been gathering at the end of the
3    pier.
4      Q.    And can you quantity the number of
5    officers?
6      A.    In the beginning when they were
7    gathering at the edge of the pier, I would say
8    four.
9      Q.    And then what happened?
10      A.    The -- the officers came down the
11    pier in a line, in a line and they were
12    walking towards us.  And I'd say
13    approximately, without being too good at
14    distance, maybe ten yards from us three
15    officers drew their handgun from their holster
16    and pointed them at us.
17      Q.    And do you know who those three
18    officers were?
19      A.    I don't.
20      Q.    And can you describe them?
21      A.    I know only one officer, Bold --
22    Bolduc I think is -- his name is.  And he had
23    come around the -- the -- behind us while the
24    other three officers had us at gunpoint.  They
25    -- they got in a position and each of them had

Page 79

1    their firearms pointed at us.

2        Q.   Did Officer Bolduc have his weapon

3    pointed at anybody?

4        A.   He was out of my line of sight.

5        Q.   Okay.  Did you ever learn the names

6    of those three officers?

7        A.   I might have looked at their name tag

8    that day and with -- and just seeing it in the

9    report.  I don't remember exact, you know,

10   face to name.

11       Q.   Okay.  The complaint specifically

12   identifies those three officers.  You didn't

13   -- you don't know who those officers were?

14       A.   I don't know their names.

15       Q.   Okay.

16       A.   Their exact names.  I know one of

17   them was Spanish, I guess, Spanish descent.

18            I am not sure of his name, though.

19       Q.   Okay.  And what was said?

20       A.   Multiple things were said.  It seemed

21   like no one had control.  One officer said

22   hands up, one officer said hands down, one

23   officer said don't move.  And then they said

24   hands up, hands down a few more times.  It was

25   -- just chaos ensued.

Page 80

1        Q.    And then what happened?

2        A.    I stood with my hands on my head

3   petrified because I had a gun in my face.

4        Q.    When you say you had a gun in your

5   face, was the gun --

6        A.    Well, it was pointed at me.

7        Q.    -- literally in your face?

8        A.    No, sir, not literally in my face,

9   but --

10       Q.    Okay.

11       A.    -- it was pointed at my face.

12       Q.    How far away was the officer from

13   you?

14       A.    Three yards, maybe.

15       Q.    Okay.  And then what happened?

16       A.    They just told us to relax, relax.

17   You know, we were trying to explain to them,

18   listen, we're just fishing, we're not, you

19   know, we're not hurting anybody.

20            And if I remember correctly, Michael

21   Taylor was next to me to my -- if I'm facing

22   that waterway, to the right of me, they put

23   Michael Taylor in handcuffs, disarmed him, and

24   he was trying to tell the officer that he had

25   -- his firearm was loaded to please be carful,

Page 81

1    because it's a SURPA holster.  And then they

2    got him detained, put him on the -- put him

3    down, sat him down.

4         And then -- oh, no Steve Keith

5    Jenkins I think was right next to me.  Then

6    they did the same to Steve, they got him in

7    cuffs, disarmed him, sat him down.

8         And then they came to me and at that

9    time they put a really big officer on me, he

10   was an African American gentleman.  I don't

11   remember his name.  And he was just telling me

12   to relax, relax.  And I was trying to tell

13   him, like, we did nothing wrong, you know, we

14   did nothing wrong.  And he's the one that

15   detained me and disarmed me.

16   Q.   Okay.  Now, when you saw that Taylor

17   was handcuffed, was he handcuffed in the back?

18   A.   Yes.

19   Q.   Were you handcuffed in the back?

20   A.   Yes, they had to use two sets of

21   cuffs.

22   Q.   And that's because you're large?

23   A.   Yes.

24   Q.   Did you tell -- did they do that

25   automatically?

Page 82

1      A.   I asked them.

2      Q.   Okay.  Had you ever been handcuffed

3  before?

4      A.   In my life?

5      Q.   Yes, sir.

6      A.   Yes.

7      Q.   When was that?

8      A.   I was handcuffed in New Jersey in --

9  probably when I was around 22 years old for

10  driving on a suspended license and I was just

11  handcuffed briefly and released on a summons.

12      Q.   Your license had expired or it was

13  revoked?

14      A.   No, it was suspended for nonpayment

15  of a fine.

16      Q.   Okay.  So then technically you were

17  arrested.

18      A.   No, I wasn't arrested.  I was

19  released.

20      Q.   Well, you were driving without a

21  valid drivers license and you were then handed

22  a document which indicated that you were under

23  arrest but if you signed and promised to

24  appear you would be released and allowed to

25  appear in court, you're not aware that that's

Page 83

1    what happened?

2        A.    I'm aware that I was ticketed and

3    released.

4        Q.    Ticketed is for speeding.  Ticketed

5    is failing to put our your directional.

6              MR. FRIDAY:  Object --

7    BY MR. SWITKES:

8        Q.    If you're driving without a valid

9    drivers license, that's a crime.

10             MR. FRIDAY:  Object to form.

11   BY MR. SWITKES:

12       Q.    Isn't that what you just told me you

13   were charged with?

14       A.    Well, I was driving with -- driving

15   with a suspended license.

16       Q.    That's a crime.  That's not a ticket.

17             MR. FRIDAY:  Object to form.

18   BY MR. SWITKES:

19       Q.    And that happened in what county of

20   New Jersey?

21       A.    Ocean County.

22       Q.    And when did that occur?

23       A.    It was so long ago, sir.

24       Q.    How old were you?

25       A.    Approximately 22, 23.

Page 84

1       Q.   And you were handcuffed, correct?

2       A.   Yes, sir.

3       Q.   And you've never been handcuffed when

4    you got a traffic ticket, have you?

5            MR. FRIDAY:  Object to form.

6            THE WITNESS:  Other than that, no.

7    BY MR. SWITKES:

8       Q.   Okay.  Did they handcuff you in the

9    back at that time?

10      A.   Yes.

11      Q.   Did they use two sets or one set?

12      A.   One set.  I wasn't as big then.

13      Q.   Okay.  How much do you weigh now,

14   approximately?

15      A.   Like 325, somewhere around there.

16      Q.   And back then?

17      A.   240.

18      Q.   Okay.  Was the officer that

19   handcuffed you polite?

20           MR. FRIDAY:  Object to form.

21           THE WITNESS:  No.

22   BY MR. SWITKES:

23      Q.   What did he say to you that wasn't

24   polite?

25      A.   Just, you know, talking down upon me,

1    really.

2        Q.   I want to know what he said.  I don't

3    know what that means.

4        A.   I don't recall it was so long

5    exactly.  I just remember him having an

6    attitude with me, that he was better than me

7    or something, that, you know, just a bully,

8    basically.

9        Q.   And can you describe this officer?

10           MR. FRIDAY:  Object to form.

11           THE WITNESS:  I can't, I don't

12       recall.

13   BY MR. SWITKES:

14       Q.   What was his race?

15       A.   I wouldn't be able to say what his

16   race was.

17       Q.   What was his color?

18       A.   It appeared to be Caucasian but, you

19   know...

20       Q.   Can you give me his approximate age?

21       A.   Approximate, from 25 to 40.

22       Q.   How about hair?

23       A.   I don't remember.

24       Q.   Do you remember anything he said?

25       A.   Just basically why he pulled me over

Page 86

1    and that he just needed to put me in cuffs for

2    his safety.

3        Q.   Okay.  Now, that's the Ocean County

4    New Jersey arrest.

5        A.   Yes.

6        Q.   How do you compare your being placed

7    in handcuffs here in Miami Beach to that

8    incident?  Was the officer a bully?

9        A.   If I were to compare the two?

10       Q.   Yes, sir.

11       A.   That police officer was an angel

12   compared to the Miami Beach police.

13       Q.   Okay.  So tell me what this Miami

14   Beach officer said to you that day.

15       A.   Well, before even going into what

16   they said, just the simple fact of a gun

17   pointed at me.

18       Q.   Okay.  We're passed that.  Now I'm

19   asking you what he said.

20           MR. FRIDAY:  Object to form.

21           THE WITNESS:  What who said?

22   BY MR. SWITKES:

23       Q.   The officer.

24           MR. FRIDAY:  Object to form.

25           THE WITNESS:  There was multiple

Page 87

1      officers.

2    BY MR. SWITKES:

3      Q.    The officer that was dealing with

4    you.  There were five or six of you, correct?

5      A.    At this time there was five.

6      Q.    Okay.  And there were four officers

7    according to your testimony.

8      A.    In the beginning, yes.

9      Q.    And one of the officers handcuffed

10   you, correct?

11     A.    Correct, the African American

12   officer.

13     Q.    The African American officer.  And

14   the African American officer used two sets of

15   handcuffs on you, correct?

16     A.    Correct.

17     Q.    And you asked him to do that?

18     A.    Well, he saw that I was in pain and I

19   did ask him, I said, hey, can you please give

20   me a second set of cuffs.

21     Q.    And he said?

22     A.    He said give me a minute and he did.

23     Q.    Okay.  What else did he say?

24     A.    Basically that we're going to get

25   this all sorted out, we're just doing our job,

Page 88

1    we're just doing our job.

2         Q.   Okay.  Anything else?

3         A.   Not really.  They placed me on a

4    bench and told me to just sit there.

5         Q.   Okay.  How long did you sit there?

6         A.   After being detained?  I'd say

7    approximately -- and -- now, again, this is an

8    approximate, I'd say an hour to an hour and a

9    half.

10        Q.   And did you have any further

11   conversations with any of the officers?

