

**MARTINELLI & ASSOCIATES**
JUSTICE & FORENSIC CONSULTANTS, INC.

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

FLORIDA CARRY, INC., a Florida not for profit corporation, et al., Plaintiffs

VS

CITY OF MIAMI BEACH, et al.,

Defendants

Case No: 19-cv-22303-KMW

Report of Defendants' Law Enforcement Practices Expert, Ron Martinelli, Ph.D., CMI-V

I have been retained by the Law Offices of Switkes & Zappala, P.A., and Attorney Robert Switkes, Esq., as an expert witness in the above civil action. I am therefore submitting the following information and accompanying documents in support of the opinions and conclusions expressed in this report.

I have spent over twenty-two years as an active police Officer and detective. I have been a Federal and States Courts qualified law enforcement practices subject matter expert since 1992.

As a uniformed and plainclothes Officer, I have worked as a solo beat patrol Officer, Field Training Officer, Supervising Field Training Officer; in Burglary Suppression, Tactical and Felony Suppression Patrol, undercover Street Crimes officer. I have supervised senior and recruit police officers as an Administrative Assistant to the District Patrol Supervisor. As a detective, I have worked crimes against persons and property to include violent crimes, street gangs, homicides, robberies, sexual assaults, child abuse/neglect, fraud and sophisticated grand thefts and computer crime.

I possess a doctorate degree (Ph.D.) in Criminology with emphasis in forensic psychology in a degree program approved by the United States Office of Education and the California Superintendent of Public Instruction. I hold a Master's degree in Public Administration with emphasis in Justice Administration (MPA/JA) and a specialization in municipal government consulting; as well as a Bachelor's degree in Physical Education with emphasis in Exercise Physiology and pre-medical studies from accredited California universities.

I am a former Division Dean of Criminal Justice and Fire Science and Director of a Law Enforcement Academy accredited by the California Commission On Peace Officer Standards & Training. In this position, I supervised a full and part-time staff of 105

instructors. I developed and supervised over all law enforcement training and taught use of force classes.

I am the director and Team Leader of the nation's only multi-disciplinary Forensic Death Investigations & Independent Review Team. This team is comprised of homicide, medical, forensic, and applied science experts, and scientists whose sole purpose is the investigation of homicide, suicide, and suspicious death cases, including those which are classified as "Officer and/or civilian-involved" self-defense cases.

I have personally researched and authored articles on active shooters/mass murderers in the United States and have presented on the subject of active shooter profiles to numerous law enforcement and civilian bodies.

I am a former adjunct professor of Forensic Science at National University – San Diego where I instruct in the University's Masters in Forensic Science program. I am a former adjunct professor of Forensic Psychology at Argosy University – San Francisco and a former adjunct professor of Criminology at California Polytechnic State University – San Luis Obispo. Since 1978, I have also been a credentialed instructor or adjunct professor of law enforcement, police practices, forensics, and the administration of justice at numerous accredited universities and colleges in California, Nevada, and Florida.

As a credentialed law enforcement instructor, a university/college professor and as an approved law enforcement training provider, I have taught over two hundred courses on the subjects of principles of arrest, laws of arrest, search, and seizure, including reasonable suspicion and probable cause standards of proof to affect law enforcement actions.

I am a former member of the American College of Forensic Examiners Institute (ACFEI), where I have presented nationally as an expert in police practices, forensics, crime scene analysis, force investigations, TASER® electronic control weapons (ECW) and forensic force analysis.

I have been certified as a Medical Investigator through the American College of Forensic Examiners. I am the former chair of ACFEI's Certified Medical Investigator's program Board. In this capacity, I was involved in the development and instruction of medical and forensic investigations curriculum.

I am Board Certified in Forensic Traumatology by the American Academy of Experts in Traumatic Stress and the National Center for Crisis Management, where I also hold Diplomate Status. This certification indicates specific expertise in the areas of stress-induced incidents, and psychological/emotional trauma. My specific areas of expertise in forensic trauma are mental health disorders, psycho-medical emergencies, human factors, psychophysiology and performance under intense stress.

I am certified as a Force Analyst through the Force Science Training Institute®. The primary field of research and curriculum at the Force Science Institute® is the analysis of crime scenes and forensic evidence relating to Officer-involved shootings, in-custody deaths and human factors involved in major uses of force. This course of instruction is approved by the Florida and Texas Commissions of Law Enforcement Training.

I am a Certified Force Investigator, with specialization in Officer-involved shootings and in-custody deaths through the Los Angeles Police Office's Force

Investigations Division. Most of my forensic education through LAPD's Force Investigations Division was crime scene management, evidence identification, recovery and forensic analysis.

I am a Certified Litigation Specialist in police and corrections litigation through Americans for Effective Law Enforcement (AELE) which is the largest law enforcement amicus curiae litigation defense organization in the nation. I maintain active participation in this professional organization, attending courses in police practices, investigations, forensics and civil rights laws pertaining to law enforcement encounters with the public.

I am a member of the International Association of Crime Scene Investigators. In 2018, I presented on the subjects of Officer-involved shootings and the reconciliation of forensic evidence in homicide and suicide cases during the IACSI international conference in Nashville, TN. I have received the organization's Achievement Award for my contributions to the forensic and CSI communities.

I am either currently, or have been retained as a police practices and forensic expert for the U.S. Office of Justice's U.S. Attorney's Office, States Attorney General's Offices of Alaska, Oregon, Nevada, New Mexico, Nebraska, Florida, West Virginia, Delaware and Vermont; the Cities of Portland, San Jose, Sacramento, Los Angeles, Long Beach, San Diego, Albuquerque, Denver, Colorado Springs, Salt Lake City, Miami Beach, Cleveland, Columbus, Richmond, VA, Schenectady, NY; and numerous other municipalities in California, Texas and Florida.

I am currently a retained civil rights and forensic police practices expert to several nationally recognized law firms specializing in civil rights and police practices litigation representing both plaintiffs and defendant agencies.

I was the independent Special Investigator for the City of Riverside (CA) Police Community Review Commission where I reviewed Officer-involved shootings and in-custody deaths for this civilian body through the Office of Mayor.

I am a former law enforcement/forensics expert for the United States Navy & Marine Corps Judge Advocate General's (JAG) Offices. In this capacity, I investigated, analyzed and opined on criminal investigations and serious violent crime and war crimes offenses for both the prosecution and defense.

As a law enforcement Officer and investigator, I have personally investigated, and/or supervised hundreds of complex crime scenes, recovering and documenting evidence from them. I investigate law enforcement cases in both field and corrections environments.

As a forensic criminologist and a Certified Medical Investigator, I have personally investigated, reviewed, analyzed, documented evidence, consulted on and/or testified in over three hundred (300) major uses of force, including nearly two hundred-fifty (250) complex officer and citizen involved shootings and in-custody deaths.

Since 1980, I have been approved as an instructor or training provider by the states of California, Nevada, Arizona's Commission on Peace Officer Standards & Training (P.O.S.T.), and the Texas Commission on Law Enforcement (TCOLE). In this capacity, I have served as an instructor in the areas of police and corrections practices, jail operations and liability; laws of arrest, search and seizure, Tactical Negotiation, de-escalation, mental health disorders, use of force, officer safety tactics,

Arrest & Control Tactics, chemical agents, electronic control weapons (ECW) – TASER®, Unarmed Defensive Tactics, impact weapons, and less lethal munitions; firearms/deadly force instruction, criminal investigations, the investigation of violent crimes including shootings; "Suicide by Cop," psychological profiling, the psychology of criminal behavior, suicidality, and the body's psycho-physiological responses to stress-induced circumstances; police responses to psycho-medical emergencies; and the investigation of Officer-involved and civilian self-defense shootings.

I am a Master-Level de-escalation instructor and author of a manual for instructors and end-user officers. I have taught hundreds of state-approved tactical negotiations and de-escalation courses in several states for over thirty years and have certified instructors and end-user officers. My de-escalation course is the model for all law enforcement officers in the State of Delaware.

I hold certifications as a firearms instructor through Gunsite® and the National Rifle Association's Law Enforcement Activities Division (NRA-LEAD). I am a recognized member of the International Law Enforcement Firearms Instructors Association. I have presented California POST and Board of Corrections approved courses in basic and advanced tactical pistol instruction.

I am a certified deadly force scenario instructor through Simunitions®. I am an approved firearm, deadly force, and concealed carry instructor by the Riverside County Sheriff Office where I teach the legal aspects of deadly force; as well as the physical aspects of pistol craft and combatives to civilians, retired peace officers and military personnel who are in application for the California Concealed Carry Permit.

I am an approved firearms instructor through the State of Arizona's Office of Public Safety to instruct basic firearms, the legal and practical aspects of deadly force for the Office's Concealed Carry Permit program. This program includes reciprocity training to train and certify civilians and military personnel to carry concealed firearms in thirty-five other states including the State of New Mexico.

I own and operate a firearms training school in California – Street Safe Defense® where my staff and I are California approved Concealed Carry Permit and self-defense training vendors to the civilian community. I have been personally been awarded numerous Certificates of Appreciation including the Patriot Award by the National Rifle Association (NRA) for my continuous contributions to the civilian community in firearms safety and the Concealed Carry Weapons training.

I am an approved firearms, deadly force and self-defense instructor by the California State Bar Association and instruct classes in these areas for attorneys and judges for CLE credit.

I have personally taught over four hundred officer safety and force encounter tactics courses to law enforcement agencies and well over eight thousand field officers.

I am a member in good standing of the International Law Enforcement Educators and Trainers Association (ILEETA) and have presented to national and international law enforcement audiences on de-escalation, use of force investigations, "Suicide by Cop" incidents, and the analysis of forensic evidence.

As a police officer, detective, law enforcement, and municipal government trainer and consultant, I have consulted with over three hundred and fifty law

enforcement and criminal justice agencies and specialized military units. I have personally trained over 60,000 peace officers and military personnel in my certified areas of instruction.

I am involved in conducting research into law enforcement encounters resulting in the use of deadly force, human factors, biomechanics and action-reaction perception lag time. I have authored peer reviewed research on this subject.

I have been repeatedly qualified in Federal and State Courts as a subject matter expert in the areas of forensic investigations, forensics, officer and civilian-involved shooting investigations, crime scene reconstruction and reconciliation, evidence collection and analysis, recorded audio-video media interpretation and analysis; human factors, psychophysiology; forensic interviewing, use of force/deadly force, laws of arrest, search and seizure, firearms, less lethal weaponry, defensive tactics, officer safety tactics, biomechanics, mechanisms of force-related injuries,, law enforcement training, practices and standards of care.

I have consulted with and/or trained numerous county, state, and federal prosecutors; Assistant State Attorney Generals; Superior Court judges; the U.S. Office of Defense Judge Advocate Generals' Office and various professional training organizations including the California District Attorneys Association (CDAA) and the Center for Judicial Research & Education. I remain an active trainer and consultant within my areas of expertise.

As a forensic criminologist, law enforcement, municipal government trainer and consultant, and a Federal/State Courts qualified police/corrections practices expert since 1993, I have been retained by county counsels, city attorneys, plaintiff attorneys, prosecutors, criminal defense attorneys and a state attorney general's office in over three hundred Federal and State Court cases.

