**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Case No.: 19-cv-22303-KMW

FLORIDA CARRY, INC., a
Florida not for profit corporation, *et al.,*

      Plaintiffs,

vs.

CITY OF MIAMI BEACH, *et al.,*

      Defendants.
_____/

## DECLARATION OF GUSTAVO VILLAMIL

The undersigned, GUSTAVO VILLAMIL, pursuant to 28 U.S.C. § 1746, declares as follows:

1. My name is Gustavo Villamil, I am over the age of 21 years old and otherwise *sui juris*.

2. I am a police officer employed with the City of Miami Beach Police Department.

3. On June 24, 2018, I was working and on-duty in my capacity as a police officer for the City of Miami Beach Police Department.

4. At approximately 10:00AM on June 24, 2018, I received a police dispatch call reference a report by Park Ranger Vinas that he observed four males open carrying firearms on the South Pointe Park Pier.

5. I was one of the first four police officers to arrive in the area in response to the dispatch call, along with Officer Michael Garcia, Officer Brian Rivera, and our commanding officer, Sergeant Kenneth Bolduc.

6. Upon arrival at South Pointe Park, I, along with Officer M. Garcia, Officer Rivera, and Sergeant Bolduc, proceeded onto the Pier unsure what to expect.

7. The South Pointe Park Pier is an elevated structure that sits between the busy

1

Government Cut Inlet and the crowded South Pointe Beach and has a heightened vantage over each area. The Pier is also a crowded tourist and recreational area, particularly on a Sunday, when this incident occurred. Thus, the Pier is a particularly sensitive area of concern in relation to a report of armed subjects and a potential active shooter or other such terror threat.

8. As we proceeded on the Pier, my fellow officers and I observed a group of four men standing on the Pier with visibly firearms holstered on their waist areas. None of the men in the group were holding a fishing pole.

9. Due to the potential danger posed by the proximity of the firearms to these unknown armed males, I drew and raised by firearm upon approach.

10. Upon coming within approximately 15 feet of the armed males, I along with other officers instructed the armed men to place their hands on their heads so that they could be disarmed and secured for officer safety while an investigation was conducted.

11. The armed men were then restrained and disarmed without incident, and I along with my fellow officers quickly re-holstered our weapons.

12. I personally handcuffed Plaintiff Michael Taylor, and at all times was professional and did not use any force to place him in handcuffs.

13. After handcuffing Plaintiff Taylor, I then disarmed Taylor by removing his firearm from his holster.

14. As I was disarming Plaintiff Taylor, he informed me that his firearm was "locked and loaded." Accordingly, I rendered the firearm safe by removing the magazine and a chambered round.

15. All firearms belonging to the subjects were then placed on a nearby bench while an

investigation was initiated to ensure that the men were in compliance with Florida law, as open carrying firearms is generally illegal subject to certain statutory affirmative defenses.

16. The subjects who had been armed were kept secured while officers conducted several records checks including checks on several items including the subject's identities, criminal records, the firearms, and fishing licenses, and whether the subjects qualified for any affirmative defense that would permit the men to possess openly carried firearms on their person while on the Pier. None of the subjects offered any evidence that he had not adjudged mentally incompetent, that he was not addicted to the use of narcotics or any similar drug, or that he was not a habitual or chronic alcoholic, or a person using weapons or firearms in violation of Fla. Stat. §§ 790.07-790.115, 790.145-790.19, 790.22-790.24; or a vagrant and other undesirable persons as defined by Florida law.

17. While officers were conducting said investigation, additional armed men showed up at the Pier and were also detained.

18. At some point during the investigation, Plaintiff Taylor complained of shoulder pain. Miami Beach Fire Rescue was promptly summoned to the scene.

19. Upon Fire Rescue's arrival, Plaintiff Taylor was escorted to the entrance of the Pier to be evaluated by Fire Rescue. Upon being cleared of any serious injuries, Plaintiff Taylor was given an opportunity to sit in an air-conditioned police vehicle to cool down. Plaintiff Taylor was then returned back to the Pier with the rest of the group for the remainder of the investigation.

20. Immediately upon concluding the investigation and determining that none of the men

would be arrested, officers unhandcuffed the handcuffed Plaintiffs.

21. The total time of the investigation from the time that the Plaintiffs were first detained until the handcuffed subjects were unhandcuffed was approximately one hour and eighteen minutes.

22. Shortly after removing handcuffs from the four Plaintiffs who had been handcuffed, Lieutenant E. Garcia addressed all the individual Plaintiffs and explained that they were free to go, but that the South Pointe Park Pier would remain closed.

23. Thereafter, the subjects and officers proceeded to the parking lot adjacent to the Pier, where all firearms and other miscellaneous property was returned to the subjects along with written property receipts.

24. All but one of the males then departed with their weapons.

25. Plaintiff Weiss returned to the area with a fishing pole and his firearm and remained in the park area for approximately 20 minutes before departing.

**I, GUSTAVO VILLAMIL, declare under penalty of perjury that the foregoing is true and correct.**

Executed on February 2_, 2021.

_Gustavo Villamil_____
Gustavo Villamil