**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 19-22303-CIV-WILLIAMS**

FLORIDA CARRY, INC. *et al.*,

      Plaintiffs,

vs.

CITY OF MIAMI BEACH, *et al.*,

      Defendants.

_____/

## ORDER

    **THIS MATTER** is before the Court on the Motions for Summary Judgment filed by Defendant City of Miami Beach and the Defendant Officers[1] (collectively, "Defendants") (DE 56; DE 59). Plaintiffs filed a response (DE 69) and Defendants filed a reply (DE 73). For the reasons below, the Motions (DE 56; DE 59) are **GRANTED IN PART**.

    I.     **BACKGROUND**

        A.  **The Undisputed Facts[2]**

            1.  **The Florida Carry Organization**

---

[1] "Defendant Officers" refers to the moving individual Defendants: Michael Garcia ("M. Garcia"), Kenneth Bolduc ("Bolduc"), Gustavo Villamil ("Villamil"), Brian Rivera ("Rivera"), Eduardo Garcia ("E. Garcia"), Jessica Salabarria ("Salabarria"), Nahami Bicelis ("Bicelis"), Robert Mitchell ("Mitchell"), Lavaniel Hicks ("Hicks"), and Elizabeth Vidal ("El. Vidal").

[2] On February 19, 2021, the Court entered an order deeming the facts in Defendants' statement of material facts (DE 57 ("Def. SOMF")) as admitted because Plaintiffs did not file a timely response or seek additional time to do so. (DE 62). On March 8, 2021, without leave of Court, Plaintiffs filed an untimely response to the statement, which does not comply with Local Rule 56.1(b)(2)(B) and (C). (DE 69-1). Moreover, in violation of Fed. R. Civ. P. Rule 56(c)(1)(A), the response fails to cite to any evidence in support of its assertions. Accordingly, the response will not be considered by the Court. Pursuant to Local Rule 56.1(c), the assertions in Defendants' statement of material fact are still deemed admitted.

At the time of the subject incident, the Individual Plaintiffs[3] were members of Florida Carry Inc. ("Florida Carry"), a gun rights advocacy group.  (Def. SOMF at ¶ 2; DE 58-1).  Florida Carry describes itself as "work[ing] tirelessly toward repealing and striking down ill-conceived gun control laws" and "advancing the fundamental civil right of all Floridians to keep and bear arms for self-defense."  *Id*.  Through social media, the group organized "open carry" events, gatherings during which members openly carried firearms in public places—despite the general prohibition in Florida against open carry.[4] (Def. SOMF at ¶ 3).  For instance, the organization held "fishing events" on piers and marinas across the state, during which members would openly carry while purporting to fish.  (*Id*. at ¶ 4).  Before the gatherings, the organization would customarily notify local law enforcement.  (*Id*. at ¶ 5).  The notice informed the police that the event did not pose a real threat to public safety, and therefore, it was "unnecessary" for officers to respond to "man-with-a-gun" calls from concerned citizens.  (DE 58-5 at 45:07-22).

## 2.  The June 24, 2018 "Fishing Event"

On the morning of Sunday, June 24, 2018, the Individual Plaintiffs travelled to South Pointe Park Pier (the "Pier") for a Florida Carry "fishing event."  (Def. SOMF at ¶ 10).  The Pier, a crowded tourist and recreational area, is located at the southernmost point of the City of Miami Beach (the "City").  (Def. SOMF at ¶¶ 11; DE 58-11 at ¶ 7).  The north side of the Pier overlooks South Pointe Beach, one of the City's most crowded beaches.  *Id*.  The south side of the Pier is adjacent to the Government Cut inlet, a heavily-traveled waterway.  (*Id*. at ¶ 11).  The Pier is also located approximately 1,500 yard southeast of the United States Coast Guard Station and 1,700 yards southeast of the embark/disembark facility for tourists and cruise ships.  (*Id*. at ¶ 13; DE 58-10 at 11).  According to Defendants' Law Enforcement Practices Expert, Ron Martinelli, both

---

[3] "Individual Plaintiffs" refers to Michael Taylor ("Taylor"), Steven Jenkins ("Jenkins"), Sean Devine ("Devine"), Christopher Philpot ("Philpot"), Carlos Gutierrez ("Gutierrez"), and Jonah Weiss ("Weiss").

[4] See Fla. Stat. § 790.053(1) ("it is unlawful for any person to openly carry on or about his or her person any firearm or electronic weapon or device.").

2

facilities are "considered high-value 'soft targets' for terrorist and active shooter / mass murderers."[5]  (DE 58-10 at 11).

Before the event, Plaintiff Philpot, on behalf of Florida Carry, said he attempted to notify the City about the gathering.  (Def. SOMF at ¶ 6).  On June 18, 2018, he sent an email with a Word document attachment regarding the event to the City's Chief of Police and the City Attorney.  (Def. SOMF at ¶ 6; DE 58-2 at 50).  However, the document attachment was in a format that could not be opened by a person of normal computer skills.  *Id.*  As such, the City did not actually receive any advance notice.  (Def. SOMF at ¶ 6).  Moreover, Philpot did not reach out to confirm whether the City had received his email.  (DE 58-5 at 35:22-25).

At approximately 9:45 A.M. on June 24, 2018, non-party Park Ranger Vinas observed a group of armed men on the Pier.  (Def. SOMF at ¶ 15).  He approached them and made contact with Plaintiffs Taylor, Philpot, and Jenkins, who were each visibly armed with semi-automatic pistols contained in outside-the-waistband holsters.  (Def. SOMF at ¶ 16; Ex. C-1).[6]  Devine was also present with a "buck folding knife," but was not visibly carrying a firearm.  (Def. SOMF at ¶ 16; DE 58-12).  Ranger Vinas explained to the armed men that open carry was prohibited and asked them to put away their weapons.  (Def. SOMF at ¶ 18).  However, they declined to do so, and told Ranger Vinas that it was lawful for them to openly carry while fishing on the Pier.  (Def. SOMF at ¶ 20; DE 58-3 at 3-4).  Taylor also handed Ranger Vinas a sheet of paper setting forth Fla. Stat. § 790.25(3)(h).[7]  (Ex. C-1).  After several minutes of discussion, Ranger Vinas called

---

[5] Just a few months before this "fishing event," a shooter killed 17 people and wounded 17 more at South Florida's Marjory Stoneman Douglas Highschool.  (Def. SOMF at 4).

[6] Defendants submitted several videos to the Court on a flash drive, which are part of the summary judgment record.  Exhibits C-1, Q-1, X, Z, and CC correspond to the videos identified in Defendants' Appendix (DE 58).

[7] Fla. Stat. § 790.25(3) enumerates the affirmative defenses to the criminal offense of open carrying of a firearm, Fla. Stat. § 790.053.  One of the affirmative defenses, Section 790.25(3)(h), states that it is lawful to "own, possess, and lawfully use firearms" when a person is <u>engaged in fishing</u>, camping, or lawful hunting or going to or returning from a fishing, camping, or lawful hunting expedition."  (emphasis added).

the City's dispatch to report three visibly armed men at the Pier.  (Def. SOMF at ¶ 22; DE 58-13 at 2).  At approximately 9:55:30 AM, a police dispatch call regarding three males on the Pier with visible firearms went out over police radio.  (Def. SOMF at ¶ 23; DE 58-13 at 2).