12        A.   Just random.  At this time now it

13   seemed like the whole police force descended

14   upon us.  Randomly there was questions being

15   asked by this officer, by this officer, you

16   know, it was -- there was no order.

17        Q.   Okay.  My question was, did you have

18   any conversations with any of the officers

19   and, if so, relate them to me.

20        A.   The only conversations I had was the

21   questions that they asked me.

22        Q.   What did they ask you?

23        A.   What are doing here, why are you open

24   carrying, do you have a concealed carry

25   permit, what kind of gun do -- which gun is

Page 89

1    yours, is the gun stolen, do you have a

2    fishing license.  That's all I can recall.

3         Q.   And what was your answer to what were

4    you doing here?

5         A.   I said we were fishing.

6         Q.   And when he asked you if you had a

7    concealed weapons license what was your

8    answer?

9         A.   Yes, I do.

10        Q.   And you've had that since when?

11        A.   I'd have to look at it.

12        Q.   Give me your best approximation.

13        A.   I'm have it for about two years --

14   approximately three years, actually.

15        Q.   So approximately 2016?

16        A.   Yes, approximately.

17        Q.   And what kind of gun did you have?

18        A.   I don't --

19             MR. FRIDAY:  Objection.  Don't

20        answer.

21             MR. SWITKES:  Excuse me?

22             MR. FRIDAY:  Well, excuse me, you're

23        asking what kind of gun he had that day?

24             MR. SWITKES:  Yes, sir.

25             MR. FRIDAY:  Okay.  Go ahead.  Sorry.

Page 90

1           THE WITNESS:  That day I had a

2       Walther PPS, nine millimeter.

3   BY MR. SWITKES:

4       Q.   What kind of ammunition did you have

5   that day?

6       A.   Winchester White Box, full metal

7   jacket, 155 grain ammo.

8       Q.   Hollow point?

9       A.   No, sir.

10      Q.   Why didn't you have hollow point?

11      A.   I just didn't have hollow points in

12  the gun at this time.

13      Q.   You normally use hollow point?

14      A.   Yes, sir.

15      Q.   Okay.  Was one in the chamber?

16      A.   I don't recall one in the chamber.

17      Q.   Did you hear similar questions being

18  asked of other members of your group?

19      A.   Yes.

20      Q.   Do you remember their responses?

21      A.   Similar to mine, to my responses, you

22  know.  I know a few -- I don't know exactly

23  who, but I know a couple people had concealed

24  weapons permit also.

25      Q.   Okay.  Do you remember one of your

Page 91

1    group in particular constantly talking

2    throughout the time that the officers were

3    there while you were handcuffed?

4          MR. FRIDAY:  Object to form.

5          THE WITNESS:  We weren't allowed to

6        constantly talk.

7    BY MR. SWITKES:

8      Q.   Who told you you weren't allowed to

9    talk?

10     A.   Well, not that we weren't allowed but

11   we -- if -- in that setting no one was really

12   talking.  It was -- it was just anytime you

13   talked it was kind of like, okay, we're

14   dealing with it, we're dealing with it, it was

15   kind of, like, you know, just check down.

16     Q.   So you didn't talk?

17     A.   Only when I was asked --

18     Q.   Other than that, when you were asked

19   you -- when you were asked you answered a

20   question.  Other than that you didn't have any

21   other conversations?

22     A.   A little bit of chitchat.

23     Q.   Such as?

24     A.   Like next to the people that was

25   handcuffed, like, man, it's hot out here, I'm

Page 92

1    thirsty, you know.

2         Q.    Did you hear any of the other members

3    of your group having more conversation than

4    that?

5         A.    The only thing I remember is Michael

6    Taylor was complaining of a shoulder pain.

7         Q.    Okay.

8         A.    And he asking to just have his cuffs

9    loosened.

10        Q.    Did he -- you hear him say anything

11   else?

12        A.    The only time I ever heard him say

13   anything else was in the beginning he was

14   trying to explain, you know, why we were open

15   carrying, that it's legal to do.

16        Q.    Have you ever watched -- it seems

17   that Mr. Taylor might have had a camera

18   rolling most of the time during the

19   interaction with police, have you ever seen

20   that since the incident?

21        A.    Of Michael Taylor?

22        Q.    Yeah.

23        A.    Oh yeah.

24        Q.    And you're telling me he wasn't

25   taking during the time you were sitting there

Page 93

```
 1   quietly?
 2       A.   I didn't say he wasn't talking but he
 3   wasn't --
 4       Q.   Well, what was he saying if he was
 5   talking?  Because I asked you that and you
 6   said we just said, you know, I'm tired, it's
 7   hot?
 8       A.   What I remember?
 9       Q.   Yeah.
10           MR. FRIDAY:   Object to form.
11           Go ahead.
12           THE WITNESS:   What I remember is
13       Michael Taylor complaining of his shoulder
14       hurting.
15           MR. SWITKES:   Uh-huh.
16           THE WITNESS:   And asking for the
17       cuffs to be loosened.  And I remember him
18       trying to explain to the officers the
19       statute which allows us to open carry
20       while hunting, camping or fishing.
21   BY MR. SWITKES:
22       Q.   Did he explain -- try to explain that
23   statute one time or was it more than one time?
24       A.   I don't recall how many times he --
25   he said it.  I heard it one time for sure.
```

Page 94

```
 1      Q.   Okay.  Did you hear him say anything
 2  else?
 3      A.   Not that day, no.
 4      Q.   Did you hear him say, This is
 5  bullshit?
 6      A.   No, sir.
 7      Q.   Did you hear him say, You're going to
 8  make us rich?
 9      A.   No, sir.
10      Q.   Did you hear him say, You guys are
11  nuts?
12      A.   No, sir.  You're talking about the
13  time that we were detained, correct?
14      Q.   Yes, sir, during that entire time you
15  didn't hear almost an annoyingly constant
16  voice of Mr. Taylor, where nobody else was
17  talking, constantly speaking to the officers
18  in a manner similar to what I just described?
19          MR. FRIDAY:  Object to form.
20          THE WITNESS:  Not speaking
21      constantly, no.  I just remember him --
22  BY MR. SWITKES:
23      Q.   Pretty significantly.  I don't want
24  to get caught up on the word constantly.  You
25  were there for a couple of hours, right?
```

Page 95

1           MR. FRIDAY:  Object to form.

2           THE WITNESS:  All and all a couple of

3      hours, yes.

4   BY MR. SWITKES:

5      Q.   So he was talking a significant

6   amount of that time to the officers, wasn't

7   he?

8           MR. FRIDAY:  Object to form.

9           THE WITNESS:  In the beginning he

10      said a few things, yes.

11   BY MR. SWITKES:

12      Q.   Okay.  When was it in the sequence

13   that your handcuffs were removed?

14      A.   At this time, approximately, I would

15   say 45 minutes to an hour into the original

16   detainment I asked for water, because it was

17   very hot that day and I was, like, getting

18   dizzy.  And at first the original officer that

19   detained me, the African American fellow, he

20   grabbed a bottle of water and I was still

21   cuffed and he, like, gave it to me, almost

22   like I was hamster, like -- like -- I had to

23   like suck it out of the water bottle,

24   basically.

25           And approximately 15 minutes after

Page 96

1    that I asked, I need more water, please.  And

2    the other people, like Steve Keith Jenkins

3    said, you got to get him some water, he's

4    turning pale.  He then -- I said, can you,

5    like, can I please like hold the bottle and

6    drink it?  They removed my cuffs from behind

7    me and put them -- cuffed me in the front so I

8    could drink a bottle of water.

9        Q.    Okay.  That was that same African

10   American officer?

11       A.    I believe so, that -- that cuffed me

12   in the front.

13       Q.    Okay.  Do you know what the standard

14   operating procedure is for handcuffing in the

15   City of Miami Beach and most police agencies

16   countrywide?

17            MR. FRIDAY:  Object to form.

18            THE WITNESS:  No, sir.

19   BY MR. SWITKES:

20       Q.    Do you know why handcuff people in

21   the back?

22       A.    No, sir.

23       Q.    Okay.  Any other conversations you

24   had that you recall?

25       A.    I had a conversation with Jonah.

Page 97

1    When I saw him, when I was on the bench and I

2    turned around, I didn't even realize, I said,

3    you're here, Jonah.  And he's, like, yeah, I'm

4    here, and he was on the ground behind me.

5        Q.   Anything else you recall?

6        A.   Not specifics, no.

7        Q.   How long would you say the officers

8    had their guns -- any officer had a gun

9    pointed at you?

10       A.   Until I was in their custody and

11   disarmed.

12       Q.   Okay.  My question is approximately

13   how long was that?  Are we talking about 15

14   seconds?

15       A.   I would say 30 to 45 seconds.

16       Q.   Okay.  Any other time after you were

17   secured and handcuffed did anybody point a gun

18   at you?

19       A.   Not that I'm aware of.

20       Q.   Okay.  Anybody threaten you during

21   the time you were on the pier with the

22   officers?

23            MR. FRIDAY:  Object to form.

24            THE WITNESS:  Not that I recall.

25   BY MR. SWITKES:

Page 98

1      Q.   Your recollection of the number of

2   officers, you originally said there was four,

3   correct?

4      A.   In the beginning, yes.

5      Q.   And then you said there were a number

6   of officers.  Can you quantify for me how many

7   officers you're referring to?

8           MR. FRIDAY:  Object to form.

9           THE WITNESS:  To my recollection, I'd

10       say twelve.

11   BY MR. SWITKES:

12      Q.   So if your complaint says 20, that

13   would be incorrect?

14           MR. FRIDAY:  Object to form.

15           THE WITNESS:  I wouldn't say it'd be

16       incorrect, it's just a roundabout.  I'd

17       say twelve to twenty then, if that's what

18       I put.

19   BY MR. SWITKES:

20      Q.   After you were handcuffed were you

21   searched?