I have been deposed and have testified in numerous federal, state and military criminal and civil actions. I have been designated by Federal, State Superior Court judges and the military Judge Advocate as a qualified authority in police and corrections practices, laws of arrest, search and seizure, traffic enforcement, criminal investigations, crime scene investigations, crime scene reconstruction, forensics, officer safety tactics, use of force/excessive force at all force levels including TASER® electronic control weapons (ECW); officer-involved shootings; deadly force, suicidality; alcohol and narcotics influence; human factors and psycho-physiological responses to stress-induced circumstances.

I have also been qualified in both Federal and State Courts to render findings and opinions about hiring, supervision, training, police practices negligence, internal affairs investigations, and law enforcement liability.

As a Federal/State and military Courts qualified forensic police practices expert, the current statistics for my retention in Officer-involved cases is 62% agency/officer defense; and 38% plaintiff, prosecutorial and/or court appointments.

The information and accompanying documents I have provided to the Court are truthful and accurate to the best of my knowledge.

Signed _____   Date: October 15, 2020

      Ron Martinelli, Ph.D., CMI-V
      Forensic Criminologist/Certified Medical Investigator
      Federal/State Courts Qualified Law Enforcement Practices Expert

      The defendants' counsels have requested that I prepare this declaration and forensic report outlining my basic opinions in this case. Those findings and opinions to date have been incorporated into this document. All findings and opinions are rendered within a reasonable degree of professional certainty or probability based upon my collective law enforcement, forensic, and medical experience following a review of the discovery evidence provided.

      As is usually the case in investigations such as this, I am aware that there may be additional documents or other evidence that might subsequently become available during the discovery process that I might wish to review, and which may assist me in developing more detailed findings and opinions. Therefore, I reserve the right to amend my findings and opinions at some later date based upon my ability to review any additional records and/or items of evidence I might subsequently receive.

## MATERIALS REVIEWED FOR THIS ANALYSIS

1. Complaint – USDC – Southwestern District of Florida, Case #19-cv-22303-KNW
2. Reports – City of Miami Beach PD, Case No. 2018-00066518, including all supplemental reports, interviews of officers, and witnesses, neighborhood evidence listings, logs and chain of custody, photographs
3. Report – Miami Beach PD – Computer Aided Dispatch (CAD) Incident Summary
4. Court Document – Defendant Officers' Answer & Affirmative Defenses to Plaintiff's First Amended Complaint
5. Court Document – Plaintiff Steven Jenkins' Responses to Defendant Officers' 1st Interrogatories to Plaintiff Steven Jenkins
6. Photos – Incident scene photos
7. Photos – Google Pro overhead area photos, Dr. Martinelli
8. Deposition – Plaintiff Michael Taylor, 01-29-20
9. Deposition – Plaintiff Christopher Philpot, 01-30-20
10. Deposition – Plaintiff Steven Jenkins, 01-29-20
11. Deposition – Plaintiff Jonah Weiss, 01-31-20
12. Deposition – Plaintiff Carlos Gutierrez, 01-31-20
13. Deposition – Plaintiff Sean Devine, 01-30-20
14. Social Media Research – Florida Carry, Facebook
15. Social Media Research – Florida Carry website, floridacarry.org
16. Video – YouTube Open Carry NewsMax TV News Segment, 08-27-18, https://www.youtube.com/watch?v=Ju5rteK92Ew
17. Video – YouTube Florida Open Carry Event, 06-24-18, https://www.youtube.com/watch?v=b9_w5rA27qY

18. Video – Michael Taylor Go-Pro YouTube video,
https://www.youtube.com/watch?v=qvdyG3T_w9Y
19. Video – Excerpts from Michael Taylor Go-Pro YouTube video,
https://www.youtube.com/watch?v=uCMSRIN0M1E
20. Video – Michael Taylor Go-Pro YouTube video,
https://www.youtube.com/watch?v=4GywOrUpMOw
21. Statute – FL §790.053(1) – "Open Carry of a Firearm"
22. Statute – FL §790.23(3)(h) – "Possession of a Firearm by A Convicted Felon"
23. Statute – FL §790.25(3)(d) – "Lawful to Own/Possess Firearms"
24. Statute – FL §790.25(3)(h) – "Lawful to Own/Possess Firearms, Fishing, Hunting, Camping Exemption"
25. Case Law: Heien v. N. Carolina, 135 S.Ct. 530, 534 (2014) – Officer Info/Belief
26. Case Law: Illinois v. Krull, 480 U.S. 340, 349 (1987) – Officer Info/Belief
27. Case Law: Arizona v. Evans, 514 U.S. 1, 14-15 (1995) – Officer Info/Belief
28. Case Law: U.S. v. Chanthasouxat, 342 F.3d 1271 (11th Cir. 2003) – Officer Info/Belief
29. Case Law: United States v. Cashman, 216 F.3d 582 (7th Cir. 2000) – Officer Info/Belief
30. Case Law: United States v. Granado, 302 F.3d 421 (5th Cir. 2002) – Officer Info/Belief
31. Case Law: United States v. King, 244 F.3d 736 (9th Cir. 2001) – Officer Info/Belief
32. Case Law : United States v. Lopez-Valdez, 178 F.3d 282 (5th Cir. 1999) – Officer Info/Belief
33. Case Law: United States v. Miller, 146 F.3d 274 (5th Cir. 1998) – Officer Info/Belief
34. Case Law: United States v. Whitfield, 939 F.2d 1071 (D.C. Cir. 1991) – Officer Info/Belief
35. Case Law: Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 1663 (1996) – Officer Info/Belief
36. Case Law: United States v. Richardson, 208 F.3d 626, 629 (7th Cir. 2000) – Officer Info/Belief
37. Case Law: Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769 (1996) – Officer Info/Belief
38. Case Law: U.S. v. Spann, 2015 U.S. Dist. LEXIS 57387 (S.D. FL 2015; 11th Dist. 2016) - Probable Cause/Not considering affirmative defenses
39. Case Law: Norman v. State, 159 So. 3d 205, 226 (FL Dist. Ct. App. 2015) – Probable Cause/Not considering affirmative defenses
40. Case Law: Morris v. Town of Lexington, 748 F. 3d 1316, 1325 (11th Cir. 2014) – Probable Cause/Not considering affirmative defenses
Case Law: Case Law: Brinegar v. United States, 338 U.S. 160 (1949) – Probable Cause
41. Case Law: Tenorio v. Pitzer, 802 F.3d 1160, 1164 (10th Cir. 2015) – UOF/Objective Reasonableness
42. Case Law: Qian v. Kautz, 168 F.3d 949. 953 (7th Cir. 1999) – LEO's Reasonable Belief
43. Case Law: Arizona v. Hicks, 480 U.S. 321 (1987) – Search & Seizure
44. Case: Freeman & Florida Carry, Inc. v. City of Tampa, FL, USDC Middle Dist. Case No. 8:15-CV-2262-T-30 EAJ

45.   Case Law: Terry v. Ohio, 392 U.S. 1 (1968) – Search & Seizure of Persons
46.   Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989) - UOF
47.   Case Law: Saucier v. Katz, 533 U.S. 194, 201 (2001) - UOF
48.   Case Law: Forrester v. City of San Diego, 25 F.3d 804 (9th Cir. 1994) - UOF
49.   Manual: _Tactical Psychology & Physiology_, Martinelli, Ron, Ph.D., © 2007, Martinelli & Associates: Justice & Forensic Consultants, Inc.
50.   Manual: _Arrest, Control & Restraint Tactics_ – Instructor/End-Users, Martinelli, Ron, Ph.D., © 1986 – 2009, Martinelli & Associates, Justice & Forensic Consultants, Inc.
51.   Text: _Blink_, Gladwell, Malcolm, © Back Bay Books, New York, N.Y.
52.   Text: _On Killing, The Psychological Cost of Learning to Kill in War and Society_, Grossman, Dave, Col., U.S. Army, © 1996, Back Bay Books, New York, N.Y.
53.   Text: _Processing Under Pressure: Stress, Memory and Decision Making in Law Enforcement_, Sharps, Matthew, Ph.D., © 2010, Loose Leaf Publishing, Flushing, N.Y.
54.   Presentation – _Response to Active Shooters_, Martinelli, Ron, Ph.D., © 2019, ETCforensic, Boerne, TX
55.   Statistics – Mass Shootings/Murders, Florida - cbs12.com/news/local/tracking-mass-shootings-in-florida
56.   Statistics -
57.   Text: _Deadly Force Encounters: What Cops Need to Know to Mentally and Physically Survive a Gunfight_, Artwohl, Alexis, Ph.D., Christensen, Loren W., © 1997, Paladin Press, Boulder, CO
58.   Text: _In Defense of Self and Others: Issues, Facts & Fallacies – The Realities of Law Enforcement's Use of Deadly Force_, Patrick, Urey W., Hall, John C., © 2010, Carolina Academic Press, Durham, NC
59.   Text: _How We Decide_, Lehrer, Jonah, © 2010, First Mariner Books, Boston, MA
60.   Article: "To Shoot or Not to Shoot: Response and Interpretation of Response to Armed Assailants," Sharps, Matthew J., Ph.D., Hess, Adam, B., The Forensic Examiner, 12-22-08
61.   Seminar Notes – "Some Fundamentals of Human Performance," Dr. Richard A. Schmidt, 2010, Force Science Center, Minnesota State Univ.
62.   Seminar Notes - "Biomechanics of Lethal Encounters," Dr. William Lewinski, 2010, Force Science Center, Minnesota State Univ.
63.   Article – "Biomechanics of Lethal Force Encounters: Officer Movements," Dr. William Lewinski, The Police Marksman, Nov.-Dec. 2002, pp. 19-23
64.   Video – Human Factors Involved in Actual Officer-Involved Shooting: https://drronmartinelli.com/2016/10/04/suspects-drawing-and-accurately-firing-on-Officers-in-25-seconds/
65.   Article: _Identify the Limits of Firefight Performance,_ Siddle, Bruce, 2013, Human Factors Research Group
66.   Article: _Officer Decision Time in Firing a Handgun,_ Tobin, Ernest, Fackler, Martine, MD. Wound Ballistics Review, Fall 201, Vol. 5, No. 1.
67.   Article: _Officer Reaction – Response Time Delay at the End of Shot Series,_ Tobin, Ernest, Fackler, Martine, MD. Wound Ballistics Review, Fall 201, Vol. 5, No. 1.
68.   Article: _Shooting Dynamics – Element of Time & Movement in Shooting Incidents_, Jason Alexander Investigative Sciences Journal, Vol. 2 #1, 01/2010

**Officers Encounter with Armed Subjects In Public**
**Temporary Detentions, Searches and Seizures**

## Introduction

This is a federal civil tort case, evolving from an encounter between defendant officers of the City of Miami Beach Police Department and the plaintiffs who are members of an organized open carry weapons advocacy group referred to as "Florida Carry" on a public pier and park. During this encounter, officers detained the armed subjects at gunpoint, temporarily detained them, searched their persons, and temporarily seized their weapons while an investigation was conducted as to the legality of the subjects being openly armed on a public pier.

Subsequent to the investigation and release of the armed subjects and their weapons, the plaintiff's and their attorneys who are all members of Florida Carry.Org, filed a civil rights violation(s) tort in federal court, alleging violations of his civil rights of unlawful detentions, searches, and seizures of the plaintiffs.

## DETAILS OF INCIDENT

Information acquired through the plaintiff Florida Carry, Inc.'s website, on social media and through the review of discovery evidence documents that Florida Carry, Inc., the organization's attorneys and the plaintiffs are "self-defense activist" members of this organization advocate for "advancing the civil right of all Floridians to keep and bear arms for self-defense as guaranteed by the Second Amendment. [1] (Michael Taylor video, timestamps: 01:45 – 02:00 Mins.)