The video recorded by Taylor shows that none of the four men appeared to be actively fishing before or during their interaction with Ranger Vinas.  (Ex. C-1; DE 58-10 at 9-21).  Their fishing poles were unattended, and left leaning against the railing, and their tackle boxes were some distance away.  *Id.*  As Ranger Vinas left the area, Plaintiff Gutierrez, who was also visibly armed, arrived and joined the other men.  (Def. SOMF at ¶ 24; Ex. C-1; DE 58-14 at 38-39).  Gutierrez dropped an un-baited fishing line into the water before leaning it against the railing.  (Def. SOMF at ¶ 25; Ex. C-1).  He told Taylor "I'm not going to catch anything, I didn't even bring a bait." *Id.*

### 3.  The Initial Responding Officers (M. Garcia, Villamil, Rivera, and Bolduc)

Approximately two minutes after Gutierrez arrived, Officers M. Garcia, Villamil, Rivera, and Sergeant Bolduc arrived on the Pier in response to the dispatch call.  (Def. SOMF at ¶ 26).  They began their approach towards the men: Taylor, Jenkins, Philpot, Gutierrez, and Devine.  *Id.*  As the officers proceeded towards them, the Plaintiffs were not holding a fishing pole or actively fishing.  (DE 58-11 at ¶ 8).  As they advanced towards the men, and confirmed that several had semi-automatic firearms, the officers drew their firearms and instructed these Plaintiffs to place their hands on their heads.  (Def. SOMF at ¶ 27; Ex. C-1; DE 58-11; DE 58-12).  Officers M. Garcia, Rivera, and Villamil had their firearms raised, while Sergeant Bolduc had his weapon in the low ready position.  (Def. SOMF at ¶ 28; Ex. C-1).

M. Garcia, Villamil, and Rivera then proceeded to handcuff and disarm the armed men.  (Def. SOMF at ¶ 29).  Taylor was handcuffed and disarmed by Villamil; Gutierrez and Philpot by

---

Despite these exceptions, there are several disqualifiers set forth in Section 790.25(2).  For instance, the affirmative defenses in § 790.25(3) do not apply to "[a] person who has been adjudged mentally incompetent, who is addicted to the use of narcotics or any similar drugs, or who is a habitual or chronic alcoholic. . . ." § 790.25(2)(b)(1).

M. Garcia; and Jenkins by Rivera.  (Def. SOMF at ¶ 30-32).  The officers also rendered the firearms safe by removing the magazines and chambered rounds.  *Id.*  Devine, who only possessed a "buck folding knife," was not handcuffed.  (*Id.* at ¶ 33).  The men then complied with the officers' instructions to remain seated.  (Exs. C-1, Q-1).  The officers informed them that they were not under arrest, but only detained temporarily pending an investigation.  (Def. SOMF at ¶ 35; DE 58-12; DE 58-3 at 10:14-17). Immediately after gaining the men's compliance, the officers either holstered their weapons or pointed them to the ground.  (Def. SOMF at ¶ 34).

Shortly after these five Plaintiffs were detained, M. Garcia and Rivera were informed that there was another armed subject at the entrance of the Pier.  (Def. SOMF at ¶ 44; DE 58-13; DE 58-15).  As they approached that individual—who turned out to be Plaintiff Weiss—and observed that he was visibly armed, they drew their weapons and instructed him to put his hands on his head.  (Def. SOMF at ¶ 44; Ex. Q-1).  M. Garcia removed Weiss' holstered firearm and rendered it safe.  *Id.*  However, he was not handcuffed.  *Id.*  The officers allowed Weiss to collect his belongings and asked him to walk with them to join the other five Plaintiffs on the pier.  *Id.*  When they arrived at that area, M. Garcia asked Weiss to stay seated while the officers conducted their investigation.  (Def. SOMF at ¶ 49).  Soon after, the officers closed the Pier to the public.  (*Id.* at ¶ 50).

#### 4.   **The Backup Officers (Hicks, Mitchell, Salabarria, Bicelis, and El. Vidal)**

In addition to the initial responding officers, several others also arrived on the scene to assist.  (*Id.* at ¶ 36).  Officer Hicks was one of the first backup officers to arrive.  (*Id.* at ¶ 37).  When he arrived, Gutierrez asked him to remove a loaded firearm from his right pocket.  (*Id.*; DE 58-23).  Hicks gently removed the firearm and conducted a brief pat-down to ensure that Gutierrez did not possess other weapons.  (Def. SOMF at ¶ 38; Ex. X).

Officer Mitchell arrived on the scene shortly afterwards.  (*Id.* at ¶ 39).  When he arrived, the original five Plaintiffs had already been secured.  *Id.*  Nonetheless, he remained on the scene

for security and support until the investigation was completed.  *Id.* His involvement was limited to completing a property receipt and returning property to Gutierrez.  *Id.*

Sergeant Salabarria also responded to the scene.  (Def. SOMF at ¶ 40; DE 58-22).  Upon her arrival, the men had already been detained.  *Id.*  She briefly stood by as the other officers performed their investigation but left shortly after.  *Id.*  She took no law enforcement actions and had no interaction with the Plaintiffs.  *Id.*

Similarly, Bicelis arrived at the scene after the original five Plaintiffs had already been detained.  (Def. SOMF at ¶ 41; DE 58-21).  He remained for backup and aided with verifying information for the Offense Incident Reports.  *Id.*  He also completed a property receipt for Plaintiff Devine and returned his "buck folding knife" to him without incident.  *Id.*

Finally, El. Vidal responded to the scene after the Individual Plaintiffs had all been detained.  (*Id.* at ¶ 42; Exs. Y, Z).  Her involvement was limited to helping to secure the scene, and escorting Taylor to see the fire rescue after he complained of shoulder pain.  *Id.*

### 5.  The Investigation

Once the armed Plaintiffs were secured, the officers investigated whether they were carrying firearms lawfully.  (Def. SOMF at ¶ 51; DE 58-16; DE 58-11 at ¶ 16).  The officers conducted several record checks, including checks regarding their identities, criminal records, firearms, and fishing licenses.  *Id.*  They also investigated whether the Individual Plaintiffs qualified for any affirmative defense that allowed them to openly carry on the Pier.  *Id.*  While the officers conducted their investigation, Taylor made several antagonistic and disruptive statements, such as: "You guys are a bunch of crazy friggin nuts bags.  Just cause our guns are probably bigger and more powerful than yours[.]" (Def. SOMF at ¶ 52; Exs. C-1; Q-1).  Notwithstanding his behavior, each of the Defendant Officers remained polite and respectful to all throughout the incident.  (Def. SOMF at ¶ 53; Exs. C-1; Q-1; X; CC).

During the investigation, Taylor complained of shoulder pain.  (DE 58-11 at ¶ 18).  Miami Beach Fire Rescue was promptly summoned to the scene, and Taylor was escorted to the

entrance of the Pier to be evaluated by them. (*Id.* at ¶ 19). After being cleared of serious injuries, he was permitted to sit in an air-conditioned police vehicle to remain comfortable. *Id.* He was then returned to the Pier for the remainder of the investigation. *Id.*

Approximately one hour and 18 minutes after the initial officers arrived at the Pier, the officers completed their investigation and unhandcuffed Taylor, Jenkins, Philpot, and Gutierrez, determining that they would not be arrested. (Def. SOMF at ¶¶ 54-55; Ex. CC; DE 58-11 at ¶ 21). After the handcuffs were removed, Lieutenant E. Garcia addressed the Individual Plaintiffs and explained that they were free to leave, but that the Pier would remain closed. (Def. SOMF at ¶ 56). He told them that they were free to fish elsewhere. (*Id.* at ¶ 57). E. Garcia and non-party Officer Ferbeyre then stated that they would escort the men to the parking lot and return their weapons by placing them in their trunks or "somewhere away from you." (*Id.* at ¶ 58). The Individual Plaintiffs and several officers then proceeded to a nearby parking lot, where the officers returned their weapons and property with written property release sheets. (*Id.* at ¶ 59; DE 58-15; DE 58-20).

After being released from detention, Weiss re-holstered his firearm and attempted to return to the Pier to continue fishing. (Def. SOMF at ¶ 60; DE 58-22). On his way there, he noticed two to four police officers. *Id.* When he arrived at the Pier, there was a police vehicle in front of the entrance with closed gates. *Id.* A police officer informed him that the Pier was closed. *Id.* Weiss then proceeded to fish off the jetty for a while without incident before departing. *Id.*

Since the incident, Plaintiffs have returned to the Pier to hold "open carry" demonstrations on at least two other occasions. (Def. SOMF at ¶ 61). For these events, they provided advanced notice, and the City and its police department worked with them to hold a safe gathering. (*Id.*; DE 58-28).