22      A.   Yes.

23      Q.   And can you describe who handcuffed

24   you and searched you?  Was it a different

25   person or the same person?

Page 99

1      A.    The African American gentleman

2    searched me -- officer searched me.  I mean,

3    I'm sorry, he handcuffed me.  I believe, if --

4    I don't recall exactly, but I believe he was

5    part of the search.

6      Q.    And tell me what the search consisted

7    of.

8      A.    I had cargo shorts on and they were

9    going through my pockets.

10     Q.    Okay.  Was there anything in your

11   pockets?

12     A.    My wallet.

13     Q.    Other than your wallet?

14     A.    A pack of cigarettes and a lighter.

15     Q.    Other than that?

16     A.    Not that I recall.

17     Q.    Was the search the sum total of going

18   through your cargo short pockets?

19     A.    I'm sorry, can you repeat that?

20     Q.    Was the search you're describing

21   going through your cargo pants shorts pockets?

22     A.    Yes, yes.

23     Q.    There was no other search.

24     A.    Yes.

25     Q.    Okay.  Did any of the officers look

Page 100

1    into your cooler?

2        A.    Not that I recall.

3        Q.    Did any officer look into your tackle

4    box?

5        A.    Yes.

6        Q.    Was anything removed from your tackle

7    box?

8        A.    Removed but put back.  Just kind of

9    rummaging go through it.

10       Q.    Okay.  Where was the knife you had?

11       A.    I believe it was in the tackle box.

12       Q.    Was that left in the tackle box?

13       A.    Yes.

14       Q.    Okay.  During that time can you

15   describe any other actions taken by an officer

16   to your person that you haven't described

17   already?

18       A.    Actions taken?

19       Q.    Touching, speaking.

20       A.    I was asked by a female officer about

21   my firearm, if it was stolen.

22       Q.    And?

23       A.    Or if I legally owned it or if it was

24   stolen.

25       Q.    And your response was?

Page 101

1       A.   No, it's -- it's legally owned.

2       Q.   Okay.

3       A.   It's not illegally owned or it's

4   legally owned.

5       Q.   Okay.

6       A.   And there was a moment where she --

7   the female officer was asking me to kind of

8   explain the statute, because she was Googling

9   the law on her cell phone and she was reading

10  the law and she was trying to say, well, where

11  does it say here that you can open carry.  So

12  we -- I felt like we were on trial by Google

13  by her.

14      Q.   Was she pleasant to you?

15      A.   Just mundane, you know.

16      Q.   Okay.

17      A.   Not -- no emotion, really.

18      Q.   Okay.  And can you describe that

19  female officer for me?

20      A.   Definitely stockier body build type.

21  I think she was Caucasian.  It appeared that

22  she was Caucasian.  That's really it, I mean.

23      Q.   Her age, approximately?

24      A.   Approximately like 25 to 40 I would

25  say.

Page 102

1      Q.    That's a pretty big range.  You

2   couldn't narrow it down?

3          MR. FRIDAY:  Object to form.

4          THE WITNESS:  I'm terrible at

5      guessing age, I really am.  So I'd rather

6      just be safe.

7   BY MR. SWITKES:

8      Q.    Any other interaction with the

9   officers that day that you can recall, either

10  verbally or physically?

11     A.    On the pier or --

12     Q.    We're still on the pier.  We'll get

13  to the parking lot.

14     A.    Okay.  Okay.  Just a few, I remember

15  having a conversation with the officer that

16  had detained me about Lebron James leaving the

17  Heat, I remember that.

18     Q.    What was his position?

19     A.    Not happy, so...

20     Q.    Did you agree with him?

21     A.    Yeah, it's sad, you know, but...

22     Q.    Was there light chatter like that

23  while you were waiting?

24     A.    Between me and that officer, yes.

25     Q.    And can you describe that officer?

1      A.   He was taller than me, probably six

2   -- six-four, maybe, large African American

3   officer.  Probably like stocky as me, big, you

4   know.

5      Q.   Okay.  Any other recollections you

6   have that you haven't told me about?

7      A.   No.  Just answering random officers'

8   questions, like -- nothing -- and I don't

9   remember specifics besides like conceal carry,

10  what we went over before.

11     Q.   Okay.  Did you have any physical

12  problems, medical problems on the date of the

13  incident on Miami Beach?

14     A.   No.  Like I said, the only thing I

15  had was just like a little, you know,

16  dizziness from dehydration.

17     Q.   Have you suffered from any medical

18  conditions before that day for which you have

19  been treated?

20     A.   No, sir.

21     Q.   Do you have a family physician?

22     A.   At the time, no.

23     Q.   And when was it -- did you seek any

24  medical attention anytime after June 24, 2018

25  for anything relating to that incident?

Page 104

1      A.    No, sir.

2      Q.    Okay.  Have you ever had any mental

3  health treatment in your life prior to the

4  date of the accident?

5      A.    The only thing I can recall was when

6  I was 16 years old I was evaluated, that was

7  it.

8      Q.    You were evaluated by whom?

9      A.    In New Jersey.  Do you want, like,

10  the story of why it happened?

11      Q.    Yes, sir.

12      A.    Okay.  I was in eighth grade and my

13  best friend killed himself, he hung himself,

14  and then my grandma died on the same day.  And

15  I was in a catholic school and they have like

16  a crisis counselor.  They were just, you know,

17  worried about me because I was so emotional

18  and -- it wasn't like a mental health profess

19  -- I don't think he was -- I don't, you know

20  -- it wasn't like -- I don't know if he was a

21  doctor.  It was just kind of like a counselor,

22  like a spiritual counselor.  That's the only

23  closest thing to -- I can say.

24      Q.    And since that time have you had any

25  counseling, mental health treatment

Page 105

1    psychologist, psychiatrist, a mental health

2    counselor?

3         A.   No, sir.

4         Q.   And you haven't had any since the

5    date you appeared in Miami Beach, correct?

6         A.   No, sir.

7         Q.   Can you tell me what, if any, damages

8    you claim you suffered as a result of the

9    incident on Miami Beach?

10        A.   Like emotional damages.

11        Q.   I think we just talked about, you

12   haven't sought any help from anybody.  Tell me

13   what emotional damages you're claiming.

14        A.    It's just not trusting, you know,

15   police, being very wherry of them, scared of

16   them, not knowing if they're on my side or

17   not, you know, they're willing to point a gun

18   at you and possibly kill you.

19        Q.   Did you return to South Pointe Park

20   at anytime after the incident?

21        A.   Yes.

22        Q.   When did you do that?

23        A.   July.

24        Q.   Of 2018?

25        A.   I'm not sure on exact dates.  When

Page 106

1    was that event?  I've been back twice since

2    this accident.

3         Q.   Okay.  So previously you said you

4    were emotionally concerned about not being

5    treated properly by police and yet you

6    returned to the same park approximately a

7    month later; is that correct?

8         A.   It was a few months later, yeah, a

9    month or two later.

10        Q.   And were you armed at that time?

11        A.   Yes, sir.

12        Q.   And did you go back to the pier?

13        A.   Yes, sir.

14        Q.   So explain to me, if you were

15   emotionally upset and afraid to see police,

16   why would you go back to the same place that

17   you claimed you suffered some emotional upset

18   prior to that?

19        A.   Because of the support of my peers,

20   of being with me and telling me it's okay and

21   we're here for you, you know.

22        Q.   Who did you go back with?

23        A.   A group of people.

24        Q.   What are their names?

25        A.   I can't name every single one.

Page 107

1      Q.    Try to name some of them for me.

2      A.    Michael Taylor, Carlos, Richard.

3      Q.    Richard who?

4      A.    I can't say his last name.  I don't

5   know his last name.  Nascak.

6            MR. FRIDAY:  Can I assist here on

7      this one?

8            MR. SWITKES:  Permission granted.

9            MR. FRIDAY:  Richard Nascak,

10     N-A-S-C-A-K.

11           MR. SWITKES:  Thank you.

12           THE WITNESS:  Sean --

13           MR. SWITKES:  You don't have to raise

14     your hand to do that.

15           THE WITNESS:  Sean Caranna was there.

16           MR. SWITKES:  Help me.

17           MR. FRIDAY:  Caranna, C-A-R-A-N-N-A.

18           MR. SWITKES:  Steve Merrette.  I can

19     maybe spell that one for you.

20     M-E-R-R-E-T-T-E.

21           Kevin Sona, his wife.  I don't know

22     her first name.  We'll just refer to her

23     as Mrs. Sona.

24           And a few other people, Lucy -- I

25     don't know her last name.  I just know her

1    as Lucy.

2  BY MR. SWITKES:

3    Q.   And did you plan on going back

4  similar to where you planned on going on the

5  24th of June?

6    A.   Did I plan on?

7    Q.   Going back to South Pointe.

8    A.   Yes, I -- well, I planned on going

9  fishing again.

10    Q.   And carrying a gun again.

11    A.   Yes, sir.

12    Q.   Despite the fact that you said you

13  were concerned emotionally about potentially

14  having an incident with the police officer.

15  You went exactly back to the same spot with a

16  fishing rod armed again, correct?

17    A.   Correct.

18    Q.   So you overcame whatever fear you had

19  to go back, didn't you?

20        MR. FRIDAY:  Object to form.

21        THE WITNESS:  I wouldn't say I

22     overcame the fear.  I just felt more

23     comfortable with the people I was with.

24  BY MR. SWITKES:

25    Q.   Okay.

Page 109

1      A.    They gave me their strength.

2      Q.    How long were you there for on the

3   second occasion?