As Florida Carry, Inc. states on their own website, the purpose of the organization's primary goal is *to "effectively lobby…and provide a legal entity capable of filing suit to demand compliance with state and federal law.*" The social media information proffered by the activist organization shows that one strategy Florida Carry, Inc. employs are planned, provocative actions that ensure confrontations between local law enforcement and their members. The organization then files suit after law enforcement's responses, alleging "illegal searches and seizures." This is apparently how the organization funds itself and its attorney advocates.

On the morning of 06-24-18, at approximately 09:45 am hours, City of Miami Beach Park Ranger Vinas, was directed by concerned visitors on the South Pointe Park Pier to a group of armed men on the pier. The ranger contacted plaintiff Michael Taylor and three other men who were visible armed with semiautomatic pistols contained in outside the waistband holsters. None of the men were engaged in the act of fishing. The men's fishing poles are observed to be unattended and their fishing tackle boxes are observed to be some distance from them. (Taylor video, timestamps: 02:50 – 04:13 Mins.; See Images 5-14)[2]

---

[1] Michael Taylor Go-Pro video, YouTube.com/watch?V=4GYWORUPMOW

[2] Michael Taylor Go-Pro video, YouTube.com/watch?V=4GYWORUPMOW

Photos of the entrance of the South Pointe Pier show that the City of Miami Beach had posted a sign informing visitors that firearms were prohibited on the pier. Plaintiff Jenkins testifies that he saw the sign prohibiting firearms on the pier at the entrance to the pier. (Dep. Jenkins, p. 81:1-23)

Taylor's video forensically documents that Ranger Vinas politely advised the armed men that open carry firearms were prohibited in South Pointe Park and Pier. Plaintiff Taylor tells Ranger Vinas that citizens are allowed to open carry firearms if they are engaged in fishing, hunting, or camping. Ranger Vinas is heard to advise Taylor and the men that the City of Miami Beach has an ordinance prohibiting the open carry of firearms on the pier to which Taylor responds, *"Your city ordinances don't mean anything."* Taylor is observed to hand Ranger Vinas a flyer that he states has the Florida open carry statute that allows for fishing while armed. (Taylor video, timestamps: 02:50 – 04:13 Mins.)

The discovery evidence including plaintiff Taylor's Go-Pro video documents that at approximately 09:55 am hours, Ranger Vinas radioed the City of Miami Beach Emergency 9-1-1 Communications Center to report the presence of three unknown males carry firearms openly in South Pointe Park.

 

Image 1 (L) – Park Ranger Vinas contacts plaintiff Taylor and other armed men on the South Pointe Pier. Image 2 (R) – Ranger Vinas conducts a consensual encounter with plaintiff Taylor and three other armed men and calls Miami Beach 9-1-1 to report the presence of armed men on the pier.

At 10:00:39 am hours, uniformed, solo beat Miami Beach PD (MBPD) patrol unit radioed that the Park Ranger had updated the address to the South Pointe Pier,  located at 1 Washington Avenue at the water inlet into the Miami Beach harbor complex.[3] (MBPD CAD, pp. 1-2 at 09:55:30 hours; 10:01 hours)

---

[3] MBPD Computer-Aided Dispatch (CAD) Call for Service (CFS) Detail Report, #CFS 22817.

*Forensic Report, Ron Martinelli, Ph.D., CMI-V*
*Florida Carry v. City of Miami Beach, et. al, Case No. 19-22303-CIV-KMW*

The South Pointe Pier is located immediately adjacent to the inlet leading into the Miami Beach Harbor, which is one of the world's most heavily traveled waterways.

It is important to note that the South Pointe Pier is located approximately 1,500 yards southeast of the U.S. Coast Guard station and approximately 1,700 yards southeast of embark/debarking facility for tourist and cruise ships. The inlet into the Miami Beach Harbor is referred to as the "Government Cut." Coast Guard vessels and large cruise ships frequently travel in and out of this this channel. Cruise ships with upwards of 5,000 passengers each and traveling very slowly enter the inlet on Saturday mornings and others leave for voyages at staggered hours on Saturday afternoons. The Coast Guard facility is considered to be a high security military/maritime installation. Both the Coast Guard station and the tourist ship docking facilities would be considered high-value "soft targets" for terrorists and active shooter/mass murderers.



Image 3 (L) – Documents line of sight distance between South Pointe Park Pier and the U.S. Coast Guard station Miami Beach. Image 4 (R) – Documents line of sight distance between South Pointe Park Pier and the cruise & tourist ship docking facilities.

A "Go-Pro" video of the police encounter with the armed men who are avowed members of the Florida Carry, Inc. organization taken by plaintiff Michael Taylor forensically documents that none of the armed men were actually engaged in fishing on the pier. The video shows that none of the men were holding fishing poles and in fact one of the plaintiff's was not even anywhere near his fishing pole. No tackle boxes are observed proximate to the fishing poles. (Taylor video, timestamps: 02:50 – 11:40 Mins.; See Images 5 - 11)

One of the men was dressed in olive drab tactical (battle dress uniform (BDU)) shorts with an outside waistband holster containing a semiautomatic pistol on his right hip. This man had a fishing pole next to him, did not appear to be fishing and appeared clearly out of place for the environment. (See Image 7)

 

Image 5 (L) – Is a still frame from plaintiff Taylor's Go-Pro video taken just before the plaintiffs' encounter with MBPD officers showing a fishing pole absent a tackle box with no one anywhere near the fishing pole on the pier (green arrow). Image 6 (R) shows plaintiff Philpot (gold arrow) standing next to a fishing pole with no tackle box in sight (green arrows).



Image 7 – A still frame from plaintiff Taylor's Go-Pro video of one of the armed Plaintiffs (yellow arrow) dressed in tactical BDU shorts (green arrow), with a fishing pole to his right side (gold arrow) but not engaged in fishing and

wearing a semiautomatic pistol (red arrow).



Images 8 (L) and 9 (R) – Still frame photos taken from plaintiff Taylor's Go-Pro video document plaintiffs (yellow arrows) including Taylor not engaged in fishing when contacted by Park Ranger Vinas. Fishing equipment seen (green arrows). Armed plaintiff (gun in red arrow) has Go-Pro camera affixed to his chest (gold arrow).



Image 10 (L) and Image 11 (R) – Still frame photos from Taylor's Go-Pro video showing that the plaintiffs were never engaged in the act of fishing during the entire video before contacted by Park Ranger Vinas or MBPD officers. Plaintiffs (yellow arrows) and fishing equipment (green arrows). Plaintiff Philpot is observed wearing a black "Florida Carry" T-shirt (gold arrow).

Within sixteen minutes of receiving the call of armed men on the South Pointe Pier, MBPD Sergeant Buldoc, Unit #S991 arrived on site and immediately radioed for emergency restricted traffic. (MBPD CAD, p. 1 at 10:11:47 hours)

Two minutes after Sgt. Buldoc arrived, the reporting person Park Ranger Vinas radioed at 10:13:18 hours that there was another male subject armed with a handgun at the entrance to the South Pointe Pier. Having an armed subject at the entrance to a pier would be tactically considered to be closing off a "choke-point" to prevent the public from escaping an ambush, as well as posting a sentry to stall and ambush the approach of police into the targeted area. (MBPD CAD, p. 1)

Within three minutes of Sgt. Buldoc's arrival on scene, at 10:14:06 hours the supervisor radioed that he observed *"multiple subjects with firearms on the South Pointe Pier."* This observation confirmed the initial information provided by Park Ranger Vinas, and elevated both the seriousness and exigency of the police response. (MBPD CAD, pp. 1, 3 at 10:14:06, 10:18:34 hours)

Within four minutes of Sgt. Buldoc arriving on scene, he requested a response from a patrol field commander. (MBPD CAD, p. 1, at 10:15:04 hours)

The MBPD CAD Details Report documents that MBPD Unit #1084 advised dispatch that some type of "media" was on scene. (MBPD CAD, p. 3)

The CAD records document that between 10:15:57 and 10:26:59 hours, multiple MBPD uniformed patrol officers responded to and arrived at the South Pointe Pier in response to multiple armed men suddenly appearing on the South Pointe Pier. [4], [5], [6], [7], [8], [9], [10], [11], [12], [13]; PO Reports, Sgt. Buldoc, p. 22:1; PO Rivera, 35:1; PO Dominguez, p. 38:1; PO Ferbeyre, p. 43:1; PO Gavallas, p. 46:1; PO Mitchell, p. 49:1; PO Becelis, p. 52:1; PO Cano, p. 55:1; PO Salabarria, p. 58:1; PO Hicks, p. 61:1; PO Villamil, p. 71:1-2)

The MBPD CAD Report Details documents that patrol commander Lt. Eduardo Garcia, Unit. L-751, arrived on scene at 10:25:23 hours. (MBPD CAD, p. 3)

The concerns and tactical mindsets of the responding officers is clearly apparent as documented by the supplemental reports of the incident authored by Officers Ferbeyre and Salabarria who specifically state that they might be responding to "a potential active shooter situation." (Reports, PO Ferbeyre, p.43:1; PO Salabarria, p. 58:1)

The officers' reports, supported by the MBPD CAD Call for Service Details Summary document that upon the arrival of Sgt. Buldoc and his officers arriving at the South Pointe Pier, they observed adult males on the pier armed with handguns plainly visible

---

[4] PO Salabarria arrives on-site, 10:15:57 hours, CAD, p. 1
[5] PO Cano arrives on-site, 10:16:04 hours, CAD, p. 1
[6] PO Garcia arrives on-site, 10:16:15 hours, CAD, p. 1
[7] MBPD Unit 1086 arrives on-site, 10:16:42 hours, CAD, p. 1
[8] MBPD Units 880 and 888 arrive on-site, 10:18:50 hours, CAD, p. 1
[9] PO Mitchell, Unit 1087 arrives on-site, 10:19:34 hours, CAD, p. 1
[10] MBPD Unit 740 arrives on-site, 10:22:29 hours, CAD, p. 1
[11] PO Bicelis, Unit 1086 arrives on-site, 10:24:38 hours, CAD, p. 1
[12] MBPD Unit 751 arrives on-site, 10:25:23 hours, CAD, p. 1
[13] MBPD Unit 10:37:04 arrives on-site, 10:37:04 hours, CAD, p. 1

in outside waistband holsters. These men were subsequently identified as plaintiffs Michael Taylor (hereafter referred to as "Taylor"), Christopher Philpot (hereafter referred to as "Philpot"), Steven Jenkins (hereafter referred to as "Jenkins), Jonah Weiss (hereafter referred to as "Weiss), Carlos Gutierrez (hereafter referred to as "Gutierrez), and  Sean Devine (hereafter referred to as "Devine"), who are acknowledged members of the 2nd Amendment open carry activist group Florida Carry, Inc.