**B. Plaintiffs' Counts**

In May 2019, Plaintiffs initiated this action in state court advancing thirteen counts.[8]  (DE 1-2).  On June 6, 2019, Defendants removed this matter to federal court.  (DE 1).  Plaintiffs assert the following six counts under federal law:

- **Count IV**: Violation of 42 U.S.C. § 1983 against M. Garcia, Villamil, Rivera, Hicks, Mitchell, and Bolduc by Devine, Weiss, Gutierrez, and Philpot.

- **Count V**: Violation of 42 U.S.C. § 1983 against Villamil by Taylor.

- **Count VI**: Violation of 42 U.S.C. § 1983 against Rivera by Jenkins.

- **Count VII**: Violation of 42 U.S.C. § 1983 against M. Garcia, Villamil, Rivera, Salabarria, Mitchell, Bicelis, Hicks, El. Vidal, Bolduc, and E. Garcia by all Plaintiffs.[9]

- **Count VIII**: Violation of 42 U.S.C. § 1983 against the City by all Plaintiffs.

- **Count IX**: Violation of 42 U.S.C. § 1985 against M. Garcia, Villamil, Rivera, Salabarria, Mitchell, Bicelis, Hicks, El. Vidal, Bolduc, E. Garcia, and the City by all Plaintiffs.

---

[8] On November 12, 2019, Plaintiffs' counts against Jimmy Morales and Dan Oates (Counts II and III) were dismissed with prejudice.  Plaintiffs failed to respond to Morales and Oates' motions to dismiss (DE 9; DE 11) and the Court's Order to Show Cause (DE 17).  Accordingly, pursuant to Local Rule 7.1(c), the Court granted the motions to dismiss by default.

[9] While Counts IV-VII are all brought under 42 U.S.C. § 1983, each count contains multiple separate causes of action. By way of example, in Count IV, Plaintiffs assert Constitutional violations under the Second Amendment (deprivation of their right to bear arms), First Amendment (violation of their rights to freedom of association), and Fourth Amendment (unlawful detention / search and seizure).  (DE 1-2 at ¶¶ 192, 199, 204). They also claim a violation of their "right to engage in the lawful taking of game fish."  (*Id.* at ¶ 206). Each count therefore constitutes improper shotgun pleading.  *See Ambrosia Coal & Const. Co. v. Pages Morales*, 368 F.3d 1320, 1331 (11th Cir. 2004) (finding the complaint was a shotgun pleading where "some counts appear to <u>state more than one cause of action</u>.") (emphasis added).  At the initial pleading stage, the moving Defendants did not file motions to dismiss.

The Court is aware that the usual remedy for shotgun pleadings is to strike the complaint and require amendment.  *See Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1357 (11th Cir. 2018) ("[w]e have explained that in a case in which a party, plaintiff, or defendant, files a shotgun pleading, the district court 'should strike the pleading' and instruct counsel to replead the case. . . .'") (internal citation and brackets omitted). However, in light of the posture of this case—with discovery completed and dispositive motions ready for adjudication—the Court will not require Plaintiffs to amend their pleadings and will consider the separate claims mentioned in each count.

Plaintiffs have also raised several counts under state law.[10]   (*See* DE 1-2 at Counts I, X-XIII).

## II.   <u>LEGAL STANDARD</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under the governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   And any such dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the Court considers the evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A).   The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008) (quotation marks and citations omitted).   At the summary judgment stage, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

For issues for which the movant would bear the burden of proof at trial, the party seeking summary judgment "must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence…that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements

---

[10] As discussed below, the Court will not address the arguments regarding the claims brought under state law.  Because the Court finds that Defendants are entitled to summary judgment on all federal claims, it declines to exercise supplemental jurisdiction over the state claims.

of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, come[s] forward with significant, probative evidence demons, demonstrating the existence of a triable issue of fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-16 (11th Cir. 1993) (emphasis in original).

**III.**     **DISCUSSION**

Defendants move for summary judgment on all federal causes of action.  The Defendant Officers move for summary judgment on the Section 1983 individual liability claims in Counts IV-VII.  (DE 59).  The City moves for summary judgment on the Section 1983 municipal liability claims in Count VIII.  (DE 56).  Defendant Officers and the City move for summary judgment on Plaintiffs' Section 1985 claim in Count IX.  (DE 56; DE 59).  As discussed below, the Court agrees that summary judgment in Defendants' favor is appropriate on these counts.

**A.**   **The Defendant Officers' Motion for Summary Judgment (DE 59)**

**1.**   **Plaintiffs' Section 1983 Claims for Unlawful Detention under the Fourth Amendment (Counts IV-VII)**

In Counts IV-VII, Plaintiffs allege that the Defendant Officers violated their Constitutional rights under the Fourth Amendment[11] when the officers: (1) detained them for a criminal investigation without reasonable suspicion and (2) detained them in an unlawful manner—by for instance, handcuffing them and seizing their weapons.  (*See generally* DE 1-2).  Defendant Officers move for summary judgment on these claims based on qualified immunity.  Because the officers' detention of the Individual Plaintiffs did not violate their Fourth Amendment rights, they are entitled to qualified immunity.

**a.**   **The Qualified Immunity Test**

---

[11] While Plaintiffs did not identify the Constitutional or statutory source for these claims, it is well-established that unlawful detention claims arise under the Fourth Amendment.  *See United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975) ("The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest.").

Where, as here, "a government official is sued in his individual capacity for money damages for alleged civil rights violations, he may posit an affirmative defense of qualified immunity." *McCorvey v. Smith*, 2009 WL 1904322, at *3 (S.D. Ala. June 30, 2009) (citing *Swint v. City of Wadley, Ala.,* 51 F.3d 988, 994 (11th Cir. 1995)).  The Supreme Court has held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir. 2002) (citations omitted).  As such, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

The qualified immunity analysis is a burden-shifting framework.  "To receive qualified immunity, the officer must first show that he acted within his discretionary authority." *Lewis v. City of West Palm Beach, Fla*., 561 F.3d 1288, 1291 (11th Cir. 2009).  If the defendant satisfies this burden, then "a plaintiff seeking to overcome the defendant's privilege of qualified immunity must show (1) that the officer violated her federal constitutional or statutory rights, and (2) that those rights were clearly established at the time the officer acted." *Douglas Asphalt Co. v. Qore, Inc.,* 541 F.3d 1269, 1273 (11th Cir. 2008).  "Thus, once the discretionary authority prong is established, the qualified immunity analysis is a two-step process [in which] the court 'determines whether the officer's conduct amounted to a constitutional violation' and 'analyzes whether the right violated was 'clearly established' at the time of the violation.'" *McCorvey*, 2009 WL 1904322, at *4 (quoting *Lewis*, 561 F.3d at 1291).   These two inquiries may be made in any order the Court sees fit.  *See Lewis,* 561 F.3d at 1291. "Whether a defendant is entitled to qualified immunity is determined using the version of facts most favorable to the plaintiff." *Reams v. Irvin,* 561 F.3d 1269, 1273 (11th Cir. 2008).

It is undisputed that the Defendant Officers were all acting within the scope of their discretionary authority during the subject incident.  (Def. SOMF at ¶¶ 36-42, 52).  Thus, in deciding whether they are entitled to qualified immunity, the Court examines whether their conduct amounted to a Constitutional violation.  In this analysis, the Court draws all reasonable inferences in Plaintiffs' favor.

b. **Did a Constitutional Violation Occur?**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV.  In interpreting the Fourth Amendment, courts have recognized three types of police-citizen encounters.  First, some contact, "such as the mere approach and questioning of a willing person in a public place, involves no coercion and detention and hence is outside the domain of the Fourth Amendment."  *United States v. Thompson*, 712 F.2d 1356, 1359 (11th Cir. 1983). "Second, ever since *Terry v. Ohio* the Court has recognized a limited class of cases where the police-citizen encounter qualifies as a seizure within the Fourth Amendment but may be justified by less than probable cause."  *Id.*  "*Terry*-type investigative stops satisfy Fourth Amendment strictures if the officer has an objective, reasonable suspicion of unlawful activity."  *Id.*  "Third, some police-citizen encounters, such as a full-scale arrest, must be supported by probable cause."  *Id.*  Here, the Parties appear to agree that the detention of the Individual Plaintiffs was not a "full-scale arrest" but a "*Terry*-type investigative stop."