4      A.    Three to four hours.

5      Q.    Did you fish?

6      A.    Yes.

7      Q.    Did you catch any fish?

8      A.    I didn't personally, no.

9      Q.    Anybody in your group catch any fish?

10     A.    Yes.

11     Q.    Who?

12     A.    I don't remember his name.

13     Q.    One?

14     A.    I believe one was caught -- yeah,

15   one.  There might -- somebody might have

16   caught one at the end of the pier also, I just

17   didn't' see that.

18     Q.    Okay.

19     A.    I heard of it.

20     Q.    And did you have any interaction with

21   police officers on that occasion?

22     A.    When I first got there, yes.  I

23   pulled into the parking lot, I opened my trunk

24   to get my fishing gear out and I was

25   approached by an undercover officer who showed

Page 110

1    his badge immediately and said Miami Beach

2    police, let me see your fishing license.

3         Q.    Did you show him your fishing

4    license?

5         A.    Yes, sir.

6         Q.    And what happened next?

7         A.    He said, have a great day.

8         Q.    Okay.  Did you encounter any other

9    Miami Beach police officers, officials, the

10   second day?

11        A.    We -- they were there, but it was

12   just kind of a wave and a...

13        Q.    When you say "they were there," I

14   don't know what they means.

15        A.    There was Miami Beach police officers

16   there at the foot of the pier in the park

17   that, you know, just a wave.

18        Q.    And how many were there,

19   approximately?

20        A.    Five.

21        Q.    Did you have any other interaction

22   with any of the five of them that day?

23        A.    No.

24        Q.    Okay.  Did you ever go back to the

25   Miami Beach pier at South Pointe again?

Page 111

1      A.   Yes.

2      Q.   And when was that?

3      A.   It's -- July 26th.

4      Q.   Of what year?

5      A.   We're in 2020, right?

6      Q.   Yes, we are.  I'll answer that

7   question.

8      A.   I believe it was 2019.

9      Q.   Well, I'm a little bit confused

10   because you said you went back the first time

11   -- at first you said July but then you said a

12   few months later.  And now you're saying July

13   again.

14      A.   Well --

15      Q.   You went originally on June 24th.

16      A.   Correct.

17      Q.   So a few months later would not be

18   July.

19      A.   No, I was mistaken then.

20      Q.   Okay.  So the first time you went

21   back was July of 2018?

22      A.   No, it was a few months after

23   June 24th, I believe.

24      Q.   July of 2019 is not a few months

25   after June --

Page 112

1      A.    That was the second time, sir.

2      Q.    -- June 24th of -- oh, 2018.

3      A.    Yes.

4      Q.    Okay.  That's not a few months,

5   that's a year.

6      A.    The second time was a year later.

7      Q.    Okay.  So the first time was July of

8   '18?

9      A.    June of '18 was the first original --

10      Q.    And the first return visit was?

11      A.    Like a few months later.

12      Q.    So not July?

13      A.    No.  Not that I recall.

14      Q.    And you went back a third time with

15   whom?

16      A.    A lot of the same names I just named.

17   I really can't point anybody new that I can

18   think of.

19      Q.    Did you notify anybody at the City of

20   Miami Beach that you were going back the

21   second time?

22      A.    No.

23      Q.    Did you notice anybody at the city of

24   Miami Beach that you're going back the third

25   time?

Page 113

1      A.    No, sir.

2      Q.    Did you encounter any police officers

3  the third time you went there?

4      A.    Same interaction with just a few

5  officers in the park.  This time I wasn't

6  approached by an undercover that asked for my

7  fishing license.

8          MR. FRIDAY:  Mr. Switkes, he did

9      answer these questions on Interrogatory

10     20, by the way.  He's one of the ones that

11     did have them.  I just wanted to make sure

12     you knew that, which have the dates.

13         MR. SWITKES:  You must have had a

14     good day, because you didn't object to

15     his, so.

16  BY MR. SWITKES:

17     Q.    How long were you at the pier the

18  third time?

19     A.    About the same time, three to

20  four hours.

21     Q.    Anybody catch any fish?

22     A.    I believe one fish was caught, yes.

23     Q.    Is that a good haul for you as a

24  fisherman?  You know, in my own experience if

25  I fish for three or four hours and one of our

Page 114

1    group catches a fish, it's a place we never go

2    back to.

3              MR. FRIDAY:  Object to form.

4    BY MR. SWITKES:

5         Q.   What is your experience with that?

6              MR. FRIDAY:  Object to form.

7              THE WITNESS:  My experience, sir, is

8         any day fishing, even if you don't catch

9         anything, is better than a day of work.

10   BY MR. SWITKES:

11        Q.   I couldn't agree -- well, I shouldn't

12   say that.  Off the record I might agree with

13   you, but in the context of my fishing

14   experience, for one, two, three, four, five,

15   six, seven, eight people fishing one fish is a

16   pretty miserable day of fishing.  Not

17   comparing it to work.

18        A.   Well --

19        Q.   Wouldn't you agree?

20        A.   It's not a good day fishing, no.  But

21   in my opinion, ten minutes after we leave

22   there could be a blitz that runs through

23   there.  Nature is amazing and the fish are

24   sometimes there and sometimes they're not.

25        Q.   But you now gave it three shots.

Page 115

1    Now, when you got out fishing do you have a

2    favorite spot to go?

3        A.    No.

4        Q.    Do you have a few favorite spots to

5    go?

6        A.    Yeah, I have a few, yeah, like, you

7    know, normal spots that I've, you know,

8    fished.

9        Q.    Where are they?

10       A.    Well, now I reside --

11       Q.    Don't tell me the exact coordinates.

12   Just tell me the location.

13       A.    Well, the longitude and latitude --

14       Q.    I've seen people do crazy things

15   hiding their spots, so I'm not asking you to

16   divulge those secrets.

17       A.    Now I live in the Tampa area and the

18   fishing is just inconsiderable there.  And a

19   lot of times I'll fish like the 60 Causeway in

20   the mangroves there.

21       Q.    I've done that myself.  On a good day

22   you would catch how many fish, 20, 30?

23       A.    Yeah, not keeping fish, you know,

24   annoying fish.

25             But I also like over there where the

Page 116

1    Skyway Bridge is on 275 --

2        Q.   Yes, sir.

3        A.   -- the state park, you just drive

4    your car in there, I like there, too.  That's

5    like grouper fishing over there, so.

6             THE VIDEOGRAPHER:  Can we take a

7        break so I can change the video?

8             MR. SWITKES:  Permission granted.

9             THE VIDEOGRAPHER:  Thank you.

10            We're off the record at 3:21 p.m.

11            (A recess was taken.)

12            THE VIDEOGRAPHER:  And we're back on

13        the record at 3:35.

14   BY MR. SWITKES:

15       Q.   After the handcuffs are taken off,

16   how long were you on the pier, approximately?

17       A.   At this time a superior officer

18   arrived and maybe five to ten minutes.

19       Q.   And then what happened?

20       A.   That officer just said -- explained

21   what was going to happen next.

22       Q.   What did he explain?

23       A.   That our firearms were going to

24   remain in the possession of the officers,

25   they're going to walk us to our car with our

Page 117

1    firearms unloaded, load them into our trunk

2    and send us on your way.  And he said that we

3    could continue to fish but the pier was closed

4    for the day and if we wanted to stay and fish

5    the only place we could fish would be the

6    jetty rocks.

7        Q.   Did you stay?

8        A.   No, sir.

9        Q.   What did you say to the officers'

10   request that they walk you to the car?

11       A.   I didn't object or say anything.

12       Q.   Did an officer walk you to the car?

13       A.   Yes, sir.

14       Q.   Okay.  Were you armed at the time you

15   walked to the car?

16       A.   No, sir.

17       Q.   Were you afraid to walk to your car

18   unarmed?

19            MR. FRIDAY:  Object to form.

20            THE WITNESS:  Given the circumstances

21       that day, I was very untrusting of the

22       police and I was nervous with them walking

23       behind me and I had no way to defend

24       myself.

25   BY MR. SWITKES:

Page 118

1      Q.   I'm not sure what that last comment

2   was about.

3           MR. FRIDAY:  Object to form.

4   BY MR. SWITKES:

5      Q.   Had you had your gun you would have

6   felt safer with the officers walking behind

7   you?

8           MR. FRIDAY:  Object to form.

9           THE WITNESS:  No, I was saying before

10      that the officer was walking behind me, so

11      it was kind of, you know, he could have

12      done anything to me, you know.

13   BY MR. SWITKES:

14      Q.   Had any of the officers done anything

15   to you on the time -- whole time you were on

16   the pier?

17           MR. FRIDAY:  Object to form.

18           THE WITNESS:  They pointed guns at

19      me.

20   BY MR. SWITKES:

21      Q.   For about 15 seconds, we went through

22   that.  Other than that, did they do anything

23   to you to put you in fear during the remainder

24   of the time you were on the pier?

25           MR. FRIDAY:  Object to form.

Page 119

```
 1            THE WITNESS:  I was in fear the whole
 2       time after being disarmed.
 3   BY MR. SWITKES:
 4       Q.   Okay.  What were you in fear of?
 5       A.   Trigger -- a cop with his hand on the
 6   trigger that was nervous and shot me.
 7       Q.   Okay.  But maybe I'm mistaken, but
 8   wasn't your testimony that after you were
 9   handcuffed none of the officers had their guns
10   drawn?
11       A.   No, sir.
12       Q.   You're saying after you were
13   handcuffed the officers kept pointing guns at
14   you?
15       A.   No, sir.  No -- no guns were pointed
16   after I was handcuffed.
17       Q.   Did any officer have his gun out of
18   his holster after the handcuffing?
19       A.   No, sir.
20       Q.   Okay.  I'm misunderstood.  I thought
21   you were saying something different.
22       A.   No, sir.  What I'm saying is whether
23   the gun is holstered or not, an officer can
24   pull out his gun in a half a second and point
25   it at me and kill me.
```

Page 120

1    Q.   Did you display any behavior that you

2    thought would cause an officer to draw his gun

3    after they initially put their guns away?