Officer Villamil reports that Park Ranger Vilas had observed and contacted four adult males on the South Pointe Pier who were visible armed with exposed, holstered handguns. Ranger advised the men that no open carried firearms were allowed on the public pier. Ranger Vilas informed the men that the pier was posted with a sign prohibiting open carry firearms. (Report, PO Villamil, p. 71:1)

Officer Villamil reports that plaintiff Taylor informed Park Ranger Vilas that openly carrying firearms on the pier was in fact lawful and attempted to provide some type of informational pamphlet to the ranger. Ranger Vilas told the plaintiffs that he was going to call the police to the pier because he was not familiar that any nuisances in the Florida open carry statute. (Report, PO Villamil, p. 71:1)

Officer Villamil reports that upon arriving at the South Pointe Pier with Sgt. Bolduc and Officers Hicks, Rivera, and Garcia, they all observed several citizens exiting the pier and motioning to them where the armed men were. Officer Villamil reports that for purposes of officer safety, the officers approached the men with their guns drawn because the plaintiffs were clearly armed. The officers issued loud commands for the armed men to put their hands on their heads for officer and citizen safety so the men would not have access to their visible weapons. The officers then detained and handcuffed the men for officer safety. The officer's statement is supported by the statements and reports of Sgt. Bolduc, p. 22:1, and Officers (Reports, PO Villamil, p. 71:2; Sgt. Bolduc, p. ; PO Rivera, p. 35:1; PO Hicks, p. 61:1; Taylor video, timestamps: 11:40 – 11:50 Mins.)[14]

---

[14] Michael Taylor Go-Pro video, YouTube.com/watch?V=4GYWORUPMOW

*Forensic Report, Ron Martinelli, Ph.D., CMI-V*
*Florida Carry v. City of Miami Beach, et. al, Case No. 19-22303-CIV-KMW*

 

Image 12 (L) – A still photo from a Go-Pro video taken by one of the Open Carry plaintiffs. In this case showing armed MBPD officers (blue arrows) detaining plaintiff Philpot (gold arrow) and another unknown plaintiff (yellow arrow) at gunpoint. Image 13 – (R) A still photo from the same Go-Pro video showing that immediately after the officers contacted the plaintiffs, the officers had either holstered their weapons, or had pointed them at the ground for safety (blue arrows show holstered or pointed downwards weapons).[15]

 

Images 14 (L) & 15 (R) - Still photo images from the same plaintiff's Go-Pro camera video showing that immediately after the officers contacted plaintiff Philpot (gold arrow) and another plaintiff (yellow arrow), the officers had either holstered their

---

[15] Unknown plaintiff's Go-Pro YouTube video, https://www.youtube.com/watch?v=qvdyG3T_w9Y

*Forensic Report, Ron Martinelli, Ph.D., CMI-V*
*Florida Carry v. City of Miami Beach, et. al, Case No. 19-22303-CIV-KMW*

weapons, or had pointed them at the ground for safety (blue arrows show holstered or pointed downwards weapons).[16]

Officer Rivera reports that after providing cover for his fellow officers while contacting the armed men, he, and Officers Villamil and Garcia handcuffed, disarmed, and searched three of the men. He personally removed one semi-automatic pistol from one of the armed men, cleared the weapon and found it to be fully loaded with a magazine of ammunition and one round inside the firing chamber. (Report, PO Rivera, p. 35:1)

Officer Hicks reports that while providing security of the detained men, plaintiff Gutierrez advised him that he had another pistol concealed inside a right front pants pocket. He states that Gutierrez asked him if he could remove the pistol from Gutierrez's pants. Officer Hicks states that he removed the pistol from the right front pants pocket of Gutierrez's pants and then secured the firearm. (Report, PO Hicks, p. 61:1; Dep. Gutierrez, pp. 55:7-23; 56:1-21)

Sgt. Bolduc states that once the armed men they had first observed had been detained, handcuffed for officer/citizen safety, searched for weapons and the mens' weapons had been secured, he directed his officers to conduct wants, warrants and records checks on the men and to also conduct records checks on all of the firearms removed from the men. The sergeant states that he had also requested that a field commander respond to the scene. This was done for both supervision and procedural consultation. (Report, Sgt. Bolduc, p. 22:1)

The MBPD CAD Detail report documents that at 10:29:36 hours, dispatch advised that MBPD patrol Unit #991 advised that more armed men might be coming onto the pier in regards to "open carry."[17] Officers Villamil and Rivera reports that while the first group of formerly armed men were being detained and records checks were being conducted, the officers learned that two additional men, at least one of whom was armed, had shown up on the pier. Officers Villamil and Garcia who were providing security for officer and citizen safety went over to the pier entrance to detain, secure, and search those men as well. The officer reports that at this point, patrol Lieutenant Garcia arrived on-site. (Report PO Villamil, p. 71:3; PO Rivera, p. 35:1)

Lt. Garcia ordered that the South Pointe Pier be closed to further visitors for the remainder of the day and that for purposes of citizen safety, officers would be posted on the pier and inside of South Pointe Park. (MBPD CAD, p. 3 at 10:32:19 hours and 11:57:43 hours; Report PO Rivera, p. 36:3; PO Cano, p. 55:1)

The MBPD CAD Details Summary documents that approximately nearly one hour after it was reported that armed men had suddenly appeared on the South Pointe Pier, a man identifying himself as Florida Open Carry organization's General Counsel, Attorney Eric Friday contacted the MBPD front desk in reference to the incident involving the armed plaintiffs who had by that time had already been detained, handcuffed, and searched

---

[16] Unknown plaintiff's Go-Pro YouTube video, https://www.youtube.com/watch?v=qvdyG3T_w9Y

[17] MBPD CAD CFS Detail Report, p. 3 at 10:29: 36 hours.

for weapons. The CAD record shows that Mr. Friday was referred to the patrol shift commander. (MBPD CAD, p. 3; Events starts at 09:55:30 hours and Eric Friday contacts MBPD at 10:49:20 hours)

However, plaintiff Taylor's Go-Pro video documents that Taylor actually called attorney Eric Friday to advise him that the plaintiff were expecting an encounter with Miami Beach PD officers after having been contacted by Park Ranger Vinas and before MBPD officers even arrived on-scene. Therefore, Attorney Friday was completely aware of the pending encounter with officers, but did not contact MBPD until sometime after police had already encountered and detained the plaintiffs. (Taylor video, timestamps: 10:50 Mins., See Image 17)

 

Image 16 (L) – Still frame photo of plaintiff Michael Taylor from his YouTube posted video of the incident. Image 17 (R) – Still frame photo from Taylor's video documenting him calling Attorney Friday on his cellphone before the arrival of MBPD officers. (Taylor video, timestamp: 10:50 Mins)[18]

Officer Hicks states that while the men were being detained and an investigation into the men being armed was being conducted, plaintiff Philpot advised that he was thirsty and asked Officer Hicks if the officer could get a bottle of water out of Philpot's cooler and assist him in drinking it. Officer Hicks states that he accommodated Philpot with his request, as well as the plaintiff's request that his hat be removed from his head. (Report, PO Hicks, p. 61:2)

Patrol Sergeant Salabarria reports that on the morning of the incident, he was the supervising patrol sergeant for Patrol District 4. Due to the nature of the call for service about armed men on the South Pointe Pier, he responded to assist Sgt. Bolduc and his patrol team because he did not know if this was going to be an active shooter situation.

---

[18] Michael Taylor Go-Pro video, YouTube.com/watch?V=4GYWORUPMOW

*Forensic Report, Ron Martinelli, Ph.D., CMI-V*
*Florida Carry v. City of Miami Beach, et. al, Case No. 19-22303-CIV-KMW*

Sgt/ Salabarria states that upon his arrival on the pier, he observed several men to be detained. He observed that Sgt. Bolduc and his patrol team were conducting a criminal investigation. Once he established that the scene and incident were under control, he cleared the scene and returned to his patrol district. He took no law enforcement actions at the scene. (Report, Sgt. Salabarria, p. 58:1-2)

Officer Ferbeyre reports that once the formerly armed men had been detained, he stood by for officer/citizen safety while other officers conducted their criminal investigation. He states that plaintiff Taylor complained that his shoulder was hurting and officers radioed for Miami Beach Fire Rescue to respond to examine and treat Taylor. (Report, p. 43:1)

Officer Ferbeyre states that he personally escorted plaintiff Taylor to the entrance of the pier so he could be seen by Fire Rescue. The paramedics determined that Taylor was suffering from an old shoulder injury and provided Taylor with an ice pack to ease his soreness. Officer Ferbeyre then accommodated Taylor by placing a second set of handcuffs on his wrists ("double-cuffing") to ease any pressure on the plaintiff's shoulders.[19], [20]

Officers Ferbeyre and Gavallas report that after Taylor had been seen by Fire Rescue, they noticed that he was sweating. The officers then accommodated the plaintiff by escorting him to a nearby patrol car with the air conditioning running. They then placed Taylor inside the patrol car so he could cool down. (Reports, PO Ferbeyre, p. 43:1; PO Gavallas, p. 46:2)

Plaintiff Michael Taylor states that he has prior criminal arrests for disorderly conduct resulting from intoxication and fight with a cab driver in 2000. He states that he injured his shoulder when police placed him into a patrol car. He has also has an arrests for possession of cocaine and marijuana in 1997 and 2002. He states that he has been diagnosed with a pre-existing rotator cuff problem from another incident in 2018 where he again injured his shoulder. (Dep. Taylor, pp. 10:1-23; 11:11-24; 14:1-25; 19:1-24)

Mr. Taylor has a history of being involved in open carry activist demonstrations. He testifies that he has been demonstrating at least once every other month while advocating for Open Carry and the 2nd Amendment with other demonstrators. His testimony documents that he has had numerous contacts with law enforcement while demonstrating advocating Open Carry from 2007 up to the Miami Beach incident. He lists the cities where he has demonstrated advocating for Open Carry as Orlando, Tampa, Naples and Rivera Beaches, Port Orange, Fort Pierce, Port St. Lucie, Jupiter, Stuart, Lake Worth, Latana and Ocala. (Dep. Taylor, pp. 33:1-25; 35:1-23; 36:4-23; 38:9-25; 39:1-17; 40:19-23)

---

[19] "Double-cuffing," refers to the linking of a second or multiple sets of handcuffs together on a mechanically restrained suspect to ease any physical pressure on wrists or shoulders. This is a nationally recognized, trained, accepted, and applied restraint technique.
[20] "*Arrest, Control & Restraint Tactics Instructor/End User Manual*," Martinelli, Ron, Ph.D., © 1986 – 2009

*Forensic Report, Ron Martinelli, Ph.D., CMI-V*
*Florida Carry v. City of Miami Beach, et. al, Case No. 19-22303-CIV-KMW*

Mr. Taylor testifies that during his Open Carry demonstrations, he had had police draw their weapons on him and other protesters before in Latana. He states that he has also been detained and handcuffed for extended periods of time of at least thirty minutes on prior occasions in Latana and St. Lucie. (Dep. Taylor, pp. 39:1-17; 40:5-25)

According to Mr. Taylor, whenever he is involved in an Open Carry/2nd Amendment protest, he is carrying his fishing pole and was engaged in fishing. (Dep. Taylor, p. 42:1-22)

Mr. Taylor testifies that he had heard about the Miami Beach South Pointe Pier Open Carry event scheduled for 06-24-18 in the Florida Carry Forum Facebook Group. He states that he has created flyers for Open Carry demonstrations in the past, but did not do the one for the Miami Beach event. He states that he did not contact the City of Miami Beach to advise them he was coming to the South Pointe Pier armed before doing so on the date of the incident. (Dep. Taylor, pp. 44:1-7; 45:3-24; 51:17-20; 52:16-20)