"In *Terry* the Supreme Court formulated a two-fold inquiry for examining whether an investigative stop is unreasonable under the Fourth Amendment."  *United States v. Street*, 472 F.3d 1298, 1306 (11th Cir. 2006).  "[I]n determining whether the seizure and search were 'unreasonable' our inquiry is a dual one—[1] whether the officer's action was justified at its inception, and [2] whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  *Terry v. Ohio*, 392 U.S. 1, 20 (1968).  The Court will analyze the Constitutionality of the detention under these two steps.

i. **Was the Detention Justified at the Inception?**

The Eleventh Circuit has explained that "*Terry*, and the cases which have followed it, make clear that 'an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000) (citing *Illinois v. Wardlow,* 528 U.S. 119 (2000)). "Whether reasonable suspicion existed at the time of the investigatory stop is a question of law to be determined ultimately by judges, not policemen." *United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006) (internal brackets omitted). In determining whether there is reasonable suspicion, courts are required to "look at the totality of the circumstances of each case to see whether the detaining officers has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu,* 534 U.S. 266, 273 (2002). "The officer's reasonable suspicion must be based on 'specific articulable facts, together with rational inferences from those facts.'" *United States v. Bautista-Silva*, 567 F.3d 1266, 1272 (11th Cir. 2009) (quoting *United States v. Brignoni–Ponce*, 422 U.S. 873, 884 (1975)). "The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Nunez*, 455 F.3d at 1226 (internal citation and brackets omitted). The Court may not consider each fact only in isolation, and reasonable suspicion may exist even if each fact 'alone is susceptible of innocent explanation.'" *Bautista-Silva*, 567 F.3d at 1272 (citing *Arvizu*, 534 U.S. at 277-278). "The 'reasonable suspicion' must be more than an 'inchoate and unparticularized suspicion or hunch.'" *Nunez*, 455 F.3d at 1226.

In this case, the undisputed facts show that the Defendant Officers' detention of the Individual Plaintiffs was justified at the inception. The specific, articulable, and objective facts confronting the initial responding officers—M. Garcia, Villamil, and Rivera and Bolduc—before they stopped Taylor, Jenkins, Philpot, Gutierrez, and Devine were: (1) the City did not receive advance notice that Plaintiffs would be holding a group "open carry" event that day, even though it was Florida Carry's normal practice to provide such notice; (2) these officers responded to a

13

dispatch call advising of multiple visibly armed men; (3) the officers saw four men (Taylor, Jenkins, Philpot, and Gutierrez) openly carrying firearms when they arrived at the Pier; (4) the men were not actively fishing; (5) it was not evident whether the Plaintiffs were categorically prohibited from openly carrying firearms because of the disqualifiers to the affirmative defenses in Fla. Stat. § 790.25(2)[12]; and (6) the men were gathered at the Pier, a crowded recreational area that is located near other busy locations, including potential targets for mass-shooting and terrorist attacks.  (Def. SOMF at ¶¶ 5-9, 11-14, 22, 26-27; Ex. C-1; DE 58-11 at ¶ 8).

Similarly, the objective facts confronting M. Garcia and Rivera before they detained Weiss were that: (1) the officers responded to a radio notification from Ranger Vinas that another male subject with a handgun was at the entrance of the Pier; (2) as these officers approached the entrance, they visually confirmed that Weiss was openly carrying a firearm; (3) Weiss was the *fifth* armed person they confronted that morning; and (4) the armed men all appeared to be associated with one another.  (Def. SOMF at ¶¶ 43-45).

On these facts, the Defendant Officers had reason to suspect that the armed Plaintiffs— Taylor, Jenkins, Philpot, Gutierrez, and Weiss—had violated Fla. Stat. § 790.053, a second-degree misdemeanor, which states that "it is unlawful for any person to openly carry on or about his person any firearm or electric weapon or device."   Each of these men were observed by officers to be openly carrying a firearm, and it was not apparent that they were authorized to do so.  *See United States. v. Spann*, 2015 WL 1969111, at *5 (S.D. Fla. May 1, 2015), *aff'd*, 649 F. App'x 714 (11th Cir. 2016) (finding probable cause where "Defendant Spann was observed openly

---

[12] § 790.25(2) states the following:

(b) The protections of this section do not apply to the following:

　　1.　A person who has been adjudged mentally incompetent, who is addicted to the use of narcotics or any similar drug, or who is a habitual or chronic alcoholic, or a person using weapons or firearms in violation of ss. 790.07-790.115, 790.145-790.19, 790.22-790.24;
　　2.　Vagrants and other undesirable persons as defined in [repealed];
　　3.　A person in or about a place of nuisance as defined in s. 823.05 unless such person is there for law enforcement or some other lawful purpose.

carrying a firearm."); *Bethel v. State*, 93 So.3d 410, 413 (Fla. 4th DCA 2012) (finding probable cause where "the officer saw four inches of the butt of a gun sticking out of the defendant's right pants pocket."); *United States v. Lewis*, 674 F.3d 1298, 1304 (11th Cir. 2012) (explaining that "[b]ased on [a defendant's] admission that he was carrying a handgun in his waistband, the officers had reasonable suspicion to believe that [he] was committing a crime under Florida law—carrying a concealed weapon."); *United States v. Presley*, 645 F. App'x 934, 937 (11th Cir. 2016) ("But the fact that he was sitting in his car with the handgun lying next to him in plain sight could reasonably indicate that he had just violated or was about to violate the law.").

And while Devine did not possess a firearm, the officers were also justified in detaining him. The Eleventh Circuit has explained that "officers may, in some circumstances, briefly detain individuals about whom they have no individualized reasonable suspicion of criminal activity in the course of conducting a valid *Terry* stop as to other related individuals." *Lewis*, 674 F.3d at 1306. The court noted that it is appropriate to detain associates, so that officers could "control the movements of nearby associates and exercise command over the situation." *Id.* at 1308. Because Devine was clearly associated with the five armed men and was carrying a weapon (a "buck folding knife") his detention was justified for public and officer safety.

In their response, Plaintiffs claim that the officers lacked reasonable suspicion to detain them because the "officers had no reason or basis to believe [their] possession of firearms [was] illegal." (DE 69 at 10). They point to Fla. Stat. § 790.25, which enumerates the instances when the prohibition on open carry does "not apply" and it is "lawful" to "own, possess, and lawfully use firearms." Among these occasions is when "[a] person [is] <u>engaged in fishing</u>, camping, or lawful hunting or going to or returning from a fishing, camping, or lawful hunting expedition." Fla. Stat. § 790.25 (3)(h) (emphasis added). Plaintiffs contend that pursuant to this exception, their open carry on the Pier was lawful because they were "engaged in fishing."

This argument misses the mark. As an initial matter, the exceptions set forth in Fla. Stat. § 790.25—including the fishing exception—are merely affirmative defenses to the open carry

15

offense, § 790.053.  *See Norman v. State*, 159 So. 3d 205, 226 (Fla. 4th DCA 2015); *Spann*, 2015 WL 1969111, at *4.[13]   Second, the Eleventh Circuit has repeatedly explained that police officers are not required to consider whether an affirmative defense to a firearm possession offense may apply before initiating a *Terry* stop to verify whether a person is carrying lawfully.  *See Lewis*, 674 F.3d at 1298; *Presley*, 645 F. App'x at 934.