4         MR. FRIDAY:  Objection to form.

5         THE WITNESS:  I don't recall

6         displaying any behavior but, then, again,

7         I was displaying no behavior when I was

8         fishing either and a gun was pointed at

9         me, so.

10   BY MR. SWITKES:

11   Q.   Yeah, but you had an armed -- a

12   firearm on you at the time.  You didn't have a

13   firearm at the time you were walking to your

14   car, I think we just went over that, right?

15        MR. FRIDAY:  Object to form.

16        THE WITNESS:  Correct, but I had a

17        firearm securely holstered, not in a

18        threatening manner.

19   BY MR. SWITKES:

20   Q.   Okay.  But let's get to the part

21   where you're walking in the parking lot.

22   A.   Uh-huh.

23   Q.   You didn't have a firearm at that

24   time, correct?

25   A.   No.

Page 121

1      Q.   You weren't doing anything

2    suspicious, were you?

3      A.   No, sir.

4      Q.   Were you -- you weren't committing

5    any criminal act during your walk to your car?

6      A.   No, sir.

7      Q.   Do you know if any of the -- your

8    fellow members refused to walk to the car?

9      A.   I don't remember anyone refusing to

10   walk to the car, no.

11     Q.   Did you hear any conversation of one

12   your friends fishing with you that day about

13   not walking to get his car?

14     A.   The only thing I recall was Jonah did

15   not want to walk to his car without his

16   firearm and he was expressing that to the

17   superior officer that had arrived on the

18   scene.

19     Q.   And why did he say that?  What was

20   his fear?  It's Jonah Weiss, right?

21     A.   Yes, sir.

22     Q.   Okay.

23     A.   I'm not sure what his fear was.  I

24   never asked him.

25     Q.   You had traversed that parking lot on

Page 122

1    the way to the pier, correct?

2         A.   Yes, sir.

3         Q.   So did you understand what his fear

4    of not walking to his car without his firearm

5    was?

6              MR. FRIDAY:  Object to form.

7              THE WITNESS:  Well, I don't know what

8         his thinking was.  If I were to guess, it

9         might have been similar to mine, that we

10        had guns pointed at us and anything could

11        happen.

12             You know, not to get off topic here,

13        but you mentioned before about have you

14        heard of the news, mass shootings, this

15        that and the other thing.  I've also heard

16        the news of cops killing innocent people,

17        you know, for doing way less than I've

18        done, you know, the -- that they thought

19        we were doing, so.

20   BY MR. SWITKES:

21        Q.   Explain to me what you have seen on

22   television of police officers shooting people

23   for less than what you did.  Give me one

24   instance.

25        A.   Okay.  So Travon Martin.

Page 123

1    Q.   He was shot by a police officer?

2    A.   Not -- I'm sorry, not --

3    Q.   Are you familiar with the Travon

4  Martin case?  You've got to be kidding me.

5    A.   Not Travon Martin.  Excuse me --

6    Q.   Okay.

7    A.   -- not Travon Martin.

8    Q.   Yeah.

9    A.   The one in Missouri.

10    Q.   The one in Missouri, what one --

11    A.   Ferguson, Missouri.

12    Q.   Yeah, what -- what was the encounter

13  between the officer and that individual?

14    A.   The news, from what I saw on the

15  news, he was innocently gunned down by police

16  officers.

17    Q.   Under what circumstances?  If you

18  watched it you'd been able to --

19    A.   A suspicion person.

20    Q.   And where was he when he was struck

21  by the bullet?

22    A.   I have no idea, I wasn't there.

23    Q.   You just said you watched it on the

24  news.

25    A.   Correct.

Page 124

```
1        Q.   I don't assume when you tell me what
2    you watched on the news that you were there
3    when it happened.
4        A.   Uh-huh.
5        Q.   Show let's get past that kind of
6    comment.
7        A.   Just trying to be specific, sir,
8    that's all.
9        Q.   Being specific would tell me what you
10   observed on the news.
11       A.   That a black male was gun down by
12   police that was innocent.
13       Q.   Of what?
14       A.   That wasn't committing a crime or
15   doing anything wrong.
16       Q.   Do you know if he had committed a
17   crime before that?
18       A.   No.
19       Q.   Do you know if he had a gun on his
20   person?
21       A.   I have no idea, no.
22       Q.   Do you know if he had refused orders
23   to get out of the car?  Was he in a car?  Was
24   he standing?  What are the circumstances?  Do
25   you even know what it was?
```

Page 125

1       A.   No.

2       Q.   Okay.  So give me one that you know

3  the circumstances about.

4       A.   Well, I don't know every detail of

5  every single case, I just know --

6       Q.   Well, give me one.

7       A.   -- that the media reports.  I gave

8  you one in Ferguson, Missouri.

9       Q.   And you believe the media?

10      A.   I mean, we hope to believe somewhat

11  of what they're is true.

12      Q.   Okay.  That's encouraging.

13      A.   We hope.

14      Q.   Okay.  So the officer walked with you

15  and who else?

16      A.   I was walking by myself with the

17  officer behind me.

18      Q.   And who came down with you in the

19  car?

20      A.   Sean was a few people -- he was

21  behind me.

22      Q.   And I'm trying to recall, is Sean

23  driving the car or are you driving the car?

24      A.   Yes, Sean -- Sean was the driver.  So

25  he was walking me to Sean's cars.

1      Q.   Okay.  And what happened when you got

2    to the car?

3      A.   The officer had my firearm, he had

4    asked Sean to pull his car up.  At South

5    Pointe Pier the parking lot, there's the

6    parking spaces and then like a -- like -- I

7    don't know what you would call it, just like a

8    half moon, you know, you can pull your car up.

9    There's no parking allowed there, but the

10   officer asked him to pull his car up there and

11   open the trunk and he put the firearm unloaded

12   and my ammunition into Sean's trunk.

13          And then Sean, you know, a minute or

14   two later got there with his officer and they

15   gave him -- he had a knife and they gave him

16   his knife back in the trunk, they put it in

17   the trunk, and then they gave us property

18   release forms.

19     Q.   Did they put his -- Sean's weapon in

20   the trunk?

21          MR. FRIDAY:  Object to form.

22          THE WITNESS:  Sean had a knife.

23   BY MR. SWITKES:

24     Q.   Didn't have any gun?

25     A.   No, sir.

Page 127

1        Q.    Okay.  Did he return -- did the
2   officers return all of Sean's property?
3        A.    From what I understand, yes.
4        Q.    Did the officers return all of your
5   property?
6        A.    Yes, sir.
7        Q.    Okay.  And then what did you do?
8        A.    We got in the car -- or, no, we
9   pulled the car into a parking place real quick
10  just to get our, like, fishing gear in order.
11              I was being approached by all these
12  media outlets that were waiting in the parking
13  lot and some lady got a camera in any face and
14  I don't know what news organization she was
15  part of and asked me what happened.  I gave
16  her a very, very brief synopsis, I changed my
17  shirt and then we left and got Jersey Mikes.
18       Q.    Okay.  Did you sign a property
19  receipt?
20       A.    I believe I did.
21       Q.    Did you get a copy of the property
22  receipt?
23       A.    Yes.
24       Q.    Okay.  Did you have any further
25  conversations with any officers?

Page 128

1      A.    After everything was put in the

2   trunk?

3      Q.    Yes, sir.

4      A.    No, sir.

5      Q.    But according to your answers to

6   interrogatories on page 12, you stated:   I

7   then closed the trunk, went back over to

8   Officer Hicks to get a case number.

9          Did you do that?

10     A.    Yes, I went over to -- okay, so I

11  went over to Officer Hicks and that's --

12  that's his name, Officer Hicks.  And that's

13  when he gave me the property release form.

14         And I asked him, is there a case

15  number?  And there wasn't, there wasn't like a

16  case number he could provide me.

17     Q.    But that's not true because you

18  wrote:  He printed one out for me.

19     A.    A property release form.

20     Q.    No, a case number.  "I then closed

21  the trunk, went back over to Officer Hicks to

22  get a case number/incident number and he

23  printed one out for me and that was it and I

24  got in the car with Sean," that's what you

25  wrote.  So what do you mean he refused to give

1   you a case number?

2        A.    Then I -- then I misstated that it

3   was a case number.  It was the property

4   release form that he gave me.  I requested --

5   I misstated that, I'm sorry.

6        Q.    Well, you said the exact opposite in

7   your answers under oath.  In your answers

8   under oath you said:  He gave a property

9   release form to sign to get my possessions

10  back.  I signed it and asked for a copy and he

11  told me I don't get a copy.

12            And then at the end of that you said:

13  I then closed the trunk, went back over to

14  Officer Hicks to get a case number or incident

15  number and he printed one out for me.

16       A.    So I flip flopped it.  I asked for

17  the case number and did not get it but I got

18  the property release form.

19       Q.    You're sure?

20       A.    From what I recall.

21       Q.    Well, from what you recall in a time

22  when you filled these interrogatories out

23  under oath you said the exact opposite.  And

24  just to be frank with you, that's probably a

25  lot closer when the officers don't have a

Page 130

1    report yet they do give persons a card with a

2    case number on it.  You don't remember getting

3    a case number?