Mr. Taylor states that the purpose of the Open Carry events is to express 2nd Amendment rights to keep and bear arms while fishing. He states that he did not expect the police to show up. He speculates that Florida Carry's attorney Chris Friday had contacted the City of Miami Beach prior to the planned event, which is something Taylor believes the organization "always does" prior to an event. (Dep. Taylor, pp. 52:16-20; 59:1-22)

Mr. Taylor testifies that on each occasion he has participated in an Open Carry event, he wears a "Go-Pro" video camera. He states that all of the interactions with police are recorded and then uploaded to the YouTube video streaming social media platform. He describes himself as an "activist" and indicates in a YouTube posted video of the incident that his objective was *I wanted to bring light to the (Open Carry) law."* (Taylor video, timestamps: 01:45 – 02:00 Mins.)[21]

Mr. Taylor states that on the day of the incident on the South Pointe Pier, he had brought a fishing rod and reel, along with squid bait and a weight. He also possessed informational flyers on the Open Carry event to pass out to pedestrians. He states that he observed boats in the inlet, but no cruise ships while on the pier, He testifies that he was fishing when contacted by MBPD. (Dep. Taylor, pp. 64:1-16; 65:1-23; 66:2-25; 67:16-25)

Mr. Taylor acknowledges that he and his group were armed and demonstrating on a pier overlooking the Government where tens of thousands of passengers on cruise ships travel through on a regular basis. He acknowledges that they were demonstrating near a U.S. Coast Guard station and near a beach where there were thousands of people. (Taylor, pp. 122:18-21; 123:14-25; 125:1-6)

Mr. Taylor testifies that when contacted by police he and the other plaintiffs did not have fishing poles in their hands, but says the poles were nearby. (Dep. Taylor., p. 132:11-12)

---

[21] Michael Taylor Go-Pro video, YouTube.com/watch?V=4GYWORUPMOW

*Forensic Report, Ron Martinelli, Ph.D., CMI-V*
*Florida Carry v. City of Miami Beach, et. al, Case No. 19-22303-CIV-KMW*

Mr. Taylor testifies that no one else on the pier were wearing guns but him, his group, and the police officers. (Dep. Taylor, p. 147:1-7)

Mr. Taylor recalls that when he was first contacted by a park ranger, he tried to give the ranger an informational pamphlet after he and the other men were detained, but the ranger declined to accept it. (Dep. Taylor, p. 68:1-5)

Mr. Taylor states that one of the officers who detained him told him that there was a sign on the pier that said that firearms were not allowed on the pier. (Dep. Taylor, p. 158:1-23)

Plaintiff Christopher Philpot recalls that on the day of the incident, he was attired in a "Florida Carry" T-shirt. He states that his main reason for coming to the pier was to "exercise their God-given right to open carry a firearm and to educate the public on this right" while fishing. (Dep. Philpot, pp. 28:2-10; 31:1-22)

Mr. Philpot states that he sent an email with an attachment to MBPD Chief of Police Daniel Oates with a copy to the City Attorney regarding the planned event. He acknowledges that he knew his email had been rejected because he had received back a daemon that his emails had not been accepted. He states that he re-sent the emails but did not hear back from anyone. He states that he also contacted the Florida Wildlife Command (FWC). Mr. Philpot testifies that he was never able to confirm that anyone received any of his emails. He states that he did receive a response from Florida Wildlife Command thanking him for letting them know about the open carry event. (Dep. Philpot, pp. 33:11-24; 34:1-23; 35:22-25)

Mr. Philpot testifies that Florida Carry, Inc. requires members to contact responsibles in any area that they are demonstrating in. Philpot recalls that he spoke to Florida Carry, Inc. board member Kevin Sona prior to the Miami Beach event and was instructed to send a letter to officials. He states that he was not on the pier to distribute pamphlets, but if someone asked, he would explain open carry rights while fishing, hunting, or camping. (Dep. Philpot, pp. 36:1-25; 37:2-22; 48:7-24)

Mr. Philpot states that he came to the South Pointe Pier with co-plaintiff Sean Devine. He testifies that he brought with him a fishing pole, tackle bag and a cooler. He recalls casting his line into the water and held his pole "on and off" for about thirty to forty-five minutes before the men were contacted by a park ranger. However, Philpot's statement regarding fishing is not supported by plaintiff Taylor's video of the circumstances of the incident. (Dep. Philpot, pp. 50:6-22; 51:1-8; 53:1-9; 56:1-16; Taylor video: 01:45 – 11:40 Mins.; See Images 4, 8-9)[22]

Mr. Philpot states that a park ranger approached the armed men and told them that they could not openly carry handguns. He recalls that plaintiff Taylor tried to hand the ranger a flyer with the Florida statute about the open carry of firearms fishing, but the ranger disagreed and then got on his cell phone. Philpot's statement is supported by

---

[22] Michael Taylor Go-Pro video, YouTube.com/watch?V=4GYWORUPMOW

Taylor's Go-Pro video. (Dep. Philpot, p. 57:1-14; Taylor video, timestamps: 02:50 – 4:13 Mins.)

Mr. Philpot testifies that the park ranger left the group and within ten to twelve minutes, the group were approached by four uniformed MBPD officers pointing guns at them. Although Philpot's testifies that "chaos ensued" during the initial encounter, his statement is not supported by plaintiff Taylor's video of the encounter. (Dep. Philpot, pp. 77:7-23; 78:1-19; 79:11-25)

Taylor's video documents that the MBPD officers approached Philpot, Taylor and another unknown armed plaintiff and clearly ordered the men to put their hands on top of their heads and, *"Do not touch your guns!" The* video documents the plaintiffs complying with the order, being detained and handcuffed. The officers are seen to be either immediately reholstering, or pointing their weapon(s) towards the ground and not on the plaintiffs. The encounter to the point of detention is observed to be direct and orderly, absent any officiousness, harshness, or excessiveness in the manner in while the men are physically controlled and mechanically restrained. In fact, Philpot, who is a man of large stature testifies that the officers used two sets of handcuffs to restrain him. (Taylor video, timestamps: 11:40 – 12:20 mins.; See Images 10 – 13; Dep. Philpot, p. 81:19-23)

The discovery evidence documents that under the supervision of Lt. Garcia, Sgt. Bolduc and his officers continuously investigated the status of the formerly armed plaintiff's, their weapons and whether it was in fact lawful for the men to possess openly carried firearms on their persons while on the public pier. The evidence further shows that Sgt. Bolduc and his officers sought out the advice of Miami Beach PD command staff to provide them with direction and instruction as to how to conduct their investigation. (Sgt. Bolduc, p. 22:1)

The discovery evidence documents that sometime after Lt. Garcia had arrived and the officers investigation was completed, it was determined that the plaintiffs had committed no violations of Florida statutes. The men were then released from custody and had their weapons and miscellaneous accessories and property returned to them with written property release sheets. (Reports Sgt. Bolduc, p. 22:1; PO Villamil, p. 71:3; PO Mitchell, p. 49:4; PO Rivera, p. 36:3; 37:1)

The discovery evidence, supported by the MBPD CAD CFS Details Report indicates that all of the plaintiffs were released from detention with their weapons and property returned to them approximately 2 hours after initial contact.

Subsequent to the detains of the plaintiffs and the investigation of their actions at the South Pointe Pier, the plaintiffs through their organization Florida Carry, Inc. filed a federal civil rights tort under Title 42 §1983 USC alleging unlawful detentions and unlawful searches and seizures of the plaintiffs.

### ANALYSIS OF INCIDENT, POLICE PRACTICES AND LAW ENFORCEMENT ACTIONS TAKEN – EXPERT'S OPINIONS & FINDINGS

<u>Finding & Opinion #1</u> – <u>The defendant Miami Beach Officers' calculus of reasonable suspicion to detain the plaintiffs for suspicion of criminal activity was consistent with Florida State Statutes; their law enforcement training; and nationally trained, recognized and applied professional law enforcement practices and standards of care</u>. The circumstances, statements, facts, and forensic evidence that support this finding and opinion are as follows:

1. Officers in Florida and nationally are taught that during the course of any investigation and encounter with an individual, they should balance and reconcile a subjects behavior, the circumstances, facts, statements, and evidence observed with exculpatory versus criminal behavior. Based upon these criteria, an officer's suspicions that a subject is involved in criminal and/or threatening behavior decreases or increases during the course of the encounter.

2. Officers receive training that they can form their calculations for reasonable suspicion, detentions, probable cause, and arrests from information provided by reliable report persons and witnesses including other officers, and municipal workers.

3. Officers are taught that the courts have ruled that officers often receive information from reporting persons and witnesses that is incomplete or inaccurate.

4. Officers are taught that *"probable cause,"* has been defined by the U.S. Supreme Court as, *"where facts and circumstances within the officer's knowledge, and of which they have reasonably trustworthy information as sufficient in themselves to warrant a belief by an (officer) of reasonable caution that a crime is being committed."* [23]

   Specific, articulable, facts and circumstances are "objective" and not subjective in nature.

5. Officers receive training in the basic police academy and during periodic training in laws of arrest and search and seizure that they can stop and detain a citizen if they are aware of or observe specific articulable facts or circumstances that connect that citizen with suspicious or criminal activity. (MBPD SOP #001)

6. Officers are taught that they can detain and arrest for any crime that they reasonably believe will occur, is occurring in their presence, or has occurred, depending upon the nature of that crime. (MBPD SOP #001, p. 1; CALEA Stds. 1.1.4, 1.2.1, 1.2.3, 1.2.5a, 1.2.7)

7. Officers are taught that they can affect the arrest for any misdemeanor or felony crime occurring in their presence. (MBPD SOP #001, p. 2 (C)(1), (D)(1); CALEA Stds. 1.1.4, 1.2.1, 1.2.3, 1.2.5a, 1.2.7)[24]

---

[23] "Probable cause," cite: Brinegar v. U.S., 338 U.S. 160 (1949)
[24] Bryant v. State, 155 So. 2d 396, at 399 (FL DCA 1963)

*Forensic Report, Ron Martinelli, Ph.D., CMI-V*
*Florida Carry v. City of Miami Beach, et. al, Case No. 19-22303-CIV-KMW*

8.  Officers are taught that they must balance their observations, information, and evidence in determining what is exculpatory or otherwise innocent behavior; as opposed to what is suspicious and/or criminal behavior in establishing reasonable suspicion to detain and/or probable cause to arrest.

9.  Officers are trained that "reasonable suspicion" and "probable cause" are objective standards of proof. (MBPD SOP #001, p. 2(D)(1); CALEA Stds. 1.1.4, 1.2.1, 1.2.3, 1.2.5a, 1.2.7)[25]

10. Officers are trained in the laws of arrest and search and seizure classes that the United State Supreme Court has ruled that "the Fourth Amendment requires only a reasonable assessment of the facts, not a perfectly accurate one." Officer are taught that an officer's mistaken belief can serve as reasonable suspicion or probable cause to justify a detention. [26]

11. Police officers are trained that they can base discretionary decisions relating to laws of arrest, search and seizure and the use of force in part upon their "collective knowledge" of professional education, training, and experience. This collective knowledge extends to include all observations they make during their moment-by-moment encounter with subject(s) they are seeking to detain, investigate or arrest. (MBPD SOP #001, p. 3(D)(2)a, b, c; CALEA Stds. 1.1.4, 1.2.1, 1.2.3, 1.2.5a, 1.2.7)

12. In the immediate case, the "collective knowledge" and facts that Detectives Balciero and Gaitan relied upon to contact and arrest suspect Johnson were as follows:

    (a) The officers received a radio call for service (CFS) from Miami Beach PD 9-1-1 Emergency Dispatch that several armed men openly carrying firearms were in the South Pointe Park. The reporting person was City of Miami Beach Park Ranger Vinas. While responding to the scene, the location of the armed men was changed to the South Pointe Park Pier.