In *Lewis*, four men gathered in a parking lot were subject to a *Terry* stop after two of the men had admitted to the officers that they were carrying a firearm.  One individual, Charles McRae, told the officers that he had a handgun in his waistband.  Another individual, Carlos Evans, informed them that he had a handgun in the open trunk of a car parked nearby.  After these admissions, the officers immediately initiated a *Terry* detention by drawing their weapons and ordering the men to sit on the ground.  Ultimately, the officers discovered that McRae was carrying lawfully because he possessed a valid concealed-weapons permit.  Under Florida Law, the concealed carry of a firearm is a third-degree felony, but the possession of a valid concealed-weapons permit is an affirmative defense.  *See* Fla. Stat. §§ 790.01(2); (3).

In ruling on a motion to suppress, the district court found that the police officers lacked reasonable suspicion to detain any of the four men, including McRae, because "mere gun possession did not justify a *Terry* stop, because it was neither per se unlawful to possess a handgun nor illegal to admit to carrying one, and because the police had no reason to believe that McRae did not have a concealed-weapons permit for the firearm."  *Lewis*, 674 F.3d at 1302.

---

[13] Plaintiffs cite to *Peoples v. State*, 287 So.2d 63 (Fla. 1973) and *French v. State*, 279 So.2d 317 (Fla. 4th DCA 1973) to support their assertion that these exceptions are not merely affirmative defenses.  (DE 69 at 3). However, neither case addressed this issue.  Both cases involved reversals of criminal convictions of individuals who carried concealed weapons on their own property.  While Fla. Stat. § 790.01(2) criminalizes carrying "a concealed firearm on or about his or her person," Fla. Stat. § 790.25 sets forth exceptions to this offense, including "possessing arms at his or her home or place of business."  The defendants in these cases were convicted under § 790.01(2), even though it was undisputed that they carried firearms at their place of home or business.  Consequently, the courts concluded that they were not guilty of the offense because of the statutory exception.  However, neither case considered or explained whether the statutory exception constitutes an affirmative defense or an element of the underlying offense.

On appeal, the Eleventh Circuit reversed the district court's ruling, explaining that the officers had reasonable suspicion to detain McRae based on his admission of possessing a firearm, and emphasized that the officers were not required to consider whether an affirmative defense applied before initiating the *Terry* stop.  The court explained:

> Based on McRae's admission that he was carrying a handgun in his waistband, the officers had reasonable suspicion to believe that McRae was committing a crime under Florida law—carrying a concealed weapon.  Under Florida law, "[a] person who carries a concealed firearm on or about his person commits a felony of the third degree."  Fla. Stat. § 790.01(2).  Notably, the possession of a valid permit for a concealed weapon is not related to the elements of the crime, but rather is an affirmative defense. Fla. Stat. § 790.01(3); *Watt v. State,* 31 So.3d 238, 241–42 (Fla. 4th DCA 2010).
>
> Moreover, because reasonable suspicion is not concerned with "hard certainties, but with probabilities," *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), McRae's admission to carrying a concealed weapon was sufficient to justify briefly stopping him before inquiring further about whether he had an affirmative defense in the form of a valid concealed-weapons permit. The Supreme Court has made it abundantly clear that, although an individual may ultimately be engaged in conduct that is perfectly lawful—as turned out to be the case with McRae—officers may "detain the individual[ ] to resolve the ambiguity." *Wardlow,* 528 U.S. at 125, 120 S.Ct. 673 (citing *Terry,* 392 U.S. at 30, 88 S.Ct. 1868); *see also United States v. Arvizu,* 534 U.S. 266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) ("A determination that reasonable suspicion exists ... need not rule out the possibility of innocent conduct."); *Adams v. Williams,* 407 U.S. 143, 145, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) ("The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.").

*Id.* at 1304-5 (emphasis added).

The Eleventh Circuit further noted that the district court erred by relying on the fact that McRae's firearm possession ultimately turned out to be lawful—which the officers only learned during the *Terry* investigation.  *Id.* at 1305.  The court explained that "the officers did not know that McRae lawfully possessed his firearm *at the time of the detention*."  *Id.* at 1305.  It also emphasized that it is "now well-settled law that the reasonable suspicion inquiry focuses on the information available to the officers at the time of the stop . . . . not information that the officers might later discovery."  *Id.*

*Lewis* sharply cuts against Plaintiffs' position that the Defendant Officers lacked reasonable suspicion to detain the armed men because they were carrying lawfully pursuant to Fla. Stat. § 790.25(3)(h).  As previously explained, immediately before detaining each of the men, the officers saw that they were openly carrying—the act prohibited by § 790.053—and it was not obvious whether they were actually fishing or categorically prohibited from open carrying because of the disqualifiers in § 790.25(2).  Under these circumstances, it was reasonable for the officers to detain them to resolve the uncertainty.  The officers were not required to explore and rule out every potential claim of innocent conduct, including affirmative defenses, before initiating a *Terry* stop.  *See GeorgiaCarry.Org, Inc. v. Metro. Atlanta Rapid Transit Auth.*, 2009 WL 5033444, at *5 (N.D. Ga. Dec. 14, 2009) ("After Raissi concealed his handgun and started walking toward the MARTA station, he had committed all of the acts required for the crime of boarding with a concealed weapon and the crime of carrying a concealed weapon. Officer Nicholas saw this happen. The officers were not then required 'to explore and eliminate every theoretically plausible claim of innocence,' including affirmative defenses, before making an investigative stop of Raissi.") (quoting *Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 128 (2d Cir.1997)).  Consequently, the Court concludes that the detention of the Individual Plaintiffs was justified at its inception.[14]

## ii. <u>Was the Detention Reasonable in Scope?</u>

Having decided that the detention was justified at its inception, the Court next examines whether the stop was reasonable in scope.  "In evaluating the reasonableness of an investigatory

---

[14] Plaintiffs cite to *Regalado v. State*, 25 So.3d 600 (Fla. 4th DCA 2009) to support their position that the Defendant Officers had no reasonable suspicion.  In *Regalado*, an officer detained an individual after receiving an anonymous tip that he had a firearm and personally observing a bulge in his waistband.  Under these circumstances, the court concluded that there was no reasonable suspicion based on the offense of concealed carry because the officer had no reason to suspect that Regalado was carrying unlawfully (without a concealed license).  The facts in *Regalado* are easily distinguishable and do not persuade the Court that reasonable suspicion is lacking here.  Nevertheless, to the extent that there is tension between *Regalado* and *Lewis*, the Court is required to follow the principles articulated in *Lewis*, which are binding on this Court.

stop, [the Court] must examine whether the stop 'was reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000) (quoting *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)).  The Court considers "the totality of the circumstances." *Id.* (quoting *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999)).  "There are several issues relevant to this analysis, 'including [1] the law enforcement purposes served by the detention, [2] the diligence with which the police pursue the investigation, [3] the scope and intrusiveness of the detention, and [4] the duration of the detention.'" *Id.* (quoting *United States v. Hardy*, 855 F.2d 753, 759 (11th Cir.1988)).

        The first and second factors—purpose and diligence—examine "whether the police detained the defendant to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference." *Id.* (citation and internal brackets omitted).  Regarding the first factor, it is undisputed that the officers detained the Individual Plaintiffs to investigate whether they were open carrying in accordance with the law.  (Def. SOMF at ¶¶ 35, 47).  Plaintiffs have presented no evidence that the detention was for an improper purpose.  As to diligence, it is uncontested that during the period of the detention, the officers "continuously investigated the status of the formerly armed Plaintiffs and their weapons."  (Def. SOMF at ¶ 51) (emphasis added).  When the officers completed their investigation and determined that they would not arrest the Individual Plaintiffs, they unhandcuffed them and let them go.  (*Id.* at ¶¶ 54, 55; Ex. CC).  Again, Plaintiffs have come forward with no evidence to establish any lack of diligence or undue delay.  *See United States v. Acosta*, 363 F.3d 1141, 1146 (11th Cir. 2004) (finding that the diligence factor weighed in favor of reasonable detention where "[n]othing in the record indicates that the police were less than prompt in carrying out their on-the-scene investigation" and when "[e]ach investigatory act logically led the next act which was done without delay.").  Accordingly, factors one and two weigh in favor of a finding of reasonableness.