4        A.   No, the only thing I remember

5    receiving was the property release form and it

6    was about this big, about the size of an index

7    card.

8        Q.   At the scene, did any of the officers

9    seem nervous?

10       A.   Yes.

11       Q.   Which officers?

12       A.   The original officers that approached

13   us and had their guns pointed at us.

14       Q.   Why do you think they were nervous?

15            MR. FRIDAY:  Object to form.

16            THE WITNESS:  Because they were, from

17       what I understand as nervousness, they

18       were barking commands and they were each

19       saying different things.  There was no

20       order and they kept saying, hands up,

21       hands down, hands up, hands down, they

22       couldn't figure out what they wanted.  So

23       to me it seemed like they were nervous.

24   BY MR. SWITKES:

25       Q.   Okay.  And it might have been that

Page 131

1    typically you might say hands up, but if

2    someone would say hands down, that would put

3    your hands in close proximity to your holster

4    and your weapon, correct?

5            MR. FRIDAY:  Object to form.

6    BY MR. SWITKES:

7       Q.   Wouldn't want somebody putting their

8    hands near a loaded weapon, would you, in that

9    circumstance?

10      A.   Well, I wouldn't -- naturally I

11   wouldn't put my hand near my loaded weapon

12   when a police office says puts your hands

13   down.

14      Q.   Okay.  But when you put your hands

15   down wouldn't they naturally be where the

16   holster is located on your hip?

17      A.   Around that area.  Not specifically

18   right there.

19      Q.   Okay.  And the fear the officers

20   displayed when they first encountered you

21   would indicate that they were concerned about

22   five armed men with only four of them on a

23   pier and they didn't know any of you, wouldn't

24   that be a fair assessment?

25           MR. FRIDAY:  Object to form.

1          THE WITNESS:  In my opinion, no.

2    BY MR. SWITKES:

3        Q.   So what were they afraid of, your

4    beard?

5        A.   I don't know what they were afraid

6    of.

7          MR. FRIDAY:  Object to form.

8    BY MR. SWITKES:

9        Q.   Well, what is -- what would be the

10   fear of police officers, except the fact they

11   encountered five armed men or four armed men

12   on a pier that they didn't know what they were

13   up to?

14         MR. FRIDAY:  Object to form.

15         THE WITNESS:  Well, that's incorrect.

16      They knew what we were up to because the

17      park ranger told them what was going on,

18      that there was --

19   BY MR. SWITKES:

20       Q.   What did the park ranger tell them?

21       A.   Well, I'm not sure exactly what he

22   told them, but from what was going on, I hope

23   is what he told them, is there was four men

24   fishing with holstered handguns.  Holstered

25   handguns not threatening anybody, not

Page 133

1   threatening the public, not threatening police

2   officers, not doing anything wrong.

3       Q.   Okay.

4       A.   So, in my opinion, we were not a

5   threat to them.  It would be one thing if they

6   got a call and there was four armed men on a

7   pier and they were pointing their guns at

8   somebody, but that wasn't the case.

9            So if this unarmed park ranger wasn't

10  scared of us and, you know -- or I don't know

11  what he was feeling.  He didn't seem scared --

12  there was no need for the police to be scared

13  or nervous.

14      Q.   Is it there any question in your mind

15  that the park ranger called the police

16  officers?

17      A.   Is there any question in my mind that

18  he didn't or he did?

19      Q.   That he didn't.  Your perception is

20  that the park ranger called the officers.

21      A.   He called the police department.

22      Q.   Okay.  And if he thought everything

23  was fine and you were just fishing, why would

24  he then have called the police department,

25  other than he thought something might be going

Page 134

1    on, right?

2              MR. FRIDAY:  Object to form.

3              THE WITNESS:  I have no idea why he

4         would do that.  It's way out of his

5         jurisdiction, I think, because he's just a

6         park ranger there.  Basically a meter

7         maid.

8    BY MR. SWITKES:

9         Q.   Okay.  Without demeaning what he

10   does, he called the police officers because he

11   saw five or four armed men on the pier and he

12   obviously did not think you were just fishing

13   or he wouldn't have summoned the police,

14   wouldn't that be a fair assumption?

15             MR. FRIDAY:  Object to form.

16             THE WITNESS:  Well, I would assume he

17        had two eyes and could see that, yes,

18        that's all we were doing was fishing.

19   BY MR. SWITKES:

20        Q.   But he also had two eyes that could

21   see that you had guns on your hips, right?

22        A.   Holstered, secured guns.

23        Q.   Do you think every time the park

24   ranger goes to the South Pointe Pier and he

25   sees fishermen he summons for police officers

Page 135

1    to come check them out?

2            MR. FRIDAY:  Object to form.

3            THE WITNESS:  I don't know what he

4        does on a daily basis.

5    BY MR. SWITKES:

6        Q.   Well, would that be logical?

7    Wouldn't -- that's the question -- it's a

8    logical question.

9            You wouldn't expect the park ranger

10   to summon for police officers if you were with

11   your friends fishing but didn't have firearms,

12   would you?

13           MR. FRIDAY:  Object to form.

14           THE WITNESS:  I don't know what --

15       what is expected for him to do, when he's

16       supposed to call the police, when he's

17       not.

18   BY MR. SWITKES:

19       Q.   Okay.  My question is real simple:

20   If you, Mr. Taylor, and the other members of

21   your crew were standing on the pier fishing

22   without firearms you would have been shocked

23   if that same park ranger had called the police

24   to come check out what was happening, wouldn't

25   you?

Page 136

1          MR. FRIDAY:  Object to form.

2          THE WITNESS:  It would be a little --

3      I wouldn't understand why he would call

4      the police.

5          MR. SWITKES:  Okay.

6          THE WITNESS:  In the first place.

7   BY MR. SWITKES:

8      Q.   Okay.  Well, in the first place we're

9   differentiating, five fishermen with no guns

10  and five fishermen with guns.  You would agree

11  with me it would be highly unlikely the park

12  ranger would have called for the police to

13  respond to five fishermen that didn't have any

14  weapons on them, correct?

15          MR. FRIDAY:  Object to form.

16  BY MR. SWITKES:

17     Q.   That's a fairly logical statement

18  that anybody would have to agree with,

19  wouldn't you agree?

20          MR. FRIDAY:  Object to form.

21          THE WITNESS:  It's a hypothetical.  I

22      can't agree with it, no, because I don't

23      know if he's a park ranger and he sees

24      people fishing and he calls to the police

25      to check their fishing license.

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com

Page 137

1    BY MR. SWITKES:

2        Q.    So logically you think that every

3    time the park ranger sees five people fishing

4    on the pier he calls for police to respond?

5            MR. FRIDAY:  Object to form.

6    BY MR. SWITKES:

7        Q.    Multiple police officers to respond.

8            MR. FRIDAY:  Object to form.

9            THE WITNESS:  I have no idea what

10        that entails, that specific park ranger to

11        call the police ever in any situation.

12            I don't know what the protocol is,

13        when he's supposed to call the police

14        or...

15    BY MR. SWITKES:

16        Q.    And you think it would perfectly

17    normal to call the police every time he sees

18    people fishing on the pier?

19            MR. FRIDAY:  Object to form.

20            THE WITNESS:  It's a hypothetical.  I

21        -- I don't know.  It's -- it's a scenario

22        that hasn't happened.

23    BY MR. SWITKES:

24        Q.    You're not claiming any lost wages,

25    correct?

Page 138

1      A.   No, sir.

2      Q.   You have no medical bills that you've

3  incurred as a result of the incident, correct?

4      A.   No, sir.

5      Q.   You've never gone for psychological

6  counseling because of the event, have you?

7      A.   No, sir.

8      Q.   And the loss of your grandmother and

9  a friend almost simultaneously didn't send you

10 to a psychologist, did it?

11     A.   No.

12     Q.   You're a pretty strong person?

13     A.   I'm sensitive.

14     Q.   Okay.  But you're able to handle a

15 real tragedy like that, right?

16          MR. FRIDAY:  Object to form.

17          THE WITNESS:  I mean, life is life,

18     man, there's certain things that affect me

19     and certain things that don't.

20          MR. SWITKES:  Okay.

21          THE WITNESS:  It's my feelings.

22 BY MR. SWITKES:

23     Q.   Equating that terrible loss you

24 suffered as a teenager to what occurred on the

25 beach, would you even put them in the same

Page 139

1   realm?

2           MR. FRIDAY:  Object to form.

3           THE WITNESS:  Well, they're two

4       different emotions.

5   BY MR. SWITKES:

6       Q.   I understand that.  I asked you would

7   you put them in the same even world of

8   experiences?

9           MR. FRIDAY:  Object to form.

10          THE WITNESS:  Sure, my life was in

11      danger.

12          MR. SWITKES:  Okay.

13          Rob.

14          MR. ROSENWALD:  I don't need a mic,

15      right?

16          THE VIDEOGRAPHER:  You're good.

17          MR. ROSENWALD:  Hi, I'm Rob

18      Rosenwald.  I represent the City of Miami

19      Beach, how are you today?

20          THE WITNESS:  Good.

21          MR. ROSENWALD:  I only have a few

22      questions for you.

23              CROSS-EXAMINATION

24   BY MR. ROSENWALD:

25      Q.   Mr Switkes asked you if you sent

Page 140

1   your letter to the Fish and Wildlife

2   Commission because you thought people might be

3   alarmed by you having a gun and I think you

4   no.

5          MR. FRIDAY:  Object to form.

6   BY MR. ROSENWALD:

7      Q.   I'd like to show up that letter and

8   mark it as Defendant City's 1.