    (b) On the date of this incident, a City of Miami Beach sign prohibiting the possession of firearms was prominently posted at the entrance of the South Pointe Pier. Unknown to the officers, this sign prohibiting the open carry of firearms was obsolete and had not been amended to reflect changes in the Florida statute §790.25(3)(h), which allows citizens who are engaged in fishing, hunting, or camping to possess "open carry" firearms.

    (c) There is evidence that at least two of the officers, Sgt. Salabarria and Officer Ferbeyre were concerned that the officers might be responding to a potential active shooter situation. (Reports, PO Ferbeyre, p.43:1; PO Salabarria, p. 58:1)

    In understanding the tactical mindset of the responding officers, it is important to note that at the time of this incident, there had been over 130 previous active

---

[25] Ibid., Bryant v. State
[26] Cashman, 216 F.3d at 587

shoot/mass murder incident in Florida. In 2014, there had been 16 active shootings/murders; in 2015, there had been 25 including the Pulse Night Club where one active shooter had killed 49 and wounded 53 people; in 2017, there had been 24 mass shootings/murders and in 2018 which was the year of this incident, there had been 30 active shooter/mass murders including one suspect who killed 17 children and wounded nearly 30 at Margorie Stoneman Douglas High School.[27], [28]

(d) The South Pointe Park and Pier is known as a place to recreate, walk, jog, fish and bird and ship watch. It is not an area one associates with openly carrying firearms. As previously discussed, the pier is immediately adjacent to a major shipping zone/harbor, relatively near and in the line of sight of passing cruise ships, a tour ship and commercial vessel passageway and a U.S. Coast Guard station; all of which would be classified as "soft targets" for domestic and international terrorists.

(e) Based upon how officers in MBPD and nationally are trained, it would have been consistent with their training for them to expect a city Park Ranger who's jurisdiction is South Pointe Park to be aware of Florida State Statutes pertaining to the possession of open carry firearms on South Pointe Park Pier. It would have consistent with the officers' training in laws of arrest/search and seizure to consider Park Ranger Vinas to be a reliable witness/reporting person.

(f) The discovery evidence documents that as Sgt. Buldoc and his uniformed officers arrived on the pier, they were directed by citizens and Park Ranger Vinas to the location of the armed plaintiffs.

(g) The discovery evidence including plaintiff Taylor's Go-Pro video documents that when Sgt. Buldoc and his officers arrived, none of the plaintiffs were engaged in fishing; no tackle boxes or bait can were near plaintiff Philpot or two unidentified plaintiffs who were standing near the pier railing. Plaintiff Taylor was not engaged in fishing whatsoever. All of the plaintiffs were armed with exposed, holstered semiautomatic handguns. From what can be observed in plaintiff Taylor's video, the plaintiffs were the only persons seen on the pier who were armed. Such an observation would have been highly suspicious and would have increased, rather than decreased the officers' suspicions that criminal activity was afoot. (Taylor video, timestamps: 02:00 – 11:35 Mins.; 11:50 – 14:03 Mins.)

(h) Sgt. Buldoc and his officers were already aware that Park Ranger Vinas had already contacted the armed plaintiffs, so it would have been highly suspicious and increased rather than diminished the suspicions of any reasonably trained officer upon encountering plaintiff Taylor that criminal activity was possibly occurring when Taylor exclaimed as the officers approached him with guns drawn, *"I'm not resisting. I don't even know what's going on."* (Taylor video, timestamps: 11:50 – 12:30 Mins.)[29]

---

[27] Gun Violence Active Tracker, 10-27-18
[28] *"Response to Active Shooters"* presentation, Martinelli, Ron, Ph.D., © 2019, ETCforensic
[29] Michael Taylor Go-Pro video, YouTube.com/watch?V=4GYWORUPMOW

(i) <u>The fact that several of the armed plaintiffs were wearing chest mounted Go-Pro cameras</u> - would have increased, rather than diminished the trained officers' suspicions that a possible active shooter encounter was potentially taking place. Officers are trained that members of anti-government subversive groups, militias and domestic and international terrorists often wear or use video cameras to video record their terrorist acts and then post them later upon the internet. (Taylor video, 11:40 – 11:50 Mins.; See Images 9, 10, 14, 15, 17)

(j) <u>The officers were aware that multiple armed men were reported to be on and coming to the pier</u>. One armed subject was reported to be posted at the entrance of the pier which any reasonably trained officer would have recognized as the "choke point" of the relatively narrow pier. Blocking choke points for the purpose of creating a "fatal funnel of fire" to ambush responding officers, or innocent citizens seeking to flee from an active shooter/mass murder site is known to be a common terrorist tactic. This information would have increased, rather than diminished any reasonably trained officers' suspicions that criminal activity was occurring in their presence.

(k) <u>Exigent circumstances and community caretaking responsibility</u> – A combination of information from a reliable source (Ranger Vinas) that multiple armed men had appeared on South Pointe Pier; the strategic location of the pier with regard to multiple "soft targets" for a potential active shoot/mass murder or terrorist threat scenario; the fact that multiple armed men did not fit the normal visitor demographic for the park and pier; the fact that none of the armed men appeared to be actively engaged in fishing and several were wearing Go-Pro video cameras; one of the armed men appeared to be posted at a choke point on the pier with more armed men possibly arriving, all created a circumstance of exigency to immediately intervene for citizen and officer safety, by detaining the armed men for possibly criminal violations.

(l) The discovery evidence reviewed indicates that based upon the defendant officers' law enforcement education, training, and experience, in consideration of the aforementioned circumstances, observations and information the officers had to work with at the time, their detentions of the plaintiffs while they investigated the applicability of FL Statute §790 would not violate the law were objectively reasonable.

13. Based upon my law enforcement and forensic education training and experience, I find and opine to a reasonable degree of professional probability the following:

(1) Based upon the defendant officers' collective knowledge of their information, circumstances, observations, and facts they had at the time that they decided to detain the plaintiffs, the officers' law enforcement actions in detaining the plaintiffs was consistent with their law enforcement training and recognized, accepted, and applied codified law enforcement practices and standards of care.

<u>Finding & Opinion No. 2</u> – <u>Circumstances created by the plaintiffs and lengthened by police department officials caused the defendant officers' to detain the plaintiffs for over two hours. The defendant law enforcement officers' actions in detaining the plaintiffs were consistent with their education, training, and experience, as well as codified law enforcement practices and standards of care.</u> The information, circumstances, statements, facts, and evidence that supports my finds and opinion are as follows:

1. Review Findings & Opinions No. 1.

2. Sgt. Bolduc and the defendant officers were forced to deal with a choreographed, planned event scheduled by the Florida Carry, Inc. organization. The plaintiff activist actors and attorneys acted in bad faith in their attempt to "educate" the City of Miami Beach, the police department and the defendant officers on 2nd Amendment and Open Carry firearms laws. The bad faith actions of the plaintiffs in concert with police administrators providing oversight of the officers' detention created a situation that lengthened the detention of the plaintiffs.

3. Officers are trained that the appropriate investigative protocol during a detention where the elements of a statutory violation are in question by those detained is to consider and attempt to reconcile various elements of any and all perceived violations before releasing persons from detention, or taking them into custody by arrest.

4. In the immediate case, the discovery evidence documents that Sgt. Bolduc and his officers had reasonable cause to believe that the plaintiffs may have violated Florida Statutes pertaining to the possession of firearms in a public setting in violation of FL §790.053 "Open Carry of Weapons – Prohibited." In addition to the possible open carry violation, the officers also needed to make sure that the plaintiffs were clear of wants and warrants, that the weapons secured from the plaintiffs were not stolen, that it was lawful for the plaintiffs to be in possession of firearms and that they all possessed valid fishing licenses. (FL §§790.25; 790.33; Reports, PO Villamil, 71:2-3)

5. The evidence reviewed documents that the investigative process of conducted computer records checks on the plaintiffs and their weapons took longer as additional armed Florida Carry, Inc. members arrived on the pier and officers had to repeatedly break away to engage, detain and escort them back to where other officers were conducting records checks. Additionally, plaintiff Taylor complained of pain in his  shoulder, so officers called Miami Beach Fire Rescue to examine and treat him at the scene. After Taylor was treated for his shoulder pain, Officers Ferbeyre and Gavallas accommodated Taylor by escorting him to a nearby air-conditioned patrol car so Taylor could cool down. (Reports, PO Ferbeyre, 43:1; PO Gavallas, 46:1)

6. The evidence reviewed documents that immediately after the plaintiffs were detained, Plaintiffs Taylor and Philpot advised the officers that they were lawfully carrying exposed firearms. The evidence indicates that Taylor attempted to inform the officers of the Florida Open Carry Statute exemption (FL §790.25(3)(h)). However, the evidence documents that Taylor's attitude was snarky and condescending

which appeared to prolong the detention while a field commander and then police administrators were contacted for consultation. (Report, Sgt. Buldoc, p. 22:1; Taylor video, timestamps: 11:40 – 25:00 Mins.)

7. Plaintiff Taylor testifies and admits that he was "angry and showing the police his frustration." He states that "he does not remember" telling police, "You are going to make me rich" in his Go-Pro video of the incident. Taylor states that the members of his group may have told him to calm down but he was not listening to them because he was so frustrated. He denies that he was "yelling" at the officers during his detention. Rather, he characterizes his tone and content as "Voicing his opinion." (Dep. Taylor, pp. 82:9-21; 84:2-25)

8. Plaintiff Steven Jenkins testifies that he told Taylor to calm down and that Attorney Eric Friday would "rescue them" during his interaction with police. (Dep. Jenkins, p. 62:6-16)

9. The evidence reviewed documents that the defendant officers never broke intentionally broke away from or slowed down their investigation of the possible offenses they were investigating, except for times when the plaintiff's actions created distractions such as more armed men arriving at the pier.

10. The video produced by plaintiff Taylor documents that at all times from the point that Park Ranger Vinas and later when Sgt. Buldoc and the defendant officers contacted, detained, handcuffed, searched, and began investigating what they believed to be possible criminal offenses, the officers' attitudes, language, deportment were patient, professional, non-officious and accommodating.

11. Once it had finally been determined that the plaintiffs' were not in violation of the Florida Open Carry statute and that they were in lawful possession of their firearms, Lt. Garcia directed that the men be freed from detention and their weapons returned to them. The plaintiffs were then provided with receipts for the seized weapons and property. (Reports, Sgt. Buldoc, p. 22:1; PO Rivera, p. 36:36:3; 37:1; PO Mitchell, p. 49:1; PO Becelis, p. 52:2; PO Villamil, p. 71:3)

12. At this time, due to the fact that depositions of MBPD administration members have not yet been taken in this matter, I cannot provide any facts or information as to what additional investigative or legal consultation or oversight was provided by the MBPD Chief of Police or any of his administrative subordinates. Accordingly, I reserve the right to supplement this Report to specifically address this issue upon receipt and review of additional information as it becomes available.