The third factor examines "whether the scope and intrusiveness of the detention exceeded the amount reasonably needed by police to ensure their personal safety." *Id.* "The Supreme Court has stated that officers may take reasonable steps to ensure their safety so long as they possess 'an articulable and objectively reasonable belief that the suspect is potentially dangerous.'" *Id.* (citing *Michigan v. Long,* 463 U.S. 1032, 1051 (1983)).  "An investigatory stop does not necessarily ripen into an arrest because an officer draws his weapon," "handcuffs a suspect," or "orders a suspect to lie face down on the ground." *Id.* (citing *United States v. Roper,* 702 F.2d 984, 987–88 (11th Cir.1983); *United States v. Hastamorir,* 881 F.2d 1551, 1557 (11th Cir.1989); *Courson v. McMillian,* 939 F.2d 1479, 1492–93 (11th Cir.1991)).

Here, the officers approached all Individual Plaintiffs with drawn firearms;  handcuffed Taylor, Philpot, Jenkins, and Gutierrez; and disarmed Taylor, Philpot, Jenkins, Gutierrez, and Weiss.  (Def. SOMF at ¶¶ 26-33; 43-46).  In addition, Officer Hicks conducted a "brief and non-intrusive" pat-down of Gutierrez.  (*Id.* at ¶ 38).  While these measures may have been intrusive, the Defendant Officers acted reasonably in taking these steps.  Prior to the detention, the officers had a reasonable basis to believe that the Individual Plaintiffs were potentially dangerous because: (1) five men were visibly carrying firearms, while one man possessed a "buck folding knife"; (2) it was not immediately obvious that the armed Plaintiffs were carrying lawfully; (3) the men were all associated with one another; (4) the City did not receive any advanced notice of the gathering; and (5) the men were congregated with weapons at a highly-trafficked area adjacent to several other busy areas.  (Def. SOMF at ¶¶ 5-9, 11-14, 22, 26-27; 43-46; Ex. C-1).

Under these circumstances, and for the safety of the officers and the public, the officers were entitled to approach the Individual Plaintiffs with drawn weapons, and to disarm and/or handcuff the armed men.  *See Aldridge*, 71 F.2d at 371 ("The use of a gun in connection with a stop is permissible when the officer reasonably believes it is necessary for his protection."); *Hastamorir,* 881 F.2d at 1557 ("The handcuffing of Hastamorir constituted a *Terry* stop, and was a reasonable action designed to provide for the safety of the agents."); *GeorgiaCarry.Org, Inc.*,

2009 WL 5033444, at *6 ("The officers were entitled to take Raissi's handgun because they knew Raissi had concealed it on his person and would have easy access to it while they questioned him."); *United States v. White*, 593 F.3d 1199, 1202 (11th Cir. 2010) ("In connection with a *Terry* stop, an officer may conduct a pat-down search if he has reason to believe that his own safety or the safety of others is at risk.").

In their response, Plaintiffs argue that it was inappropriate for the officers to return the firearms in the parking lot (as opposed to at the Pier), and to keep the Pier closed for the remainder of the day.  (DE 69 at 12).  The Court disagrees.  During the investigation, Taylor made numerous disturbing and threatening remarks, such as, "You guys are a bunch of crazy friggin nut bags. Just cause our guns are probably bigger and powerful than yours," and "I'm waiting for him to finish so I can run all of them.  About six guns."  (Def. SOMF at ¶ 52).  In light of these antagonistic remarks, the nature of the location, and the number of weapons and individuals involved, the officers acted reasonably under the circumstances.  The officers were justified in deciding not to return the firearms at the Pier, where their ability to retreat was limited and where there were crowds, but to return them at a more secluded location where the officers had more opportunity to safely clear the scene.  *See GeorgiaCarry.Org, Inc.*, 2009 WL 5033444, at *6 ("And the officers were entitled to take Raissi to a private hallway before returning his handgun because it was safer for Raissi to re-holster his handgun out of public view.").  Similarly, for public safety, it was reasonable for the officers to keep the Pier closed for the remainder of the day.  Consequently, the third factor also supports a finding of reasonableness.

Finally, the fourth factor examines the duration of the detention.  The Eleventh Circuit has explained that there is "no rigid time limitation on *Terry* stops," and that "[m]uch as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria."  *Street*, 472 F.3d at 1307 (quoting *Sharpe,* 470 U.S. at 685).  It is undisputed that all handcuffed Plaintiffs were

unhandcuffed less than one hour and twenty minutes after their initial contact with the officers. (Def. SOMF at ¶¶ 54-56). Immediately afterwards, they were told they were free to leave. *Id.*

On this record, the Court finds that an 80-minute detention was not excessive. During this period, the officers conducted a thorough investigation of <u>five</u> suspects by performing record checks on their "persons, criminal records, firearms, and fishing licenses," and examining whether any affirmative defenses or statutory disqualifiers applied. (*Id.* at ¶ 51). During the investigation, the officers were subject to the distracting jeers by Taylor and had to assist him with a medical issue. *See Gil,* 204 F.3d at 1350–51 (upholding detention under *Terry* where a single defendant was handcuffed in the back of a police car for seventy-five minutes); *Hardy,* 855 F.2d at 761 (detention of a single defendant for fifty minutes was not too long for *Terry* purposes); *Street,* 472 F.3d at 1307 (detention of a single defendant for sixty minutes was not excessive). Consequently, this factor also weighs in favor of a finding of reasonableness.

Because the Officer Defendants were entitled to conduct an investigative stop of the Individual Plaintiffs, and because the stop was conducted in a reasonable manner, the Officer Defendants did not violate Plaintiffs' Fourth Amendment rights. Accordingly, they are entitled to qualified immunity on the unlawful detention claims in Counts IV-VII[15] and summary judgment is appropriate.

### 2. Taylor and Jenkins' Section 1983 Claims for Excessive Force under the Fourth Amendment (Counts V and VI)

---

[15] In Counts IV and VII, Plaintiffs named Sergeant Salabarria and Officers El. Vidal, Bicelis, and Mitchell as defendants. The undisputed record shows that these officers had limited and ancillary roles in responding to the incident. (Def. SOMF at ¶¶ 39-42). Moreover, nothing in the record indicates that they acted unreasonably in performing their duties as assisting officers. *Id.* Accordingly, these officers are also entitled to qualified immunity on this separate basis. *See Shepard v. Hallandale Beach Police Dep't,* 398 F. App'x 480, 483 (11th Cir. 2010) ("This Court has concluded that assisting officers during a search are entitled to qualified immunity when there is no indication that they acted unreasonably in following the lead of a primary officer or that they knew or should have known that their conduct might result in a Fourth Amendment violation, even when the primary officer is not entitled to qualified immunity.").

In Count V, Taylor asserts a Fourth Amendment excessive force claim[16] against Officer Villamil, claiming that he used an unreasonable level of force against him during the handcuffing and detention.  (DE 1-2 at ¶¶ 219-225).  In Count VI, Jenkins asserts an identical excessive force claim against Officer Rivera.  (*Id.* at ¶¶ 238-244).  Officers Villamil and Rivera move for summary judgment on these claims based on qualified immunity.  Plaintiffs did not address their arguments in their response.  In any event, because the officers' application of force did not violate the Fourth Amendment, the Court concludes that they are entitled to qualified immunity.

 "The use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment."  *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002).  "In order to determine whether the amount of force used by a police officer was proper, a court must ask 'whether a reasonable officer would believe that this level of force is necessary in the situation at hand.'"  *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (internal citation omitted).  "In assessing an excessive-force claim, a court must consider whether the defendant's actions were 'objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation,' bearing in mind that 'the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat.'" *Trotter v. Shull*, 720 F. App'x 542, 544 (11th Cir. 2017) (quoting *Graham v. Connor*, 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).  "Because of this lack of a bright-line standard, 'qualified immunity applies unless application of the standard would inevitably lead' a reasonable officer in the defendant's position to conclude that the force was unlawful."  *Gold v. City of Miami*, 121 F.3d 1442, 1446 (11th Cir. 1997) (internal citation omitted).