9          MR. SWITKES:  You want to make it

10         consecutive four?

11         MR. ROSENWALD:  Whichever you want.

12         Let's do consecutive.

13         THE COURT REPORTER:  So Number 2.  We

14         marked this one Number 1.

15         MR. SWITKES:  And this is Number 2.

16         (Defendant City Exhibit Number 2.

17         Was marked for identification and is

18         attached hereto.)

19         MR. ROSENWALD:  Let me just see that

20         for a second and let me show it counsel.

21         MR. FRIDAY:  I think it's the one I

22         sent to Switkes this morning.

23         No, it's not, okay.

24         MR. ROSENWALD:  This is a different

25         letter than the one you gave --

Page 141

1              MR. FRIDAY:  It's the -- it's not the

2       one I sent to Mr. Switkes this morning.

3       The one I sent in him this morning that I

4       had found was to Chief Oates.

5              MR. ROSENWALD:  Okay, got you.

6              Can I just see that for one second.

7              MR. FRIDAY:  Sure.

8              MR. ROSENWALD:  And I'll show it to

9       you.

10   BY MR. ROSENWALD:

11       Q.   Could you just read the last

12   paragraph out loud of that -- well, first, can

13   you identify that letter?

14          Do you know what that letter is?

15       A.   Correct, this is a letter to Fish and

16   Wildlife Commission.

17       Q.   Is it from you?

18       A.   Yes, sir.

19       Q.   What's the date?

20       A.   June 7, 2018.

21       Q.   Can you just read the last paragraph

22   out loud of that letter?

23       A.   The reason I wanted to reach out to

24   your offices is because I'm sure there will be

25   citizens that don't know the law and may

Page 142

```
 1   contact law enforcement --

 2           THE COURT REPORTER:  Okay.  Wait a

 3      second.  May contact...

 4           MR. SWITKES:  Slow down, slow down,

 5      please.

 6           THE WITNESS:  ...may contact law

 7      enforcement when they see someone open

 8      carrying a handgun.  I just wanted to be

 9      sure that the City of Miami Beach and law

10      enforcement are fully aware that what we

11      are doing is completely legal.  My friends

12      and I are all law abiding citizens and we

13      all are legal firearm owners that have

14      never committed any felonies or violent

15      crimes.  We are just a few people that

16      love to fish and celebrate our freedom and

17      second amendment rights.

18   BY MR. ROSENWALD

19      Q.   And again, you said the date was June

20   18th on that?

21      A.   June 7th of 2018.

22      Q.   That's the date on the letter.

23      A.   Correct.

24      Q.   Do you know what date you send that

25   letter to the Fish and Wildlife Commission?
```

Page 143

1      A.    I don't recall.  I'd have to check my

2    emails.

3      Q.    Does that letter refresh your

4    recollection as to whether you expected your

5    presences to cause alarm among the citizenry

6    of Miami Beach?

7      A.    I'm sorry --

8           MR. FRIDAY:  Object to form.

9    BY MR. ROSENWALD:

10     Q.    Does that the letter authored by you

11   refresh your recollection as to whether you

12   expected your presence in Miami Beach carrying

13   -- openly carrying handguns cause alarm among

14   the citizenry?

15     A.    So personally I don't think it should

16   alarm the citizen -- that citizens should be

17   alarmed.

18     Q.    That wasn't the question.

19     A.    So the reason I wrote that is really

20   for Miami Beach to -- to make sure that they

21   knew their laws, in case a concerned citizen

22   did call dispatch it could be completely taken

23   care of right then and there.

24     Q.    You expected that people were going

25   to be alarmed seeing four guys carrying a gun

Page 144

1    openly in Miami Beach, didn't you?

2          MR. FRIDAY:  Object to form.

3          THE WITNESS:  I wouldn't say I

4       expected it, but in case it did happen.

5    BY MR. ROSENWALD:

6       Q.   I'm going to represent to you that

7    the City of Miami Beach, including the city

8    manager -- I'm sorry, the city attorney and

9    the chief of police received emails from you

10   on June 7th and 8th, 2018.  And I'm going to

11   represent to you that Dr. Reinert, at the Fish

12   and Wildlife Commission, received this email

13   from you on June 18, 2018.

14          Does that -- is it that consistent

15   with your recollection, ten days later?

16      A.   Yeah, sure.

17      Q.   Did you author the letter that went

18   from you to the city attorney of Miami Beach,

19   the chief of police of Miami Beach and

20   Dr. Reinert at the Fish and Wildlife

21   Commission?

22      A.   Yes, it was proofread by a friend.

23      Q.   Who is the friend?

24      A.   Dennis Fields.

25      Q.   And what was his role?

Page 145

1      A.   He's just a friend and he's like

2   really good at grammar and English and, you

3   know, that's -- how to correctly write a

4   letter, so he just proofread it for me.

5      Q.   Did he make any changes to the

6   letter?

7      A.   I don't recall.

8      Q.   Did you send it to him to proof read

9   or did he read it on your computer?

10      A.   I believe I sent it to him.  And the

11   only changes I could remember, like

12   grammatical, like a comma here, semicolon

13   here, you know.

14      Q.   And when did he make those changes,

15   before you sent them -- the letters to anyone

16   or at any point in between up and to and

17   including when you sent it last on June 18th?

18      A.   From what I recall, I think it was

19   before I sent it to the city.

20      Q.   So the grammatical changes that

21   Mr. Fields made were made before you sent it

22   to anyone?

23      A.   To my recollection I believe so.

24      Q.   Did you write the letter on a

25   computer that you own?

Page 146

1      A.   I wrote it on my phone.

2      Q.   And what Word processing program did

3  you use?

4      A.   Microsoft Word.

5      Q.   What phone did you use to write it?

6      A.   A Galaxy, a Samsung Galaxy.  I don't

7  remember the exact -- maybe like an S8.

8      Q.   Is it the same phone that you have

9  now?

10     A.   No, sir.

11     Q.   How long ago did you switch phones?

12     A.   Well, I've had a phone since that

13  one -- six months ago I got this phone that I

14  have now.

15     Q.   Do you still have the old phone?

16     A.   No, sir.

17     Q.   What did you do with it?

18     A.   It got destroyed.  It was -- it got

19  wet, like it got moisture and it fried it.

20     Q.   Okay.  And so you wrote the letter on

21  your, possibly, Samsung phone on Microsoft

22  Word --

23     A.   Correct.

24     Q.   -- application on that phone.  You

25  sent it to Mr. Fields to edit for grammar.

Page 147

1      A.   Uh-huh.

2      Q.   He sent it back to you by email?

3      A.   Yes.

4      Q.   And then you mailed it to the city

5  attorney and to the chief of police on

6  June 7th and/or 8th, 2018, and then to the

7  Fish and Wildlife Commission on June 18th?

8      A.   Correct.  I kept the same date on the

9  Fish and Wildlife letter that I originally

10  sent to the city.  I didn't update the date of

11  when I was sending it to FWC.

12      Q.   Did you make any other changes to --

13  well, let me ask you what changes, if any, did

14  you make to the letter that you sent to the

15  city between the time you sent it to the city

16  and when you sent it to the Fish and Wildlife

17  Commission?

18      A.   I don't recall making any changes.  I

19  -- honestly I think I copied the pasted.

20      Q.   Did you change the address?

21      A.   Yeah, just changed the name and

22  address.

23      Q.   But you cut and pasted from one into

24  another you said?

25      A.   Correct.  So I took the original

Page 148

1    email that I sent to the city, all the --

2    these three paragraphs, put that onto the

3    letter to FWC, including, you know, all the

4    signatures, and then I just changed the head,

5    the letterhead.

6        Q.   Did you edit the document that you

7    sent to the city to change -- to make the

8    changes to create the version that went to the

9    Fish and Wildlife Commission or did you cut

10   and paste from the version that went to the

11   city and create a new Word document for the

12   FWC version?

13       A.   Correct, I cut -- I copied this,

14   pasted it in a new Word document and put the

15   -- the letter -- the newsletter head.

16       Q.   And you -- you didn't receive any

17   response back from the City of Miami Beach to

18   any of these letters?

19       A.   No, sir.

20       Q.   Are you aware that the version that

21   you sent to the City of Miami Beach was

22   unopenable by a person of normal computer

23   skill?

24       A.   I was not aware.

25       Q.   But that the version that you sent to

Page 149

1    Fish and Wildlife Commission had been altered

2    into a state that was easily and readily

3    openable by a person of normal computer

4    skills, are you aware of that?

5        A.    Well, I was aware of it because they

6    responded back.  I was -- I just assumed that

7    the city got the letter and they just didn't

8    respond back to me.

9             I did the process the same exact way

10   I did it to Miami Beach.  There was no

11   different -- like I didn't do this from a

12   desktop.  It was all done on my phone.

13       Q.    So you weren't doing anything to try

14   and set the City of Miami Beach up by sending

15   them a letter that you knew they couldn't

16   open?

17       A.    No, sir.

18       Q.    I want to show you this letter.

19             I'd like you to zoom in on it.

20             You're going to have to look from the

21   side so that the camera can see it as well.

22             THE VIDEOGRAPHER:  Give me one

23       second.

24             MR. ROSENWALD:  Hand me my glasses as

25       well, so I can see it.

Page 150

1          THE VIDEOGRAPHER:  Push it up, Rob,

2      there's too much glare on it for me to --

3      yeah, that's better.  Thank you.

4  BY MR. ROSENWALD:

5      Q.   I'm going to show you two versions,

6  which I'll represent as an officer of the

7  court were forwarded to me, that one is the

8  version you sent to the City of Miami Beach,

9  that's this one.  And when you click on it

10 nothing at all happens.  Nothing opens.