13. Based upon my law enforcement and forensic education training and experience, I find and opine to a reasonable degree of professional probability the following:

(a) The investigation of initial beliefs of a criminal violation of the Florida Open Carry statute was conducted in a professional manner, consistent with trained, recognized, accepted, and applied codified law enforcement practices and standards of care in Florida and nationally.

(b) Officers are taught that they may detain subjects suspected of a criminal offense(s) for a period of time while they diligently pursue a means of investigation that it likely to confirm or dispel the suspicion during which time the detention was necessary. If during the course of the stop an officer(s) acquires suspicion that a detainee(s) may have committed a different crime, the detention may be extended for a reasonable time to verify or dispel that suspicion.[30], [31]

(c) Due to the unique circumstances of the encounter between an activist Open Carry organization and the officers, as well as plaintiff Taylor's questionable, angry, abrasive, and condescending attitude, it was reasonable for the defendant Sgt. Bolduc and his patrol officers to be highly suspicious of Taylor and Philpot and not to accept the men's word or an advocate pamphlet they attempted to present to the officers, justifying their actions being armed on the pier.

(d) Much of the evidence reviewed documents the unique circumstances of the plaintiffs' detention, the distractions caused by multiple armed activist Florida Carry members appearing at different times on the pier, the obvious officer safety issues involved and the defendant supervisors and officers' attempts to conduct and complete an investigation involving multiple subjects, dealing with medical accommodations for plaintiff Taylor, while at the same time attempting to follow the guidance of a field commander and police administrators who were downtown and physically disengaged from the incident site. These difficulties caused the detentions of the plaintiffs to be prolonged.

(e) The totality of the evidence I have reviewed documents and indicates that Sgt. Bolduc's and the defendant officers' law enforcement actions during the detention and investigation of the officers' believe that the plaintiffs' had violated the Florida Open Carry statute was consistent with trained, recognized, accepted, and applied codified law enforcement practices and standards of care in Florida and nationally.


Finding & Opinion No. 3 – The defendant officers' uses of handcuffing/restraint force upon the plaintiffs was consistent with their law enforcement education, training and recognized, accepted; and applied codified law enforcement practices and standards of care. The information, circumstances, statements, facts, and forensic evidence that support my findings and opinion are as follows:

1. Officers nationally and in Florida are taught in law enforcement academies and in periodic Office training that they can use whatever force is objectively reasonable to effect an arrest, prevent escape, and/or overcome a suspect's resistance.[32]

---

[30] United States v. Sharpe, 470 U.S. 675 (1985)
[31] Arizona v. United States, 567 U.S. 387 (2012)
[32] Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989)

2. Officers are taught that they need not necessarily use the least intrusive level of force when attempting to effect a detention or arrest. Again, they learn that whatever level(s) of force they use must be objectively reasonable.[33], [34], [35], [36], [37], [38]

3. Officers are taught that when considering non-force or forceful responses to a subject's resistance they must balance the "government need" against the "intrusion upon the individual." [39]

4. Officers are taught that the "reasonableness" of any use of force must be judged from the perspective of an objectively reasonable officer on the scene and his understanding of the "totality of circumstances." An officer's calculus in their decision to use force, including deadly force, includes the emergent nature of the circumstances and the need to decide about the use of force under rapidly developing events or occurrences; as compared to a review of events in hindsight.[40]

5. Officers are taught that officers and civilians need not retreat or desist from their efforts to defend themselves against persons who threaten them, nor shall they be deemed to be an "aggressor" or lose their right to self-defense using reasonable force to protect themselves and/or others against a possible deadly force threat.

6. Officers in the Miami Beach Police Department are taught that it would be objectively reasonable to display or use deadly force if they reasonably believed that they were facing a circumstance where they, another officer and/or a third person were in imminent danger of serious bodily injury or death; and/or to prevent serious felonies. [41], [42]

7. Officers are taught in the academy and during Office update Use of Force training that prior to the deployment of force, when they are considering which force option(s) to select, they must consider the following: [43]

   1. The severity of the crime.
   2. Does the subject pose a physical threat to the Officer(s), or a 3rd person.
   3. What level of resistance is the subject using against the Officer(s).
   4. Is the subject attempting to evade arrest by flight.

   <u>Severity of the crime</u> – In this case, the "totality of circumstances the officers were aware of at the moments they encountered the plaintiffs was that there were multiple armed men on a public pier which was a potential violation of the Florida

---

[33] Ibid., Graham v. Connor
[34] Plakas v. Drinski, 19 F. 3d 1143 (7th Cir. 1994)
[35] Salas v. Carpenter, 980 F. 2d 299, 310 (5th Cir. 1992)
[36] Scott v. Edinburg, 346 F. 3d 752 (7th Cir. 2003)
[37] Menuel v. City of Atlanta, 25 F. 3d 990 (11th Cir. 1994)
[38] Ibid., Scott v. Henrich
[39] Graham v. Connor
[40] Ibid., Graham v. Connor
[41] Ibid., Graham v. Connor
[42] Tennessee v. Garner, 471 U.S. 1 (1985)
[43] Ibid., Graham v. Connor

Open Carry statute. Further, the evidence documents that at least two officers believed that they were responding to a potential active shooter scenario.

In their officer safety tactics and response to active shooter training, officers nationally are trained that multiple armed men in any public venue constitute not only a "disparity of force," but exigent circumstances that often requires and immediate forceful control of the armed individuals through the display of defensive weaponry. FBI officers killed and injured statistics document that from 2016 – 2017 there was a 125% increase in officers being ambushed and killed by armed subjects.[44], [45]

Multiple human factors research studies show that an armed subject can turn 180°, draw, fire and accurately hit an officer in .25 seconds before the officer can return fire, even when the officer is unholstered and pointing a firearm at the armed subject.[46]

Potential Risk to Officers and Others -

(1) Officers are trained that they may use reasonable force, including the brandishing and/or use of deadly force to protect themselves and the public from imminent threats of great bodily injury or death. As previously discussed, officers are trained in federal/state statutes and legal guidelines that allow them to use reasonable force to effect detentions and arrests, as well as overcoming resistance by a person who they reasonably believe has or is committing a public offense.

(2) It is irrelevant whether the stated intent of the armed plaintiffs in this case was peaceful and educational. The potential threat to the officers based upon their collective knowledge of the circumstances, a potential active shooter scenario, multiple armed subjects in a public venue, the potential danger to the public and their law enforcement training, the rapidly evolving circumstances of their encounter and their law enforcement training in their stated mindset dictated an armed response and a display of defensive weaponry to immediately control the armed plaintiffs.

(3) Plaintiff Taylor's testimony characterizing the police as "*wanted to talk with him with a gun and tried to end his life with guns pointed at him for at least a minute,*" is unsupported by his own Go-Pro video of the incident. (Dep. Taylor, pp. 74:13-25)[47]

(4) Plaintiff Jonah Weiss – Testifies that police pointed their guns at him for 15-20 seconds until he was disarmed. (Dep. Weiss, p. 52:1-5)

---

[44] FBI LEOKI Summary, 2016 - 2017
[45] Law Enforcement Memorial Fund Officers Killed/Injured Summary, 2016 - 2017
[46] Report References #54 - 62
[47] Michael Taylor Go-Pro video, YouTube.com/watch?V=4GYWORUPMOW

*Forensic Report, Ron Martinelli, Ph.D., CMI-V*
*Florida Carry v. City of Miami Beach, et. al, Case No. 19-22303-CIV-KMW*

(5) <u>Plaintiff Christopher Philpot</u> – Testifies that no officers pointed guns at the men after they had been handcuffed. (Dep. Philpot, p. 119:12-19)

(6) <u>Plaintiff Sean Devine</u> – Testifies that the officers had their guns drawn when they approached him and he was scared. He had his hands near his thighs and was told to put his hands up. He complied and was detained. (Dep. Devine, p. 40:5-25)

(7) <u>Handcuffing of the plaintiffs</u> -

   (a) Officers are taught in their officer safety and Arrest & Control Tactics courses that it is appropriate and safer to handcuff and search detainees and arrestees. [48], [49]

   (b) Officers are taught that handcuffing a person too tightly can constitute excessive force, but the mere handcuffing of a detainee/arrestee is not excessive force. For excessive force to occur, the arrestee must complain that the handcuffs were too tight; the officer must ignore the complaints; and the detainee/arrestee must have experienced some physical injury as a result. [50]

   (c) In the immediate case, the evidence documents that all of the plaintiffs were armed with exposed, out of the waistband semiautomatic pistols and that plaintiff Gutierrez was found to have a .38 special revolver concealed inside his pants pocket. (PO Hicks, p. 61:1; Dep. Gutierrez, p. 56:1-21; Taylor video, timestamps: 02:00 – 14:03 Mins.; See Images 6, 7, 9, 11)

   (d) <u>Plaintiff Michael Taylor</u> - Testifies that the officers handcuffed the group "instantaneously" upon detaining them. He testifies that an officer came up behind him and handcuffed him with his hands behind his back. He states that the officers helped him to take stress off of his (previously injured) shoulder; he did not ask them for help. Taylor testifies that when he complained of pain in his shoulder, the officers called for medical assistance for him. Taylor states that the paramedics arrived within fifteen minutes. He states that when the paramedics told him they could not do much for him with the handcuffs being removed, he told them that "*(he) didn't want the cuff off.*" *(*Dep. Taylor, pp. 140:22-25; 165:10-23; 166:10-24; 167:2-18; 168:13-18)

   (e) Plaintiff Taylor states that he injured his right shoulder prior to 2018 and this incident. He has not gone to a doctor since this incident for pain in his left shoulder. He states that he "still has a little bit of pain in his left shoulder." He was diagnosed with a rotator cuff problem. (Dep. Taylor, 16:8-22; 19:1-24; 20:15-24)

---

[48] Terry v. Ohio, 392 U.S. 1 (1968)
[49] *Arrest & Control Tactics Instructor Manual*, Martinelli, Ron, Ph.D., © 1997 - 2009
[50] Morrison v. Board of Trustees of Green Twp., 583 F.3d 394 (6th Cir. 2009)

(f)  Plaintiff Sean Devine testifies that he recalls Taylor complaining of pain in his shoulder. He states that officers brought Taylor to the end of the pier where EMS examined his shoulder. (Dep. Devine, p. 48:1-16; 49:1-22)

(g)  There is no testimony from plaintiff Taylor, nor in any police reports documenting that any of the defendant officers injured Taylor during the handcuffing process. There is no testimony from Taylor indicating that officers injured either of his shoulders; only that Taylor expressed some pain in his right shoulder. He never complained that his handcuffs were too tight.