Here, the undisputed record evidence—including the videos that depict the handcuffing of Taylor and Jenkins—shows that Villamil and Rivera did not use undue force when handcuffing

---

[16] Again, Plaintiffs did not identify the Constitutional or statutory source of their excessive force claim in their complaint.  "[W]here, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment."  *Graham v. Connor*, 490 U.S. 386, 394 (1989).

them.  (Exs. C-1, Q-1, X).  Instead, the officers employed standard handcuffing techniques, and detained them in a non-violent and professional manner.  *Id.*  Villamil and Rivera used no greater force than what an ordinary officer would apply in executing a routine handcuffing.  *Id.*  And while they were being handcuffed, Taylor and Jenkins did not appear to be in pain, nor did they indicate or otherwise verbalize any discomfort.  *Id.*  Despite their allegations that they suffered "permanent injuries" from the purported excessive use of force, Taylor and Jenkins have presented absolutely no evidence to substantiate these assertions.  Moreover, Villamil and Rivera did not apply force against Taylor and Jenkins at any other point during the detention after they were handcuffed.  *Id.*

Under these circumstances, the Court finds that Villamil and Rivera did not employ an unconstitutional level of force while handcuffing Taylor and Jenkins or at any other time during the detention.  *See Rodriguez*, 280 F.3d at 1351 (finding that the officer did not use excessive force because "[t]he handcuffing technique used by Sgt. Farrell is a relatively common and ordinarily accepted non-excessive way to detain an arrestee."); *Gold*, 121 F.3d at 1446 (finding that officers were entitled to qualified immunity where plaintiff "experienced pain from the handcuffs for roughly twenty minutes" and "suffered only skin abrasions"); *Sutherland v. Allison*, 416 F. App'x 45, 48 (11th Cir. 2011) (finding that the deputies were entitled to qualified immunity where "there is no evidence that the Deputies used any more force than they would usually use to handcuff any person who is the subject of an arrest.").  Consequently, Villamil and Rivera are entitled to summary judgment on the excessive force claims in Counts V and VI.

### 3.  Plaintiffs' Section 1983 Claim for Deliberate Indifference under the Fourteenth Amendment (Count VII)

In Count VII, Plaintiffs allege a deliberate indifference claim[17] against the Defendant Officers, contending that they failed to take reasonable steps to relieve Taylor of the shoulder pain caused by the handcuffing, and did not adequately protect him from further injury.  The

---

[17] Again, Plaintiffs did not identify the Constitutional or statutory source of this claim.  Nevertheless, the only cause of action that could logically apply is a claim for deliberate indifference under the Fourteenth Amendment.  *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291 (11th Cir. 2009).

Defendant Officers move for summary judgment on this claim, contending that it is undisputed that they took reasonable measures to assist Taylor.  Again, Plaintiffs did not respond to the Defendants' arguments on this issue.  Nevertheless, the Court agrees with the officers that summary judgment is appropriate.

"To prevail on his claim of deliberate indifference to serious medical need under the Fourteenth Amendment, [a plaintiff] must show: '(1) a serious medical need; (2) the [defendants'] deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Sutherland*, 416 F. App'x at 49 (quoting *Mann,* 588 F.3d at 1306–07).  "A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (quoting *Mann,* 588 F.3d at 1306–07).  "To prove 'deliberate indifference' to that serious need, the following must be shown: '(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that is more than gross negligence.'" *Id.* (quoting *Youmans v. Gagnon,* 626 F.3d 557, 564 (11th Cir. 2010)).

The Defendant Officers are entitled to summary judgment because Plaintiffs have not come forward with any evidence of: (1) a serious medical need or (2) subjective officer knowledge of a risk of serious harm.  It is undisputed that during the investigation, Taylor advised the officers that his shoulder was in pain due to an "old shoulder injury." (DE 58-19; DE 58-11 at ¶¶ 18-19) (emphasis added).  However, he did not explain that his shoulder was *still* injured or that he needed urgent medical care.  *See Sutherland*, 416 F. App'x at 49 (granting summary judgment in favor of the deputies because the plaintiff never told them that "his arm had been fractured or was otherwise injured," but instead, vaguely explained that his arm was "sick").

Moreover, there is no record evidence that the officers responded to Taylor's complaint in an unreasonable or grossly negligent way.  The uncontested facts are that once Taylor complained of the pain, the officers summoned Miami Beach Fire Rescue to the scene.  (DE 58-19; DE 58-11 at ¶¶ 18-19; Exs. Y, Z).  When they arrived, Taylor was escorted to the entrance of

the Pier for evaluation.  *Id.*  Non-party officer Ferbeyre double-cuffed Taylor so that he could be more comfortable and Fire Rescue issued him an ice pack.  *Id.*  After being cleared of serious injuries, Taylor was allowed to sit in an air-conditioned police vehicle for his comfort, before returning to the Pier for the remainder of the investigation.  *Id.*  Consequently, the Defendant Officers are entitled to summary judgment on the deliberate indifference claim in Count VII.

### 4.  Plaintiffs' Remaining Section 1983 Claims

In some of the Section 1983 counts against the Defendant Officers, Plaintiffs also allege that they violated their Second Amendment right to bear arms, First Amendment rights of freedom of assembly and association, and their "rights to engage in lawful taking of game fish."  (DE 1-2 at 28-38).

Defendant Officers are entitled to qualified immunity as to these claims because Plaintiffs have failed to demonstrate that their conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818. The Eleventh Circuit has made clear that "only materially similar cases from the United States Supreme Court, this Circuit, and/or the highest court of the relevant state can clearly establish the law." *Waldron v. Spicher*, 954 F.3d 1297, 1304 (11th Cir. 2020).  Plaintiffs have cited to no "binding precedent tied to particularized facts in a materially similar case."  *Id.*  Accordingly, summary judgment is appropriate as to these remaining claims.

### B.  The City's Motion for Summary Judgment (DE 56)

### 1.  Plaintiffs' Section 1983 Claim (Count VIII)

In Count VIII, Plaintiffs assert a Section 1983 claim against the City based on municipal liability.  (DE 1-2 at ¶¶ 260-286).  Plaintiffs allege that on the day of the incident, the City violated their rights under the First, Second, and Fourth Amendment when the officers detained the Individual Plaintiffs, disarmed them, and closed down the Pier.  *Id.*  The City moves for summary judgment, arguing *inter alia*, that Plaintiffs cannot establish that a City "policy or custom" caused the alleged Constitutional violations.

26

While municipalities and other local government entities are "persons" within the scope of Section 1983, they cannot be held liable for injuries caused solely by their employees.  *See McDowell v. Brown*, 393 F.3d 1283, 1289 (11th Cir. 2004); *Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658, 691 (1978) ("a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.").  Instead, a municipality is liable only when the "execution of the government's policy or custom" causes the constitutional injury. *McDowell*, 392 F.3d at 1289 (citing *City of Harris*, 489 U.S. 378, 385 (1989)).  Accordingly, to prevail on a claim for municipal liability under Section 1983, a plaintiff must establish that the constitutional deprivation was the result of: (1) "an official government policy," (2) "the actions of an official deemed to represent government policy," or (3) "a custom or practice so pervasive and well-settled that it assumes the force of law." *Denno v. Sch. Bd. of Volusia Cty., Fla.*, 218 F.3d 1267, 1276 (11th Cir. 2000).  A "municipality can be liable under § 1983 only where its policies are the "moving force [behind] the constitutional violation."  *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998).