11          Can you see that on the video and do

12 you see that before you now?

13     A.   Yes.

14     Q.   I'm going to show up, then, the

15 version that you sent to the Fish and Wildlife

16 Commission.  You can see in the email that

17 that is the version that you sent to

18 Dr. Reinert on June 18, 2018, 10 days later.

19          You click on that one, it opens right

20 up.

21     A.   Okay.  Can we go back to the Miami

22 Beach one?

23     Q.   Of course.  There you go.

24     A.   Click right here, the arrow.

25     Q.   Sure.

Page 151

1          A.    What does that say?

2          Q.    This is just various ways you can

3    open it or save it.  And I can tell you, both

4    our IT department and I have tried every which

5    way to get this to open.  Our IT department

6    actually was eventually able to get it open by

7    renaming it as a different type of document in

8    a different format.  But no normal user would

9    ever be able to open this, is what we've been

10   told by our IT department.

11          Do you have any other questions about

12   that before I just step away and ask some more

13   questions about it?

14         A.    No, no.

15         Q.    Okay.  Do you have any explanation of

16   how the version that went to the Fish and

17   Wildlife Commission is readily openable but

18   the versions, all of the versions that came to

19   the City of Miami Beach can't be opened at

20   all?

21         A.    No, sir.  My computer skills are as

22   good as writing a Word document and sending

23   it, that's it.

24         Q.    Let me ask you, the phone that you

25   created both letters on, was it in your

Page 152

1    control solely from June 7th through June 18th

2    of that year, 2018?

3         A.   Yes, sir.

4         Q.   No one else took it and had any

5    access to it.  The letter that you sent to the

6    city and to the Fish and Wildlife Commission,

7    other than sending it to Mr. Fields for

8    grammatical editing before you sent it to

9    anyone, did you provide it to anyone else who

10   could have corrupted it or changed it before

11   it was sent to the these separate entities?

12        A.   No, sir.

13        Q.   Let me ask you, have you ever been

14   adjudged mentally incompetent?

15        A.   No, sir.

16        Q.   Are you currently adjudged mentally

17   incompetent?

18        A.   No, sir.

19        Q.   Are you addicted to the use of

20   narcotics or any similar drug?

21        A.   No, sir.

22        Q.   Have you ever been addicted to the

23   use of narcotics or any similar drug?

24             MR. FRIDAY:  Object to form.

25             THE WITNESS:  Not to my recollection,

Page 153

1      no.

2   BY MR. ROSENWALD:

3      Q.   That's something you would remember,

4   wouldn't it?

5      A.   No.

6      Q.   Have you ever been treated for

7   alcoholism?

8      A.   No.

9      Q.   Have you ever been treated for drug

10  addiction?

11     A.   No.

12     Q.   Have you ever been to an AA meeting?

13     A.   I've been to an AA meeting.

14     Q.   For what -- in what capacity?

15     A.   In support of a friend.

16     Q.   How many times have you been to an AA

17  meeting?

18     A.   Five to ten times.

19     Q.   Without telling me the identity of

20  that friend, when was that and what were the

21  circumstances?

22     A.   I mean, I went -- what's the -- could

23  you repeat it?

24     Q.   How did you end up going to five to

25  ten times to an AA or NA meeting to support a

Page 154

1  friend?

2      A.   Because I wanted to help them and I

3  wanted to be there for them and, I mean, I

4  wanted them to stay sober.

5      Q.   When was that?

6      A.   2016.

7      Q.   And how long a span of time did those

8  five to ten meetings cover?

9      A.   A month.

10      Q.   So around 2016 you attended about

11  five to ten -- AA or NA meeting or something

12  else?

13      A.   I believe it was Alcoholics

14  Anonymous, yes.

15      Q.   And so five to ten meetings in

16  support of a friend.  Any other AA/NA or any

17  type of recovery meetings in your life?

18          MR. FRIDAY:  Object to form.

19          Go ahead and answer.

20          THE WITNESS:  Not that I recall, no.

21  BY MR. ROSENWALD:

22      Q.   Well, that's something you would

23  recall, isn't it?

24      A.   I -- no, I don't, no.

25      Q.   Has anyone ever suggested to you that

Page 155

1    you were drinking too much?

2        A.    No, sir.

3        Q.    Do you drink now?

4        A.    Maybe a beer a month.

5        Q.    Has anyone ever suggested to you that

6    are abusing narcotics?

7        A.    No, sir.

8        Q.    Do you take any narcotics now?

9        A.    No, sir.

10       Q.    Did you take any narcotics in 2018?

11       A.    No, sir.

12       Q.    On the date of this incident in Miami

13   Beach, the date we've been talking about when

14   you interacted with the police officers who

15   detained you, did you present any evidence to

16   those officers that you had not been adjudged

17   mentally incompetent?

18           MR. FRIDAY:  Object to form.

19           THE WITNESS:  Did I produce --

20   BY MR. ROSENWALD:

21       Q.    Did you present any evidence to those

22   officers that you had not been adjudged

23   mentally incompetent?

24       A.    The only thing I produced to them is

25   my concealed carry permit.

Page 156

1      Q.   And that wouldn't have any evidence

2   to suggest you weren't adjudged mentally

3   incompetent, correct?

4      A.   If you have one you're not mentally

5   incompetent, according to the state.

6      Q.   That's your belief?

7      A.   No, that's the rules.  It's the law.

8      Q.   Anything else?

9      A.   No.

10      Q.   Did you present any evidence to the

11   City of Miami Beach officers on that day that

12   you were not addicted to the use of narcotics

13   or any similar drug?

14          MR. FRIDAY:  Object to form.

15          THE WITNESS:  No, sir.

16   BY MR. ROSENWALD:

17      Q.   Did you present any evidence to the

18   City of Miami Beach officers on that day that

19   you were not a habitual or chronic alcoholic?

20          MR. FRIDAY:  Object to form.

21          THE WITNESS:  No, sir.

22   BY MR. ROSENWALD:

23      Q.   Did you present any evidence to Miami

24   Beach officers on that day that you were not a

25   person who was using your weapon or firearm in

Page 157

1    violation of Florida Statutes 790.07 to

2    790.115, 790.145 to 790.19, or 790.22 to

3    790.24?

4         MR. FRIDAY:  Object to form.

5         You may answer.

6         THE WITNESS:  I don't know all those

7    statutes you just read offhand or -- no, I

8    didn't present anything to anybody.

9    BY MR. ROSENWALD:

10    Q.   Did you present any evidence to the

11   Miami Beach officers that you were not a

12   vagrant or undesirable person, as defined in

13   Florida statute 856.02?

14        MR. FRIDAY:  Object to form.

15        THE WITNESS:  No, sir.

16        MR. ROSENWALD:  I don't have anything

17    further.

18        MR. FRIDAY:  We will read.

19        THE VIDEOGRAPHER:  We're off the

20    record at 4:19.

21        (Deposition concluded.)

22

23

24

25

Page 158

1                        CERTIFICATE

2    STATE OF FLORIDA:
                  :  SS.
3    COUNTY OF BROWARD:

4         I, SONNIA MARTINEZ, COURT REPORTER AND
     NOTARY PUBLIC, IN AND FOR THE STATE OF FLORIDA
5    AT LARGE, DO HEREBY CERTIFY THAT CHRISTOPHER
     PHILPOT WAS BY ME FIRST DULY SWORN TO TESTIFY
6    THE WHOLE TRUTH; THAT I WAS AUTHORIZED TO AND
     DID REPORT SAID DEPOSITION IN STENOTYPE; THAT
7    A FOREGOING PAGES, NUMBERED FROM 1 TO 158,
     INCLUSIVE, ARE A TRUE AND CORRECT TRANSCRIPT
8    OF MY SHORTHAND NOTES OF SAID DEPOSITION.

9         I FURTHER CERTIFY THAT SAID
     DEPOSITION WAS TAKEN AT THE TIME AND PLACE
10   HEREINABOVE SET FORTH AND THAT THE TAKING OF
     SAID DEPOSITION WAS COMMENCED AND COMPLETED AS
11   HEREINABOVE SET OUT.

12        I FURTHER CERTIFY THAT I AM NOT AN
     ATTORNEY OR COUNSEL OF ANY OF THE PARTIES, NOR
13   AM I A RELATIVE OR EMPLOYEE OF ANY ATTORNEY OR
     COUNSEL OF ANY PARTY CONNECTED WITH THE
14   ACTION, NOR AM I FINANCIALLY INTERESTED IN THE
     ACTION.
15
          THE FOREGOING CERTIFICATION OF THIS
16   TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION
     OF THE SAME BY ANY MEANS UNLESS UNDER THE
17   DIRECT CONTROL AND/OR DIRECTION OF THE
     CERTIFYING REPORTER.
18
          DATED IN MIRAMAR, BROWARD COUNTY,
19   FLORIDA, THIS 17th DAY OF FEBRUARY, 2020.

20

21

22   _____
     SONNIA MARTINEZ, NOTARY PUBLIC
23   STATE OF FLORIDA, AT LARGE.
24   MY COMMISSION #FF960975
     EXPIRES:  03/10/2020
25

Page 159

1

2                    CERTIFICATE

3

4    THE STATE OF FLORIDA,

5    COUNTY OF BROWARD.

6

7

8           I hereby certify that I have read the

9    foregoing deposition by me given, and that the

10   statements contained herein are true and

11   correct to the best of my knowledge and

12   belief, with the exception of any corrections

13   or notations made on the errata sheet, if one

14   was executed.

15

16          Dated this _____ day of ___, 2020.

17

18

19

20

21

22           _____

23               (Deponent's name)

24

25