(h)  The evidence reviewed documents that defendant Officers Ferbeyre and Gavallas accommodated Taylor's complaint of pain by immediately calling for paramedics to respond to examine and treat him. Taylor testifies that states that the officers helped him to take stress off of his (previously injured) shoulder; he did not ask them for help. He also testifies that he informed the paramedics that he did not want his handcuffs removed. *(*Dep. Taylor, pp. 140:22-25; 165:10-23; 166:10-24; 167:2-18; 168:13-18)

(i)  <u>Plaintiff Steven Jenkins</u> – Testifies that after he was handcuffed, he told a female officer that his handcuffs were too tight. He states that the female officer examined the handcuffs and told him he had "plenty of room" (around his wrists). He estimates that he remained in handcuffs for two to two-and-a-half hours. He states that when the handcuffs were removed, there was bruising. He did not see a doctor from his allegedly bruised wrists. He now claims a shoulder injury, but has elected not to have surgery on his shoulder at this time. He states that he now suffers from "emotional distress." (Dep. Jenkins, pp. 52:1-9; 68:1-13; 70:1-24; 71:16-24; 109:2-15)

(j)  Plaintiff Jenkins believes that the defendant officers used excessive force by handcuffing all of the men. (Dep. Jenkins, p. 81:1-23)

(k)  <u>Plaintiff Weiss</u> – testifies that he was not handcuffed, suffered no physical injuries, but claims he has emotional distress from the incident. He states that he has not seen a professional for his emotional distress. (Dep. Weiss, pp. 53:17-19; 78:11-24; 79:1-25)

(l)  <u>Plaintiff Carlos Gutierrez</u> – Testifies that he was detained and handcuffed behind his back for approximately one to one-and-a-half hours. He did not time it. He states that he suffered no injuries and has no claims for emotional distress. (Dep. Gutierrez, pp. 46:11-25; 59:9-14; 64:1-2; 66:15-18; 67:2-4)

(m)  <u>Plaintiff Sean Devine</u> – Testifies that he was never handcuffed and does not know which officers handcuffed other members of his group. He makes no medical claims and has no seen a physician or a psychologist. (Dep. Devine, pp. 42:2-24; 70:12-18

(n)  <u>Plaintiff Christopher Philpot</u> – Testifies that he was allowed by the officers to be handcuffed with his hands in front of him using two sets of handcuffs linked together so he could drink water that was provided to him by a black male

officer. He states that he did not suffer any medical conditions from his detention and handcuffing. He does not recall any of the officers threatening him while detained. (Dep. Philpot, pp. 81:19-23; 97:20-24; 103:11-25)

(o) Plaintiff Devine - Testifies that plaintiff Philpot asked officers to loosen his handcuffs. He recalls the officers being "respectful" and providing water to the detainees. (Dep. Devine, p. 48:4-18)

(p) <u>Searching the plaintiffs</u> – Officers are taught may conduct a limited pat-down/cursory search of a person's outer clothing where the officer also has reasonable cause to believe that the person is armed.[51], [52], [53]

(q) The discovery evidence reviewed documents that the defendant officers searched all of the armed plaintiffs, recovering their firearms, magazines, and weapon accessories. This is a trained police practice.

(r) The discovery evidence reviewed documents that once it was determined that the plaintiffs had not violated any Florida laws, the officers returned all of the plaintiffs' weapons and property and provided them with written property receipts.

8. Based upon my law enforcement and forensic education training and experience, I find and opine to a reasonable degree of professional probability the following:

(a) The defendant officers' handcuffing and searching of the plaintiffs was consistent with their law enforcement education, training and recognized, accepted, and applied codified law enforcement practices and standards of care in Florida and nationally.

(b) It was appropriate and safe for citizens on the pier and the officers to handcuff the plaintiffs. The evidence documents that the officers were respectful careful of the plaintiffs' personal safety. The officers accommodated plaintiff Philpot who is a large statured man by placing his hands/wrists into two linked handcuffs to the front so that he could drink water and be more comfortable. The officers accommodated plaintiff Taylor by calling EMT's/paramedics immediately after Taylor complained of shoulder pain to have him examined. Taylor refused aid by the paramedics to have his handcuffs removed. Non-diagnostically, this may have exacerbated his pre-existing shoulder injury. The evidence documents that any time a plaintiff complained about their restraints, officers accommodated them by examining the handcuffs for tightness. This is a trained handcuffing protocol.

(c) I find that there is insufficient evidence provided by the plaintiffs supporting their claims of medical injuries caused by the tight application of handcuffs.

---

[51] Terry v. Ohio, 392 U.S. 1 (1968)
[52] Navarette v. California, 572 U.S. 393 (2014)
[53] Utah v. Strieff_U.S._ 136 S. Ct. 2056 (2016)

(d) I find that there is insufficient evidence provided by the plaintiffs supporting their claims of emotional trauma allegedly caused by the stress of this event.

(e) I find that the defendant officers' searching of the plaintiffs at their time of detention was consistent with the officers' law enforcement education, training and recognized, accepted, and applied codified law enforcement practices and standards of care in Florida and nationally.

Findings & Opinion No. 4 – A preponderance of evidence indicates that the plaintiffs were not engaged in fishing, hunting, or camping on the South Pointe Pier while they were open carry armed. Rather, the totality of evidence and circumstances suggests that the plaintiffs were engaged in a 2nd Amendment and Open Carry demonstration and public education mission. Their actions were inconsistent with the spirit and letter of Florida Statute's §790.25(3)(h) open carry exception clause. The information, circumstances, statements, facts, and forensic evidence that support my findings and opinion are as follows:

1.  Review the Details of the Incident, pp. 9-23

2.  Review Findings & Opinion No. 1

3.  Review plaintiff Michael Taylor's Go-Pro video on YouTube, YouTube.com/watch?V=4GYWORUPMOW

4.  Review plaintiff Taylor's deposition transcript.

5.  Review plaintiff Christopher Philpot's deposition transcript.

6.  The information, circumstances, statements, facts, and forensic evidence in the discovery evidence indicates that all of the plaintiffs' are active members in Florida Carry, Inc., which is an avowed pro-2nd Amendment, pro-Open Carry firearms advocacy organization.

7.  The plaintiffs admit that their purpose for their being on the South Pointe Pier was to advocate and educate others on Florida Open Carry firearms exceptions. The plaintiffs admit that they specifically came to the pier armed and in possession with informational Florida Carry, Inc. Open Carry firearms pamphlets. The plaintiffs jointly admit to all coming together on the South Pointe Pier for a pre-scheduled event, rather than fishing.

8.  Plaintiff Michael Taylor specifically admits on his YouTube video to being a pro-2nd Amendment and Open Carry firearms "activist." He states that the purpose for being on the South Pointe Pier on the day of the incident was, *I wanted to bring to light this law."* There is sufficient cause to believe that the Plaintiffs' intention on the date of the incident was not to engage in fishing but rather to conduct a public

demonstration on the right to bear arms. (Taylor YouTube video, timestamps: 01:45 – 02:00 Mins.) [54]

9. None of the plaintiffs are observed to actually be engaged in fishing on the South Pointe Pier prior to being contacted by Park Ranger Vinas and MBPD officers. The plaintiffs are seen completely disengaged from the activity of fishing, they are not handling fishing poles; they are merely near them. No bait buckets or fishing tackle boxes are observed proximate to the plaintiffs on the pier while they are at the pier railings. Plaintiff Taylor is not engaged in fishing during the entire duration of the video before being contacted by Park Ranger Vinas, and before he is contacted by MBPD officers. (Taylor video, timestamps: 02:00 – 11:40 Mins.)

10. Plaintiff Taylor appears on his own video to be actively choreographing an encounter with MBPD officers. After Taylor and the first plaintiffs are contacted by Ranger Vinas, Taylor is observed to call Florida Carry, Inc. Attorney Eric Friday on Taylor's cell phone and advise Friday,

*"Eric and Kevin, tell everybody that you know we have a little police interaction happening here at Miami. We're just going to keep this (Go-Pro camera video) live so there's no bullshit. We're all fishing and open carrying and we're about to find out what's going to go down."* (Taylor video timestamps: 10:50 Mins., Image 17)

11. Based upon a review of Taylor's video, his statements, and the statements of the other plaintiffs in this case, it is apparent that Taylor and the plaintiffs are precipitating an encounter with police. When MBPD officers respond and engage the armed men with their guns drawn for officer safety, Taylor is heard to exclaim while he is actively recording the encounter, "I'm not resisting. I don't know what's going on" to the officers detaining him and the other plaintiffs.

12. The evidence shows that plaintiff Philpot was attired in a black Florida Carry, Inc. T-shirt advertising the organization and that Taylor had a number of Florida Carry, Inc. informational flyers in his possession while on the pier.

13. The evidence indicates that prior to MBPD officers arriving, media had already been contacted and was staging at the scene. Three of the plaintiffs were observed to be wearing Go-Pro video camera which is not an accessory used for pier fishing. (Report PO Villamil, p. 72:1)

14. After being released from detention, all of the plaintiffs left the pier but plaintiff Weiss. Weiss remained with his fishing pole, but then simply walked around the pier for twenty minutes and left without fishing, even though he had that opportunity. (Report, PO Villamil, p. 72:2)

15. The evidence including plaintiffs' admissions, and the Florida Carry Inc., website, and social media sites advertise that all of the Florida Carry, Inc. pro-2nd Amendment and Open Carry demonstrations are pre-planned events that have nothing to do with the activity of fishing. The events are planned informational

---

[54] Plaintiff Michael Taylor video, YouTube.com/watch?V=4GYWORUPMOW

*Forensic Report, Ron Martinelli, Ph.D., CMI-V*
*Florida Carry v. City of Miami Beach, et. al, Case No. 19-22303-CIV-KMW*

protests/demonstrations and gatherings to forward the Open Carry cause, rather than to engage in legitimate sport fishing.

16. There is no evidence that the Florida Carry, Inc. organization, its attorneys or any of the plaintiff members ever met, conferred with and/or educated the officials of the City of Miami Beach on the Florida Open Carry statute exemption for fishing, hunting, or camping before going to the South Pointe Pier openly armed. Plaintiffs purport to have sent an email to the City of Miami Beach to provide notice of the planned event prior to the incident, as is Florida Carry Inc.'s custom and practice prior to conducting demonstrations of this nature; however, it has since been established that the email was corrupted and unable to be opened by the recipient. Accordingly, the manner of their attempt to advise the City of Miami Beach in advance was inadequate and inconsistent with Florida Carry, Inc.'s customs and practices. But for this fact, it is likely that the incident and all events that transpired on the date in question could have largely been avoided.

17. None of the plaintiffs nor the Florida Carry, Inc. attorneys can attest that they established written and/or verbal communication with the City of Miami Beach officials including its police department advising them that a group of armed Florida Carry, Inc. members planned to visit the South Point Park and Pier to conduct a demonstration on the date of the incident before the plaintiff members were contacted by police. In fact, the evidence documents that Florida Carry, Inc. "general counsel" Eric Friday did not contact the MBPD front desk to advise of open carry members on the pier until sometime after police had been called to the scene and the plaintiffs members had been detained.

18. If the trier of fact determines that the true purpose of the plaintiffs' visit to South Pointe Pier was to engage in an informational 2nd Amendment Open Carry firearms display/protest, deliberately provoke and engage the police using the guise of "fishing," and were not actively engaged in recreational fishing, then I would find and opine that the plaintiffs were acting in bad faith to Florida statute §790.25(3)(h) and that they were in fact in violation of the law that prohibited the open carry of firearms.

19. A preponderance of the evidence I have reviewed strongly suggests that the plaintiffs in this case, conspired to choreograph a potentially high-risk confrontation between members of Florida Carry, Inc. and MBPD for the purpose of stirring up social media controversy support for their organization and hopefully (for their part) generate a civil rights lawsuit against the City of Miami Beach and its police officers.


My findings and opinions are based upon my review of the listed documents as provided to me at this time. I will alter, amend, enhance or delete my findings and opinions as necessary following my review of any additional discovery in this case.

I would so testify to my findings and opinions under penalty of perjury if called upon to do so in any subsequent civil proceedings.

Signed _____ Date: October 15, 2020

      Ron Martinelli, Ph.D., CMI-V

      Forensic Criminologist/Certified Medical Investigator

      Federal/State Courts Qualified Law Enforcement Practices Expert