The Court examines whether there is a genuine issue of fact regarding whether the Defendant Officers were executing a City "policy or custom" on the day of the incident.  The City claims that it is undisputed that the officers' conduct that day—including their decision to detain the Individual Plaintiffs and to keep the Pier closed—was <u>not</u> pursuant to a City "policy or custom". (DE 56 at 11-14).  In support, the City points to the declaration of Paul Acosta, the Assistant Chief of Police, who testified that: "[t]he City of Miami Beach does not now, and has not had since at least 2014, any officially authorized ordinance, administration regulation, or rule that prohibits carrying a firearm on the Southpointe Park Pier, on the City's beaches, or in the City's Parks." (DE 58-29 at ¶ 1).  Acosta also explained that the City does not have a "policy or custom" of "detaining lawfully armed subjects."  (*Id.* at ¶ 9).  As further evidence, the City notes that after the investigation, Weiss was able to continue fishing while openly carrying a firearm off a jetty located near the Pier.  (DE 58-26).  Moreover, the City points to the deposition testimony of several Florida Carry members, who testified that after the incident, they attended other "open carry"

27

demonstrations at the Pier without issues.  (DE 58-4 at 211:21-211:22; DE 58-5 at 105:19-112:11; DE 58-2 at 22:14-24).

In response, Plaintiffs argue that the City maintained a policy of categorically prohibiting firearms on the Pier, pointing to the fact that on that day, a sign was posted stating, "No Firearms." (DE 69 at 17-18).  However, this fact is not enough to raise a triable issue as to whether the officers were carrying out a City "policy or custom".  It is undisputed that this sign did not accurately reflect the policies that were in place on the day of the incident.  (Def. SOMF at ¶ 62).  Acosta testified that in 2014, City officials had ordered all "No Firearm" signs to be removed and replaced, but due to inadvertence, the sign on the Pier remained posted.  (*Id.*; DE 58-29 at ¶¶ 2-4).  Plaintiffs have not submitted any evidence to rebut this testimony.  In addition, as captured on the dispatch recordings, one of the officers made clear that they were not relying on any signs for their authority, declaring "open carry is illegal regardless of the sign."  (Def. SOMF at ¶ 47).  Plaintiffs have proffered no other evidence showing that the alleged Constitutional violations were caused by a City "policy or custom."  Accordingly, the City is entitled to summary judgment on Count VIII.

### C.  Plaintiffs' Section 1985 Claim (Count IX)

In Count IX, Plaintiffs assert a claim under 42 U.S.C. § 1985 against the Officer Defendants and the City.  (DE 1-2 at ¶¶ 287-303).  They claim that by shutting down the Pier with the intent of preventing Plaintiffs from expressing their rights, Defendants "conspired" to violate their First Amendment right to assembly and association and Second Amendment right to bear arms.[18]  (DE 1-2 at ¶¶ 287-300).  Defendants move for summary judgment, claiming that Plaintiffs do not belong to a class protected under this statute.  (DE 59 at 16).  Plaintiffs again failed to respond to Defendants' arguments on this issue.  Nevertheless, the Court agrees that summary judgment is appropriate.

---

[18] Defendants correctly notes that while Plaintiffs failed to identify which subsection of Section 1985 applies, the only provision that could logically apply is Section 1985(3).  *See Anderson v. Vanguard Car Rental USA, Inc.*, 304 F. App'x 830, 831 (11th Cir. 2008) ("Section 1985(3) provides a remedy for conspiracy to interfere with civil rights.").

"In order to recover under 42 U.S.C. Section 1985(3), the plaintiff must allege and prove (1) a conspiracy; (2) for the purpose of depriving, directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws; (3) an overt act in furtherance of the object of the conspiracy; and (4) that the plaintiff (a) was injured in his person, or (b) was deprived of having and exercising any right or privilege of a United States citizen." *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986) (citing *Griffin v. Breckenridge,* 403 U.S. 88 (1971)).   "The language of Section 1985 which requires an intent to deprive one of equal protection or equal privileges and immunities means that there must be some racial or otherwise class-based invidious discriminatory animus behind the conspirators' action." *Id.* (citing *Griffin,* 403 U.S. 88 at 102, 91 S.Ct. at 1798); *see also Childree v. UAP/GA CHEM, Inc*., 92 F.3d 1140, 1147 (11th Cir. 1996) ("The second element requires a showing of some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.") (internal citations and quotation marks omitted).

Defendants argue that summary judgment is appropriate because Plaintiffs do not belong to a class that is protected under Section 1985.  Plaintiffs have not provided, and this Court has not located, binding authority recognizing members of Florida Carry (or a similar gun's rights organization) as a protected class.  To the contrary, in declining to recognize "whistleblowers" as a protected class, the Eleventh Circuit has explained that it "repeatedly [has] declined to extend that section to apply in non-racial contexts."  *Childree*, 92 F.3d at 1147.  The court further explained that only "[t]wo types of classes come within § 1985(3)'s protection: (1) classes having common characteristics of an inherent nature—i.e., those kinds of classes offered special protection under the equal protection clause, and (2) classes that Congress was trying to protect when it enacted the Ku Klux Klan Act."  *Id.*  Accordingly, the Court is skeptical that the protections of Section 1985 extend to the members of Florida Carry.  On this basis alone, Defendants are entitled to summary judgment on this count.

But even assuming *arguendo* that Plaintiffs are protected under this statute, Defendants are still entitled to summary judgment because Plaintiffs have failed to come forward with evidence to support two essential elements of this claim: (1) a "conspiracy" between Defendants and (2) class-based animus.  As to the "conspiracy" element, "a plaintiff must show an agreement between two or more persons to deprive her of her civil rights." *Wilbourne v. Forsyth Cty. Sch. Dist.*, 306 F. App'x 473, 478 (11th Cir. 2009) (quoting *Dickerson v. Alachua* County *Comm'n,* 200 F.3d 761, 767 (11th Cir.2000)) (internal quotation marks and brackets omitted).  That is "'a plaintiff must show that the parties reached an understanding to deny the plaintiff…her rights and prove an actionable wrong to support the conspiracy.'" *Id.* at 478 (quoting *Bailey v. Bd. of* County *Comm'rs,* 956 F.2d 1112, 1122 (11th Cir.1992)).  Here, the record evidence is devoid of evidence that Defendants reached an agreement to violate Plaintiffs' Constitutional rights.

Moreover, Plaintiffs have not come forward with evidence showing that the closure of the Pier was motivated by Defendants' animus towards the Florida Carry organization, as opposed to a legitimate purpose like public safety.  To the contrary, it is undisputed that after the incident, Plaintiffs have returned to the City to hold "open carry" demonstrations at least twice.  (Def. SOMF at ¶ 61).  On those occasions, the City and its police department collaborated with Florida Carry ensure a safe event.  *See Byrd*, 783 F.2d at 1008 (granting summary judgment for defendants because the record did not "reflect any racial or class-based animus against the plaintiff."); *Mason v. Vill. of El Portal*, 240 F.3d 1337, 1340 (11th Cir. 2001) (same).  Accordingly, Defendants are also entitled to summary judgment on Plaintiffs' Section 1985 claim.

### D.  The Remaining State Law Claims

The Court has federal question jurisdiction over the claims arising under federal law and supplemental jurisdiction over the state law claims. *See* 28 U.S.C. §§ 1331, 1367.  Here, because summary judgment in favor of Defendants is appropriate as to all federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state law claims.  *See Maughon v. City of Covington*, 505 F. App'x 818, 823 (11th Cir. 2013) ("[t]he district court properly granted

summary judgment to Fuller on all of Maughon's federal claims.  Therefore, the district court did not abuse its discretion in declining to exercise supplemental jurisdiction over Maughon's state law claims.") (citing *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 349–50, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)).  Accordingly, the state claims (Counts I, X-XIII) are **DISMISSED**.

IV.     <u>**CONCLUSION**</u>

For the reasons stated above, it is **ORDERED AND ADJUDGED** that:

1.  Defendants' Motions for Summary Judgment (DE 56; DE 59) are **GRANTED IN PART**.

2.  The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiffs on Counts IV through IX.

3.  The Court **DECLINES** to exercise supplemental jurisdiction over the remaining state law claims, Counts I, X-XIII, which are **DISMISSED** from this action.

4.  The Clerk of Court is **DIRECTED** to terminate all pending deadlines and **CLOSE** this case.

**DONE AND ORDERED** in Chambers in Miami, Florida, this <u>30th</u> day of September, 2021.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE